Exhibit A

POWELL
GOLDSTEIN LLP

Atlanta • Washington • Dallas

RESIDENT IN ATLANTA OFFICE
DIRECT DIAL: (404) 572-6771
CELL: (404) 307-3611
DMINKIN@POGOLAW.COM

June 18, 2007

**VIA EMAIL (ShanksC@adr.org)**

Ms. Catherine Shanks
Vice President, Case Management Center
950 Warren Avenue
East Providence, RI 02914

      Re:    Pencor-Masada OxyNol, LLC
              Waste-to-Ethanol Facility
              Middletown, New York

Dear Ms. Shanks:

      Attached please find Commercial Arbitration Rules Demand for Arbitration submitted by Pencor-Masada OxyNol, LLC, attached to which is Pencor-Masada OxyNol, LLC's Complaint in Arbitration.

      Our client has a question concerning the amount of the filing fee and will be sending to you by first class mail a check in the amount of $46,119.20 (which includes a $6,000.00 case service fee, after the question is answered by the Northeast Case Management Center).

      Please do not hesitate to contact me if you have any questions.

                    Sincerely,

                    David N. Minkin

DNM/ko
Attachment

cc:    Mr. Donald V. Watkins
       Michael G. Murphy, Esq.
       Christopher McKenzie, Esq.
       Mr. Tim Judge

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

### COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

| | |
|---|---|
| **MEDIATION:** *If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐ *There is no additional administrative fee for this service.* | |

| Name of Respondent<br>The City of Middletown, New York, et al | Name of Representative (if known)<br>Michael Murphy |
|---|---|
| Address<br>Mayor's Office, City Hall | Name of Firm (if applicable)<br>Beverage & Diamond, PC |
| 16 James Street | Representative's Address<br>15th Floor, 477 Madison Avenue |

| City<br>Middletown | State<br>NY | Zip Code<br>10940-5710 | City<br>New York | State<br>NY | Zip Code<br>10022-5802 |
|---|---|---|---|---|---|
| Phone No.<br>845-346-4100 | | Fax No.<br>845-343-7439 | Phone No.<br>212-702-5436 | | Fax No.<br>212-702-5450 |
| Email Address:<br>mayor@middletown-ny.com | | | Email Address:<br>mmurphy@bdlaw.com | | |

The named claimant, a party to an arbitration agreement dated December 2003 _____, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

**THE NATURE OF THE DISPUTE**
The claims in the case involve breach of contract, tortious interference with Claimant's business relationships, and the deprivation of Claimant's rights under the First and Fourteenth Amendments to the U.S. Constitution, as described more fully in the attached Complaint in Arbitration. The arbitration provisions of the agreement provide for a resolution by a single qualified arbitrator.

| *Dollar Amount of Claim* $286,192,000.00 | *Other Relief Sought:* ☒ Attorneys Fees  ☐ Interest<br>☒ Arbitration Costs  ☒ Punitive/ Exemplary  ☒ Other Dec. Judgmnt |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (*please refer to the fee schedule in the rules for the appropriate fee*) $46,119.20

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
The arbitrator must have recognized expertise in solid waste management, real estate law, municipal law, and constitutional rights.

Hearing locale New York, New York _____ (check one) ☐ Requested by Claimant  ☒ Locale provision included in the contract

| Estimated time needed for hearings overall:<br><br>_____ hours or 5 _____ days | Type of Business: Claimant ____Waste-to-ethanol conversion____<br><br>Respondent _a municipality_ |
|---|---|

Is this a dispute between a business and a consumer? ☐ Yes ☒ No  Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐ Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one) ☐ Atlanta, GA  ☐ Dallas, TX  ☒ East Providence, RI  ☐ Fresno, CA  ☐ International Centre, NY, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)  Date:<br>June 18, 2007 | Name of Representative<br>David N. Minkin |
|---|---|
| Name of Claimant<br>Pencor Masada OxyNol, LLC | Name of Firm (if applicable)<br>Powell Goldstein, LLP |
| Address (to be used in connection with this case)<br>2170 Highland Avenue S., Suite 100 | Representative's Address<br>One Atlantic Center, 14th Floor, 1201 West Peachtree St., N.W. |

| City<br>Birmingham | State<br>AL | Zip Code<br>35205- | City<br>Atlanta | State<br>GA | Zip Code<br>30309-3488 |
|---|---|---|---|---|---|
| Phone No.<br>205-558-4665 | | Fax No.<br>877-558-4670 | Phone No.<br>404-572-6771 | | Fax No.<br>404-572-6999 |
| Email Address:<br>donaldwwatkinspc@aol.com | | | Email Address:<br>dminkin@pogolaw.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA. Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online. AAA Customer Service can be reached at 800-778-7879

### IN RE: ARBITRATION PROCEEDINGS BEFORE THE AMERICAN ARBITRATION ASSOCIATION

PENCOR-MASADA OXYNOL, LLC,  )
             )
Plaintiff,          )
             )
v.             )  Case No. _____
             )
CITY OF MIDDLETOWN,     )
  NEW YORK, et al,      )
             )
Defendants.        )

### PENCOR-MASADA OXYNOL, LLC'S COMPLAINT IN ARBITRATION

#### Jurisdiction

Pencor-Masada OxyNol, LLC ("PMO") files this Complaint in Arbitration pursuant to the mandatory arbitration requirements and jurisdiction conferred in Schedule 5, "Dispute Resolution" of the City Waste Management Services Agreement ("CWMSA") executed between the City of Middletown, New York ("City") and PMO. Accompanying this Complaint is the written notice of arbitration required under Section 1(b) of Schedule 5. The case in controversy involves claims, causes of action and disputes arising out of or relating to this agreement, and three companion City agreements executed by the parties.

#### Parties

The plaintiff in the arbitration proceedings is PMO, an Alabama limited liability company and party to the CWMSA. PMO's designated Manager is Pencor Orange Corp. ("Pencor").

The defendants in the arbitration proceedings are: (1) the City, a municipality of the State of New York; (2) Marlinda Duncanson, individually and as Mayor of Middletown in her official capacity; (3) Robert Moson, as President of the Common Council in his official capacity; (4) Maxine Meyer and James Rollins, individually and as members of the City's Common Council in their official capacities, and (5) Thomas J. Burr, John VanderVoort, Gerald Kleiner, Raymond Depew, Miguel Rodrigues, and Joel Sierra, as members of the City's Common Council in their official capacities. PMO's claims and causes of action against the law firm of Beveridge & Diamond, PC ("B&D"), a relevant non-party to these arbitration proceedings, will be pursued in the appropriate Federal Court of New York, New York.

**Factual Allegations.**

1.  On January 23, 1995, PMO was designated by the City as the "preferred vendor" for disposing of municipal solid waste (MSW) and sludge for the City and other municipalities in Orange County. PMO's long-term solution for waste disposal was the construction and operation of an innovative waste-to-ethanol facility to be located in Middletown on land leased from the City. The facility would convert MSW and non-hazardous sludge into ethanol and other useful products using PMO's patented CES OxyNol process. It would serve Middletown and surrounding municipalities.

2.  On January 22, 1996, the City unanimously adopted Resolution No. 20-96 which: (a) named PMO as the project developer; (b) designated the City's project team members; (c) pledged the City's full cooperation in assisting PMO with project financing; and (d) authorized the City's project team (including its special counsel) to assist PMO in pursuing the necessary approvals, permits, and other evidences of permission and authority necessary to develop, construct and acquire the project. Then-Councilwoman and current Mayor Marlinda Duncanson voted in favor of Resolution No. 20-96. At all times material to PMO's claims and causes of action against the defendants, the Resolution remained in effect.

3.  Following the adoption of Resolution 20-96, PMO worked diligently with the City and the municipalities in the Orange County area to obtain their support for the facility.  PMO and its representatives attended more than 200 public meetings to secure supply contracts or other commitments for the local municipalities' MSW and sludge and received overwhelming support for the planned facility.  Formal approvals for the waste-to-ethanol project were obtained in December 2003 when the Common Council voted to ratify the four municipal agreements between PMO and the City, including the CWMSA in dispute. The signed City agreements were delivered by the City to PMO in April of 2004.

4.  PMO has secured all environmental permits, identified principal Engineering, Procurement & Construction ("EPC") providers, created a risk mitigation plan and assembled most of the key parties required for construction, start-up and operation.   PMO's development work has resulted in securing long-term commitments for a large portion of the primary revenue streams of the facility. PMO estimates that the target cost of development, construction and installation of the facility and of certain financing costs will total $287 million.

5.  The New York State Department of Environmental Conservation ("NYSDEC"), with approval of the Environmental Protection Agency ("EPA"), issued a Federal Title V Air Permit and a New York Part 360 Solid Waste Permit, among others. The facility has also concluded the State Environmental Quality Review process to assess the environmental impacts of the project.  Since PMO's facility is the first commercial MSW to ethanol project in the United States, the federal and state environmental agencies worked together for nearly two years to determine

2

the correct classification for the facility prior to issuing the appropriate permits. Importantly, these agencies concluded that the PMO Facility is not subject to provisions of the Clean Air Act that trigger Prevention of Significant Deterioration (PSD) in non-attainment areas since the project is not an incinerator or a chemical plant. All challenges to the permits that have asserted such claims have been denied in the courts, and the remaining public comment and appeal periods for any further challenges have expired.

6. In reliance on the good faith of City officials who adopted Resolution No. 20-96 and ratified the City agreements, PMO spent more than $41 million in pre-development work and development activities relating to the waste-to-ethanol facility. Throughout the project development period, PMO gave City project team members written and oral progress reports on all aspects of the project development.

7. In January of 2004, Daryl Harms, the founder and CEO of Masada, PMO's parent company, developed brain cancer and eventually died from his debilitating condition in July of 2005. PMO timely notified the City about Mr. Harms' prolonged illness and unfortunate death. Mr. Harms' illness and death had a "material adverse effect" on the PMO project and impacted the "ownership, possession or operation of the Project", as those terms are defined in the Section 14, "Uncontrollable Circumstances" of the CWMSA. PMO notified the City on several occasions about the "Uncontrollable Circumstances" PMO experienced because of Mr. Harms' illness and death. As such, PMO was entitled to extend the date by which PMO must begin accepting and disposing of the City's waste beyond the December 9, 2008 "Service Date" specified in the City agreements.

8. In December of 2005, the City was notified in writing that Pencor Orange Corp., a member of PMO, had been designated by the Masada shareholders to head all of the Masada companies, including PMO. The City was also informed that PMO was continuing its development of the waste-to-ethanol facility. Shortly thereafter, PMO was invited to meet with the Common Council.

9. In February of 2006, PMO met with the Common Council. The Mayor and Council were openly hostile to PMO's continued development of the project. Council members, including Alderman James Rollins and Maxine Meyers, voiced their extreme dissatisfaction with the City agreements which were ratified by the previous Common Council and signed by former Mayor Joseph DeStefano. At the time, PMO did not know that Mr. Rollins had an undisclosed conflict of interest because of his associations with potential competitors to PMO in the waste disposal business.

10. In spite of the City's new political and attitudinal sea-change and open hostility to the PMO project, PMO pledged during the February 2006 Council meeting to educate new Council members on the project, and pressed on with its

3

its development plans. It retained financial advisors, engineering firms, project consultants, research and development partners, and engaged in extensive due diligence worked with potential financing partners.

11. In April of 2006, PMO was notified that the City had hired B&D as special counsel on the PMO project. From April 20, 2006 through June 12, 2007, B&D, acting in concert with the City, engaged in an unrelenting and continuing letter writing campaign designed to undermine, obstruct and thwart PMO's ability to develop the waste-to-ethanol facility and obtain financing. B&D's actions were in complete disregard of the separate and independent affirmative duty imposed upon the firm by Resolution 20-96. The B&D body of PMO correspondence:

a. deliberately and substantially mischaracterized PMO's development plans and related construction activities;

b. declared (on June 12, 2007) the City's intent to "terminate the agreements" in the event PMO does not have "a fully operational waste-to-ethanol facility at the Facility Site" by December 9, 2008;

c. arbitrarily and capriciously imposed new conditions restricting PMO's substantive rights and expanding its existing obligations under the City agreements;

d. renounced (or otherwise ignored) B&D's separate and independent affirmative duty, as special counsel to the City, to provide PMO with the necessary project-related assistance and cooperation specified in Resolution No. 20-96 (which remains in effect);

e. repudiated and unilaterally nullified all of PMO's prior and timely written notifications to the City of "Uncontrollable Circumstances" and PMO's commercially reasonable steps to reduce costs and time associated with these circumstances; and/or

f. improperly attempted to interfere with PMO's duly issued Title V Air Permit and NYSDEC Part 360 Solid Waste Permit.

12. As the City's designated "preferred vendor" and "project developer", PMO politely and properly reserved its legal rights under the agreements while proceeding with its efforts to accommodate the City's repeated requests for information and erroneously issued mandate that PMO commence accepting the City's waste streams by December 9, 2008. PMO's good faith efforts to cooperate with the City were met with massive resistance and bad faith actions by the City at every turn.

13. On May 22, 2007, PMO attended the Common Council meeting and formally requested that Alderman Rollins, a leading opponent of the City's contractual

4

relationship with PMO, refrain from participating in any further Common Council discussions, deliberations and votes on matters pertaining to PMO. On information and belief, PMO alleges that Mr. Rollins had already participated in Common Council discussions, deliberations and votes prior to PMO's recusal request even though he had an undisclosed conflicts of interest. PMO also provided the City, on its own initiative, with a written progress report, along with a copy of its completed DOE loan guarantee pre-application submission form. The report detailed PMO's ongoing "commercially reasonable efforts to reduce costs and time associated with the 'Uncontrollable Circumstances' [relating to Mr. Harms death and the PMO project]."

14. On May 31, 2007, PMO provided the City with a notice of its indicative construction schedule prepared by PMO's engineers and a request for the City to implement the Work Plan for Investigation of the Middletown Landfill during construction of the Orange Recycling and Ethanol Production Facility, the project's official name.

15. Throughout the course of its dealings with the City, PMO repeatedly affirmed PMO's willingness and ability to meet its essential obligations to the City. These obligations are threefold: (a) acceptance and disposal of the City's waste streams, under the terms and conditions of the City agreements; (b) production of ethanol from the City's waste streams on the site leased by PMO from the City, in accordance with the requirements of PMO's Part 360 and Title V permits; and (c) remittance of payments to the City, in accordance with the terms and conditions of the City agreements.

16. On June 12, 2007, B&D sent PMO a private letter declaring the City's intent to "terminate the agreements" in the event PMO does not have "a fully operational waste-to-ethanol facility at the Facility Site" by December 9, 2008. This was the first time the City and B&D had threatened PMO with explicit adverse action that is detrimental to the very foundation for financing the facility. The private letter was sent to PMO one day after the City publicly adopted a Resolution (at PMO's request) announcing support for PMO's December 28, 2006 U.S. Department of Energy pre-application submission for a construction loan guarantee of $229 million for the project.

17. The June 12, 2007 B&D letter had the purpose and effect of undermining PMO's DOE and private equity financing. When authorizing the June 12 letter, the City defendants and B&D knew PMO had a duty to report the June 12 contract termination threat to DOE and the equity firms. They also knew PMO was one of 143 entities aggressively competing for limited DOE loan guarantee money, and that PMO's application enjoyed significant bipartisan support from senior members of Congress, including New York Senator Hillary Rodham Clinton. Finally, they knew that the PMO project was being financed from the revenue streams derived from its long-term waste contracts with the City and surrounding municipalities. In short, the defendants knew the letter would have a

5

chilling effect on PMO's financing efforts resulting in devastating consequences to PMO.

18.   On June 13, 2007, PMO demanded that the defendants withdraw and repudiate the June 12, 2207 letter. They have refused to do so. This defiant refusal leaves PMO in the unfortunate position of having to report the defendants' threatening conduct to DOE and other appropriate authorities or risk the appearance of perpetrating a financial fraud on the DOE. This course of action is certain to be the deathblow for PMO's pre-application submission.

19.   The actions and conduct of the defendants, as alleged in this Complaint, were done under color of law, were arbitrary and capricious, were contrary to the City's enunciated public policy and executed agreements with PMO, were taken in bad faith, and were intended to deny PMO of its contractual property rights without due process. The totality of the defendants' open and continuing hostility toward PMO since December of 2005 has irreparably harmed PMO's well-positioned chances for necessary third party project equity and debt financing. PMO's waste-to-ethanol project has, in effect, been sabotaged by its own business partner.

20.   The City agreements have a total economic value to PMO of several hundred million dollars. PMO's Title V Air Permit and Part 360 Permit have a separate estimated value to PMO of $41 million.

## Claims and Causes of Action

PMO avers that the defendants' actions and conduct, as alleged, in this Complaint has deprived PMO of the following substantive rights:

1.   PMO's rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution, which is actionable under 42 USC § 1983 (with attorney's fees provided to prevailing parties under 42 USC § 1988);

2.   PMO's freedom of political association guaranteed under the First Amendment to the United States Constitution, which is actionable under 42 USC § 1983 (with attorney's fees provided to prevailing parties under 42 USC § 1988);

3.   PMO's rights under the City agreements, including PMO's right to invoke "Uncontrollable Circumstances" and have the Service Date in the agreements extended because of the illness and death of Mr. Harms;

4.   PMO's rights under Resolution 20-96 and the City agreements to have the City's project team cooperate with PMO on obtaining financing and other matters related to the project;

6

5. PMO's rights under the laws of New York to be protect from tortious interference with the City agreements and third party relationships; and

6. PMO's rights under New York law to due process and equal protection.


## Relief Requested

Based upon the above referenced violations of rights, PMO is entitled to the following relief:

1. A declaratory judgment that the actions and conduct of the municipal defendants and B&D, as described in this Complaint, violated rights conferred upon PMO under the City agreements, the laws of the State of New York, and the First and Fourteenth Amendments to the United States Constitution, as described more fully above;

2. A declaratory judgment that the illness and death of Mr. Harms constituted "Uncontrollable Circumstances" for PMO within the meaning of Section 14 of the CWMSA;

3. A declaratory judgment that defendants Duncanson, Meyers and Rollins acted outside the line and scope of their permissible authority as City officials when engaging in the bad faith actions and conduct described in this Complaint;

4. A declaratory judgment that the actions of the defendants from December of 2005 to the present were and remain arbitrary and capricious;

5. Monetary damages in an amount equal to PMO's project development expenses and loss of economic value under the City agreements, as described in the Complaint;

6. Punitive damages (in their individual capacities) against those municipal defendants who acted outside the line and scope of their permissible authority as City officials;

7. Attorney's fees under 42 USC §1988 for the violation of PMO's First and Fourteenth Amendment rights, as described in the Complaint;

8. An award of PMO's litigation expenses, as provided for in Schedule 5 to the CWMSA; and

9. Any and all further relief that the Arbitrator deems necessary and proper to remedy the violation of rights described in the Complaint.

7

Respectfully submitted this 18th day of June, 2007 by:

David Minkin
Powell Goldstein
One Atlantic Center
1201 West Peachtree Street, NW
Fourteenth Floor
Atlanta, Georgia  30309
Counsel for Plaintiff PMO

### Certificate of Service

I hereby certify that a copy of the foregoing Complaint, together with a written notice of arbitration, has been served upon Beveridge & Diamond, PC, counsel of record for the defendants, via email on this 18th day of June, 2007, as provided for in Schedule 5 of the CWMSA.

*David Minkin*

8

Exhibit B

# CITY WASTE MANAGEMENT SERVICES AGREEMENT

between

# CITY OF MIDDLETOWN, NEW YORK

and

# PENCOR-MASADA OXYNOL, LLC

\\ATL-SRV02\379700v19\81504.000016

# TABLE OF CONTENTS

Page

Section 1.    Conditions Precedent................................................................................1
Section 2.    Delivery and Acceptance of Acceptable Waste. .....................................2
Section 3.    Unacceptable Waste. ................................................................................2
Section 4.    Company's Rejection Rights.....................................................................3
Section 5.    Receiving and Operating Hours. ..............................................................3
Section 6.    Alternate Disposal Facilities. ...................................................................4
Section 7.    Annual Service Fee. ..................................................................................4
Section 8.    Additional Amounts. .................................................................................5
Section 9.    Billing and Payments.................................................................................5
Section 10.   Tonnage Requirements. .............................................................................6
Section 11.   [Reserved] ...................................................................................................6
Section 12.   Termination for Company Event of Default. ............................................6
Section 13.   Termination for City Event of Default.......................................................8
Section 14.   Uncontrollable Circumstances. .................................................................9
Section 15.   Term. ..........................................................................................................11
Section 16.   Insurance and Indemnities.........................................................................11
Section 17.   Dispute Resolution. ....................................................................................11
Section 18.   General Contract Conditions. .....................................................................11
Section 19.   Cross-Defaults; Terminations. ...................................................................11

## SCHEDULES

1    Tonnage Requirements
2    Waste Disposal Operations
3    Payments
4    Insurance and Indemnity
5    Dispute Resolution
6    General Contract Conditions

## CITY WASTE MANAGEMENT SERVICES AGREEMENT

This City Waste Management Services Agreement, is made as of December 9, 2003 by and between the CITY OF MIDDLETOWN, NEW YORK (the "City") and PENCOR-MASADA OXYNOL, LLC, a Delaware limited liability company (the "**Company**").

### Background

A.    The City desires a comprehensive, integrated and environmentally sound solution to its solid waste needs that maximizes recycling, materials reuse and value-added processing of such waste.

B.    Pursuant to N.Y. Gen. Mun. Law § 120-w, the City selected the Company to provide solid waste disposal services to the City (the "**Procurement**").

C.    The Company plans to design, construct, start up, operate and maintain an integrated solid waste processing facility (the "**Facility**") in the City for receiving Acceptable Waste, separating such waste for recycling and producing marketable byproducts.

D.    The City intends to maintain or establish and maintain a solid waste collection system, which may involve other municipalities in the County and desires to deliver, or cause to be delivered, to the Delivery Site, Acceptable Waste for disposal by the Company.

E.    Pursuant to N.Y. Gen. Mun. Law §§ 119-m - 119-o, the City is empowered to procure from the Company, and contract with the Company for, solid waste processing and disposal services.

F.    Capitalized terms used in this Agreement that are not defined above or elsewhere are defined in Section 1 of Schedule 6.

### Agreements

In consideration of the foregoing and the respective obligations undertaken herein, and intending to be legally bound, the parties hereto agree as follows:

### Section 1.    Conditions Precedent

(a)    The obligations of each party to this Agreement, other than its obligations under Section 1 of Schedule 2 and Section 7 of Schedule 6, shall be subject to the satisfaction, or waiver by such party, of the following conditions precedent:

(i)    The Company shall have obtained suitable financing for the Facility.

(ii)    All necessary approvals shall have been secured to permit lawful disposal of all Acceptable Waste at the Facility.

(iii)    The Service Date must occur within five (5) years of the date of this Agreement.

(b)    The parties shall use their best efforts to satisfy the foregoing conditions precedent as soon as reasonably practicable. This Agreement may be terminated by either party upon written notice delivered to the other party if any conditions precedent in this Section 1 are not satisfied or waived on or before sixty (60) months from the date of this Agreement, which time period shall be extended due to Uncontrollable Circumstances. Neither party shall be liable to the other for the termination of this Agreement pursuant to this Section 1.

**Section 2.    Delivery and Acceptance of Acceptable Waste.**

(a)    In the event the Company determines there is a need for Acceptable Waste (except for Acceptable Construction Waste) during start-up and testing operations prior to the Service Date, the City has the obligation to furnish all Acceptable Waste collected by the City or its agents (except for Acceptable Construction Waste) or such portion of its Acceptable Waste (except for Acceptable Construction Waste) as is requested by the Company to be delivered to the Facility at the times requested by the Company. The Company shall give to the City, for informational purposes only, no later than ninety (90) days prior to the Start-up Date the Company's proposed schedule for such start-up and testing and shall update such schedule periodically thereafter as material changes become known to the Company. The Company shall give the City at least sixty (60) days prior written notice of the Start-Up Date and its request for the receipt of Acceptable Waste (except for Acceptable Construction Waste) quantities from the City required for such limited operations. During start-up and testing operations, the Company shall give the City at least five (5) days prior written notice of any change in such quantities. The City shall pay the per ton fees set forth in Sections 7(a)(i) and (iii) for the disposal of Acceptable Waste permitted to be delivered during startup and testing.

(b)    Beginning on the Service Date, the City shall cause all Acceptable Waste collected by the City or its agents, employees or contractors, including all recyclable components thereof, to be delivered to the Company at the Delivery Site or, if directed by the Company, at an Alternate Disposal Facility. Subject to the Company's Rejection Rights, the Company shall accept and Dispose of all Acceptable Waste delivered under this Agreement. The City's failure to deliver or to cause to be delivered to the Company all Acceptable Waste collected by the City or its agents, employees or contractors after the Service Date shall not constitute a breach of this Agreement if it has paid the fees required by Section 7.

(c)    The Parties shall carry out their obligations under this Section in accordance with the provisions of Schedule 2.

(d)    The Company shall Dispose of all Residue in an Alternate Disposal Facility or otherwise, all in accordance with Applicable Law.

**Section 3.    Unacceptable Waste.**

(a)    The City shall not deliver, and shall use reasonable efforts to prevent the delivery on its behalf of, Unacceptable Waste to the Delivery Site or to an Alternate Disposal Facility.

(b)     The City shall pay Unacceptable Waste Costs arising from the delivery to or abandonment at the Delivery Site or Alternate Disposal Facility of Unacceptable Waste by the City or on its behalf or by any of its agents, employees or contractors.

(c)     The Company shall notify the City of any delivery to or abandonment at the Delivery Site of any Unacceptable Waste. The Company shall use its best efforts to identify the Person responsible for such delivery or abandonment. If such Person was the City or its agent, employee or contractor, the City shall clean up, contain and remove, or cause such agent, employee or contractor to clean up, contain and remove, any such waste from the Delivery Site, the Facility Site or the Alternate Disposal Site, as the case may be, and pay to the Company all associated Unacceptable Waste Costs.

(d)     It is expressly understood and agreed that the City shall not be liable to the Company in any way for any cost, damage, injury, claim or other consequence of the acceptance, processing or disposal of Unacceptable Waste which is delivered to the Facility but not rejected by the Company in the tipping area pursuant to Section 4(c) below.

**Section 4.     Company's Rejection Rights.** The Company may reject:

(a)     Acceptable Waste delivered at hours other than the receiving times established in Section 5(a) (except as provided in Section 5(b));

(b)     Acceptable Waste to the extent it is unable to Dispose of such waste as a result of an Uncontrollable Circumstance; and

(c)     Unacceptable Waste, provided that such rejection occurs as a result of an inspection of a load of material containing said Unacceptable Waste in the tipping area, conducted in the presence of the driver of the vehicle delivering said material, or by indisputable video, photo or other evidence that such Unacceptable Waste arose from material delivered to the Facility by the City. Any Unacceptable Waste not rejected in this manner shall be deemed accepted by the Company.

**Section 5.     Receiving and Operating Hours.**

(a)     On and after the Service Date, the Company shall cause the Delivery Site to be kept open for the receiving of Acceptable Waste between 6 a.m. and 6 p.m. Monday through Friday, and 6 a.m. and 1 p.m. on Saturday, excluding a holiday on which State or federally chartered banks are not open for business.

(b)     Upon thirty (30) days' prior written notice (or, in the event of the occurrence of a natural disaster or other emergency condition, such shorter notice as may be practicable) from the City, the Company shall use its reasonable efforts to accept deliveries of Acceptable Waste at other times. The City shall pay to the Company the Company Actual Cost of accepting Acceptable Waste during hours outside of the receiving time in response to such request.

**Section 6.     Alternate Disposal Facilities.**

(a)     If sufficient Facility capacity is not available for any reason, the Company (i) shall use the Facility as a transfer station to dispose of Acceptable Waste at Alternate Disposal Facilities, or (ii) direct the City to deliver Acceptable Waste to an Alternate Disposal Facility located within thirty-six (36) miles of the Facility.

(b)     If the Company uses the Facility as a transfer station and employs Alternate Disposal Facilities to dispose of Acceptable Waste or otherwise directs the City to deliver Acceptable Waste to an Alternate Disposal Facility for any reason other than an Uncontrollable Circumstance, the City shall continue to pay the Annual Service Fee, and the Company shall reimburse the City for any direct costs reasonably incurred by it in connection with the transportation and delivery of such waste to the Alternate Disposal Facility in excess of those costs that it would have incurred in delivering such waste to the Delivery Site.

(c)     If the Company uses the Facility as a transfer station and employs Alternate Disposal Facilities to dispose of Acceptable Waste or otherwise directs the City to deliver Acceptable Waste to an Alternate Disposal Facility due to an Uncontrollable Circumstance, the City shall pay the Company Actual Cost, if any, of transporting and Disposing of the City's Acceptable Waste in excess of the cost that would have been incurred by the Company had it accepted such waste at the Delivery Site.

(d)     If the Company uses the Facility as a transfer station and employs Alternate Disposal Facilities to dispose of Acceptable Waste or otherwise directs the City to deliver Acceptable Waste to an Alternate Disposal Facility, the tonnage so directed shall be credited against the City Minimum Tonnage as calculated in Schedule 3, Part B.

**Section 7.     Annual Service Fee.**

(a)     For each Operating Year or portion thereof after the Service Date, the City shall pay to the Company an Annual Service Fee equal to the sum of the following:

(i)     The Base Municipal Waste Fee ($65.00) times the Inflation Adjustor in effect at the time of delivery for each ton of Acceptable Municipal Waste delivered by or on behalf of the City during such Operating Year; plus

(ii)     The tipping fee then in effect for Disposal of Acceptable Construction Waste as announced by the Company from time to time for each ton of Acceptable Construction Waste delivered by or on behalf of the City during such Operating Year; plus

(iii)     For each ton of Acceptable Sludge delivered by or on behalf of the City during such Operating Year the following Base Sludge Fees (A) $22.50 if such ton contains less than 5 percent solids, (B) $45.00 if such ton contains at least 5 percent but less than 12 percent solids, (C) $59.50 if such ton contains at least 12 percent but less than 18 percent solids, (D) $68.50 if such ton contains at least 18 percent and less than 23 percent solids, and (E) $80.00 if such ton contains at least 23 percent but less than 30 percent solids; in each case times the Inflation Adjustor in effect at the time of delivery.

(b)    The Annual Service Fee will be increased by (i) the Allocated Excess Fee, if any, for each Operating Year in which the City delivers more than its Maximum Tonnage, or (ii) the Allocated Shortfall Fee, if any, for any Operating Year in which the City delivers less than its Minimum Tonnage, each calculated as described in Schedule 3.

(c)    Notwithstanding anything provided herein to the contrary, (i) if during the term hereof, at the request of the Company, the City enters into an agreement for the provision of solid waste management services with a municipality in Orange County, New York, and (ii) if such agreement provides for an Annual Service Fee (assuming that such term is defined and used in such agreement in a similar manner as it is defined and used herein) more favorable to such municipality than the Annual Service Fee is to the City herein, then and in such events the Company and the City shall promptly amend this Agreement to reduce going forward the Annual Service Fee payable by the City hereunder to the amount of Annual Service Fee provided in such other agreement.

**Section 8.    Additional Amounts.**  In addition to the Annual Service Fee, the City shall pay to the Company the following amounts: (i) any amounts payable under Section 3 with respect to Unacceptable Waste Costs, under Section 5 with respect to additional receiving hours and under Section 2 of Schedule 2 with respect to certain testing of the weighing facilities, (ii) the amount of any increase in costs of the Company or decrease in revenues payable by the Company as a result of any change in any law of the City, other than nondiscriminatory taxes and (iii) the City's Proportionate Share of any such amounts resulting from any change in any law of the County, other than nondiscriminatory taxes. The Company shall pay to the City the allowance, if any, described in Schedule 7.

**Section 9.    Billing and Payments.**

(a)    On or before the tenth day of each month, the Company will bill the City the Estimated Service Fee for that month following the procedures set forth in Schedule 3. The monthly statement will also include any additional amounts payable pursuant to Section 7 and/or Section 8 and certain adjustments as described in Schedule 3. The City shall pay the amount set forth on each monthly statement on or before the fifth day of the following month, except that amounts payable with respect to the quarterly adjustments described in Schedule 3 shall not be due until sixty (60) days following the City's receipt of the monthly statement.

(b)    In the event of a dispute as to any portion of any bill, the City shall unconditionally pay (i) the Estimated Service Fee and (ii) the additional amount not in dispute, but not less than sixty (60%) percent of the total additional amount of the bill in excess of the Estimated Service Fee when due and shall, within ten (10) days from the due date of the disputed bill, give the Company written notice of the dispute. Such notice shall identify the disputed bill, state the amount in dispute and set forth a full statement of the grounds which form the basis of such dispute. No adjustment shall be considered or made for disputed charges until such notice is given. No payment of any disputed charges shall be construed as a waiver of any rights in such dispute.

**Section 10.    Tonnage Requirements.**

(a)    The City's initial annual Minimum Tonnage and the calculation of its initial annual Maximum Tonnage and Proportionate Share are set forth in Part A of Schedule 1.

(b)    The City may increase its Minimum Tonnage for any Operating Year by giving ninety (90) days' notice prior to start of such Operating Year subject to the available capacity of the Facility. If the City gives such notice and the capacity of the Facility that is not committed under contracts of at least three years limits increases, the available capacity will be allocated to the City and the other Contract Municipalities giving similar notice pro rata in accordance with their then-current respective Minimum Tonnages.

(c)    Not later than forty-five (45) days prior to the beginning of each Operating Year, the Company shall deliver to the City a notice substantially in the form of Part B of Schedule 1 setting forth the City's Minimum Tonnage and the calculation of its Proportionate Share for such year.

(d)    If, in any Operating Year, the City expects to deliver less than its Minimum Tonnage and the Contract Municipalities anticipate a Net Municipal Shortfall (as defined in Schedule 3) for such Operating Year, the City may deliver or cause to be delivered to the Company, Acceptable Waste that was not generated within its boundaries.

**Section 11.    [Reserved]**

**Section 12.    Termination for Company Event of Default.  Each of the following shall constitute an event of default on the part of the Company (each, a "Company Event of Default"):**

(a)    The persistent or repeated failure by the Company to timely perform any material obligation under this Agreement (except obligations to pay money, as to which subsection (b) below shall apply) unless such failure shall be excused or justified by an act or omission by the City directly related to the performance of such material obligation, provided, however, that no such failure shall constitute a Company Event of Default unless and until:

(i)    The City shall have given written notice to the Company, together with written notice to any Leasehold Mortgagee, stating that in its opinion a particular default exists (to be described in reasonable detail in such notice) which will, unless cured, constitute a material breach of this Lease on the part of the Company; and

(ii)    The Company or any Leasehold Mortgagee, shall not have either remedied such default or commenced and pursued with diligence the cure of such default within a period of ninety (90) days after the City gives notice pursuant to clause (i) of this paragraph, provided that if the Company shall have commenced to take reasonable steps to cure such default within such ninety (90) day period, the same shall not constitute a Company Event of Default for as long as the Company continues to pursue with diligence the cure of such default;

(b)    If the Company fails to pay any sum payable under this Agreement within thirty (30) days after such payment was due, and if such failure is not completely cured within a period of ten (10) days after the City gives written notice to the Company of such failure, the City shall have the right to offset the amount so owing from the next payment of Estimated Service Fee due from the City.

(c)    If this Agreement is terminated by the City pursuant to this Section, subject to the provisions of Section 19 of Schedule 6, the Company shall pay to the City, as a contract termination fee, the excess of (i) the City's actual cost of disposal of Acceptable Waste for the 183-day period immediately following such termination over (ii) the amount which would have been payable by the City as part of the Annual Service Fee had the Company Disposed of such Acceptable Waste under this Agreement for the same period.  The Company shall, from time to time upon written request from the City, provide to the City appropriate certification with respect to the availability of disposal space for such Acceptable Waste for such 183-day period, and the Company shall, at termination of this Agreement, assign to the City the Company's rights to such other disposal space.

(d)    Disposal Letter of Credit.  The Company shall deliver to the City no later than thirty (30) calendar days prior to the Service Date an irrevocable letter of credit (or other financial instrument reasonably acceptable to the City and the Company) (the "Disposal Letter of Credit") in form and substance reasonably acceptable to City in an amount determined as provided below, and Company shall keep such Disposal Letter of Credit in effect, in its then applicable amount, throughout the term of this Agreement.  The amount of the Disposal Letter of Credit shall be determined no later than sixty (60) calendar days prior to the Service Date and on each anniversary thereof throughout the term by R.W. Beck or any successor engineering firm reasonably acceptable to City and Company (the "Engineering Firm"), in accordance with the following:

(i)    The Engineering Firm shall make a good-faith estimate of the excess of (i) the City's actual cost of disposal of Acceptable Waste (assuming that such cost would be the result of a competitive bid process) for the 183-day period commencing on the ninetieth (90th) calendar day following the date of such determination over (ii) the amount which would have been payable by the City as part of the Annual Service Fee had the Company Disposed of such Acceptable Waste under this Agreement for the same period;

(ii)    In making such good-faith estimate, the Engineering Firm shall apply the tipping fees and hauling rates applicable at the landfill that at such time is providing to the Company the disposal space described in subsection (c) immediately hereinabove;

(iii)    The Engineering Firm shall deliver to the City and the Company in writing its calculation of such excess, if any.  The amount of such excess shall be the amount of the Disposal Letter of Credit until the next calculation thereof;

(iv)    The Company shall pay the reasonable fees and expenses incurred by the Engineering Firm under this subsection (d); and

(v)    Notwithstanding the foregoing, if the Company is able, from time to time, to deliver to the City evidence reasonably satisfactory to the City that confirms the likely cost to the City under clause (i) above, such evidence to include, without limitation, copies of contracts in effect at such time with regard to disposal of Acceptable Waste and hauling rates, then in such event the City agrees that, in lieu of the provisions set forth immediately hereinabove with respect to the determination by the Engineering Firm of the amount of the Disposal Letter of Credit, the Company and the City shall mutually agree upon the amount of the Disposal Letter of Credit.

**Section 13.    Termination for City Event of Default.  Each of the following shall constitute an event of default on the part of the City (each, a "City Event of Default"):**

(a)    The persistent or repeated failure by the City to timely perform any material obligation under this Agreement (except obligations to pay money, as to which subsection (b) below shall apply) unless such failure shall be excused or justified by an act or omission by the Company directly related to the performance of such material obligation, provided, however, that no such failure shall constitute a Company Event of Default unless and until:

(i)    The Company shall have given written notice to the City, stating that in its opinion a particular default exists (to be described in reasonable detail in such notice) which will, unless cured, constitute a material breach of this Lease on the part of the City; and

(ii)    The City shall not have either remedied such default or commenced and pursued with diligence the cure of such default within a period of ninety (90) days after the Company gives notice pursuant to clause (i) of this paragraph, provided that if the City shall have commenced to take reasonable steps to cure such default within such ninety (90) day period, the same shall not constitute a City Event of Default for as long as the City continues to pursue with diligence the cure of such default;

(b)    If the City fails to pay any sum payable under this Agreement within thirty (30) days after such payment was due, and if such failure is not completely cured within a period of ten (10) days after the Company gives written notice to the City of such failure (such written notice is hereinafter referred to as the "First Notice"), the Company shall have the right to offset any sum so owing against amounts next owing to the City under the Host Agreement.  If for any reason the amount of any such available offset does not completely pay the Company all sums so owing within ninety (90) days of the date of the First Notice, then the Company shall deliver to the City an additional written notice (such written notice is hereinafter referred to as the "Second Notice") of such failure of such offset to pay the Company in full.  If the City does not pay to the Company all sums then owing within ten (10) days after the Second Notice, this Agreement shall terminate immediately upon written notice thereof by the Company to the City, subject to the provisions of Section 19 of Schedule 6.

(c)    If this Agreement is terminated pursuant to this Section 13, the City shall pay to the Company, as a contract termination fee, its Proportionate Share of the outstanding

principal amount of the Bonds as of the date of such termination, together with accrued interest to the date of such payment.

Section 14.    Uncontrollable Circumstances.

(a)    If, as a result of an Uncontrollable Circumstance, either party is prevented from performing or delayed in the performance of any of its obligations under this Agreement, such prevention of or delay in performance shall be, subject to such party's satisfaction of the conditions precedent in paragraph (b) of this Section 14, excused during any period in which such performance is prevented or delayed by an Uncontrollable Circumstance, and for such period thereafter as is necessary to correct the adverse effect of such Uncontrollable Circumstance; provided that the failure to pay any amounts owed under this Agreement (whether accruing prior to or during the Uncontrollable Circumstance) in a timely manner shall not be excused by an Uncontrollable Circumstance.

(b)    A party shall be excused from performance hereunder as a result of an Uncontrollable Circumstance only to the extent of and subject to the following conditions:

(i)    the non-performing party shall give the other party prompt written notice describing the particulars of the Uncontrollable Circumstance and the potential duration of the prevention of or delay in performance;

(ii)    the excuse of performance shall be of no greater scope and of no longer duration than is required to correct the adverse effect of the Uncontrollable Circumstance;

(iii)    no obligation of either party which was required to be performed or satisfied before the Uncontrollable Circumstance causing the suspension of performance shall be excused as a result of the Uncontrollable Circumstance;

(iv)    the non-performing party shall use its commercially reasonable efforts to reduce costs during any prevention of or delay in performance, to pursue insurance and any other third-party reimbursement which may reasonably be expected to be obtained with respect to the Uncontrollable Circumstance and to overcome the prevention of or delay in performance and performance shall be resumed at the earliest practicable time after cessation of the Uncontrollable Circumstance; and

(v)    if the non-performing party is the Company, it shall use its best efforts to accept and Dispose of as much Acceptable Waste as is practicable.

(c)    In this Agreement, "Uncontrollable Circumstance" means any act, event or condition that has a material adverse effect on the rights or the obligations of a party under this Agreement, or a material adverse effect on the Project or the ownership, possession or operation of the Project by the Company, if such act, event or condition is beyond the reasonable control of the party relying thereon as justification for not performing an obligation or complying with any condition required of such party under this Agreement. For the purpose of this Agreement, Uncontrollable Circumstances may include, but shall not be limited to, the following:

       (i)     an act of God, landslide, lightning, earthquake, fire, explosion, flood, sabotage or similar occurrence, acts of a public enemy, extortion, war, blockade or insurrection, riot or civil disturbance;

       (ii)    the order, judgment or legislative act of any Governmental Authority, provided that, if the non-performing party is the City, the order or judgment of the City or the County shall not constitute an Uncontrollable Circumstance;

       (iii)   the failure to issue, suspension, termination, interruption, denial or failure of renewal of or the imposition of any new conditions upon any permit, license, consent, authorization or approval essential to the operation of the Project;

       (iv)   a Change in Law;

       (v)    the failure of any Governmental Authority or private utility to provide and maintain utilities, services, public streets, water and sewer lines and power transmission lines to the Facility Site or the Delivery Site (if other than the Facility Site);

       (vi)   the failure of any subcontractor or supplier to furnish labor, services, materials or equipment on the dates agreed to; provided that such failure is caused by an act, event or condition that would be an Uncontrollable Circumstance if it directly affected the non-performing party;

       (vii)   the condemnation, taking, seizure, involuntary conversion or requisition of title to or use of the Project or any material portion or part thereof by the action of any Governmental Authority; or

       (viii)  (A) as to the Company, the negligence, willful misconduct or unexcused failure to perform of the City or its agents and (B) as to the City, the negligence, willful misconduct or unexcused failure to perform of the Company or its agents.

    (d)    For the purpose of this Agreement, the following shall not constitute an Uncontrollable Circumstance:

       (i)     adverse changes in the financial ability of either party to this Agreement to perform its obligations hereunder;

       (ii)    the consequences of errors of design, construction, startup, operation or maintenance of the Facility on the part of the Company;

       (iii)   the failure of the Company to secure or maintain patents or licenses in connection with the technology necessary to design, construct, maintain or operate the Facility; or

       (iv)   any act or omission by the Company or any affiliate thereof relating to the design, construction, operation or maintenance of the Facility, including but not limited to any failure to adequately inspect incoming waste for the presence of Unacceptable Waste.

**Section 15.    Term.** Unless sooner terminated in accordance with the terms hereof, the initial term of this Agreement shall continue in effect for twenty-five (25) years from the Service Date. The initial term is subject to renewal as provided in Section 10 of Schedule 6.

**Section 16.    Insurance and Indemnities.** The parties agree to obtain and maintain or cause to be obtained and maintained the insurance set forth in Schedule 4 and to provide the indemnities set forth in Schedule 4.

**Section 17.    Dispute Resolution.** The parties agree to submit any dispute under this Agreement to dispute resolution in accordance with Schedule 5.

**Section 18.    General Contract Conditions.** The parties' obligations under this Agreement are subject to the general contract conditions set forth in Schedule 6. Capitalized terms used in this Agreement and not otherwise defined have the meanings specified in Schedule 6.

**Section 19.    Cross-Defaults; Terminations.** The occurrence of an Event of Default by either party that is not cured within the applicable cure period under the Lease, the Host Community Agreement, or the Comprehensive Waste Agreement shall also constitute an event of default under this Agreement, and termination of any of said Agreements shall, at the option of the non-defaulting party and subject to the provisions of Section 19 of Schedule 6, terminate this Agreement. In the event that this Agreement is so terminated, neither party shall have any further liability to the other hereunder other than any obligations or liabilities which shall expressly survive such termination in accordance with the terms hereof. Notwithstanding the foregoing, the Company shall not have the right to terminate the Comprehensive Waste Agreement because of an Event of Default by the City or the termination of any of such Agreements if the City shall, not later than the 180th calendar day following the termination of this Agreement, pay to the Company the contract termination fee described in Section 13(c) hereinabove.


[SIGNATURES ON FOLLOWING PAGE]

ATTEST:

CITY OF MIDDLETOWN, NEW YORK

By: _____
Name: 
Title: MAYOR

PENCOR-MASADA OXYNOL, LLC

By:  Masada OxyNol, LLC
     Manager

By:  Masada Resource Group, LLC
     Manager

By: _____
Name: Daryl E. Harms
Title: Manager

12

## SCHEDULE 1
## TONNAGE REQUIREMENTS

**Part A:**      Initial Tonnage Requirements and Proportionate Shares

The City's initial Minimum Tonnage is 13,000 tons of Acceptable Municipal Waste and 3,000 tons of Acceptable Sludge.

The City's **Maximum Tonnage** in any Operating Year is 108% of its Minimum Tonnage for such year.

The City's **Proportionate Share** in any Operating Year is its Minimum Tonnage for such year divided by the aggregate Minimum Tonnage of all Contract Municipalities for such year.

For purposes of determining Minimum Tonnage and Maximum Tonnages, tons of Acceptable Sludge delivered to the Company having a solids content higher than 23 or less than 18 percent shall be converted into Moisture Adjusted Tons as follows:

$$\text{Moisture Adjusted Tons} = \text{Actual Tons} \times \frac{\text{(solids content)}}{23}$$

Where "solids content" means the actual percentage of solids contained in Acceptable Sludge delivered by or on behalf of the City.

**Part B:**      Form of Annual Notice

To the City:

Based on the following Minimum Tonnages for all Contract Municipalities for the year, 20___, your Proportionate Share for year is ___%.

Annual Minimum Tonnage for Year

Contract Municipality #1
Contract Municipality #2
Contract Municipality #3
Contract Municipality #4
Contract Municipality #5
Contract Municipality #6
Contract Municipality #7
Contract Municipality #8
Contract Municipality #9
Contract Municipality #10

Aggregate Minimum Tonnage for all Contract Municipalities          _____

## SCHEDULE 2
## WASTE DISPOSAL OPERATIONS

| Section | | Page |
|---|---|---|
| 1 | Permits | 2-1 |
| 2 | Inspection of Vehicles | 2-1 |
| 3 | Weighing of Waste Deliveries | 2-1 |
| 4 | Record keeping | 2-1 |
| 5 | Facility Operating Standards | 2-1 |
| 6 | Rules and Regulations | 2-2 |

1.    **Permits.** The Company shall, at its sole expense, obtain and maintain all permits necessary for the construction and operation of the Facility, provided that the City shall provide at its own expense all such cooperation in connection with obtaining and maintaining such permits.

2.    **Inspection of Vehicles.** The Company may inspect the contents of any vehicle delivering waste to the Delivery Site. The Company may require any person delivering waste to the Delivery Site to separate Unacceptable Waste from Acceptable Waste. The Company may reject any part of a load if it contains Unacceptable Waste or an entire such load if separating such waste from Acceptable Waste would be unduly burdensome. The contents of any partial or entire load so rejected shall be deemed Unacceptable Waste. Any Unacceptable Waste which is not rejected [as referenced in Section 4(c) above] shall be deemed accepted by the Company, and the City shall have no further responsibility or liability for said waste.

3.    **Weighing of Waste Deliveries.**

(a)    On and after the Service Date, the Company shall cause weighing facilities to be maintained and operated at the Delivery Site for the purpose of determining the number of tons of Acceptable Waste delivered to the Delivery Site.

(b)    The Company shall cause the weighing facilities to be tested at such frequency as is in accordance with Applicable Law and at the written request of the City, but in any event no less frequently than annually. If a test of the weighing facilities performed at the request of the City indicates that the scales meet the accuracy requirements of Applicable Law, the City shall reimburse the Company for the Company Actual Cost of performing such test. If such a test indicates that the weighing facilities do not meet the requirements of Applicable Law, the Company shall not be so reimbursed. If any test indicates that the weighing facilities do not meet the accuracy requirements of Applicable Law, the Company and the City agree to compute the number of days since the last test and divide that number of days by two, and the tonnage during that number of days shall be subject to such reasonable adjustment as shall be negotiated by the Company and the City to the extent such records relate to the City. If all weighing facilities are incapacitated or are being tested, the Company shall estimate the tons of Acceptable Waste delivered on the basis of truck volumes and estimated data obtained through historical information pertinent to the Persons making the deliveries which shall take the place of actual weighing records during the scale outage.

4.    **Recordkeeping.** On and after the Service Date, the Company shall establish and maintain an information system to provide storage and ready retrieval of Facility operating data, including all information necessary to verify calculations relating to amounts payable under this Agreement. The Company shall provide the City and its auditors with reasonable access to such records.

5.    **Project Operating Standards.**

(a)    The Company shall (i) cause safety procedures to be maintained at the Project at a level consistent with Applicable Law and normal plant practice for facilities such as the Facility; (ii) give all notices and comply with Applicable Law; and (iii) cause to be designated a qualified and responsible member of the Project staff whose duty shall be Project safety, the prevention of fires and accidents, and the coordination of such activities as shall be necessary with federal, State and municipal officials.

(b)    The Company shall cause the Project to be maintained at all times in good, clean, orderly condition, including the implementation of necessary repairs, the purchase of necessary replacement equipment or parts and clean-up consistent with meeting normal plant practice for facilities such as the Facility and industry standards relating to waste handling and disposal.

(c)    The Company shall (i) cause the Project to be operated in compliance with Applicable Law and in accordance with good waste industry practice and (ii) notify the City promptly if the Project is seriously damaged, irrespective of cause.

6.    **Rules and Regulations.**

(a)    The City shall comply, and cause its haulers and other agents to comply, with the Rules and Regulations set forth in Exhibit A to this Schedule 2. The Company may in its discretion revise such Rules and Regulations and shall notify the City in writing of any such revision which shall be effective no earlier than thirty (30) days following the Company's delivery of such notice to the City.

(b)    The Company may designate vehicle routes for use by the City, its agents and its designated haulers for the delivery of Acceptable Waste to Alternate Disposal Facilities.

(c)    The Company may refuse to receive Acceptable Waste from any hauler who repeatedly or intentionally or by negligent action violates the Rules and Regulations or fails to use the designated routes referred to above. The Company shall give the City at least thirty (30) days' prior written notice of its intent permanently to refuse deliveries from any of the City's haulers.

## EXHIBIT A TO SCHEDULE 2

### RULES AND REGULATIONS

1.   Only refuse collection vehicles owned or operated by the City or haulers authorized by the City are permitted to bring and discharge waste on behalf of the City at the Delivery Site. Each truck operator or passenger must identify him or herself and the authorized hauler that employs him or her to Company personnel on request.

2.   Obey all posted traffic control signs and devices.

3.   Obey the instructions of Company personnel.

4.   Have your vehicle identification clearly visible on vehicle for viewing by closed circuit TV cameras and Company personnel.

5.   No parking on the Delivery Site except in designated areas. Absolutely no parking in roadways. Avoid obstructing traffic on the Delivery Site or the tipping floor.

6.   Any waste which remains in vehicles after normal unloading procedures may be cleared from vehicles only in designated areas of the tipping floor. No external cleaning of vehicles or vehicle maintenance may be performed on the Delivery Site.

7.   No alcoholic beverages or drugs are permitted on the Delivery Site. You may not operate a vehicle on the Delivery Site while intoxicated or impaired to any extent by the use of alcohol or drugs.

8.   No firearms, explosives or other weapons are permitted on the Delivery Site.

9.   No smoking. All open flames and other sources of igniting fires (such as matches or lighters) are prohibited.

10.  Burning or smoldering waste is not allowed on the Delivery Site.

11.  No Hazardous Waste may be delivered to or disposed at the Delivery Site:

"Hazardous Waste" means (a) any material or substance which, by reason of its composition or characteristics, is (i) regulated as a toxic or hazardous waste as defined in (A) either the Solid Waste Disposal Act 42 U.S.C. §§ 6901 et seq., or Section 6(e) of the Toxic Substances Control Act, 15 U.S.C. § 2605(e), as either may be replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (B) in N.Y. ECL § 27-0901 (McKinney 1984), as replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (ii) special nuclear or by-products materials within the meaning of the Atomic Energy Act of 1954; and (b) any other materials which any governmental authority having appropriate jurisdiction shall determine from time to time is ineligible for disposal whether by reasons of being harmful, toxic or dangerous, or otherwise.

All commercial and industrial establishments are required by federal and state law to determine whether any wastes which they generate are Hazardous Wastes, and to dispose of all Hazardous Wastes at a permitted Hazardous Waste disposal facility. You are responsible for assuring that industrial and commercial establishments from which you collect waste, have excluded all Hazardous Waste from waste which you collect for disposal at the Delivery Site.

12. In addition, the following types of waste are defined as Unacceptable Waste meaning Hazardous Waste or any other portion of solid waste if Disposed of at the Facility (or any Alternate Disposal Facility) may harm the Facility or impair its operation and therefore may not be disposed of at the Delivery Site as it would:

    (a)    present a substantial endangerment to health or safety of the public or Facility employees; or

    (b)    cause a violation of Applicable Law; or

    (c)    adversely affect the equipment at or operation of the Facility.

Unacceptable Waste includes explosives, including hand grenades, blasting caps, shotgun shells, closed containers capable of exploding upon Processing and fireworks, gasoline, kerosene, turpentine, waste oil, ether, acetone, solvents, paints, alcohol, acids, hydraulic oil, petroleum, caustics, burning or smoldering materials, materials that have elevated temperatures or that may self-ignite, flammable or volatile liquids, any other liquids (other than as contained in Acceptable Sludge), pathological, chemotherapeutic and biological waste, radioactive materials, hospital waste, medical waste, red bag waste, ashes, foundry sand, sewage sludge other than Acceptable Sludge, construction and demolition debris that is not Acceptable Construction Waste, septage, cesspool and other untreated human waste, leachate, human and animal remains, kitchen sinks, motor vehicles, including such major motor vehicle parts as automobile transmissions, rear ends, springs and fenders, bulk loads of tires, agricultural and farm machinery and equipment, marine vessels and major parts thereof, any other large types of machinery or equipment, liquid wastes and asbestos or asbestos containing material.

13. Your vehicle is subject to inspection at any time to determine whether it contains Hazardous Waste or Unacceptable Waste.

14. You are required to certify that no Hazardous or Unacceptable Waste is known to be in your truckload. Your signature on the Company's form certifying scale weight will constitute your certification.

15. All incoming vehicles are automatically screened for radiation. If your vehicle registers positive on our radiation detector you must pull off for further inspection as directed. Vehicles still registering positive for radiation will be refused entry to the Delivery Site.

16. Upon request of Company personnel, you must empty the contents of your vehicle on the tipping floor or other designated location for inspection of the contents.

17. If your vehicle is found to contain Hazardous Waste or Unacceptable Waste, you must remain on the Delivery Site and await instructions of Company personnel as to disposition of the waste. You may be refused permission to dispose of any waste from your vehicle at the Delivery Site. You must promptly pay all costs incurred by the Company or any third party for the removal or disposal of such waste.

18. No waste may be unloaded except in the enclosed tipping area or other location designated by Company representatives.

19. All waste must be transported in enclosed or tightly covered vehicles. No littering.

20. All vehicles must be well maintained and clean so they do not leak or spill on the Delivery Site.

21. All hauler personnel using the Project will be informed of the Project's Hazardous and Unacceptable Waste Screening Program.

22. Any hauler bringing Hazardous or Unacceptable Waste to the Delivery Site is subject to permanent suspension of its use of the Project.

23. Violation of any of these regulations may also result in suspension of the use of the Facility by the individuals involved. Repeated violations by personnel of any hauler may result in suspension of such hauler's use of the Project.

SCHEDULE 3
PAYMENTS

Part A:    Monthly Statement.

(a)    The monthly statement for the City will set forth the Estimated Service Fee. The Estimated Service Fee for each month of the first Operating Year and, if the first Operating Year is shorter than three (3) months, the second Operating Year, will equal the product of (a) the Base Municipal Waste Fee times the Inflation Adjustor times (b) one-twelfth of the Minimum Tonnage. In each Operating Year thereafter, the Estimated Service Fee will equal one-twelfth of the prior Operating Year's Annual Service Fee unless the City's Minimum Tonnage has been changed, in which case the Estimated Service Fee will be adjusted proportionately.

(b)    The monthly statement for any month will also include amounts, if any, owed by the City to the Company under Section 8 with respect to the prior month. The monthly statement will include as a credit any amounts owed by the Company to the City under this Agreement. If the actual value of an item in any monthly statement cannot be accurately determined by the Company on or prior to the date of such statement, it will be billed on an estimated basis calculated in good faith and an adjustment will be made to reflect the difference between such estimated amount and the actual amount of such item on the next monthly statement following the date on which the Company learns the exact amount of such item.

(c)    The monthly statement submitted in April, July, and October of each Operating Year shall include an adjustment if, during the preceding calendar quarter, Acceptable Waste was delivered by or on behalf of the City in excess of one-quarter of the annual Maximum Tonnage. Such adjustment will be equal to the Base Municipal Waste Fee times the Inflation Adjustor times the number of tons of such excess waste.

Part B:    Adjustments to Annual Service Fee.

Calculation of Allocated Excess Fee and Allocated Shortfall Fee.

(a)    If the City delivers **Excess Tons** in any Operating Year, the **Allocated Excess Fee** will be an amount equal to the product of (i) the City's **Allocated Share** for such Operating Year times (ii) the **Net Municipality Excess Tons** for such Operating Year times (iii) the **Excess Tonnage Surcharge**.

(b)    If the City experiences a **Shortfall** in any Operating Year, the **Allocated Shortfall Fee** will be an amount equal to the product of (i) the City's Allocated Share for such Operating Year times (ii) the **Net Municipality Shortfall** for such Operating Year times (iii) the Base Municipal Waste Fee, times (iv) the Inflation Adjustor for such Operating Year.

(c)     Capitalized terms used in this Schedule 3 have the meanings set forth below. As used in these definitions, "tons of Acceptable Waste" assumes that the Acceptable Sludge component of such waste has been converted into Moisture Adjusted Tons.

**Allocated Share** means (i) in any Operating Year in which the City experiences a Shortfall, an amount equal to (A) such Shortfall divided by (B) by the aggregate Shortfall of all Contract Municipalities that experienced a Shortfall in such year and (ii) in any Operating Year in which the City delivers Excess Tons, an amount equal to (A) such Excess Tons divided by (B) the aggregate Excess Tons of all Contract Municipalities that delivered Excess Tons in such year.

**Excess Tonnage Surcharge** means (i) the amount, if any, by which (A) the average cost incurred by the Company to Dispose of an Excess Ton at an Alternate Disposal Facility exceeds (B) the Base Municipal Waste Fee times (ii) the Inflation Adjustor.

**Excess Tons** means, for any Contract Municipality in any Operating Year, the amount, if any, by which the tons of Acceptable Waste delivered by such Contract Municipality in such year exceeds its annual Maximum Tonnage.

**Net Municipality Excess Tons** means, for any Operating Year, the amount, if any, by which (i) the aggregate tons of Acceptable Waste delivered by or on behalf of all Contract Municipalities exceeds (ii) the aggregate annual Maximum Tonnages for all Contract Municipalities.

**Net Municipality Shortfall** means, for any Operating Year, the amount, if any, by which (i) the aggregate annual Minimum Tonnages for all Contract Municipalities exceeds (ii) the aggregate tons of Acceptable Waste delivered by or on behalf of all Contract Municipalities.

**Shortfall** means, for any Contract Municipality in any Operating Year, the amount, if any, by which such Contract Municipality's annual Minimum Tonnage exceeds the tons of Acceptable Waste it delivers in such year.

**Part C:**     <u>Annual Settlement Statement</u>

1.     **Annual Settlement Statement.** Within ninety (90) days after the end of each Operating Year, the Company will deliver to the City an Annual Settlement Statement, which shall (i) show the computation of the City's Annual Service Fee for such year, showing all estimated monthly service fees and interim adjustments paid by the City in such year as a credit against the City's Annual Service Fee, provided that any amounts paid in respect of interest shall not be so credited and (ii) correct to actual values any remaining estimated amounts from monthly statements.

2.    **Payments.** If the Annual Settlement Statement reflects (i) any balance due to the City, then the Company shall, within sixty (60) days of delivery of such statement, pay to the City the balance due or (ii) any balance due to the Company, then the City shall, within sixty (60) days of receipt of the statement, pay to the Company the balance due.

**Part D:**    <u>General</u>

1.    **Overdue Obligations to Bear Interest.** Any amount owed to a party under the Agreement more than sixty (60) days beyond the date of the other party's receipt of the statement covering such amount shall accrue interest each day thereafter that such amount is not paid at the annual prime interest rate as published in <u>The Wall Street Journal</u> on the first day that such sum becomes past due .

2.    **Manner of Termination Payment.** Within sixty (60) days following termination of this Agreement under Section 12 or 13, the Company and the City as to which such termination is effective shall reconcile all amounts then due and payable to each other under the terms of this Agreement, including any amounts payable pursuant hereunder.  Within ninety (90) days after such reconciliation, the Company or the City, as the case may be, shall make final payment in complete discharge of its obligations under this Agreement, except those obligations which survive the termination of this Agreement.

## SCHEDULE 4
## INSURANCE AND INDEMNIFICATION

1.     **Insurance.** Not less than thirty (30) days prior to the commencement of any work undertaken by the Company pursuant to this Agreement, and for the duration of construction, start-up and testing operations, and thereafter from and after the Service Date, the Company shall obtain and maintain insurance coverage as is prudent and customary in businesses such as that of the Company and as is required by the issuer of Bonds, including, without limitation, the insurance coverage described in Exhibit A to this Schedule 4. Concurrently with the provision of insurance coverage by the Company pursuant to this Schedule 4, the City shall obtain and maintain such insurance coverage as is prudent and customary with current limits of not less than $1,000,000 for General Liability Broad Form Coverage and not less than $1,000,000 of Automobile liability insurance and excess umbrella coverage of $5,000,000. The City shall cause any Person (other than Contract Municipalities contracting with the City under the Comprehensive Waste Agreement, it being agreed that the Company shall have the responsibility to enforce such Contract Municipalities) with which it contracts to deliver Acceptable Waste to the Company to obtain and maintain such insurance coverage as is prudent and customary for Persons collecting and transporting solid waste, and such Person shall name the Company and the Company as additional insureds with coverage limits no less than those required of the City under this Agreement; provided, however that the City shall at all times require the Persons delivering Acceptable Waste to the Facility to provide coverage limits equal to the greater of (a) the highest coverage limits then offered by such Persons to other municipal customers or private customers in the Mid-Hudson Region, (being defined as Orange County and all adjoining counties) or (b) the amounts otherwise required by this Section 1. The Company and the City shall meet at least sixty (60) days before the first, fifth, tenth and fifteenth anniversary date of the Service Date, or any five year extension of this Agreement, and review the insurance coverages to determine the coverages and the  limits of coverage required of the City and each Person delivering Acceptable Waste during the next five (5) years of the Agreement. If the Company and City are not able to resolve adjusted limits by the anniversary date, this matter shall be subject to the provisions of Schedule 5. All such insurance coverage shall provide that such coverage cannot be canceled without thirty (30) days prior written notice to the City. In addition, the Company shall deliver to the City at least thirty (30) days prior to the expiration of any insurance coverage evidence of either the renewal of such otherwise expiring coverage or the replacement of such expiring coverage with equivalent insurance coverage in compliance with the terms hereof.

2.     **Company Indemnification.**   The Company agrees that it shall protect, indemnify, and hold harmless the City and its respective officers, employees and agents (the "City Indemnified Parties") from and against all liabilities, actions, damages, claims, demands, judgments, losses, costs, expenses, suits, or actions and attorneys' fees, and shall defend the City Indemnified Parties in any suit, including appeals, for personal injury to, or death of, any person or persons, or loss or damage to property arising out of the  negligence or willful misconduct of the Company or any of its agents or employees, contractors or subcontractors, in connection with its performance under this Agreement . The Company is not, however, required to reimburse or indemnify any City Indemnified Party for loss or claim due to the negligence or willful misconduct of any City Indemnified Party, and the City Indemnified Party whose negligence or

willful misconduct is adjudged to have caused or contributed to such loss or claim shall reimburse the Company (or in the case of negligence or willful misconduct of a City Indemnified Party other than the City, the City shall cause such party to reimburse the Company) for the costs of defending any such suit.

3.    [Reserved]

4.    **City Indemnification**. The City agrees that it shall protect, indemnify, and hold harmless the Company, and its respective officers, directors, members, employees and agents (the "**Company Indemnified Parties**") from and against all liabilities, damages, claims, demands, judgments, losses, costs, expenses, suits, or actions and attorneys' fees, and shall defend the Company Indemnified Parties in any suit, including appeals, for personal injury to, or death of, any person or persons, or loss or damage to property arising out of the negligence or willful misconduct of the City or any of its agents or employees, contractors or subcontractors, in connection with their performance under this Agreement. The City is not required to reimburse or indemnify any Company Indemnified Party for loss or claim due to the negligence or willful misconduct of any Company Indemnified Party, and the Company Indemnified Party whose negligence or willful misconduct is adjudged to have caused or contributed to such loss or claim shall reimburse the City (or, in the case of negligence or willful misconduct of a Company Indemnified Party other than the Company, the Company shall cause such party to reimburse the City) for the costs of defending any such suit.

5.    **Comparative Negligence**.    Notwithstanding any other provision of this Schedule 4, if negligence of any person seeking indemnification for a loss or claim is adjudged to have contributed to such loss or claim, (a) the person from whom indemnification is sought shall be required only to reimburse or indemnify the negligent indemnified person for such loss or claim pro rata to the extent that such negligence is not adjudged to have contributed to such loss or claim and (b) the Company (if the negligent party is a Company Indemnified Party) or the City (if the negligent party is a City Indemnified Party), as the case may be, shall only be obligated to reimburse the indemnifying person for the costs of defending any such suit to the extent such negligence is adjudged to have contributed to such loss or claim.

6.    **Cooperation Regarding Claims**.    The Company and the City (who are hereinafter collectively referred to in this Section 6 as the "**Indemnitors**" or individually as an "**Indemnitor**") shall promptly inform one another of any claim, demand, action, suit or proceeding of which it has knowledge that may affect the performance by either of them of its respective obligations under this Agreement.    If Indemnitor receives notice or has any knowledge of any claim, demand, action, suit or proceeding that may result in either a claim for indemnification for or against either of the Indemnitors pursuant to this Schedule 4, the Indemnitor shall, as promptly as possible, give notice of such claim, demand, action, suit or proceeding to the other Indemnitor, including a reasonably detailed description of the facts and circumstances relating to such claim, demand, action, suit or proceeding and a complete copy of all notices, pleadings and other papers related thereto, and, in the case of a claim for indemnification pursuant to this Schedule 4, such claim and the basis therefor in reasonable detail; provided that failure promptly to give such notice or to provide such information and documents shall not relieve the applicable Indemnitor of any obligation of indemnification it may have under this Agreement, unless such failure shall materially diminish the ability of such

Indemnitor to respond to, or to defend the Indemnitor failing to give such notice against, such claim, demand, action suit or proceeding. The Indemnitors shall consult with each other regarding and cooperate in respect of the response to and the defense of any such claim, demand, action, suit or proceeding, and, in the case of a claim for indemnification pursuant to this Schedule 4, the Indemnitor against whom indemnification is claimed shall, upon its acknowledgment in writing of its obligation to indemnify with respect to such claim, be entitled to assume the defense or to represent the interests of the Indemnified party in respect of such claim, demand, action, suit or proceeding, which shall include the right to select and direct legal counsel and other consultants, appear in proceedings on behalf of such Indemnified party and to propose, accept or reject offers of settlement; provided, however, that the Indemnified party shall have the right to retain separate counsel in respect of such claim, demand, action, suit or proceeding, the retention of which counsel shall be at the Indemnified party's own expense, unless the retention of such counsel has been specifically authorized by the party against whom indemnification is claimed.

7.     **Survival.**     Notwithstanding any other provisions of this Agreement, the obligations of the parties pursuant to Sections 2 through 6 of Schedule 4 shall remain in full force and effect after the termination of this Agreement until the expiration of the period stated in the applicable statute of limitations during which a claim, cause of action or prosecution relating to the matters herein described may be brought and the payment in full or the satisfaction of such claim, cause of action or prosecution and the payment of all expenses, charges and costs incurred by the indemnified party relating thereto.

8.     **Indemnity Provisions in Lease.**     Notwithstanding anything provided to the contrary herein or in the Lease, and except as provided in Section 9 of this Schedule 4 immediately hereinbelow, the provisions of Section 11 of the Lease shall govern and control with respect to environmental matters arising under the Lease.

9.     **Letter of Credit.**     Not less than thirty (30) days prior to the commencement of any work undertaken by the Company pursuant to this Agreement, and for the duration of construction,, and thereafter from and after the Service Date, the Company shall obtain and deliver to the City a letter of credit (the "Letter of Credit") for the benefit of the City in the amount of $1,000,000, subject to the terms hereof. The Letter of Credit shall provide that the City shall have the right, from time to time, to draw upon the Letter of Credit, to the extent of any loss or damage incurred by the City, (i) if the Company is obligated to the City under the terms of Section 11.4 of the Lease arising as a result of a breach by the Company of its obligations under either Section 11.2(c) or Section 11.2(e) of the Lease, and (ii) if the City is not covered for any such loss or damage by any of the insurance policies delivered for the benefit of the City under the provisions of Exhibit A to this Schedule 4. Notwithstanding the foregoing, the City and the Company agree that, no later than sixty (60) days prior to the commencement of any work undertaken by the Company pursuant to this Agreement, they shall mutually agree upon a nationally recognized insurance consultant (the "Insurance Consultant") that shall promptly thereafter be retained by the Company at the sole expense of the Company (not to exceed $10,000) to review the terms and provisions of this Schedule 4 as well as Exhibit A attached hereto and the relevant provisions of the Lease and to advise the City and the Company in writing on or before thirty (30) days prior to the commencement of any work undertaken by the Company pursuant to this Agreement of, in the reasonable commercial judgment of the

Insurance Consultant, the amount of the potential gap between the amount of the coverage provided to the City by the insurance policies to be delivered for the benefit of the City under the provisions of Exhibit A to this Schedule 4, and the likely potential liability of the City that could arise as a result of a breach by the Company of its obligations under either Section 11.2(c) or Section 11.2(e) of the Lease. If the Insurance Consultant determines that the amount of such potential gap is less than $1,000,000, then in such event the City agrees that the Company shall have the right to reduce the amount of the Letter of Credit to the amount of such potential gap as so determined by the Insurance Consultant.

EXHIBIT A
TO SCHEDULE 4

## INSURANCE PROVISIONS

A.     **Environmental Insurance**

With respect to environmental liability insurance to be provided by the City under 14(a) of the Lease:

The Company, on behalf of the City, and subject to the reasonable approval of the City, and at the expense of the Company, will provide a one-year, claims-made pollution/environmental liability insurance policy for pollution conditions not known to the responsible insured with a policy limit of $5.0 million. This coverage shall include bodily injury, property damage and shall have the following endorsements subject to insurance availability and insurance market conditions.

1.     The Company shall be named as Additional Insured.

2.     The insurance shall cover property damage costs for the Site.

With respect to insurance coverage to be provided by the Company under Section 14 of the Lease:

The Company shall provide continuous claims-made pollution/environmental liability insurance for pollution incidents commencing after the policy date, with a policy limit of not less than $5.0 million. This coverage shall include bodily injury, property damage and remediation costs and it shall have the following endorsements:

A.     The City shall be named as an Additional Insured.

B.     The insurance shall cover any contractual liability that either the City or the Company may have assumed under the Lease, the Voluntary Cleanup Agreement and the Work Plan.

C.     The insurance shall cover costs incurred by reason of governmental mandates to perform remediation.

B.     **Other Insurance**

The Company shall obtain and maintain insurance against its contractual liability created under this Agreement, from an insurer reasonably satisfactory to the City in the following amounts:

1.     Workers compensation insurance for the benefit of the employees as required by law; and

2.     Comprehensive general liability coverage with a limit of liability of not less than a $1,000,000 CSL with respect to any occurrence and $2,000,000 in aggregate; and

3.     All-risk insurance, standard extended coverage, replacement value, without co-insurance factor (full replacement value of Facility and Company's personal property); and

4.     Business auto liability, including all owned, non-owned and hired autos, with a limit of liability of not less than $1,000,000 CSL for personal injury, including bodily injury or death, and property damage; and

5.     "Umbrella" coverage providing liability insurance in excess of the coverage required by these Paragraphs 'A,' 'B,' 'C,' and 'D,' with a limit of not less than $5,000,000.

The Company will provide Certificates and Policies of Insurance for above listed insurance to the City for its approval  no later than thirty  (30) days prior to commencement of construction of the Facility.  Such insurance coverage shall be written so that it shall not lapse or terminate without at least thirty (30) days' written notice to the City.

The Company's insurance shall have no right of recovery or subrogation against the City. The Company's policies shall be **primary** coverage for any and all losses covered by said policies.

## SCHEDULE 5
## DISPUTE RESOLUTION

1.    **Dispute Resolution.**

(a)    Any claim, action, dispute or controversy of any kind arising out of or relating to this Agreement or concerning any aspect of performance by the City or the Company (each a "Party") under the terms of this Agreement ("Dispute") shall be resolved by mandatory and binding arbitration administered by the American Arbitration Association (the "AAA") pursuant to the Federal Arbitration Act (Title 9 of the United States Code) in accordance with this Agreement and the then-applicable Commercial Arbitration Rules of the AAA. The Parties acknowledge and agree that the transactions evidenced and contemplated hereby involve "commerce" as contemplated in Section 2 of the Federal Arbitration Act. If Title 9 of the United States Code is inapplicable to any such Dispute for any reason, such arbitration shall be conducted pursuant to this Agreement and the then-applicable Commercial Arbitration Rules of the AAA. To the extent that any inconsistency exists between this Agreement and the foregoing statutes or rules, this Agreement shall control. Judgment upon the award rendered by the arbitrator acting pursuant to this Agreement may be entered in, and enforced by, any court having jurisdiction, absent manifest disregard by such arbitrator of applicable law; provided, however, that the arbitrator shall not amend, supplement or reform in any manner any of the rights or obligations of any Party hereunder or the enforceability of any of the terms or provisions of this Agreement. Any arbitration proceedings under this Agreement shall be conducted in New York, New York before a single arbitrator who has no direct or indirect relationship with any Party or any Party's Affiliate and who has recognized expertise in solid waste management and real estate law.

(b)    Any Party may commence an arbitration provided for in Section (a) by serving a written notice of arbitration. Within ten (10) days after a Party's receipt of such notice, the Parties who are parties to the Dispute shall agree upon a qualified arbitrator. If the Parties cannot agree within such 10-day period, an arbitrator shall be appointed by the AAA. If a replacement arbitrator is necessary for any reason, such replacement arbitrator shall be appointed by the AAA.

(c)    Any Party may bring summary proceedings (including, without limitation, a plea in abatement or motion to stay further proceedings) in court to compel arbitration of any Dispute in accordance with this Agreement.

(d)    All statutes of limitation that would otherwise be applicable shall apply to any arbitration proceeding. Reasonable discovery (which shall not include the discovery of any proprietary or confidential information) shall be available to the parties under the supervision of the arbitrator. Any attorney-client privilege and other protection against disclosure of privileged or confidential information (including, without limitation, any protection afforded the work-product of any attorney) that could otherwise be claimed by any Party shall be available to, and may be claimed by, any such Party in any arbitration proceeding. No Party waives any attorney-client privilege or any other protection against disclosure of privileged or confidential information by reason of anything contained in, or done pursuant to, the arbitration provisions of this Agreement.

(e)     The arbitration shall be conducted and concluded as soon as is reasonably practicable, based on a schedule established by the arbitrator. Any arbitration award shall be based on and accompanied by findings of fact and conclusions of law, shall be conclusive as to the facts so found and shall be confirmable by any court having jurisdiction over the Dispute, provided that such award, findings and conclusions are not in manifest disregard of applicable law.

(f)     Each Party shall bear its own expenses of the arbitration, including, without limitation, fees and expenses of counsel incident to any mediation or arbitration. The fees and expenses of the arbitrator and the AAA shall be borne equally by the Parties. The arbitrator shall have the power and authority to award expenses to the prevailing Party if the arbitrator elects to do so.

(g)     In order for an arbitration award to be conclusive, binding and enforceable under this Agreement, the arbitration must follow the procedures set forth in the portions of this Agreement relating to such arbitration and any award or determination shall not be in manifest disregard of applicable law. The obligation to arbitrate any Dispute shall be binding upon the successors and assigns of each of the Parties.

2.     The City agrees to consolidate any dispute it may have under this Agreement with the active dispute of any other similarly situated Contract Municipality and to be bound by any decisions of the arbitrators with respect to such dispute.

## SCHEDULE 6
## GENERAL CONTRACT CONDITIONS

| Section | | Page |
|---|---|---|
| 1 | Definitions | 6-1 |
| 2 | Conventions | 6-4 |
| 3 | Consent to Assignment | 6-5 |
| 4 | Remedies | 6-5 |
| 5 | Limited Obligation | 6-5 |
| 6 | Confidentiality | 6-5 |
| 7 | Cooperation in Financing | 6-5 |
| 8 | Relationship of the Parties | 6-6 |
| 9 | Assignment | 6-6 |
| 10 | Renewal Terms | 6-6 |
| 11 | Notices | 6-7 |
| 12 | Waiver | 6-7 |
| 13 | Entire Agreement; Modifications | 6-7 |
| 14 | Severability | 6-8 |
| 15 | Headings | 6-8 |
| 16 | Governing Law | 6-8 |
| 17 | Venue | 6-8 |
| 18 | Counterparts | 6-8 |

1.    **Definitions**.  Unless otherwise required by the context in which any defined term appears, the following defined terms shall have the meanings as specified below:

**Acceptable Construction Waste** means solid waste arising from the construction or demolition of a structure by or on behalf of the City that (a) comports with the requirements of all permits for the Project regarding such waste and otherwise meets the requirements of Applicable Law, and (b) is separated from other waste prior to delivery to the Delivery Site and excluding (i) construction or demolition debris that is Hazardous Waste, asbestos or asbestos containing material or otherwise is Unacceptable Waste, (ii) solid waste resulting from construction or demolition of roads, sidewalks and parking areas, and (iii) solid waste resulting from the construction or demolition of equipment or anything else other than a structure or from construction or demolition which is not conducted by or on behalf of the City.

**Acceptable Municipal Waste** means that portion of solid waste which has characteristics such as that collected and disposed of as part of normal municipal collection of solid waste in the City, including white goods, but excluding (a) sludge, (b) construction and demolition debris, (c) tires delivered as part of a bulk load of tires, and (d) Unacceptable Waste.

**Acceptable Sludge** means sewage sludge generated at a wastewater treatment plant owned or operated by or on behalf of the City that (a) is derived from treatment of sewage consisting predominantly of domestic sewage and otherwise having the characteristics of

wastewater treated at publicly owned treatment works, (b) meets all requirements related to sewage sludge contained in any applicable permits for the wastewater treatment plant at which it is generated, (c) comports with the requirements of all permits for the Facility regarding sewage sludge, (d) otherwise meets the requirements of Applicable Law, (e) is processed utilizing standard processing techniques, as defined in Chapter 12 of the Third Edition of Metcalf and Eddy's book entitled, "Wastewater Engineering", (f) has properties and compositions within the ranges defined in Chapter 12 of the Third Edition of Metcalf and Eddy's book entitled, "Wastewater Engineering" and (g) is less than 30 percent solids, and expressly excluding (i) sewage sludge which is Hazardous Waste, has not been properly characterized by appropriate testing to determine that it is not Hazardous Waste or otherwise is Unacceptable Waste, and (ii) sewage sludge that has a specific gravity of less than one.

Sewage sludge that has been classified, through documented tests, as not being Hazardous Waste, yet has been excluded due to the aforementioned criteria, may be deemed to be acceptable provided that testing carried out by the Company proves its compatibility with the Process.

**Acceptable Waste** means Acceptable Construction Waste, Acceptable Municipal Waste and Acceptable Sludge.

**Agreement** means this City Waste Management Services Agreement between the Company and the City, including the Schedules and any written amendments hereto.

**Alternate Disposal Facility** means a landfill or other facility, equipment or site other than the Facility or other Delivery Site that (a) the Company designates as an Alternate Disposal Facility, (b) is used by the Company to accept, transport, store or dispose of Acceptable Waste or Residue under this Agreement, and (c) has all permits required by Applicable Law for the acceptance and disposal of the type and quantities of solid waste for which it is used by the Company.

**Annual Service Fee** means the fee described in Section 7.

**Applicable Law** means any law, regulation, requirement or order of any federal, State or local government agency, court or other governmental body, or the terms and conditions of any permit, license or governmental approval, applicable from time to time to the construction of the Facility or the performance of any obligation under this Agreement.

**Base Fees** means the Base Municipal Waste Fee and the Base Sludge Fees, collectively.

**Base Municipal Waste Fee** means, during the initial term of this Agreement, $65.00, the amount set forth in Section 7(a)(i), and, thereafter, the amount determined pursuant to Section 10 of Schedule 6 for the Disposal of Acceptable Waste other than Acceptable Construction Waste and Acceptable Sludge.

**Base Sludge Fees** means, during the initial term of this Agreement, the unadjusted dollar amounts set forth in Section 7(a)(iii) and, thereafter, the amounts determined pursuant to Section 10 of Schedule 6 for the Disposal of Acceptable Sludge.

**Bonds** means the bonds issued to finance, in part, the design, construction and testing of the Facility and related costs, including any additional bonds or refunding bonds issued in accordance with the same indenture.

**Calculation Year** has the meaning set forth in the definition of the Inflation Adjustor in this Schedule 6.

**Change in Law** means (a) the adoption, promulgation or modification or reinterpretation (including any change in enforcement policy) after the Contract Date of any federal, State, county, Company or municipality statute, ordinance, permit, code or regulation not adopted, promulgated, modified and officially published, as appropriate, in The Congressional Record, The Federal Register, or similar publication of the State, County or City on or before the Contract Date, or (b) the imposition after the Contract Date of any material conditions or change in government or judicial policy in connection with the issuance, renewal, modification or enforcement of any official permit, license or approval, which in the case of either (a) or (b) establishes requirements affecting the obligation of either party under this Agreement (other than payment obligations) or the design, construction, start-up, acceptance testing, operation, maintenance, cost or construction of the Project more burdensome than the most stringent requirements (i) in effect as of the Contract Date, (ii) agreed to in any applications of the Company for official permits, licenses or approvals pending as of the date of this Agreement or (iii) contained in any official permits, licenses, or approvals with respect to the Project obtained as of the date of this Agreement, or (c) the failure of any applicable federal, state or local governmental agency or unit having jurisdiction over the Project to issue any permit, license or approval after the Contract Date necessary for the operation of the Project, which permit, license or approval was not issuable on or before the Contract Date; provided that a change in any law of the City or the County will not be a Change in Law with respect to the City.

**City** means the City of Middletown, New York.

**Company** means Pencor-Masada OxyNol, LLC, a Delaware limited liability company.

**Company Actual Cost** means, with respect to any material or service, the amount the Company pays for such material or service.

**Comprehensive Waste Agreement** means the Comprehensive Waste Management Services Agreement between the City and the Company.

**Contract Municipality** means (a) the City in its role as a party to this Agreement, and (b) any municipality that has entered into an agreement with the City for the provision of solid waste management services, which municipalities are listed on Attachment - Background H of the Host Community Agreement.

**County** means Orange County, New York.

**CPI** means the Consumer Price Index for all Urban Wage Earners for the New York Region, all items, as published by the Bureau of Labor Statistics of the U.S. Department of Labor. For the purposes of determining the Inflation Adjustor, if the CPI is no longer published

or the method of computation thereof is substantially modified, an agreed upon alternative index of similar geographic focus and substantially identical economic criteria shall be substituted therefor.

**CPI Fraction** means a fraction the numerator of which is the sum of (i) the CPI for January of the preceding Operating Year immediately preceding the Calculation Year plus (ii) the product of multiplying 64% times the difference of (A) the CPI for the Calculation Year minus (B) CPI for January of the immediately preceding Operating Year, and the denominator of which is the CPI for January of the Operating Year immediately preceding the Calculation Year.

**Delivery Site** means the Facility Site, an Alternate Disposal Facility or any other site agreed to in writing by the parties.

**Disposal Letter of Credit** is defined in Section 12 above.

**Dispose, Disposed, Disposing** means treatment, processing or disposal by the Company in accordance with Applicable Law of (a) Acceptable Waste delivered to the Company in accordance with this Agreement by the following means in the order of priority listed: (i) Processing, (ii) transporting Residue to an Alternate Disposal Facility, (iii) transporting Acceptable Waste to an Alternate Disposal Facility, and (iv) directing the City to deliver Acceptable Waste to an Alternate Disposal Facility for disposal if for any reason the Facility is not available.

**Estimated Service Fee** is defined in Schedule 3.

**Facility** means the integrated solid waste processing facility, together with all additions, replacements, appurtenant structures and equipment, to be designed, constructed and operated by the Company on the Facility Site.

**Facility Operating Costs** means all costs and expenses incurred by the Company for operation of the Facility provided, however, that such expenses shall not include costs incurred with respect to the issuance of the Bonds, interest payable with respect to the outstanding principal indebtedness of the Bonds, or any allowance or expense for depreciation of the Facility. For purposes of determining Facility Operating Costs, there shall be included all amounts reserved for capital improvements, maintenance and other operating reserves. Facility Operating Costs shall be determined in accordance with generally accepted accounting principles consistently applied and shall be submitted to the Company in a certified statement prepared by the independent accounting firm engaged by the Company.

**Facility Site** means the real property upon which the Facility is located.

**Governmental Authority** means (a) the federal, state or any local government, (b) any agency, Authority, special district or political subdivision thereof and (c) any court or other government tribunal.

**Ground Lease** means the Lease for the Facility Site between the City as landlord and the Company as tenant.

**Hazardous Waste** means (a) any material or substance which, by reason of its composition or characteristics, is (i) regulated as a toxic or hazardous waste as defined in (A) either the Solid Waste Disposal Act 42 U.S.C. §§ 6901 et seq., or Section 6(e) of the Toxic Substances Control Act, 15 U.S.C. § 2605(e), as either may be replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (B) in N.Y. ECL § 27-0901 (McKinney 1984), as replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (ii) special nuclear or by-products materials within the meaning of the Atomic Energy Act of 1954; and (b) any other materials which any Governmental Authority having appropriate jurisdiction shall determine from time to time is ineligible for Disposal whether by reasons of being harmful, toxic or dangerous, or otherwise.

**Host Community Agreement** means the Host Community Agreement between the City and the Company

**Inflation Adjustor** means the number multiplied by the Base Fees to determine the Annual Service Fee as provided in Section 7. The Inflation Adjustor shall be effective as of the first day of April in each Operating Year and the twelve (12) consecutive calendar months thereafter. (The Operating Year in which the Inflation Adjustor is calculated and goes into effect shall be referred to as the "Calculation Year.") The Inflation Adjustor shall be determined in the Calculation Year as provided in one of the following alternatives, whichever is applicable:

(a)    The Inflation Adjustor shall, subject to the provisions of paragraph (b) below, be a fraction the numerator of which is the sum of (i) the CPI for January of the year following the December 31 prior to the Acceptance Date, which is the date upon which the performance test established by the Facility financing party is satisfied (the "CPI Base") plus (ii) the product of multiplying (A) 64% times (B) the amount, if any, the CPI for January of the Calculation Year exceeds the CPI Base, and the denominator of which is the CPI Base.

(b)    If the Inflation Adjustor as calculated for the Calculation Year under paragraph (a) is less than the Inflation Adjustor determined in the Operating Year immediately preceding the Calculation Year, the Inflation Adjustor shall be the greater of the following:

(i)    the number which is the product of multiplying the Inflation Adjustor determined in the Operating Year immediately preceding the Calculation Year, times the CPI Fraction; or

(ii)    the number which is the product of multiplying the Inflation Adjustor determined in the Operating Year immediately preceding the Calculation Year, times the Operating Costs Fraction.

Notwithstanding anything in this Agreement to the contrary, the Inflation Adjustor shall not be less than 1.00.

An example of the calculation of the Inflation Adjustor is attached hereto as Schedule 7.

**Lease** means the Lease Agreement between the City and the Company.

**Maximum Tonnage** and **Minimum Tonnage** are defined with respect to the City in Part A of Schedule 1. When such terms are used with reference to another Contract Municipality, they mean that municipality's tonnage requirements under its contract with the City as reflected in the Company's notice delivered pursuant to Schedule 1.

**Moisture Adjusted Tons** is defined in Part A of Schedule 1.

**Operating Costs Fraction** means a fraction the numerator of which is the Facility Operating Costs for the Operating Year immediately preceding the Calculation Year and the denominator of which is the Facility Operating Costs for the Operating Year immediately preceding the Operating Year used in the numerator of the Operating Costs Fraction.

**Operating Year** means (i) the period beginning on the Service Date and ending on the following December 31 and (ii) each calendar year thereafter, except that the last Operating Year shall begin on January 1 immediately preceding the end of the term of this Agreement and end on the last day of the term of this Agreement. All annual amounts set forth in this Agreement shall be adjusted pro rata for the first and last Operating Years.

**Person** means a corporation, limited liability company, partnership, business trust, trust, joint venture, company, firm, individual, city, municipality or other governmental entity.

**Process, Processed** or **Processing** means the recovery of recyclable materials, the processing of cellulosic waste material to produce ethanol and $CO_2$ using the CES OxyNol™ Process, or the beneficial use of residual materials.

**Project** means the Facility, the Facility Site and the Delivery Site (if other than the Facility Site).

**Proportionate Share** is defined in Schedule 1.

**Residue** means any material derived from Acceptable Waste which remains after the Processing of Acceptable Waste which the Company is unable to sell or give away.

**Service Date** means the date the City shall commence the delivery of all its Acceptable Waste to the Facility, notice of which date shall be provided in writing by the Company.

**Start-Up Date** means the first day prior to the Service Date upon which the City is required to deliver Acceptable Waste collected by the City (except for Acceptable Construction Waste) to the Company for start-up and testing operations.

**State** means the State of New York.

**Unacceptable Waste** means Hazardous Waste or any other portion of solid waste which, if Disposed of at the Facility (or any Alternate Disposal Facility), may harm the Facility or impair its operation or otherwise may not be Disposed of at a Delivery Site as it would:

(a)    present a substantial endangerment to health or safety of the public or Facility employees; or

(b)    cause a violation of Applicable Law; or

(c)    adversely affect the equipment at or operation of the Facility.

Unacceptable Waste includes explosives, including hand grenades, blasting caps, shotgun shells, closed containers capable of exploding upon Processing and fireworks, gasoline, kerosene, turpentine, waste oil, ether, acetone, solvents, paints, alcohol, acids, hydraulic oil, petroleum, caustics, burning or smoldering materials, materials that have elevated temperatures or that may self-ignite, flammable or volatile liquids, any other liquids (other than as contained in Acceptable Sludge), pathological, chemotherapeutic and biological waste, radioactive materials, hospital waste, medical waste, red bag waste, ashes, foundry sand, sewage sludge other than Acceptable Sludge, construction and demolition debris that is not Acceptable Construction Waste, septage, cesspool and other untreated human waste, leachate, human and animal remains, kitchen sinks, motor vehicles, including such major motor vehicle parts as automobile transmissions, rear ends, springs and fenders, bulk loads of tires, agricultural and farm machinery and equipment, marine vessels and major parts thereof, any other large types of machinery or equipment, liquid wastes and asbestos or asbestos containing material.

Unacceptable Waste Costs means the Company Actual Cost of removing from the Delivery Site or Alternate Disposal Site and disposing of Unacceptable Waste.

2.    Conventions.  Unless otherwise limited in this Agreement, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form on paper; any references to agreements and other contractual instruments shall be deemed to include all subsequent amendments thereto, restatements or replacements thereof, or changes therein duly entered into and effective among the parties thereto or their permitted successors and assigns; references to persons include their permitted successors and assigns; the term "including" shall mean including without limitation; references to schedules and sections mean the Schedules to and Sections of this Agreement and references to this Agreement mean this Agreement including all Schedules; the term "day" means a calendar day and includes Saturdays, Sundays and holidays, except that, in the event that any payment obligation to be performed under this Agreement falls due on a Saturday, Sunday or a holiday on which State or federally chartered banks are not open for business, the obligation shall be deemed due on the next business day thereafter; the term "prompt" means as soon as is practicable but in any event not to exceed seven days from the day of the event with respect to which action is to be taken; and the term "ton" means a short ton of 2,000 pounds.

3.    [Reserved]

4.    **Remedies.**

(a)    To the extent that specific remedies, damages or adjustments are set forth in this Agreement, such remedies, damages or adjustments shall be the sole and exclusive remedy available in the circumstances giving rise to such remedy, damage or adjustment.

(b)    It is understood and agreed between the parties that the calculations of the contract termination fees under Sections 12 and 13 are intended to provide a consistent method for the determination of the actual damages that the City or the Company, as the case may be, will sustain in the event this Agreement is terminated pursuant to Section 12 or 13, and that these calculations are agreed upon and fixed as liquidated damages and not as a penalty.

(c)    In no event, whether because of the breach of any provisions contained in this Agreement or for any other cause, whether based upon contract, strict liability, tort, warranty, delay or otherwise, shall either the City or the Company be liable, or otherwise be obligated in any manner to pay to the other any incidental, special, punitive, consequential or indirect damages of any nature (whether such damages occur prior to or after the expiration or termination of this Agreement), except as specifically provided in Sections 12 and 13 regarding contract termination fees. Nothing in this Section shall be deemed to affect the obligations of the Company and the City under Schedule 4.

(d)    Any obligation for the payment of money arising from the conduct of the parties pursuant to this Agreement prior to termination shall not be affected by any termination and shall remain in full force and effect.

5.    **Limited Obligation.    NO RECOURSE SHALL BE HAD FOR THE PAYMENT OF THE PRINCIPAL OF ANY BONDS ISSUED FOR THE FACILITY OR FOR THE PERFORMANCE OF ANY OF THE OBLIGATIONS UNDER THIS AGREEMENT AGAINST THE CITY [EXCEPT AS OTHERWISE PROVIDED IN SECTION 13(C) ABOVE] ANY PAST, PRESENT OR FUTURE MEMBER, OFFICER, EMPLOYEE OR AGENT OF THE CITY OR THE ISSUER OF THE BONDS OR ANY PREDECESSOR OR SUCCESSOR CORPORATION, EITHER DIRECTLY OR INDIRECTLY, THROUGH THE CITY OR OTHERWISE, WHETHER BY VIRTUE OF ANY CONSTITUTION, STATUTE, OF LAW OR BY THE ENFORCEMENT OF ANY ASSESSMENT OR PENALTY, OR OTHERWISE, ALL SUCH LIABILITY BEING, BY ACCEPTANCE HEREOF, EXPRESSLY WAIVED AND RELIEVED.**

6.    **Confidentiality.** Any information or materials furnished to a City or its auditor pursuant to this Agreement with respect to the operation of the Project shall be treated as confidential and maintained in strict confidence, and the City shall take all reasonable steps to prevent disclosure to third parties to the extent permitted by law, except to the extent such information is already in the public domain at the time furnished.

7.    **Cooperation in Financing.** The City agrees to make available, to the prospective issuer of the Bonds, its underwriters, their counsel, bond counsel, the rating agencies, independent engineers or feasibility consultants, credit facility providers and other financing institutions or parties involved in the financing process and the issuance of bonds, such

information in the control of the City (including financial information concerning the City) as may reasonably be requested. The City agrees to make available to the independent engineer and the feasibility consultant designated by the Company such information concerning the City as they reasonably request so they can render opinions concerning the City's abilities to perform its obligations under this Agreement. The City further agrees that, in connection with the financing of the Facility, it shall (i) provide an opinion of counsel as to the enforceability against the City of this Agreement and as to such other matters reasonably requested in connection with such financing and (ii) grant to the Company's senior lenders or their trustees such rights to cure a default by the Company hereunder as they may reasonably request in connection with the financing of the Facility and provide such certificates as are customary in connection with such financings. The Company agrees to reimburse all reasonable costs incurred by City's counsel in providing the information required in connection with the financing as set forth herein. The City does not, by virtue of entering into this Agreement, assume any liability for the Bonds or the issuer of, the holders of or the trustee for the holders of the Bonds. Except as provided in this Section and in Section 13(c) in connection with a default by the City hereunder, the City shall have no obligations to the Company with respect to the Bonds.

8.    **Relationship of the Parties.**  Neither party to this Agreement shall by virtue of this Agreement have any responsibility whatsoever with respect to services provided or contractual obligations assumed by the other party, and nothing in this Agreement shall be deemed to constitute either party a partner, agent or legal representative of the other party or to create any fiduciary relationship between the parties.

9.    **Assignment.**

(a)    This Agreement may not be assigned by the Company without the prior written consent of the City, which consent shall not be unreasonably withheld or delayed; provided that the Company may, without such consent, assign this Agreement in connection with the financing and refinancing from time to time of the Facility and/or may assign this Agreement to an affiliate of the Company. Nothing in this section shall prevent the Company from subcontracting or assigning its obligations or rights under this Agreement to third parties, provided that the Company remains liable for the performance of its obligations hereunder.

(b)    This Agreement may not be assigned by the City without the prior consent of the Company, which consent shall not be unreasonably withheld or delayed.

(c)    This Agreement shall be binding upon and inure to the benefit of the permitted successors and assigns of the parties hereto pursuant to this Section. Any attempted assignment made contrary to this Section shall be void.

10.    **Renewal Terms.**

(a)    The term of this Agreement shall be extended under the terms set forth in this paragraph (a) if, prior to the anniversary dates of the Service Date of the Facility (each, an "**Anniversary**") identified below, the City provides notice to the Company pursuant to paragraph (c).

(i)    On the fifth Anniversary, this Agreement shall be extended until the thirtieth Anniversary on its existing terms.

(ii)    After the fifth Anniversary but on or before the tenth Anniversary, this Agreement shall be extended until the thirty-fifth Anniversary on its existing terms, except that, for the period of the extension, the Base Fees shall be as announced by the Company pursuant to paragraph (b) of this Section.

(iii)    After the tenth Anniversary but on or before the fifteenth Anniversary, this Agreement shall be extended until the fortieth Anniversary on its existing terms, except that, for the period of the extension, the Base Fees shall be as announced by the Company pursuant to paragraph (b) of this Section.

(b)    At least six (6) months prior to the tenth Anniversary and fifteenth Anniversary, the Company shall give notice to the City stating the Base Fees that will be in effect for the period of the extension under paragraph (a)(ii) or (iii) above, as the case may be. The Base Fees announced by the Company under paragraph (a)(ii) shall not exceed 125% of the Base Fees. The Base Fees announced by the Company under paragraph (a)(iii) shall not be less than 110% of the Base Fees in effect at the time the Company gives such notice.

(c)    At any time prior to the fifth, tenth and fifteenth Anniversaries [in accordance with the provisions of paragraphs (a)(ii) and (a)(iii) above], the City may provide written notice to the Company that it desires to extend this Agreement at such time, and this Agreement shall be extended at such time.

(d)    Notwithstanding anything to the contrary in this Section 10, if at the twenty-fifth, thirtieth or thirty-fifth Anniversary, the Company does not have contracts with the Contract Municipalities for an aggregate Minimum Tonnage for the next five years of at least 80 percent of the then existing operating capacity of the Facility, the Company may terminate this Agreement by providing at least six (6) months' prior written notice to the City.

11.    **Notices.**

(a)    Any notice given pursuant to this Agreement shall be in writing and may be cabled, telecopied, delivered by hand, mailed by first class, certified mail, return receipt requested, postage prepaid, or dispatched by next day delivery service and, in any case, shall be addressed as follows:

If delivered to the Company:

Pencor-Masada OxyNol, LLC
2170 Highland Avenue
Suite 200
Birmingham, Alabama  35205
Attention:    Daryl Harms
Telephone:    205-558-7900
Fax:          205-558-7911

<u>With a copy to</u>:

        Pencor-Masada OxyNol, LLC
        2170 Highland Avenue
        Suite 200
        Birmingham, Alabama  35205
        Attention:    General Counsel
        Telephone:   205-558-7900
        Fax:          205-558-7911

<u>If delivered to the City</u>:

        City of Middletown
        16 James Street
        Middletown, New York  10940
        Attention:    Joseph DeStefano
                    Mayor
        Telephone:   845-346-4100
        Fax:          845-343-7439

<u>With a Copy to</u>:

        Alex Smith, Esq.
        Corporation Counsel
        City of Middletown, New York
        16 James Street
        Middletown, New York 10940
        Telephone:   845-346-4139
        Fax:          845-346-4146

Either party may change the address to which its communications are delivered by notice to the other parties.

        (b)    Any communication given in accordance with this Section shall be deemed to have been given to a party upon its receipt by such party or upon such party's refusal to accept its delivery.

        12.    **Waiver.**  The waiver by either party of a default or a breach of any provision of this Agreement by the other party shall not operate or be construed to operate as a waiver of any subsequent default or breach.  The making or the acceptance of a payment by either party with knowledge of the existence of a default or breach shall not operate or be construed to operate as a waiver of any default or breach.

        13.    **Entire Agreement; Modifications.**  This Agreement, together with the Host Community Agreement, the Comprehensive Waste Agreement and the Ground Lease, (i) is the entire understanding of the parties with respect to the subject hereof and supersedes all prior

agreements, understandings and commitments with respect thereto and (ii) may be modified only by written agreement executed by both parties.

14.    **Severability.**  In the event that any provision of this Agreement, or the application of such provision to any Person or circumstance shall, for any reason, be determined to be invalid, illegal, or unenforceable in any respect, the parties shall negotiate in good faith and agree to such amendments, modifications, or supplements of or to this Agreement or such other appropriate actions as shall, to the maximum extent practicable in light of such determination, implement and give effect to the intentions of the parties as reflected herein, and other provisions of this Agreement shall, as so amended, modified, or supplemented, or otherwise affected by such action, remain in full force and effect.

15.    **Headings.**  Captions and headings in this Agreement are for ease of reference only and do not constitute a part of this Agreement.

16.    **Governing Law.**  This Agreement and any question concerning its validity, construction or performance shall be governed by the laws of the State, irrespective of the place of execution or of the order in which the signatures of the parties are affixed or of the place or places of performance.

17.    **Venue.**  The Company and the City hereby agree that any action, suit or proceeding arising out of this Agreement or any transaction contemplated hereby shall be brought in a court of competent jurisdiction in the State, and that neither the Company nor the City shall object to the institution or maintenance of any such action, suit or proceeding in such court based on improper venue, forum non conveniens or any other ground relating to the appropriate forum for such action, suit or proceeding.  Notwithstanding the foregoing, the provisions of Schedule 5 shall govern and control.

18.    **Counterparts.**  This Agreement may be executed in more than one counterpart, each of which shall be deemed to be an original but all of which taken together shall be deemed a single instrument.

19.    **Leasehold Financing.**  The Company will be entering into Leasehold Mortgages (as defined in the Ground Lease) with Leasehold Mortgagees in connection with the financing of the Facility.  If the Company or any Leasehold Mortgagee shall send to the City a true copy of any such Leasehold Mortgage, together with written notice specifying the name and address of the Leasehold Mortgagee, the City agrees that after receipt of such notice and so long as any such Leasehold Mortgage shall remain unsatisfied of record or until written notice of satisfaction is given by the holder to the City, the following provisions shall apply:

(a)    There shall be no cancellation, surrender, amendment, or modification of this Agreement by joint action of the City and the Company without the prior written consent of the Leasehold Mortgagee.

(b)    The City shall, upon mailing or giving to the Company any notice of default or any other notice hereunder, simultaneously send a copy of such notice to the

Leasehold Mortgagee at the address furnished in said written notice or in any subsequent written notice to the City changing such address.

(c)    The City agrees that the City will not terminate this Agreement following any default by the Company hereunder and the expiration of any grace or notice period granted to the Company hereunder for the cure of such event of default provided that:

(i)    If such default can be cured by the payment or expenditure of money or reasonably can be cured within ninety (90) days and without possession of the Site, the Leasehold Mortgagee cures the default or breach described in such notice within ninety (90) days following receipt of written notice that the Company has failed to timely cure such default; or

(ii)    If such default or breach cannot be cured by the payment or expenditure of money or cannot reasonably be cured within ninety (90) days, the Leasehold Mortgagee commences the cure of such default within the ninety (90) day period after receipt of written notice that the Company has failed to timely cure such default, and thereafter diligently pursues such cure to completion, even if completion of such cure requires a longer period of time; or

(iii)    If such default or breach cannot be cured without possession of the Site, the Leasehold Mortgagee commences proceedings for foreclosure and sale under the Leasehold Mortgage within the ninety (90) day period after receipt of written notice that the Company has failed to timely cure such default, which period shall be deemed extended by the number of days of delay occasioned by judicial restriction against commencement of foreclosure, including, without limitation, a stay imposed by a bankruptcy petition, or occasioned by other circumstances beyond the Leasehold Mortgagee's control, and thereafter the Leasehold Mortgagee diligently pursues such proceedings to completion and, upon obtaining possession of the Site, diligently pursues the cure of such default to completion.

(d)    If a Leasehold Mortgagee shall fail to comply with any of the requirements of this Section 19, then and thereupon the City shall be released from the covenant of forbearance herein contained as to such Leasehold Mortgagee, and City shall be entitled to proceed to terminate this Agreement. Nothing herein contained shall preclude the City from terminating this Agreement following completion of any proceedings for foreclosure or assignment in lieu of foreclosure to any Leasehold Mortgagee if within ninety (90) days thereafter any default hereunder which can be cured is not cured.

(e)    The City shall give the Leasehold Mortgagee prompt notice of any intended termination of this Lease no later than ninety (90) days prior to the intended date of such termination and of the amount owing to the City as of the date of termination of the Lease.

(f)    In the event a Leasehold Mortgagee succeeds to the rights of Company hereunder by foreclosure or assignment in lieu of foreclosure or otherwise, said Leasehold Mortgagee shall be released from any liability hereunder from and after the date of any assignment of its interest hereunder. The City acknowledges and confirms that the

Leasehold Mortgagee shall have the full and absolute right to assign the rights and obligations of the Company hereunder to any party or entity. No Leasehold Mortgagee shall become liable for the performance or observance of any covenants to be performed by the Company hereunder unless and until such Leasehold Mortgagee becomes the owner of the Company's interest hereunder. Notwithstanding anything herein contained to the contrary, the Leasehold Mortgagee or any person or entity acquiring such leasehold estate shall be liable to perform the obligations imposed on the Company by this Lease only during the period such person has ownership of said leasehold estate or possession of the Premises.

(g)    All of the provisions contained in this Agreement with respect to Leasehold Mortgages and the rights of the Leasehold Mortgagees shall survive the termination of this Agreement for such period of time as shall be necessary to effectuate the rights granted to all Leasehold Mortgagees by the provisions of this Agreement.

(h)    Nothing herein contained shall require any Leasehold Mortgagee to cure any default by the Company hereunder; provided, however, that the City agrees to accept the performance by any Leasehold Mortgagee of any obligation under this Agreement in lieu of performance by the Company.

(i)    In the event two or more Leasehold Mortgagees each exercise their rights hereunder and there is a conflict which renders it impossible for the City to comply with all such requests, the Leasehold Mortgagee whose Leasehold Mortgage would be senior in priority if there were a foreclosure shall prevail.

(j)    Upon the reasonable request of any Leasehold Mortgagee, the City and the Company shall cooperate in including in this Agreement by suitable amendment from time to time any provisions reasonably requested by any Leasehold Mortgagee for the purpose of implementing the protective provisions contained in this Section 19 for the benefit of such Leasehold Mortgagee. The City and the Company shall execute, deliver and acknowledge any amendment reasonably necessary to effect any such requirement; provided, however, that any such amendment shall not in any way affect the term nor otherwise in any material respect adversely affect any rights of the City under this Agreement.