SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
------------------------------------------------------------------x
CITY OF MIDDLETOWN, MARLINDA                  :
DUNCANSON, INDIVIDUALLY AND IN HER            :
OFFICIAL CAPACITY AS MAYOR OF THE             :
CITY OF MIDDLETOWN, ROBERT MOSON,             :
IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE  :
COMMON COUNCIL OF THE CITY OF                 :
MIDDLETOWN, MAXINE MEYER,                     :
INDIVIDUALLY AND IN HER OFFICIAL              :
CAPACITY AS A MEMBER OF THE COMMON            :
COUNCIL OF THE CITY OF MIDDLETOWN,            :
JAMES ROLLINS, INDIVIDUALLY AND IN HIS        :
OFFICIAL CAPACITY AS A MEMBER OF THE          :
COMMON COUNCIL OF THE CITY OF                 :
MIDDLETOWN, THOMAS J. BURR, IN HIS            :
OFFICIAL CAPACITY AS A MEMBER OF THE          :
COMMON COUNCIL OF THE CITY OF                 :
MIDDLETOWN, JOHN VANDERVOORT,                 :
IN HIS OFFICIAL CAPACITY AS A MEMBER          :
OF THE COMMON COUNCIL OF THE CITY OF          :
MIDDLETOWN, GERALD KLEINER, IN HIS            :
OFFICIAL CAPACITY AS A MEMBER OF THE          :
COMMON COUNCIL OF THE CITY OF                 :
MIDDLETOWN, RAYMOND DEPEW, IN HIS             :
OFFICIAL CAPACITY AS A MEMBER OF THE          :
COMMON COUNCIL OF THE CITY OF                 :
MIDDLETOWN, AND JOEL SIERRA, IN HIS           :
OFFICIAL CAPACITY AS A MEMBER OF THE          :
COMMON COUNCIL OF THE CITY OF                 :
MIDDLETOWN,                                   :
                                              :
                                              :
                    Petitioners,              :
                                              :
                                              :
                                              :
        -against-                             :
                                              :
PENCOR-MASADA OXYNOL, LLC,                    :
                                              :
                    Respondent.               :
                                              :
------------------------------------------------------------------x

**AFFIRMATION IN
SUPPORT OF PETITION
TO STAY ARBITRATION
AND REQUEST FOR
TEMPORARY STAY**

**Index No. __ - _____**

**MICHAEL G. MURPHY, ESQ.**, an attorney duly admitted to practice law in the State of New York, affirms under penalty of perjury as follows:

1.      I am a member of the law firm Beveridge & Diamond, P.C., attorneys for petitioners, the City of Middletown (the "City"), a New York municipal corporation, and the above-captioned individual petitioners (the "Individual Petitioners" and, collectively with the City, the "Petitioners").

### PARTIES AND DESCRIPTION OF PROCEEDING

2.      I respectfully submit this Affirmation in support of the Petitioners' Petition for a permanent stay of arbitration pursuant to CPLR 7502 and 7503, and in support of Petitioners' request for a temporary stay of arbitration to preserve the status quo until this Court decides the threshold issues presented in Petitioners' Petition.

3.      The Petitioners have been named as Defendants in an arbitration proceeding captioned *Pencor-Masada Oxynol, LLC v. City of Middletown, New York, et al.*, case no. 13 192 Y 01324 07 (the "Arbitration Proceeding"), which was brought by Pencor-Masada OxyNol LLC ("PMO") on or about June 18, 2007 by filing a Complaint in Arbitration with the American Arbitration Association (the "AAA"). *See* Petition, Exhibit A.

4.      The Arbitration Proceeding was purportedly brought pursuant to a "Dispute Resolution" provision of certain related agreements between the City and PMO.

5.      The City and PMO were the only parties to these agreements.  The Individual Petitioners were not signatories to any of these agreements and never consented to arbitrate any dispute with PMO, and therefore were not properly named as Defendants in PMO's Complaint in Arbitration.  Accordingly, the arbitration claims against the Individual Petitioners should be permanently stayed and/or dismissed.

6.      In its Complaint in Arbitration, PMO alleges that the Petitioners tortiously interfered with its prospective and/or existing business relationships.  PMO further alleges that Petitioners violated PMO's rights under the New York State Constitution.  However, PMO never filed a notice of claim prior to commencing the Arbitration Proceeding, as required under General Municipal Law 50-e and, insofar as PMO purports to assert such claims, they would have accrued more than 90 days prior to the commencement of the Arbitration Proceeding.

7.      PMO's tortious interference and state constitutional claims are not arbitrable and should be permanently stayed and/or dismissed because they are time-barred by General Municipal Law §§ 50-e and 50-i.

8.      Petitioners also respectfully request a temporary stay of the Arbitration Proceeding until this Court decides the issues presented in Petitioners' Petition.

9.      The potential harm to Petitioners is imminent.  By letter dated June 27, 2007, annexed hereto as Exhibit 1, the AAA informed Petitioners that, if they wish to file an answer or assert a counter-claim, they must do so on or before July 12, 2007.  As Exhibit 1 shows, PMO's Complaint in Arbitration was filed by the law firm of Powell Goldstein, LLP.  Exhibit 2 is a copy of the notice of appearance on behalf of PMO by the law firm of Thomas, Means, Gillis & Seay, P.C.  In order to give advance notice to PMO of Petitioners' application for a temporary stay, copies of Petitioners' Verified Petition (and exhibits thereto), the proposed Order to Show Cause and this affirmation (and exhibits thereto) are being forward to Powell Goldstein, LLP and Thomas, Means, Gillis & Seay, P.C. by e-mail today.

10.     In the absence of a stay, Petitioners will be irreparably harmed.  Unless the Arbitration Proceeding is stayed, Petitioners will be forced to respond to PMO's Complaint in Arbitration by filing an answer and asserting counterclaims, and therefore will be forced to

participate in an arbitration to which they never consented and to potentially relinquish their rights to access the courts.

11.    At a minimum, how Petitioners -- or the City alone -- formulates their defenses and/or counterclaims to PMO's Complaint in Arbitration necessarily depends upon this Court's determination of the issues presented in Petitioners' Petition. Petitioners should not be forced to face an arbitration deadline or participate in the arbitration until these issues are decided.

12.    Granting Petitioners' request for a temporary stay will merely maintain the status quo while the Court considers Petitioners' application for a permanent stay pursuant to Article 75 of the CPLR.

13.    Moreover, for the reasons stated herein, Petitioners have a strong likelihood of successfully staying the Arbitration Proceeding on the grounds that: (1) there is no valid arbitration agreement between the Individual Petitioners and PMO because the individuals named in the Arbitration Proceeding never consented to arbitration; (2) certain of the claims asserted in the Arbitration Proceeding are barred by the statute of limitations; and (3) the constitutional violations alleged in the Arbitration Proceeding are beyond the scope of the arbitration clause at issue and, in any event, the arbitration of those claims is against public policy. *See* Petition ¶ 2.

## FACTUAL BACKGROUND

14.    PMO brought the Arbitration Proceeding to resolve a contract dispute between the City and PMO. Despite PMO's efforts to dress its contract claims in constitutional and tort cloth and to implead the Individual Petitioners in an effort to intimidate City officials, the essence of this dispute concerns PMO's ability to perform its legal duties under a series of related agreements in which PMO agreed to develop and construct a facility on City property that would convert the City's waste to ethanol. The Individual Petitioners never consented to arbitrate any

dispute with PMO. They are not signatories to these agreements and, in fact, many of them, including the current Mayor, were not even elected to their respective positions at the time these agreements were executed. Moreover, the City never intended the Dispute Resolution clause contained in these agreements to cut so broadly as to encompass allegations of unconstitutional action on the City's behalf wholly unrelated to the terms and conditions of these agreements.

15.     In 1994, the City issued a request for proposals ("RFP") pursuant to General Municipal Law § 120-w for a long-term, comprehensive, integrated and environmentally sound solution to its solid waste disposal needs that excluded incineration.

16.     In 1995, Pencor Orange Corporation ("Pencor"), a New York Corporation, responded to the RFP and was selected as the preferred bidder. Pencor's selection was based on its proposal for the construction of a materials recovery facility coupled with the conversion of the organic fraction of the waste into useful products with minimal residual waste. More specifically, the conversion component would utilize Pencor's "OxyNol" process to convert the organic constituents of municipal solid waste ("MSW") into ethanol.

17.     Upon information and belief, Pencor caused to be formed and/or otherwise became affiliated with PMO.

18.     PMO was designated as project developer, with Pencor as PMO's managing member.

19.     Between 1996 and 2003, the City and PMO negotiated the terms of several related agreements. During this time period, the project was reviewed by the City, acting as lead agency, pursuant to the State Environmental Quality Review Act ("SEQRA"). The City's SEQRA findings statement expressly states that PMO would construct and operate a facility that "would utilize an innovative process, the CES OxyNol™ process, for converting municipal solid waste (MSW) and sewage sludge into ethanol and other valuable products" and that the facility

- 4 -

was "expected to process 230,000 wet tons per year of MSW and up to 49,000 tons per year (dry solids basis) of sewage sludge and produce 7 million gallons per year or ethanol." All of the City's SEQRA findings were based on this assumption.

20.     In December 2003, almost 10 years after the City issued the RFP, and after the SEQRA process was complete, the City authorized then-Mayor Joseph DeStefano to execute certain agreements relating to the proposed PMO waste-to-ethanol project ("December 2003 Resolution").

21.     The agreements at issue had an effective date of December 9, 2003 and consisted of following: (1) City Waste Management Services Agreement (Petition, Exhibit B); (2) Comprehensive Waste Management Services Agreement (Petition, Exhibit C); (3) Lease Agreement (Petition, Exhibit D); and (4) Host Community Agreement (Petition, Exhibit E), (collectively, the "City Agreements").

22.     The City and PMO were the only two parties to the City Agreements.

23.     None of the individual members of the City Council nor the current Mayor signed the City Agreements, and none of them ever consented to submit to arbitration any claim against them individually or in their capacity as a public official, or to waive their right to defend themselves in Court.

24.     Following the issuance of the December 2003 Resolution, the parties continued to finalize certain terms of the City Agreements relating to insurance and/or indemnification.

25.     In March 2004, these remaining provisions were finalized and then-Mayor Joseph DeStefano executed the City Agreements on behalf of the City of Middletown.

26.     The City forwarded the partially executed City Agreements to PMO in late March 2004.

27.     Approximately one year and a half later, by letter dated October 11, 2005, PMO returned to the City the fully executed City Agreements, which, upon information and belief, had been executed by PMO in July 2005.

28.     At no time prior to its execution or delivery of the fully-executed agreements to the City in October 2005 did PMO seek to revisit, amend or extend any of the provisions of the agreements.

29.     The City Agreements contemplate the construction and operation by PMO on City property of an "integrated solid waste processing facility" available to receive MSW and sewage sludge, and separating such waste for recycling and producing marketable byproducts (*i.e.,* ethanol).

30.     Under the City Agreements, the term "Facility" means "the integrated solid waste processing facility, together with all additions, replacements, appurtenant structures and equipment, to be designed, constructed and operated by the Company [PMO] on the Facility Site."

31.     Under the City Agreements, either party may terminate the City Agreements in the event PMO fails to have a fully operational Facility capable of, *inter alia*, accepting all of the MSW and sewage sludge generated by the City, by the "Service Date" deadline of December 9, 2008.

32.     The City Agreements include and/or incorporate certain Schedules, one of which sets forth certain "Common Contract Conditions." These Common Contract Conditions contain, *inter alia*, an "Entire Agreement; Modifications" provision, under which the Lease, City Waste Management Services Agreement, Comprehensive Waste Agreement and Host Community Agreement together constitute "the entire understanding of the parties with respect to the subject

hereof and supersedes all prior agreements, understandings and commitments with respect

thereto and . . . may be modified only by written agreement executed by both parties."

33.    The City Agreements also contain a "Dispute Resolution" clause, which states in

pertinent part:

> Any claim, action dispute or controversy of any kind arising out of
> or relating to this Agreement or concerning any aspect of
> performance by the City or the Company [PMO] (each a "Party")
> under the terms of this Agreement ("Dispute") shall be resolved by
> mandatory and binding arbitration administered by the American
> Arbitration Association (the "AAA"). . . .  To the extent that any
> inconsistency exists between this Agreement and the foregoing
> statutes or rules, this Agreement shall control. . . .

See Petition, Exhibit B (City Waste Management Services Agreement, Schedule 5, Dispute

Resolution).

34.    The City Agreements expressly prohibit recovery of punitive damages:

> In no event, whether because of the breach of any provisions
> contained in this Agreement or for any other cause, whether based
> on contract, strict liability, tort, warranty, delay or otherwise, shall
> either the City or the Company be liable, or otherwise be obligated
> in any manner to pay to the other any incidental, special, punitive,
> consequential or indirect damages of any nature.

See id. (City Waste Management Services Agreement, Schedule 6, General Contract Conditions,

§ 4(c)).

## RELEVANT POST-AGREEMENT CONDUCT

35.    As of the first quarter of 2006, PMO had made no measurable progress with

respect to the development of the Facility, despite the fact that the RFP process had commenced

in 1994, approximately 12 years earlier.  Accordingly, in or about April 2006, the City began

making certain inquiries of PMO in order to obtain reasonable assurances that PMO could fulfill

its obligations under the City Agreements, including the Service Date deadline of December 9,

2008.

36.    By letter dated August 18, 2006, and on numerous occasions before and thereafter, the City raised several issues pertaining to PMO's ability to comply with its obligations under the City Agreements, including the Service Date deadline of December 9, 2008. The City also questioned the ongoing validity of key provisions of the City Agreements in light of a unilateral decision by PMO not to seek financing from the Middletown Industrial Development Agency ("MIDA"), as expressly contemplated by the City Agreements (*e.g.,* the commencement of the term of the Lease is tied to closing on MIDA bond financing). *See* Petition, Exhibit F.

37.    PMO's responses were largely evasive and non-responsive.

38.    In December 2006, PMO provided a "2006 Year-End Report," in which PMO informed the City, that, among other things, it was filing a pre-application for construction loan financing from the United States Department of Energy ("DOE") under a program established by the Energy Policy Act of 2005 and that it intended to purchase from the Tennessee Valley Authority ("TVA") certain "biomass pilot plant equipment." *See* Petition, Exhibit G.

39.    Subsequent correspondence from PMO confirmed that the outdated pilot plant equipment could process no more than two to four tons per day of MSW for conversion to ethanol, far less than the quantities of MSW and sewage sludge generated by the City.

40.    By letter dated January 4, 2007, the City informed PMO that it was "deeply troubled by PMO's sudden announcement that it intends to relocate old 'pilot plant' equipment for use in Middletown" and expressed its position that such a proposal would not be "consistent with the scope or intent of the City/PMO agreements," which required a full-scale waste to ethanol facility to be operational by December 2008. *See* Petition, Exhibit H.

41.    The City also inquired into PMO's pre-application to the DOE for a construction loan guarantee pursuant to Title XVII of the Energy Policy Act, related to "innovative

technologies," which contains specific statutory eligibility criteria, including air emission limits for sulfur dioxide and nitrogen oxides. *Id.*

42.     In its January 4, 2007 letter to PMO, the City sought an explanation of how PMO was eligible under the Title XVII program when its existing Air Permit appeared to authorize emissions of sulfur dioxide and nitrogen oxides in excess of the statutory limits set forth in the Energy Policy Act. *Id.* The City also inquired about the status of PMO's private equity financing and stated that the City did not have a reasonable basis to believe that PMO could meet its contractual obligations. *Id.*

43.     By letter dated January 5, 2007, PMO responded to the City's inquiry, but conflated two programs authorized under the Energy Policy Act. *See* Petition, Exhibit I. The first program described by PMO was authorized under Title XV, which DOE was not yet pursuing and which, upon information and belief, was inapplicable to PMO's financing application. *Id.* The other program, authorized under Title XVII, which DOE was pursuing, contained the express statutory requirements for eligibility described above. *Id.* PMO further asserted that the City had unreasonably or improperly attempted to "interfere with [PMO's] ongoing financial relationships," but did not substantively respond to the City's inquiry regarding PMO's eligibility under the DOE program. *Id.*

44.     Concerning its representations regarding private equity financing, PMO responded to the City's inquiry by vaguely stating that it may pursue European private financing for the project. *See id.* PMO also stated that it did not expect to close on private equity financing until a determination had been made regarding PMO's application to DOE. *Id.*

45.     By letter dated January 17, 2007, the City informed PMO that it believed PMO's assertion of the City's improper interference with business relations was without merit and that the City stood by its reasonable requests for information concerning PMO's DOE construction

loan guarantee application, as this issue was now directly related to PMO's ability to perform under the City Agreements. *See* Petition, Exhibit J.

46.     On May 22, 2007, PMO appeared before the City's Common Council to deliver a project status update.

47.     As of May 22, 2007, PMO still had not closed on any of its promised private financing, nor had PMO secured DOE financing, but now professed to be able to self-finance a portion of the project.

48.     At the May 22, 2007 meeting, PMO handed out a report entitled "Progress Report to the City of Middletown, New York on the Orange Recycling and Ethanol Production Facility by Pencor Masada OxyNol, LLC" (the "Progress Report"). *See* Petition, Exhibit K (Progress Report).

49.     In the Progress Report, PMO stated its plan to "employ the transfer station on site to fulfill its contractual obligation" and to develop and build "PMO's full scale waste-to-ethanol facility in stages, starting with the reassembly and operation of the TVA facilities and equipment" and then, sometime after the Service Date deadline of December 9, 2008, "resume PMO's preferred project development approach for its full-scale PMO facility in a manner that prudently advances PMO's original business objectives." *Id.*

50.     This proposal was inconsistent with PMO's obligations under the City Agreements, as the City had made abundantly clear in January.

51.     By letter dated June 6, 2007, PMO demanded that the City's Common Council adopt a resolution of support for PMO's application to DOE.

52.     On June 11, 2007, the Common Council adopted a resolution (the "June 11 Resolution") in support of PMO's application for DOE financing, contingent on PMO developing a Facility that fully complied with the City Agreements. *See* Petition, Exhibit L. The

resolution expressly stated the City's position that the Service Date deadline was December 9,

2008, and that, pursuant to the City Agreements, PMO must have a full-scale waste-to-ethanol

facility on the project site by that date. *Id.*

53.    By letter dated June 12, 2007, the City restated its position, first stated in its

January 4, 2007 letter to PMO, that PMO's proposed development of a transfer station and

small-scale pilot waste-to-ethanol facility in lieu the promised full-scale waste-to-ethanol plant

"would be a direct violation of the City/PMO agreements, and would eviscerate the basis for the

City's decision to contract with PMO in the first place."  *See* Petition, Exhibit M. The City

further reiterated its consistent position that the Service Date deadline was December 9, 2008.

*Id.*

## THE ARBITRATION PROCEEDING

54.    On or about June 18, 2007, PMO filed a "Complaint in Arbitration" with the

AAA against all of the Petitioners, including each member of the Common Council in his or her

official capacity and the Mayor and two Common Council members in their individual

capacities, purportedly based on the Dispute Resolution clause contained in Schedule 5 to the

City Agreements.  *See* Petition, Exhibit A.

55.    In its Complaint in Arbitration, PMO alleged, *inter alia*, that the Petitioners

violated "PMO's rights to due process and equal protection under the Fourteenth Amendment to

the United States Constitution, which is actionable under 42 U.S.C. § 1983 . . .," that the

Petitioners violated "PMO's freedom of political association guaranteed under the First

Amendment of the United States Constitution, which is actionable under 42 U.S.C. § 1983 . . .,"

that Petitioners violated "PMO's rights under the laws of New York to be protect [sic] from

tortious interference with the City's agreements and third-party relationships" and that the

Petitioners violated "PMO's rights under New York law to due process and equal protection." *Id.*

56.    PMO's Complaint in Arbitration seeks, *inter alia*: (1) declarations that PMO's rights under "the City agreements, the laws of the State of New York, and the First and Fourteenth Amendments of the United States Constitution" have been violated; (2) certain monetary damages, including PMO's alleged project development costs; (3) punitive damages against individual Petitioners Duncanson, Meyer and Rollins; and (4) attorneys' fees "under 42 USC § 1988 for the violation of PMO's First and Fourteenth Amendment rights." *Id.*

## STANDARDS OF REVIEW

57.    CPLR 7502(b) and (c) state in pertinent part that:

> (b) If, at the time that a demand for arbitration was made or a notice of intention to arbitrate was served, the claim sought to be arbitrated would have been barred by limitation of time had it been asserted in a court of the state, a party may assert the limitation as a bar to the arbitration on an application to the court as provided in section 7503 or subdivision (b) of section 7511. . . .

> (c) Provisional remedies. The supreme court in the county in which an arbitration is pending or in a county specified in subdivision (a) of this section, may entertain an application for an order . . . for a preliminary injunction in connection with an arbitration that is pending or that is to be commenced inside or outside this state, whether or not it is subject to the United Nations convention on the recognition and enforcement of foreign arbitral awards, but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief. . . .

58.    No party will be compelled to arbitrate absent "evidence which affirmatively establishes that the parties expressly agreed to arbitrate their disputes." *Waldron v. Goddess*, 61 N.Y.2d 181, 183, 473 N.Y.S.2d 136, 137 (1984) (internal quotation omitted). In this regard, an arbitration agreement must be "clear, explicit and unequivocal . . . and must not depend upon

- 12 -

implication or subtlety." *Id.* at 183-84, 137 (internal citations omitted). Therefore, where, as here, a party named in an arbitration proceeding never agreed to arbitrate any dispute with regard to the contract in question, a stay of arbitration is appropriate. *See Bidermann Indus. Licensing v. Avmar N.V.*, 155 A.D.2d 303, 547 N.Y.S.2d 589 (1st Dep't 1989).

59.    Further, New York law is clear that "in proceedings authorized by a prior agreement to arbitrate future disputes, it is for the court to determine whether the claim, and therefore the arbitration, is barred by the statute of limitations." *Paver & Wildfoerster v. Catholic High Sch. Ass'n*, 38 N.Y.2d 669, 674, 382 N.Y.S.2d 22, 24 (1976); *see also SCM Corp v. Fisher Park Lane Co.*, 40 N.Y.2d 788, 792, 390 N.Y.S.2d 398, 402 (1976). Indeed, CPLR 7502(b) was enacted specifically to clarify that statute of limitations issues were to be determined by a court, not an arbitrator. *Paver*, 38 N.Y.2d at 673, 382 N.Y.S.2d at 24.

60.    CPLR 7503(c) states in pertinent part: "Any provision in an arbitration agreement or arbitration rules which waives the right to apply for a stay of arbitration is hereby declared null and void."

## RELIEF SOUGHT

61.    PMO commenced the Arbitration Proceeding purportedly based on a Dispute Resolution clause applicable to certain related agreements between the City and PMO concerning PMO's proposed waste-to-ethanol facility (the "City Agreements"). *See* Petition ¶¶ 24, 36, Exhibits B-E (City Agreements; City Agreements, Schedule 5, Dispute Resolution).

62.    PMO did not file a notice of claim prior to commencing the Arbitration Proceeding.

- 13 -

**A.**    **The Individual Petitioners Were Not Parties to the City Agreements and Cannot be Compelled to Arbitrate**

63.    The Individual Petitioners are not parties to the City Agreements and cannot be compelled to arbitrate under the Dispute Resolution clause contained therein. It is black-letter law in New York that no party will be compelled to arbitrate absent "evidence which affirmatively establishes that the parties expressly agreed to arbitrate their disputes." *Rockland v. Primiano Constr. Co.*, 51 N.Y.2d 1, 6, 431 N.Y.S.2d 478, 480-81 (1980). None of the Individual Petitioners signed the City Agreements or otherwise agreed to relinquish their right to access the courts in a dispute involving PMO. Simply stated, there is no agreement to arbitrate between PMO and any of the Individual Petitioners. Consequently, none of PMO's claims against the Individual Petitioners are arbitrable. Thus, at the very least, this Court should temporarily stay the Arbitration Proceeding until the Court determines whether PMO's claims against the Individual Petitioners may proceed.

**B.**    **PMO's Punitive Damages Claim May Not Be Arbitrated**

64.    As noted earlier, the City Agreements expressly exclude an award of punitive damages. See Petition, Exhibit B (City Waste Management Services Agreement, Schedule 6, General Contract Conditions, § 4(c)).

65.    Further, punitive damages cannot be recovered from a municipality as a matter of law. *See Newport v. Fact Concerts, Inc.,* 453 U.S. 247 (1981). In any event, PMO seeks punitive damages solely from three of the Individual Petitioners, none of whom is properly named as a Defendant in the Complaint in Arbitration for the reasons stated above.

66.    Thus, in addition to there being no valid agreement to subject the Individual Petitioners to arbitration, the Arbitration Proceeding against the three Individual Petitioners also should be stayed with respect to PMO's claims for punitive damages.

**C.    PMO's Tortious Interference and State Constitutional Tort Claims Are Barred by the Statute of Limitations and Are Not Arbitrable**

67.    In the Arbitration Proceeding, PMO alleges, among other things, that the Petitioners tortiously interfered with PMO's unspecified existing and/or potential business relationship or contracts.

68.    General Municipal Law § 50-e requires that a notice of claim be served upon the City, within 90 days after the claim arises, prior to commencing a tortious interference claim against a municipal government. *See McVan v. New Rochelle*, 127 A.D.2d 825, 511 N.Y.S.2d 942 (2d Dep't 1987). A cause of action for tortious interference accrues when the plaintiffs' alleged contractual relationship was harmed and not upon discovery of the tortious act. *Bib Constr. Co. v. City of Poughkeepsie*, 273 A.D.2d 186, 709 N.Y.S.2d 112 (2d Dep't 2000) (dismissing tortious interference claim for failure to file a notice of claim). Here, insofar as PMO has alleged a cause of action for tortious interference with PMO's unspecified contractual relationships based on the alleged effect of the content of the City's correspondence questioning PMO's ability to live up to its contractual obligations, that correspondence began no later than April 2006. By August 2006, the City had questioned PMO's ability to finance the project with DOE and private equity funds; by January 2007, PMO had already directly asserted that the City had interfered with its business relationships. If PMO believed it had a viable claim for tortious interference, it would have accrued, at the latest, in January 2007, when PMO itself accused the City of interfering with "PMO's ongoing financial relationships . . ." *See* Petition Exhibit I. PMO failed to file a notice of claim within 90 days of the accrual of this purported cause of action or, indeed, at anytime thereafter. Therefore, insofar as PMO asserts that the City tortiously interfered with PMO's prospective business relationship or contract, such a claim is time-barred. *See Bib Constr., supra.*; Petition ¶¶ 74-80.

69.     For identical reasons, this Court should stay PMO's claims that the City violated its state constitutional rights.  Claims of state constitutional violations are subject to notice of claim requirements of General Municipal Law § 50-e.  *See Mazzilli v. City of New York,* 154 A.D.2d 355, 545 N.Y.S.2d 833 (2d Dep't 1989).  Although vaguely pled, this cause of action is based on the same alleged course of conduct as PMO's tortious interference claim.  Because PMO failed to file a notice of claim for their purported causes of action alleging violations of the state constitution, this Court should stay the arbitration of those claims as well.

**D.     PMO's Constitutional Claims Are Beyond the Scope of the Dispute Resolution Clause and Are Not Arbitrable as a Matter of Public Policy**

70.     In the Arbitration Proceeding, PMO further alleges, among other things, that Petitioners violated PMO's constitutional rights under the Federal and New York state constitutions.  "The question of arbitrability turns on whether the parties did agree by the terms of their particular arbitration clause to refer their differences in this specific area to arbitration."  *In re City of Elmira,* 34 A.D.3d 1075, 824 N.Y.S.2d 778 (3d Dep't 2006) (citing *Matter of Board of Educ. of Watertown City School Dist.,* 93 N.Y.2d 132, 138, 688 N.Y.S.2d 463 (1999) (internal quotation marks omitted).  A waiver of party's access to a judicial forum must be "clear[] and unmistakable[.]"  *Conde v. Yeshiva Univ.,* 16 A.D.3d 185, 792 N.Y.S.2d 387 (1st Dep't 2005) (staying arbitration of employment and tort law claims where such claims were not within the purview of an arbitration clause providing for arbitration of claim "related to" wages).  The Dispute Resolution provision of the City Agreements does not clearly and unmistakably waive the City's right to access a judicial forum for the resolution of disputes over the *constitutionality* of the actions of municipal officials.  Rather, it compels arbitration of disputes "arising out of" the City Agreements.  PMO's broad constitutional tort allegations go far beyond a dispute arising out of the City Agreements.  Indeed, according to PMO, these claims involve PMO's "freedom of political association" and "rights to due process and equal protection under the Fourteenth

- 16 -

Amendment to the United States Constitution." *See* Petition, Exhibit A (Complaint in

Arbitration at 6). Under no circumstances can these allegations of unconstitutional conduct fall

within the Dispute Resolution clause of the City Agreements, which themselves are contracts

limited to the construction and operation of a waste-to-ethanol facility, and the provision of

waste disposal services. The Dispute Resolution clause was never intended to waive the

Petitioners' rights to access the courts where the constitutionality of municipal government

action is at stake.

71.    Naturally, in instances where the constitutionality of government action is at

issue, New York public policy favors the resolution of such claims by the courts, not by private

arbitrators. *See Wertheim & Co. v. Halpert,* 48 N.Y.2d 681, 421 N.Y.S.2d 876 (1979)(finding

constitutional discrimination claim not arbitrable where prohibited by public policy); *Rogers v.*

*New York University*, 220 F.3d 73, 75 (2d Cir. 2000) (arbitration clause not enforceable against

constitutional claims brought under the Americans with Disabilities Act and Family Medical

Leave Act); *Cf. Coppinger v. Metro-North C. R.R.,* 861 F.2d 33, 36 (2d Cir. 1988) (employee

could not be compelled to arbitrate civil rights claims because his civil rights claim has a "legally

independent origin[]" from his other, arbitrable claims). Here, the Court should recognize New

York's important public policy against arbitrating constitutional claims, especially where no

party has expressly consented to such an arbitration. As a result, this Court should stay PMO's

constitutional claims in the Arbitration Proceeding.

72.     For the foregoing reasons, Petitioners respectfully request that this Court stay the

Arbitration Proceeding on the grounds that: (1) there is no valid arbitration agreement between

the Individual Petitioners and PMO because the individuals named in the Arbitration Proceeding

never consented to arbitration; (2) certain of the claims asserted in the Arbitration Proceeding are

barred by the statute of limitations; and (3) the constitutional violations alleged in the Arbitration

Proceeding are beyond the scope of the arbitration clause at issue and, in any event, the

arbitration of those claims is against public policy.   Additionally, Petitioners request that this

Court grant a temporary stay of the Arbitration Proceeding until such time as the Court can fully

address the threshold issues raised in the Petition, along with any other relief this Court deem

just, necessary and proper.


Dated:  New York, New York
        July 6, 2007.



                                    _____
                                    Michael G. Murphy, Esq.

                                    Beveridge & Diamond, P.C.
                                    477 Madison Avenue, 15th Floor
                                    New York, NY 10022-5802
                                    Tel.:  (212) 702-5400
                                    Fax:  (212) 702-5450

                                    Attorney for Petitioners.

86068v7 NewYork 012753

Exhibit 1

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Northeast Case Management Center*
Catherine Shanks
Vice President
Christopher Fracassa, Yvonne L. Baglini
Assistant Vice Presidents

950 Warren Avenue, East Providence, RI 02914
telephone: 866-293-4053 facsimile: 401-435-6529
internet: http://www.adr.org/

Via Email

June 27, 2007

David N. Minkin
Powell Goldstein LLP
1201 West Peachtree Street, NW
14th Floor
Atlanta, GA  30309

Michael Murphy
Beverage & Diamond, PC
15th Floor, 477 Madison Avenue
New York, NY  10022-5802

Re: 13 192 Y 01324 07
    Pencor Masada OxyNol, LLC
    and
    The City of Middletown, New York
    Marlinda Duncanson, individually and as
    Major of Middletown in her official capacity
    Robert Moson, as President of the Common Council
    in his official capacity; Maxine Meyer and
    James Rollins, individually and as members of
    the city's Common Council in their official
    capacities, and Thomas J. Burr, John VanderVoort
    Gerald Kleiner, Raymond Depew, Miguel Rodrigues
    and Joel Sierra, as members of the City's Common
    Council in their official capacities


Dear Counsel:

This will acknowledge receipt on June 18, 2007, of a Demand for Arbitration dated June 18, 2007.  We understand that a copy was sent to Respondent.  This will also acknowledge receipt on June 25, 2007 of the contract clause providing for administration of a controversy arising out of a contract between the above-captioned parties and providing for administration by the American Arbitration Association (the Association).  As the claim exceeds $500,000.00, the Large Complex Case Procedures will apply unless the parties agree otherwise.

Please refer to our website for a copy of our Commercial Arbitration and Mediation Procedures, as amended and in effect September 15, 2005, as well as a copy of our Guide to the Management of Large Complex Cases.  The Guide to the Management of Large Complex Cases is an excellent resource to parties.  This guide includes a comprehensive review of each of the Association's Large Complex Case Rules, related commentary, and useful tips and information about the arbitration process.  If you would like a printed copy of the Rules, or the Guide to the Management of Large Complex Cases, please contact the undersigned.

This will confirm telephone conversations today with Messrs. Minkin and Murphy, wherein they acknowledged that the deadline for the parties to agree upon an arbitrator in accordance with the provisions of the parties' arbitration clause is June 29, 2007. Absent notification by that date, the Association may make the appointment as authorized by the contract. Should the parties desire a list of arbitrators to assist in the selection of the arbitrator, please contact me.

In accordance with the Rules, if Respondent does not answer on or before July 12, 2007, we will assume that the claim is denied. If Respondent wishes to counterclaim, file the appropriate number of copies, together with the initial filing fee to the attention of the undersigned. A copy should be directly sent to Claimant.

We note the parties' agreement stipulates the locale as New York, NY.

Enclosed is a Checklist for Conflicts to list those witnesses you expect to present, as well as any persons or entities with an interest in these proceedings. The Conflicts Checklist is due by July 12, 2007. The parties are to exchange copies of all correspondence except this checklist and the arbitrator list.

Additionally, the parties may desire to mediate this case prior to an arbitration hearing. Mediation is a private, non-binding process under which the parties submit their dispute to a third-party neutral. The mediator may suggest ways of resolving the dispute, but may not impose a settlement on the parties; the parties attempt to negotiate their own settlement agreement. Please contact the undersigned for further details regarding mediation.

We invite the parties to visit our website to learn more about how to file and manage your cases online. As part of our administrative service, AAA's WebFile allows parties to perform a variety of case related activities, including:

- File additional claims
- Complete the Checklist for Conflicts form
- View invoices and submit payment
- Share and manage documents
- Strike and rank listed neutrals
- Review case status

AAA WebFile provides flexibility because it allows you to work online as your schedule permits - day or night. Cases originally filed in the traditional offline manner can also be viewed and managed online.

In closing we wish to remind the parties that the Association has a refund schedule in the administrative fee section of the Rules. After 60 days or the appointment of the arbitrator the filing fees are non-refundable. If the parties enter settlement negotiations at any time after the Association has opened its file, you should take into consideration the refund schedule in the Rules. The Association will only refund filing fees as outlined in the Rules and does not refund neutral costs incurred when parties settle their dispute or withdraw their claims. We encourage parties to resolve their disputes as amicably as possible and this notice is just to alert you to this issue so that it doesn't become a concern in the future.

Please feel free to call if you have any questions.  We look forward to assisting you in this matter.

Sincerely,


Jennifer Eltahan
Case Manager
401 431 4738
Eltahanj@adr.org

*Supervisor Information: Heather Santo, 401 431 4702, SantoH@adr.org*

Encl.

# AMERICAN ARBITRATION ASSOCIATION
## CHECKLIST FOR CONFLICTS

In the Matter of the Arbitration between:
Re: 13 192 Y 01324 07
     Pencor Masada OxyNol, LLC
     and
     The City of Middletown, New York
     Marlinda Duncanson, individually and as
     Major of Middletown in her official capacity
     Robert Moson, as President of the Common Council
     in his official capacity; Maxine Meyer and
     James Rollins, individually and as members of
     the city's Common Council in their official
     capacities, and Thomas J. Burr, John VanderVoort
     Gerald Kleiner, Raymond Depew, Miguel Rodrigues
     and Joel Sierra, as members of the City's Common
     Council in their official capacities

To avoid the possibility of a last-minute disclosure and/or disqualification of the arbitrator pursuant to the rules, we must advise the arbitrator of the names of all persons, firms, companies or other entities involved in this matter. Please list below all interested parties in this case, including, but not limited to, witnesses, consultants, and attorneys. In order to avoid conflicts of interest, parties are requested to also list subsidiary and other related entities. This form will only be used as a list for conflicts, not a preliminary or final witness list. Please note that the Association will not divulge this information to the opposing party, and the parties are not required to exchange this list. This form will, however, be submitted to the arbitrator, together with the filing papers. You should be aware that arbitrators would need to divulge any relevant information in order to make appropriate and necessary disclosures in accordance with the applicable arbitration rules.

NAME                                       AFFILIATION                                ADDRESS

DATED: _____ PARTY: _____
                                                    Please Print

Exhibit 2

## IN RE: ARBITRATION PROCEEDINGS BEFORE THE AMERICAN
## ARBITRATION ASSOCIATION

PENCOR MASADA OXYNOL, LLC,    )
          )
Plaintiff,          )
          )
v.          )    Case No. 13 192 Y 01324 07
          )
City of Middletown, New York, et al,    )
          )
Defendants.

## NOTICE OF APPEARANCE

The undersigned counsel hereby notifies the American Arbitration Association and counsel for the defendants of their appearance on behalf of plaintiff Pencor-Masada OxyNol, LLC. Copies of all pleadings and orders filed in the case should be provided to the undersigned counsel.

Respectfully submitted,


 /s/ Kenneth L. Thomas
KENNETH L. THOMAS
klthomas@tmgslaw.com,

And


 /s/ Ramadanah S. Jones
RAMADANAH S. JONES
rsjones@tmgslaw.com,

Thomas, Means, Gillis & Seay
3121 Zelda Court (36106)
P.O. Box 5058
Montgomery, Alabama
36103-5058 (334) 270-
1033 (phone)
(334) 260-9396 (fax)
Attorneys for Plaintiff PMO

Of Counsel:

David N. Minkin
Powell Goldstein One
Atlantic Center
1201 West Peachtree Street, NW
Fourteenth Floor Atlanta, Georgia
30309
Counsel for Plaintiff PMO

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Notice has been served upon Michael Murphy and Christopher McKenzie, Beveridge & Diamond, PC, counsel of record for the defendants, via email on this 3rd day of July, 2007.

/s/ Kenneth L. Thomas_____

KENNETH L. THOMAS