Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
------------------------------------------------------------------------x
CITY OF MIDDLETOWN, MARLINDA
DUNCANSON, INDIVIDUALLY AND IN HER
OFFICIAL CAPACITY AS MAYOR OF THE
CITY OF MIDDLETOWN, ROBERT MOSON,
IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, MAXINE MEYER,
INDIVIDUALLY AND IN HER OFFICIAL
CAPACITY AS A MEMBER OF THE COMMON
COUNCIL OF THE CITY OF MIDDLETOWN,
JAMES ROLLINS, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, THOMAS J. BURR, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, JOHN VANDERVOORT,
IN HIS OFFICIAL CAPACITY AS A MEMBER
OF THE COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, GERALD KLEINER, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, RAYMOND DEPEW, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, AND JOEL SIERRA, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN,

              Petitioners,

    -against-

PENCOR-MASADA OXYNOL, LLC,

              Respondent.
------------------------------------------------------------------------x

VERIFIED PETITION
TO STAY ARBITRATION
PURSUANT TO ARTICLE
75 OF THE CIVIL
PRACTICE LAW
AND RULES

Index No. 2007 6035

## PETITION TO STAY ARBITRATION

The City of Middletown (the "City") and the above-captioned City officials (collectively with the City, the "Petitioners"), by and through their undersigned counsel, for their Petition to stay the arbitration proceeding captioned *Pencor-Masada Oxynol, LLC v. City of Middletown, New York, et al.*, case no. 13 192 Y 01324 07 (the "Arbitration Proceeding"), pursuant to CPLR 7502 and 7503(c), against Respondent Pencor-Masada Oxynol, LLC ("PMO"), allege as follows:

### NATURE OF THE ACTION

1. This Petition seeks to stay the Arbitration Proceeding commenced by PMO against the City and the above-captioned City officials, both in their individual and official capacities, in order to prevent PMO from seeking improperly to intimidate public officials and to "constitutionalize" a simple contract dispute with the City. A true and correct copy of PMO's Complaint in Arbitration is attached hereto as Exhibit A.

2. Petitioners seek to stay the Arbitration Proceeding on the grounds that: (1) there is no valid arbitration agreement between the individual Petitioners and PMO because the individuals named in the Arbitration Proceeding never consented to arbitration; (2) certain of the claims asserted in the Arbitration Proceeding are barred by the statute of limitations; and (3) the constitutional violations alleged in the Arbitration Proceeding are beyond the scope of the arbitration clause at issue and, in any event, the arbitration of those claims is against public policy.

### PARTIES

3. The City is a municipal corporation organized and existing under the laws of the State of New York, located in Orange County, New York, with an office located at 16 James Street, Middletown, New York.

4. Petitioner Marlinda Duncanson is the Mayor of the City of Middletown and a resident of the State of New York, County of Orange.

5. Petitioner Robert Moson is the President of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

6. Petitioner Maxine Meyer is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

7. Petitioner James Rollins is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

8. Petitioner Thomas J. Burr is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

9. Petitioner John VanderVoort is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

10. Petitioner Gerald Kleiner is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

11. Petitioner Raymond Depew is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

12. Petitioner Miguel Rodrigues is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

13. Petitioner Joel Sierra is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

14. Upon information and belief, Respondent PMO is a Delaware limited liability company, doing business in the State of New York, County of Orange, and has offices located at 2170 Highland Avenue S., Suite 100, Birmingham, Alabama.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter of this special proceeding to stay an arbitration pursuant to CPLR 7502 and 7503(c).

16. This Court has personal jurisdiction over PMO pursuant to CPLR 301 and 302 because PMO is a corporate entity doing business in New York.

17. Venue properly lies in this Court pursuant CPLR 503(a) and (c), CPLR 504 and CPLR 7502(a).

## THE AGREEMENTS BETWEEN THE CITY AND PMO

18. In 1994, the City issued a request for proposals ("RFP") pursuant to General Municipal Law § 120-w for a long-term, comprehensive, integrated and environmentally sound solution to its solid waste disposal needs that excluded incineration.

19. In 1995, Pencor Orange Corporation ("Pencor"), a New York Corporation, responded to the RFP and was selected as the preferred bidder. Pencor's selection was based on its proposal for the construction of a materials recovery facility coupled with the conversion of the organic fraction of the waste into useful products with minimal residual waste. More specifically, the conversion component would utilize Pencor's "OxyNol" process to convert the organic constituents of municipal solid waste ("MSW") into ethanol.

20. Upon information and belief, Pencor caused to be formed and/or otherwise became affiliated with PMO.

21. PMO was designated as project developer, with Pencor as PMO's managing member.

22. Between 1996 and 2003, the City and PMO negotiated the terms of several related agreements. During this time period, the project was reviewed by the City, acting as lead agency, pursuant to the State Environmental Quality Review Act ("SEQRA"). The City's SEQRA findings statement expressly states that PMO would construct and operate a facility that "would utilize an innovative process, the CES OxyNol™ process, for converting municipal solid waste (MSW) and sewage sludge into ethanol and other valuable products" and that the facility was "expected to process 230,000 wet tons per year of MSW and up to 49,000 tons per year (dry solids basis) of sewage sludge and produce 7 million gallons per year or ethanol." All of the City's SEQRA findings were based on this assumption.

23. In December 2003, almost 10 years after the City issued the RFP, and after the SEQRA process was complete, the City authorized then-Mayor Joseph DeStefano to execute certain agreements relating to the proposed PMO waste-to-ethanol project ("December 2003 Resolution").

24. The agreements at issue had an effective date of December 9, 2003 and consisted of following: (1) City Waste Management Services Agreement (true and complete copy annexed as Exhibit B hereto); (2) Comprehensive Waste Management Services Agreement (true and complete copy annexed as Exhibit C hereto); (3) Lease Agreement (true and complete copy annexed as Exhibit D hereto); and (4) Host Community Agreement (true and complete copy annexed as Exhibit E hereto), (collectively, the "City Agreements").

25. The City and PMO were the only two parties to the City Agreements.

26. None of the individual members of the City Council nor the current Mayor signed the City Agreements, and none of them ever consented to submit to arbitration any claim against them individually or in their capacity as a public official, or to waive their right to defend themselves in Court.

27. Following the issuance of the December 2003 Resolution, the parties continued to finalize certain terms of the City Agreements relating to insurance and/or indemnification.

28. In March 2004, these remaining provisions were finalized and then-Mayor Joseph DeStefano executed the City Agreements on behalf of the City of Middletown.

29. The City forwarded the partially executed City Agreements to PMO in late March 2004.

30. Approximately one year and a half later, by letter dated October 11, 2005, PMO returned to the City the fully executed City Agreements, which, upon information and belief, had been executed by PMO in July 2005.

31. At no time prior to its execution or delivery of the fully-executed agreements to the City in October 2005 did PMO seek to revisit, amend or extend any of the provisions of the agreements.

32. The City Agreements contemplate the construction and operation by PMO on City property of an "integrated solid waste processing facility" available to receive MSW and sewage sludge, and separating such waste for recycling and producing marketable byproducts (*i.e.*, ethanol).

33. Under the City Agreements, the term "Facility" means "the integrated solid waste processing facility, together with all additions, replacements, appurtenant structures and equipment, to be designed, constructed and operated by the Company [PMO] on the Facility Site."

34. The City Agreements permit either party to terminate the City Agreements in the event PMO fails to have a fully operational Facility capable of, *inter alia*, accepting all of the MSW and sewage sludge generated by the City, by the "Service Date" deadline of December 9, 2008.

35. The City Agreements include and/or incorporate certain Schedules, one of which sets forth certain "Common Contract Conditions." These Common Contract Conditions contain, *inter alia*, an "Entire Agreement; Modifications" provision, under which the Lease, City Waste Management Services Agreement, Comprehensive Waste Agreement and Host Community Agreement together constitute "the entire understanding of the parties with respect to the subject hereof and supersedes all prior agreements, understandings and commitments with respect thereto and . . . may be modified only by written agreement executed by both parties."

36. The City Agreements also contain a "Dispute Resolution" clause, which states in pertinent part:

> Any claim, action dispute or controversy of any kind arising out of or relating to this Agreement or concerning any aspect of performance by the City or the Company [PMO] (each a "Party") under the terms of this Agreement ("Dispute") shall be resolved by mandatory and binding arbitration administered by the American Arbitration Association (the "AAA"). . . . To the extent that any inconsistency exists between this Agreement and the foregoing statutes or rules, this Agreement shall control. . . .

*See* Exhibit B (City Waste Management Services Agreement, Schedule 5, Dispute Resolution).

37. The City Agreements expressly prohibit recovery of punitive damages:

> In no event, whether because of the breach of any provisions contained in this Agreement or for any other cause, whether based on contract, strict liability, tort, warranty, delay or otherwise, shall either the City or the Company be liable, or otherwise be obligated in any manner to pay to the other any incidental, special, punitive, consequential or indirect damages of any nature.

*See* Exhibit B (City Waste Management Services Agreement, Schedule 6, General Contract Conditions, § 4(c)).

## RELEVANT POST-AGREEMENT CONDUCT

38. As of the first quarter of 2006, PMO had made no measurable progress with respect to the development of the Facility, despite the fact that the RFP process had commenced

- 7 -

in 1994, approximately 12 years earlier. Accordingly, in or about April 2006, the City began making certain inquiries of PMO in order to obtain reasonable assurances that PMO could fulfill its obligations under the City Agreements, including the Service Date deadline of December 9, 2008.

39. By letter dated August 18, 2006, a true and correct copy of which is annexed hereto as Exhibit F, and on numerous occasions before and thereafter, the City raised several issues pertaining to PMO's ability to comply with its obligations under the City Agreements, including the Service Date deadline of December 9, 2008. The City also questioned the ongoing validity of key provisions of the City Agreements in light of a unilateral decision by PMO not to seek financing from the Middletown Industrial Development Agency ("MIDA"), as expressly contemplated by the City Agreements (*e.g.*, the commencement of the term of the Lease is tied to closing on MIDA bond financing).

40. PMO's responses were largely evasive and non-responsive.

41. In December 2006, PMO provided a "2006 Year-End Report," in which PMO informed the City, that, among other things, it was filing a pre-application for construction loan financing from the United States Department of Energy ("DOE") under a program established by the Energy Policy Act of 2005 and that it intended to purchase from the Tennessee Valley Authority ("TVA") certain "biomass pilot plant equipment." Annexed hereto as Exhibit G is a true and correct copy of the 2006 Year-End Report.

42. Subsequent correspondence from PMO confirmed that the outdated pilot plant equipment could process no more than two to four tons per day of MSW for conversion to ethanol, far less than the quantities of MSW and sewage sludge generated by the City.

43. By letter dated January 4, 2007, a true and correct copy of which is annexed hereto as Exhibit H, the City informed PMO that it was "deeply troubled by PMO's sudden

- 8 -

announcement that it intends to relocate old 'pilot plant' equipment for use in Middletown" and expressed its position that such a proposal would not be "consistent with the scope or intent of the City/PMO agreements," which required a full-scale waste to ethanol facility to be operational by December 2008.

44.     The City also inquired into PMO's pre-application to the DOE for a construction loan guarantee pursuant to Title XVII of the Energy Policy Act, related to "innovative technologies," which contains specific statutory eligibility criteria, including air emission limits for sulfur dioxide and nitrogen oxides. Exhibit H.

45.     In its January 4, 2007 letter to PMO, the City sought an explanation of how PMO was eligible under the Title XVII program when its existing Air Permit appeared to authorize emissions of sulfur dioxide and nitrogen oxides in excess of the statutory limits set forth in the Energy Policy Act. *Id.* The City also inquired about the status of PMO's private equity financing and stated that the City did not have a reasonable basis to believe that PMO could meet its contractual obligations. *Id.*

46.     By letter dated January 5, 2007, a true and correct copy of which is annexed hereto as Exhibit I, PMO responded to the City's inquiry, but conflated two programs authorized under the Energy Policy Act. The first program described by PMO was authorized under Title XV, which DOE was not yet pursuing and which, upon information and belief, was inapplicable to PMO's financing application. The other program, authorized under Title XVII, which DOE was pursuing, contained the express statutory requirements for eligibility described above. PMO further asserted that the City had unreasonably or improperly attempted to "interfere with [PMO's] ongoing financial relationships," but did not substantively respond to the City's inquiry regarding PMO's eligibility under the DOE program.

47. Concerning its representations regarding private equity financing, PMO responded to the City's inquiry by vaguely stating that it may pursue European private financing for the project. *See* Exhibit I. PMO also stated that it did not expect to close on private equity financing until a determination had been made regarding PMO's application to DOE.

48. By letter dated January 17, 2007, a true and correct copy of which is annexed hereto as Exhibit J, the City informed PMO that it believed PMO's assertion of the City's improper interference with business relations was without merit and that the City stood by its reasonable requests for information concerning PMO's DOE construction loan guarantee application, as this issue was now directly related to PMO's ability to perform under the City Agreements.

49. On May 22, 2007, PMO appeared before the City's Common Council to deliver a project status update.

50. As of May 22, 2007, PMO still had not closed on any of its promised private financing, nor had PMO secured DOE financing, but now professed to be able to self-finance a portion of the project.

51. At the May 22, 2007 meeting, PMO handed out a report entitled "Progress Report to the City of Middletown, New York on the Orange Recycling and Ethanol Production Facility by Pencor Masada OxyNol, LLC" (the "Progress Report"). A true and correct copy of the Progress Report is annexed hereto as Exhibit K.

52. In the Progress Report, PMO stated its plan to "employ the transfer station on site to fulfill its contractual obligation" and to develop and build "PMO's full scale waste-to-ethanol facility in stages, starting with the reassembly and operation of the TVA facilities and equipment" and then, sometime after the Service Date deadline of December 9, 2008, "resume

PMO's preferred project development approach for its full-scale PMO facility in a manner that prudently advances PMO's original business objectives."

53. This statement was inconsistent with PMO's obligations under the City Agreements.

54. By letter dated June 6, 2007, PMO demanded that the City's Common Council adopt a resolution of support for PMO's application to DOE.

55. On June 11, 2007, the Common Council adopted a resolution (the "June 11 Resolution") in support of PMO's application for DOE financing, contingent on PMO developing a Facility that fully complied with the City Agreements. The resolution expressly stated the City's position that the Service Date deadline was December 9, 2008, and that, pursuant to the City Agreements, PMO must have a full-scale waste-to-ethanol facility on the project site by that date. A true and correct copy of the June 11 Resolution is annexed hereto as Exhibit L.

56. By letter dated June 12, 2007, a true and correct copy of which is annexed hereto as Exhibit M, the City restated its position, first stated in its January 4, 2007 letter to PMO, that PMO's proposed development of a transfer station and small-scale pilot waste-to-ethanol facility in lieu the promised full-scale waste-to-ethanol plant "would be a direct violation of the City/PMO agreements, and would eviscerate the basis for the City's decision to contract with PMO in the first place." The City further reiterated its consistent position that the Service Date deadline was December 9, 2008.

## THE ARBITRATION PROCEEDING

57. On or about June 18, 2007, PMO filed a "Complaint in Arbitration" with the AAA against all of the Petitioners, including each member of the Common Council in his or her

official capacity and the Mayor and two Common Council members in their individual capacities, purportedly based on the Dispute Resolution clause contained in Schedule 5 to the City Agreements. Exhibit A.

58. In its Complaint in Arbitration, PMO alleged, *inter alia*, that the Petitioners violated "PMO's rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution, which is actionable under 42 U.S.C. § 1983 . . .," that the Petitioners violated "PMO's freedom of political association guaranteed under the First Amendment of the United States Constitution, which is actionable under 42 U.S.C. § 1983 . . .," that Petitioners violated "PMO's rights under the laws of New York to be protect [sic] from tortious interference with the City's agreements and third-party relationships" and that the Petitioners violated "PMO's rights under New York law to due process and equal protection." *Id.*

59. PMO's Complaint in Arbitration seeks, *inter alia*: (1) declarations that PMO's rights under "the City agreements, the laws of the State of New York, and the First and Fourteenth Amendments of the United States Constitution" have been violated; (2) certain monetary damages, including PMO's alleged project development costs; (3) punitive damages against individual Petitioners Duncanson, Meyer and Rollins; and (4) attorneys' fees "under 42 USC § 1988 for the violation of PMO's First and Fourteenth Amendment rights." *Id.*

### FIRST CLAIM FOR RELIEF

60. Petitioners repeat and re-allege each and every allegation contained in paragraphs 1 through 59 as if fully set forth herein.

61. The only parties to the City Agreements are the City and PMO.

62. None of the individual Petitioners is a party to the City Agreements.

- 12 -

63. None of the individual Petitioners has agreed to submit to arbitration any dispute of any kind arising between the individual Petitioner and PMO.

64. None of the individual Petitioners has agreed to surrender his or her rights to defend himself or herself against claims alleged by PMO in Court.

65. The City Agreements do not provide a basis for requiring the individual Petitioners to submit to arbitration.

66. CPLR 7503(c) provides that any arbitration agreement or arbitration rules which waives the right to apply for a stay of arbitration is declared null and void.

67. By reason of the foregoing, the individual Petitioners herein cannot be compelled to submit to arbitration of PMO's claims as defendants and are entitled to a permanent stay of arbitration by this Court.

## SECOND CLAIM FOR RELIEF

68. Petitioners repeat and re-allege each and every allegation contained in paragraphs 1 through 67 as if fully set forth herein.

69. As set forth above, the individual Petitioners were not properly named as defendants in PMO's Complaint in Arbitration and are therefore entitled to a permanent stay of arbitration.

70. PMO's Complaint in Arbitration seeks punitive damages only as against individual Petitioners Duncanson, Meyer and Rollins, none of whom has agreed to submit to arbitration and none of whom is properly named as a defendant in PMO's Complaint in Arbitration.

71. Punitive damages cannot be recovered from a municipality as a matter of law.

72. Further, the City Agreements expressly preclude recovery of punitive damages.

73. By reason of the foregoing, PMO's claim for punitive damages through arbitration must be permanently stayed and/or otherwise dismissed.

### THIRD CLAIM FOR RELIEF

74. Petitioners repeat and re-allege each and every allegation contained in paragraphs 1 through 73 as if fully set forth herein.

75. Insofar as PMO's Complaint in Arbitration seeks damages from the City for tortious interference with a prospective business relationship or contract, such a cause of action would have accrued, at the latest, in January 2007, more than ninety (90) days before PMO commenced the Arbitration Proceeding, when the City first informed PMO that the information it had provided regarding the DOE pre-application contained numerous discrepancies, that its proposal to relocate outdated pilot plant equipment was contrary to its obligations under the City Agreements, and that the City had a reasonable basis to believe that PMO would not meet its contractual obligations.

76. In January 2007, PMO accused the City of interfering with "PMO's ongoing financial relationships . . ."

77. PMO did not file a Notice of Claim with the City prior to filing its Complaint in Arbitration or at anytime thereafter, as required under General Municipal Law § 50-e.

78. PMO's Complaint in Arbitration did not allege that any Notice of Claim had been served upon the City as required by General Municipal Law §§ 50-e and 50-i.

79. PMO's claim for tortious interference is barred by the applicable statute of limitations.

80. By reason of the foregoing, PMO's claim for relief through arbitration based on tortious interference must be permanently stayed and/or otherwise dismissed.

## FOURTH CLAIM FOR RELIEF

81. Petitioners repeat and re-allege each and every allegation contained in paragraphs 1 through 80 as if fully set forth herein.

82. PMO's Complaint in Arbitration alleges that Petitioners violated PMO's rights under the New York State Constitution, but does not specify how or when this violation is alleged to have occurred.

83. Based on all of the allegations in PMO's Complaint in Arbitration, insofar as PMO's Complaint in Arbitration seeks damages from the City for such a violation of state constitutional rights, such a cause of action would have accrued, at the latest, in January 2007, more than ninety (90) days before PMO commenced the Arbitration Proceeding.

84. PMO did not file a Notice of Claim with the City prior to filing its Complaint in Arbitration or at any time thereafter, as required under General Municipal Law § 50-e.

85. PMO's Complaint in Arbitration did not allege that any Notice of Claim had been served upon the City as required by General Municipal Law §§ 50-e and 50-i.

86. PMO's claim for violations of PMO's rights under the New York State Constitution is barred by the applicable statute of limitations.

87. By reason of the foregoing, PMO's claim for relief through arbitration based on violations of the New York State Constitution must be permanently stayed and/or otherwise dismissed.

## FIFTH CLAIM FOR RELIEF

88. Petitioners repeat and re-allege each and every allegation contained in paragraphs 1 through 87 as if fully set forth herein.

89. PMO's Complaint in Arbitration does not specify how Petitioners' conduct is alleged to have violated PMO's constitutional rights.

- 15 -

90. The City Agreements, including the arbitration provision contained therein, do not require or specify that claims based on alleged violations of constitutional rights are arbitrable.

91. Public policy disfavors arbitration of constitutional claims.

92. By reason of the foregoing, PMO's claims for relief through arbitration based on alleged violations of its constitutional rights must be permanently stayed and/or otherwise dismissed.

WHEREFORE, the Petitioners respectfully request that the Court permanently stay the Arbitration Proceeding and enter judgment in their favor as follows:

1. Declaring that the individual Petitioners are not parties to the City Agreements and did not consent to arbitration of the claims brought by PMO against them and, therefore, those claims, including the claims for punitive damages against the individually named Petitioners, are not arbitrable under the Dispute Resolution provisions of the City Agreements;

2. Declaring that PMO's cause of action for tortious interference with a prospective business relationship or contract is time-barred by General Municipal Law § 50-e because PMO failed to timely submit a Notice of Claim to the City and, therefore, that claim is not arbitrable;

3. Declaring that PMO's causes of action for violations of the New York State constitution are time-barred by General Municipal Law § 50-e because PMO failed to timely submit a Notice of Claim to the City and, therefore, those claims are not arbitrable;

4. Declaring that PMO's causes of action alleging the City's violation of PMO's constitutional rights, including their due process rights and equal protection rights under the Fourteenth Amendment to the United States Constitution and their First Amendment rights to political association, are not arbitrable because they are not within the scope of the Dispute Resolution clause contained in Schedule 5 of the City Agreements and because arbitration of such fundamental constitutional questions is against public policy;

5.  Granting the Petitioners reasonable costs and attorneys fees; and

6.  Granting the Petitioners any such further relief that the Court deems just, necessary and proper.

Dated: New York, New York
July 6, 2007.

Respectfully submitted,

BEVERIDGE & DIAMOND, P.C.

By: _____
Michael G. Murphy, Esq.
Christopher J. McKenzie, Esq.
Zackary D. Knaub, Esq.

477 Madison Avenue
15th Floor
New York, NY 10022-5802
Tel.: (212) 702-5400
Fax: (212) 702-5450

*Attorneys for Petitioners*

Of Counsel:  Alex Smith, Esq.
Office of the Corporation Counsel
City of Middletown
16 James Street
Middletown, New York 10940
(845) 346-4140

## ATTORNEY VERIFICATION

MICHAEL G. MURPHY, an attorney duly admitted to practice law before the Courts of this State, affirms the following under penalties of perjury:

I am a member of the firm Beveridge & Diamond, P.C., and attorney for petitioners herein. I have read the annexed Verified Petition, know the contents thereof, and the same are true to my knowledge based on documents maintained by my office and my clients, except those matters therein which are stated to be alleged on information and belief, and as to those matters, I believe them to be true. The reason this verification is made by me and not by the petitioners is that (i) petitioners are not located in the county where I maintain my office, and (ii) petitioners consist of a governmental subdivision and public officers thereof.

Dated: New York, New York
       July 6, 2007

                                                            _____
                                                                  Michael G. Murphy, Esq.