UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
CITY OF MIDDLETOWN, MARLINDA DUNCANSON,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY
AS MAYOR OF THE CITY OF MIDDLETOWN,
ROBERT MOSON, IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE COMMON COUNCIL OF
THE CITY OF MIDDLETOWN, MAXINE MEYER,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY
AS A MEMBER OF THE COMMON COUNCIL OF THE
CITY OF MIDDLETOWN, JAMES ROLLINS,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY
AS A MEMBER OF THE COMMON COUNCIL OF THE
CITY OF MIDDLETOWN, THOMAS J. BURR, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE COMMON
COUNCIL OF THE CITY OF MIDDLETOWN,
JOHN VANDERVOORT, IN HIS OFFICIAL CAPACITY
AS A MEMBER OF THE COMMON COUNCIL OF THE CITY
OF MIDDLETOWN, GERALD KLEINER, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE COMMON
COUNCIL OF THE CITY OF MIDDLETOWN, RAYMOND
DEPEW, IN HIS OFFICIAL CAPACITY AS A MEMBER
OF THE COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, AND JOEL SIERRA, IN HIS OFFICIAL
CAPACITY AS A MEMBER OF THE COMMON COUNCIL
OF THE CITY OF MIDDLETOWN,

Petitioners,

-against-

PENCOR-MASADA OXYNOL, LLC,

Respondent.
------------------------------------------------------------------------X

**NOTICE OF REMOVAL**

**07 CIV. 6572**

State Court Index **BRIEANT**
No.: 2007/6035

## NOTICE OF REMOVAL PURSUANT TO 28 USC §1441 et seq.

Respondent in the above-captioned proceeding PENCOR-MASADA OXYNOL, LLC, (hereinafter

"PMO"), by and through its attorneys TARSHIS, CATANIA, LIBERTH, MAHON & MILLIGRAM,

PLLC, hereby files this Notice of Removal in the foregoing case from the Supreme Court of the State of

New York, County of Orange to this United States District Court for the Southern District of New York, and respectfully shows and petitions this Court as follows:

1.    On or about the 9th day of July, 2007, a Verified Petition to Stay Arbitration pursuant to Article 75 of the New York State Civil Practice Law and Rules was served on PMO.

2.    The proceeding was commenced in the New York State Supreme Court, County of Orange under Index No. 2007/6035.  Copies of the Notice of Petition, Petition and annexed exhibits, along with the Request for Judicial Intervention filed in the State Court action are annexed hereto as Exhibit "A" in compliance with S.D.N.Y. Local Civil Rule 81.1(b)and 28 U.S.C. § 1446 (a).  To the best of the knowledge of the undersigned, no further proceedings have been had in the State Court.

3.    All individual Petitioners are citizens of the State of New York and Petitioner CITY OF MIDDLETOWN is a municipal corporation duly organized and existing pursuant to the laws of the State of New York, with an office at 16 James Street, Middletown, Orange County, New York State.  Respondent PMO is a Delaware Limited Liability Company with a principal place of business in the State of Alabama.  The arbitration agreement which is the subject of the Petition is governed by the Federal Arbitration Act.

4.    Therefore, the within matter is one in which this Court has original jurisdiction under the provisions of 28 U.S.C. §1331 since there is complete diversity among the parties and an amount in controversy in excess of the statutory threshold.  Further, federal questions permeate this matter relating to violations of PMO's Constitutional rights made actionable under 42 U.S.C. §1983; and the application of the Federal Arbitration Act (9 U.S.C. §1 et seq.).

5.    The underlying State Court Petition to Stay Arbitration is brought on by residents of the State of New York against PMO, a Delaware Corporation whose principal place of business is in Alabama.  As such, there is complete diversity of citizenship among the parties per 28 U.S.C. §1331.

6.     Moreover, the Petition to Stay Arbitration seeks to dismiss certain tort claims as well as certain state and federal Constitutional rights claims which seek damages well in excess of $75,000.00.  As a matter of fact, the complaint in arbitration filed by PMO seeks over $200 million in damages. *See*, Exhibit "A". The Petition seeks dismissal of these claims for money damages. Accordingly, per 28 U.S.C. § 1332, this Court has diversity jurisdiction since the amount in controversy well exceeds $75,000.00 in value.

7.     Further, there is federal question jurisdiction over the claims asserted in the Petition. The Petition to Stay Arbitration seeks dismissal of certain Federal Constitutional rights claims that have been asserted in the underlying arbitration proceeding by PMO. The basis for dismissal is, *inter alia*, that "public policy" forbids arbitration of PMO's Federal Constitutional rights claims brought under section 1983. Of necessity this claim involves resolution of federal questions as to, *inter alia*, the interpretation of 42 U.S.C. §1983, provisions of the Federal Arbitration Act 9 U.S.C. §1 et seq. which govern the underlying dispute between the City and PMO, as well as broader questions of federal common law, Congressional intent and federal policy.

8.     This Notice of Removal is being filed within 30 days from the date of service of the State Court Petition to Stay Arbitration, and as such is timely filed pursuant to 28 U.S.C. § 1446 (b).

9.     Venue is appropriate in the Southern District of New York pursuant to 28 U.S.C. Section 1391 (b)(1) and (2) because the Petitioners reside in this judicial district and events in controversy which give rise to the subject proceedings occurred in this judicial district.

10.     This matter is properly assigned to White Plains under Rule 21(a)(i) of the Rules for Division of Business Among District Judges for the Southern District of New York since the claim arose in whole or in major part in the County of Orange (a "Northern County") and at least one of the parties resides in the Northern Counties.

WHEREFORE, PMO gives notice that the State Court action is removed from the Supreme

Court of the State of New York, County of Orange to this Court.

Dated: Newburgh, New York
      July 23, 2007

                                  Respectfully Submitted,

By:

                                    NICHOLAS A. PASCALE (NP-5766)
                                    TARSHIS, CATANIA, LIBERTH,
                                    MAHON & MILLIGRAM, PLLC
                                    Attorneys for the Respondent
                                    PENCOR-MASADA OXYNOL, LLC
                                    One Corwin Court, P.O. Box 1479
                                    Newburgh, NY 12550
                                    845)565-1100

TO:  BEVERIDGE & DIAMOND, P.C.
       Attorneys for Petitioners
       477 Madison Avenue – 15th Floor
       New York, New York 10022-5802
       Tel. No. (212) 702-5400

Exhibit A

UCS-840(REV 1/2000)

### REQUEST FOR JUDICIAL INTERVENTION

**2007 6035**

| Supreme Court | Orange | | | | For Clerk Only |
|---|---|---|---|---|---|
| COURT | COUNTY | INDEX NO. | DATE PURCHASED | | |

PLAINTIFF(S):

    City of Middletown, et al.

IAS entry date

DEFENDANT(S):

    Pencor-Masada OxyNol, LLC

Judge Assigned

RJI Date

................................................................................

Date issue joined: _____  Bill of particulars served (Y/N):  [ ]Yes  (x)No

................................................................................

**NATURE OF JUDICIAL INTERVENTION** (check **ONE** box only **AND** enter information)

[ ] Request for preliminary conference

[ ] Note of issue and/or certificate of
    readiness

[ ] Notice of motion (return date:_____)
    Relief sought _____

[X] Order to show cause
    (clerk enter return date:_____)
    Relief sought _Stay of Arbitration_

[ ] Other ex parte application (specify:

_____)

[ ] Notice of petition (return date:_____)
    Relief sought _____

[ ] Notice of medical or dental malpractice
    action (specify:_____)

[ ] Statement of net worth

[ ] Writ of habeas corpus

[ ] Other (specify:_____

_____

*Stamp: 2007 JUL -9 A 10: 22  ORANGE COUNTY CLERK  FILED  ORIGINAL FILED*

**NATURE OF ACTION OR PROCEEDING** (Check **ONE** box only)

**MATRIMONIAL**
[ ] Contested — CM
[ ] Uncontested — UM

**COMMERCIAL**
[ ] Contract — CONT
[ ] Corporate — CORP
[ ] Insurance (where insurer is a
    party, except arbitration) — INS
[ ] UCC (including sales, negotiable
    instruments) — UCC
[ ] *Other Commercial — OC

**REAL PROPERTY**
[ ] Tax Certiorari — TAX
[ ] Foreclosure — FOR
[ ] Condemnation — COND
[ ] Landlord/Tenant — LT
[ ] *Other Real Property — ORP

**OTHER MATTERS**
[ ] *_____ — OTH

**TORTS**

Malpractice
[ ] Medical/Podiatric — MM
[ ] Dental — DM
[ ] *Other Professional — OPM

[ ] Motor Vehicle — MV
[ ] *Products Liability — PL

[ ] Environmental — EN
[ ] Asbestos — ASB
[ ] Breast Implant — BI
[ ] *Other Negligence — OTN

[ ] *Other Tort (including
    intentional) — OT

**SPECIAL PROCEEDINGS**
[X] Art. 75 (Arbitration) — ART75
[ ] Art. 77 (Trusts) — ART77
[ ] Art. 78 — ART78
[ ] Election Law — ELEC
[ ] Guardianship (MHL Art. 81) — GUARD81
[ ] *Other Mental Hygiene — MHYG
[ ] *Other Special Proceeding — OSP

Check "YES" or "NO" for each of the following questions:

Is this action/proceeding against a

YES  NO                                    YES  NO
[x]  [ ] Municipality:                     [ ]  [ ] Public Authority:
         (Specify City of Middletown  )             (Specify_____)

YES  NO
[X]  [ ] Does this action/proceeding seek equitable relief?
[ ]  [X] Does this action/proceeding seek recovery for personal injury?
[ ]  [X] Does this action/proceeding seek recovery for property damage?

Pre-Note Time Frames:
(This applies to all cases except contested matrimonials and tax certiorari cases)

Estimated time period for case to be ready for trial (from filing of RJI to filing of Note of Issue):

   □ Expedited: 0-8 months       ⊠ Standard: 9-12 months       □ Complex: 13-15 months

Contested Matrimonial Cases Only: (Check and give date)

   Has summons been served?        □ No        □ Yes, Date_____

   Was a Notice of No Necessity filed?  □ No    □ Yes, Date_____

ATTORNEY(S) FOR PLAINTIFF(S):

| Self Rep.* | Name | Address | Phone # |
|---|---|---|---|
| | Michael G. Murphy, Esq. | Beveridge & Diamond, P.C. | 212-702-5400 |
| □ | Christopher J. McKenzie, Esq. | 477 Madison Ave., 15th FL. New York, NY  10022 | |
| □ | Zackary D. Knaub, Esq. | | |

ATTORNEY(S) FOR DEFENDANT(S):

| Self Rep.* | Name | Address | Phone # |
|---|---|---|---|
| □ | | | |
| □ | | | |

*Self Represented: parties representing themselves, without an attorney, should check the "Self Rep." box and enter their name, address, and phone # in the space provided above for attorneys.

INSURANCE CARRIERS:

RELATED CASES: (IF NONE, write "NONE" below)
Title            Index #            Court            Nature of Relationship
None

        I AFFIRM UNDER PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.

Dated: July 6, 2007            _____
                                      (SIGNATURE)

                               Michael G. Murphy, Esq.
                                 (PRINT OR TYPE NAME)

                               Petitioners
                                 ATTORNEY FOR

        ATTACH RIDER SHEET IF NECESSARY TO PROVIDE REQUIRED INFORMATION

\forms\rji2000.vpd

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE

-------------------------------------------------------------x

CITY OF MIDDLETOWN, MARLINDA
DUNCANSON, INDIVIDUALLY AND IN HER
OFFICIAL CAPACITY AS MAYOR OF THE
CITY OF MIDDLETOWN, ROBERT MOSON,
IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, MAXINE MEYER,
INDIVIDUALLY AND IN HER OFFICIAL
CAPACITY AS A MEMBER OF THE COMMON
COUNCIL OF THE CITY OF MIDDLETOWN,
JAMES ROLLINS, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, THOMAS J. BURR, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, JOHN VANDERVOORT,
IN HIS OFFICIAL CAPACITY AS A MEMBER
OF THE COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, GERALD KLEINER, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, RAYMOND DEPEW, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, AND JOEL SIERRA, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN,

**ORDER
TO SHOW CAUSE**

Index No. **2007 6035**

Assigned Judge:
Hon. Joseph G. Owen, J.S.C.

                    Petitioners,

        -against-

PENCOR-MASADA OXYNOL, LLC,

                Respondent.

-------------------------------------------------------------x

UPON the annexed Affirmation of Michael G. Murphy, Esq., in Support of Petitioners'

Petition to Stay Arbitration and Request for Temporary Stay, dated July 6, 2007, and the above-

captioned Petitioners' Petition to Stay Arbitration, verified on July 6, 2007, ~~and submitted this~~

~~day of July, 2007~~, it is  *subject to any appropriate jurisdictional or other* *legally suggestible objection*

ORDERED, that Respondent, Pencor-Masada OxyNol, LLC ("PMO"), show

*(Hon. Joseph G. Owen, JSC)*   *11:00*

cause before a Justice of this Court, ~~to be assigned pursuant to 22 N.Y.C.R.R. § 202.8~~, at ~~9:30~~

*23rd*

a.m. on the ~~day of July, 2007~~ at the Courthouse located at 285 Main Street, Goshen, New

York 10924, why an order and judgment should not be granted:

1.      Declaring that the individual Petitioners named as defendants in the arbitration

proceeding captioned *Pencor-Masada Oxynol, LLC v. City of Middletown, New York, et al.*, case

no. 13 192 Y 01324 07 (the "Arbitration Proceeding"), are not parties to the agreements upon

which that arbitration may be compelled and did not consent to arbitration of the claims brought

against them therein and, therefore, those claims, including PMO's claims for punitive damages

against the individually named Petitioners, are not arbitrable, and ~~arbitration of those claims is~~

*staying arbitration of those claims*

permanently ~~stayed~~ pursuant to CPLR 7503(a);

*claim*

2.      Declaring that PMO's ~~cause of action~~ for tortious interference with a prospective

or existing business relationship or contract is time-barred by General Municipal Law § 50-e

because PMO failed to timely serve a Notice of Claim upon the City of Middletown and,

*staying arbitration of that claim*

therefore, that claim is not arbitrable, and ~~arbitration of that claim is~~ permanently ~~stayed~~ pursuant

to CPLR 7503(a);

*claim*

3.      Declaring that PMO's ~~causes of action~~ for violations of the New York State

constitution are time-barred by General Municipal Law § 50-e because PMO failed to timely

- 2 -

serve a Notice of Claim upon the City of Middletown and, therefore, those claims are not

arbitrable, and ~~arbitration of those claims is~~ *staying arbitration of these claims* permanently ~~stayed~~ pursuant to CPLR 7503(a);

    4.    Declaring that PMO's ~~causes of action~~ *claims* alleging the City's violation of PMO's

constitutional rights, including their due process rights and equal protection rights under the

Fourteenth Amendment to the United States Constitution and their First Amendment rights to

political association, are not arbitrable and are permanently stayed pursuant to CPLR 7503(a)

because they are not within the scope of the agreements upon which the Arbitration Proceeding

may be compelled and because arbitration of the fundamental constitutional questions raised

therein is against public policy; and

    5.    Granting the Petitioners reasonable costs and attorneys fees; and it is further

ORDERED that the arbitration proceeding is hereby temporarily stayed in order to *pending the return date and time hereof*

maintain the status quo ~~pending this Court's resolution of the claims for relief stated above and~~

~~in Petitioners' Petition to Stay Arbitration~~; and it is further

~~ORDERED, that,~~ Sufficient cause appearing therefore, *let* service of a copy of this Order to

Show Cause and the papers upon which it is granted upon the attorney(s) for Respondent PMO

and upon the American Arbitration Association, pursuant to CPLR 7503(c), by registered or

certified mail, return receipt requested on July _9_, 2007.

*and by overnight delivery service*

ENTER:

＿＿＿＿＿＿＿＿＿＿＿＿＿
J.S.C.

HON. JOSEPH G. OWEN
SUPREME COURT JUSTICE

- 3 -

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
------------------------------------------------------------x

CITY OF MIDDLETOWN, MARLINDA
DUNCANSON, INDIVIDUALLY AND IN HER
OFFICIAL CAPACITY AS MAYOR OF THE
CITY OF MIDDLETOWN, ROBERT MOSON,
IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, MAXINE MEYER,
INDIVIDUALLY AND IN HER OFFICIAL
CAPACITY AS A MEMBER OF THE COMMON
COUNCIL OF THE CITY OF MIDDLETOWN,
JAMES ROLLINS, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, THOMAS J. BURR, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, JOHN VANDERVOORT,
IN HIS OFFICIAL CAPACITY AS A MEMBER
OF THE COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, GERALD KLEINER, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, RAYMOND DEPEW, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, AND JOEL SIERRA, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF
MIDDLETOWN,

**AFFIRMATION IN
SUPPORT OF PETITION
TO STAY ARBITRATION
AND REQUEST FOR
TEMPORARY STAY**

**Index No. __ - _____**

Petitioners,


-against-

PENCOR-MASADA OXYNOL, LLC,

Respondent.

------------------------------------------------------------x

MICHAEL G. MURPHY, ESQ., an attorney duly admitted to practice law in the State of New York, affirms under penalty of perjury as follows:

1.    I am a member of the law firm Beveridge & Diamond, P.C., attorneys for petitioners, the City of Middletown (the "City"), a New York municipal corporation, and the above-captioned individual petitioners (the "Individual Petitioners" and, collectively with the City, the "Petitioners").

## PARTIES AND DESCRIPTION OF PROCEEDING

2.    I respectfully submit this Affirmation in support of the Petitioners' Petition for a permanent stay of arbitration pursuant to CPLR 7502 and 7503, and in support of Petitioners' request for a temporary stay of arbitration to preserve the status quo until this Court decides the threshold issues presented in Petitioners' Petition.

3.    The Petitioners have been named as Defendants in an arbitration proceeding captioned *Pencor-Masada Oxynol, LLC v. City of Middletown, New York, et al.*, case no. 13 192 Y 01324 07 (the "Arbitration Proceeding"), which was brought by Pencor-Masada OxyNol LLC ("PMO") on or about June 18, 2007 by filing a Complaint in Arbitration with the American Arbitration Association (the "AAA"). *See* Petition, Exhibit A.

4.    The Arbitration Proceeding was purportedly brought pursuant to a "Dispute Resolution" provision of certain related agreements between the City and PMO.

5.    The City and PMO were the only parties to these agreements. The Individual Petitioners were not signatories to any of these agreements and never consented to arbitrate any dispute with PMO, and therefore were not properly named as Defendants in PMO's Complaint in Arbitration. Accordingly, the arbitration claims against the Individual Petitioners should be permanently stayed and/or dismissed.

6.    In its Complaint in Arbitration, PMO alleges that the Petitioners tortiously interfered with its prospective and/or existing business relationships. PMO further alleges that Petitioners violated PMO's rights under the New York State Constitution. However, PMO never filed a notice of claim prior to commencing the Arbitration Proceeding, as required under General Municipal Law 50-e and, insofar as PMO purports to assert such claims, they would have accrued more than 90 days prior to the commencement of the Arbitration Proceeding.

7.    PMO's tortious interference and state constitutional claims are not arbitrable and should be permanently stayed and/or dismissed because they are time-barred by General Municipal Law §§ 50-e and 50-i.

8.    Petitioners also respectfully request a temporary stay of the Arbitration Proceeding until this Court decides the issues presented in Petitioners' Petition.

9.    The potential harm to Petitioners is imminent. By letter dated June 27, 2007, annexed hereto as Exhibit 1, the AAA informed Petitioners that, if they wish to file an answer or assert a counter-claim, they must do so on or before July 12, 2007. As Exhibit 1 shows, PMO's Complaint in Arbitration was filed by the law firm of Powell Goldstein, LLP. Exhibit 2 is a copy of the notice of appearance on behalf of PMO by the law firm of Thomas, Means, Gillis & Seay, P.C. In order to give advance notice to PMO of Petitioners' application for a temporary stay, copies of Petitioners' Verified Petition (and exhibits thereto), the proposed Order to Show Cause and this affirmation (and exhibits thereto) are being forward to Powell Goldstein, LLP and Thomas, Means, Gillis & Seay, P.C. by e-mail today.

10.    In the absence of a stay, Petitioners will be irreparably harmed. Unless the Arbitration Proceeding is stayed, Petitioners will be forced to respond to PMO's Complaint in Arbitration by filing an answer and asserting counterclaims, and therefore will be forced to

- 2 -

participate in an arbitration to which they never consented and to potentially relinquish their rights to access the courts.

11.    At a minimum, how Petitioners -- or the City alone -- formulates their defenses and/or counterclaims to PMO's Complaint in Arbitration necessarily depends upon this Court's determination of the issues presented in Petitioners' Petition. Petitioners should not be forced to face an arbitration deadline or participate in the arbitration until these issues are decided.

12.    Granting Petitioners' request for a temporary stay will merely maintain the status quo while the Court considers Petitioners' application for a permanent stay pursuant to Article 75 of the CPLR.

13.    Moreover, for the reasons stated herein, Petitioners have a strong likelihood of successfully staying the Arbitration Proceeding on the grounds that: (1) there is no valid arbitration agreement between the Individual Petitioners and PMO because the individuals named in the Arbitration Proceeding never consented to arbitration; (2) certain of the claims asserted in the Arbitration Proceeding are barred by the statute of limitations; and (3) the constitutional violations alleged in the Arbitration Proceeding are beyond the scope of the arbitration clause at issue and, in any event, the arbitration of those claims is against public policy. *See* Petition ¶ 2.

## FACTUAL BACKGROUND

14.    PMO brought the Arbitration Proceeding to resolve a contract dispute between the City and PMO. Despite PMO's efforts to dress its contract claims in constitutional and tort cloth and to implead the Individual Petitioners in an effort to intimidate City officials, the essence of this dispute concerns PMO's ability to perform its legal duties under a series of related agreements in which PMO agreed to develop and construct a facility on City property that would convert the City's waste to ethanol. The Individual Petitioners never consented to arbitrate any

- 3 -

dispute with PMO. They are not signatories to these agreements and, in fact, many of them, including the current Mayor, were not even elected to their respective positions at the time these agreements were executed. Moreover, the City never intended the Dispute Resolution clause contained in these agreements to cut so broadly as to encompass allegations of unconstitutional action on the City's behalf wholly unrelated to the terms and conditions of these agreements.

15.     In 1994, the City issued a request for proposals ("RFP") pursuant to General Municipal Law § 120-w for a long-term, comprehensive, integrated and environmentally sound solution to its solid waste disposal needs that excluded incineration.

16.     In 1995, Pencor Orange Corporation ("Pencor"), a New York Corporation, responded to the RFP and was selected as the preferred bidder. Pencor's selection was based on its proposal for the construction of a materials recovery facility coupled with the conversion of the organic fraction of the waste into useful products with minimal residual waste. More specifically, the conversion component would utilize Pencor's "OxyNol" process to convert the organic constituents of municipal solid waste ("MSW") into ethanol.

17.     Upon information and belief, Pencor caused to be formed and/or otherwise became affiliated with PMO.

18.     PMO was designated as project developer, with Pencor as PMO's managing member.

19.     Between 1996 and 2003, the City and PMO negotiated the terms of several related agreements. During this time period, the project was reviewed by the City, acting as lead agency, pursuant to the State Environmental Quality Review Act ("SEQRA"). The City's SEQRA findings statement expressly states that PMO would construct and operate a facility that "would utilize an innovative process, the CES OxyNol™ process, for converting municipal solid waste (MSW) and sewage sludge into ethanol and other valuable products" and that the facility

- 4 -

was "expected to process 230,000 wet tons per year of MSW and up to 49,000 tons per year (dry solids basis) of sewage sludge and produce 7 million gallons per year or ethanol." All of the City's SEQRA findings were based on this assumption.

20.    In December 2003, almost 10 years after the City issued the RFP, and after the SEQRA process was complete, the City authorized then-Mayor Joseph DeStefano to execute certain agreements relating to the proposed PMO waste-to-ethanol project ("December 2003 Resolution").

21.    The agreements at issue had an effective date of December 9, 2003 and consisted of following: (1) City Waste Management Services Agreement (Petition, Exhibit B); (2) Comprehensive Waste Management Services Agreement (Petition, Exhibit C); (3) Lease Agreement (Petition, Exhibit D); and (4) Host Community Agreement (Petition, Exhibit E), (collectively, the "City Agreements").

22.    The City and PMO were the only two parties to the City Agreements.

23.    None of the individual members of the City Council nor the current Mayor signed the City Agreements, and none of them ever consented to submit to arbitration any claim against them individually or in their capacity as a public official, or to waive their right to defend themselves in Court.

24.    Following the issuance of the December 2003 Resolution, the parties continued to finalize certain terms of the City Agreements relating to insurance and/or indemnification.

25.    In March 2004, these remaining provisions were finalized and then-Mayor Joseph DeStefano executed the City Agreements on behalf of the City of Middletown.

26.    The City forwarded the partially executed City Agreements to PMO in late March 2004.

27.    Approximately one year and a half later, by letter dated October 11, 2005, PMO returned to the City the fully executed City Agreements, which, upon information and belief, had been executed by PMO in July 2005.

28.    At no time prior to its execution or delivery of the fully-executed agreements to the City in October 2005 did PMO seek to revisit, amend or extend any of the provisions of the agreements.

29.    The City Agreements contemplate the construction and operation by PMO on City property of an "integrated solid waste processing facility" available to receive MSW and sewage sludge, and separating such waste for recycling and producing marketable byproducts (*i.e.,* ethanol).

30.    Under the City Agreements, the term "Facility" means "the integrated solid waste processing facility, together with all additions, replacements, appurtenant structures and equipment, to be designed, constructed and operated by the Company [PMO] on the Facility Site."

31.    Under the City Agreements, either party may terminate the City Agreements in the event PMO fails to have a fully operational Facility capable of, *inter alia*, accepting all of the MSW and sewage sludge generated by the City, by the "Service Date" deadline of December 9, 2008.

32.    The City Agreements include and/or incorporate certain Schedules, one of which sets forth certain "Common Contract Conditions." These Common Contract Conditions contain, *inter alia*, an "Entire Agreement; Modifications" provision, under which the Lease, City Waste Management Services Agreement, Comprehensive Waste Agreement and Host Community Agreement together constitute "the entire understanding of the parties with respect to the subject

- 6 -

hereof and supersedes all prior agreements, understandings and commitments with respect

thereto and . . . may be modified only by written agreement executed by both parties."

33.    The City Agreements also contain a "Dispute Resolution" clause, which states in

pertinent part:

>    Any claim, action dispute or controversy of any kind arising out of
>    or relating to this Agreement or concerning any aspect of
>    performance by the City or the Company [PMO] (each a "Party")
>    under the terms of this Agreement ("Dispute") shall be resolved by
>    mandatory and binding arbitration administered by the American
>    Arbitration Association (the "AAA"). . . . To the extent that any
>    inconsistency exists between this Agreement and the foregoing
>    statutes or rules, this Agreement shall control. . . .

See Petition, Exhibit B (City Waste Management Services Agreement, Schedule 5, Dispute

Resolution).

34.    The City Agreements expressly prohibit recovery of punitive damages:

>    In no event, whether because of the breach of any provisions
>    contained in this Agreement or for any other cause, whether based
>    on contract, strict liability, tort, warranty, delay or otherwise, shall
>    either the City or the Company be liable, or otherwise be obligated
>    in any manner to pay to the other any incidental, special, punitive,
>    consequential or indirect damages of any nature.

See id. (City Waste Management Services Agreement, Schedule 6, General Contract Conditions,

§ 4(c)).

## RELEVANT POST-AGREEMENT CONDUCT

35.    As of the first quarter of 2006, PMO had made no measurable progress with

respect to the development of the Facility, despite the fact that the RFP process had commenced

in 1994, approximately 12 years earlier. Accordingly, in or about April 2006, the City began

making certain inquiries of PMO in order to obtain reasonable assurances that PMO could fulfill

its obligations under the City Agreements, including the Service Date deadline of December 9,

2008.

36.    By letter dated August 18, 2006, and on numerous occasions before and thereafter, the City raised several issues pertaining to PMO's ability to comply with its obligations under the City Agreements, including the Service Date deadline of December 9, 2008. The City also questioned the ongoing validity of key provisions of the City Agreements in light of a unilateral decision by PMO not to seek financing from the Middletown Industrial Development Agency ("MIDA"), as expressly contemplated by the City Agreements (*e.g.*, the commencement of the term of the Lease is tied to closing on MIDA bond financing). *See* Petition, Exhibit F.

37.    PMO's responses were largely evasive and non-responsive.

38.    In December 2006, PMO provided a "2006 Year-End Report," in which PMO informed the City, that, among other things, it was filing a pre-application for construction loan financing from the United States Department of Energy ("DOE") under a program established by the Energy Policy Act of 2005 and that it intended to purchase from the Tennessee Valley Authority ("TVA") certain "biomass pilot plant equipment." *See* Petition, Exhibit G.

39.    Subsequent correspondence from PMO confirmed that the outdated pilot plant equipment could process no more than two to four tons per day of MSW for conversion to ethanol, far less than the quantities of MSW and sewage sludge generated by the City.

40.    By letter dated January 4, 2007, the City informed PMO that it was "deeply troubled by PMO's sudden announcement that it intends to relocate old 'pilot plant' equipment for use in Middletown" and expressed its position that such a proposal would not be "consistent with the scope or intent of the City/PMO agreements," which required a full-scale waste to ethanol facility to be operational by December 2008. *See* Petition, Exhibit H.

41.    The City also inquired into PMO's pre-application to the DOE for a construction loan guarantee pursuant to Title XVII of the Energy Policy Act, related to "innovative

- 8 -

technologies," which contains specific statutory eligibility criteria, including air emission limits for sulfur dioxide and nitrogen oxides. *Id.*

42.    In its January 4, 2007 letter to PMO, the City sought an explanation of how PMO was eligible under the Title XVII program when its existing Air Permit appeared to authorize emissions of sulfur dioxide and nitrogen oxides in excess of the statutory limits set forth in the Energy Policy Act. *Id.* The City also inquired about the status of PMO's private equity financing and stated that the City did not have a reasonable basis to believe that PMO could meet its contractual obligations. *Id.*

43.    By letter dated January 5, 2007, PMO responded to the City's inquiry, but conflated two programs authorized under the Energy Policy Act. *See* Petition, Exhibit I. The first program described by PMO was authorized under Title XV, which DOE was not yet pursuing and which, upon information and belief, was inapplicable to PMO's financing application. *Id.* The other program, authorized under Title XVII, which DOE was pursuing, contained the express statutory requirements for eligibility described above. *Id.* PMO further asserted that the City had unreasonably or improperly attempted to "interfere with [PMO's] ongoing financial relationships," but did not substantively respond to the City's inquiry regarding PMO's eligibility under the DOE program. *Id.*

44.    Concerning its representations regarding private equity financing, PMO responded to the City's inquiry by vaguely stating that it may pursue European private financing for the project. *See id.* PMO also stated that it did not expect to close on private equity financing until a determination had been made regarding PMO's application to DOE. *Id.*

45.    By letter dated January 17, 2007, the City informed PMO that it believed PMO's assertion of the City's improper interference with business relations was without merit and that the City stood by its reasonable requests for information concerning PMO's DOE construction

- 9 -

loan guarantee application, as this issue was now directly related to PMO's ability to perform under the City Agreements. *See* Petition, Exhibit J.

46.     On May 22, 2007, PMO appeared before the City's Common Council to deliver a project status update.

47.     As of May 22, 2007, PMO still had not closed on any of its promised private financing, nor had PMO secured DOE financing, but now professed to be able to self-finance a portion of the project.

48.     At the May 22, 2007 meeting, PMO handed out a report entitled "Progress Report to the City of Middletown, New York on the Orange Recycling and Ethanol Production Facility by Pencor Masada OxyNol, LLC" (the "Progress Report"). *See* Petition, Exhibit K (Progress Report).

49.     In the Progress Report, PMO stated its plan to "employ the transfer station on site to fulfill its contractual obligation" and to develop and build "PMO's full scale waste-to-ethanol facility in stages, starting with the reassembly and operation of the TVA facilities and equipment" and then, sometime after the Service Date deadline of December 9, 2008, "resume PMO's preferred project development approach for its full-scale PMO facility in a manner that prudently advances PMO's original business objectives." *Id.*

50.     This proposal was inconsistent with PMO's obligations under the City Agreements, as the City had made abundantly clear in January.

51.     By letter dated June 6, 2007, PMO demanded that the City's Common Council adopt a resolution of support for PMO's application to DOE.

52.     On June 11, 2007, the Common Council adopted a resolution (the "June 11 Resolution") in support of PMO's application for DOE financing, contingent on PMO developing a Facility that fully complied with the City Agreements. *See* Petition, Exhibit L. The

resolution expressly stated the City's position that the Service Date deadline was December 9, 2008, and that, pursuant to the City Agreements, PMO must have a full-scale waste-to-ethanol facility on the project site by that date. *Id.*

53.    By letter dated June 12, 2007, the City restated its position, first stated in its January 4, 2007 letter to PMO, that PMO's proposed development of a transfer station and small-scale pilot waste-to-ethanol facility in lieu the promised full-scale waste-to-ethanol plant "would be a direct violation of the City/PMO agreements, and would eviscerate the basis for the City's decision to contract with PMO in the first place." *See* Petition, Exhibit M. The City further reiterated its consistent position that the Service Date deadline was December 9, 2008. *Id.*

## THE ARBITRATION PROCEEDING

54.    On or about June 18, 2007, PMO filed a "Complaint in Arbitration" with the AAA against all of the Petitioners, including each member of the Common Council in his or her official capacity and the Mayor and two Common Council members in their individual capacities, purportedly based on the Dispute Resolution clause contained in Schedule 5 to the City Agreements. *See* Petition, Exhibit A.

55.    In its Complaint in Arbitration, PMO alleged, *inter alia,* that the Petitioners violated "PMO's rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution, which is actionable under 42 U.S.C. § 1983 . . .," that the Petitioners violated "PMO's freedom of political association guaranteed under the First Amendment of the United States Constitution, which is actionable under 42 U.S.C. § 1983 . . .," that Petitioners violated "PMO's rights under the laws of New York to be protect [sic] from tortious interference with the City's agreements and third-party relationships" and that the

- 11 -

Petitioners violated "PMO's rights under New York law to due process and equal protection."

*Id.*

56.     PMO's Complaint in Arbitration seeks, *inter alia*: (1) declarations that PMO's

rights under "the City agreements, the laws of the State of New York, and the First and

Fourteenth Amendments of the United States Constitution" have been violated; (2) certain

monetary damages, including PMO's alleged project development costs; (3) punitive damages

against individual Petitioners Duncanson, Meyer and Rollins; and (4) attorneys' fees "under 42

USC § 1988 for the violation of PMO's First and Fourteenth Amendment rights." *Id.*

## STANDARDS OF REVIEW

57.     CPLR 7502(b) and (c) state in pertinent part that:

> (b) If, at the time that a demand for arbitration was made or a
> notice of intention to arbitrate was served, the claim sought to be
> arbitrated would have been barred by limitation of time had it been
> asserted in a court of the state, a party may assert the limitation as
> a bar to the arbitration on an application to the court as provided in
> section 7503 or subdivision (b) of section 7511. . . .

> (c) Provisional remedies. The supreme court in the county in which
> an arbitration is pending or in a county specified in subdivision (a)
> of this section, may entertain an application for an order . . . for a
> preliminary injunction in connection with an arbitration that is
> pending or that is to be commenced inside or outside this state,
> whether or not it is subject to the United Nations convention on the
> recognition and enforcement of foreign arbitral awards, but only
> upon the ground that the award to which the applicant may be
> entitled may be rendered ineffectual without such provisional
> relief. . . .

58.     No party will be compelled to arbitrate absent "evidence which affirmatively

establishes that the parties expressly agreed to arbitrate their disputes." *Waldron v. Goddess*, 61

N.Y.2d 181, 183, 473 N.Y.S.2d 136, 137 (1984) (internal quotation omitted). In this regard, an

arbitration agreement must be "clear, explicit and unequivocal . . . and must not depend upon

implication or subtlety." *Id.* at 183-84, 137 (internal citations omitted). Therefore, where, as here, a party named in an arbitration proceeding never agreed to arbitrate any dispute with regard to the contract in question, a stay of arbitration is appropriate. *See Bidermann Indus. Licensing v. Avmar N.V.*, 155 A.D.2d 303, 547 N.Y.S.2d 589 (1st Dep't 1989).

59.     Further, New York law is clear that "in proceedings authorized by a prior agreement to arbitrate future disputes, it is for the court to determine whether the claim, and therefore the arbitration, is barred by the statute of limitations." *Paver & Wildfoerster v. Catholic High Sch. Ass'n*, 38 N.Y.2d 669, 674, 382 N.Y.S.2d 22, 24 (1976); *see also SCM Corp v. Fisher Park Lane Co.*, 40 N.Y.2d 788, 792, 390 N.Y.S.2d 398, 402 (1976). Indeed, CPLR 7502(b) was enacted specifically to clarify that statute of limitations issues were to be determined by a court, not an arbitrator. *Paver*, 38 N.Y.2d at 673, 382 N.Y.S.2d at 24.

60.     CPLR 7503(c) states in pertinent part: "Any provision in an arbitration agreement or arbitration rules which waives the right to apply for a stay of arbitration is hereby declared null and void."

## RELIEF SOUGHT

61.     PMO commenced the Arbitration Proceeding purportedly based on a Dispute Resolution clause applicable to certain related agreements between the City and PMO concerning PMO's proposed waste-to-ethanol facility (the "City Agreements"). *See* Petition ¶¶ 24, 36, Exhibits B-E (City Agreements; City Agreements, Schedule 5, Dispute Resolution).

62.     PMO did not file a notice of claim prior to commencing the Arbitration Proceeding.

- 13 -

**A.    The Individual Petitioners Were Not Parties to the City Agreements and Cannot be Compelled to Arbitrate**

63.    The Individual Petitioners are not parties to the City Agreements and cannot be compelled to arbitrate under the Dispute Resolution clause contained therein. It is black-letter law in New York that no party will be compelled to arbitrate absent "evidence which affirmatively establishes that the parties expressly agreed to arbitrate their disputes." *Rockland v. Primiano Constr. Co.*, 51 N.Y.2d 1, 6, 431 N.Y.S.2d 478, 480-81 (1980). None of the Individual Petitioners signed the City Agreements or otherwise agreed to relinquish their right to access the courts in a dispute involving PMO. Simply stated, there is no agreement to arbitrate between PMO and any of the Individual Petitioners. Consequently, none of PMO's claims against the Individual Petitioners are arbitrable. Thus, at the very least, this Court should temporarily stay the Arbitration Proceeding until the Court determines whether PMO's claims against the Individual Petitioners may proceed.

**B.    PMO's Punitive Damages Claim May Not Be Arbitrated**

64.    As noted earlier, the City Agreements expressly exclude an award of punitive damages. See Petition, Exhibit B (City Waste Management Services Agreement, Schedule 6, General Contract Conditions, § 4(c)).

65.    Further, punitive damages cannot be recovered from a municipality as a matter of law. *See Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981). In any event, PMO seeks punitive damages solely from three of the Individual Petitioners, none of whom is properly named as a Defendant in the Complaint in Arbitration for the reasons stated above.

66.    Thus, in addition to there being no valid agreement to subject the Individual Petitioners to arbitration, the Arbitration Proceeding against the three Individual Petitioners also should be stayed with respect to PMO's claims for punitive damages.

- 14 -

**C.    PMO's Tortious Interference and State Constitutional Tort Claims Are Barred by the Statute of Limitations and Are Not Arbitrable**

67.    In the Arbitration Proceeding, PMO alleges, among other things, that the Petitioners tortiously interfered with PMO's unspecified existing and/or potential business relationship or contracts.

68.    General Municipal Law § 50-e requires that a notice of claim be served upon the City, within 90 days after the claim arises, prior to commencing a tortious interference claim against a municipal government. *See McVan v. New Rochelle*, 127 A.D.2d 825, 511 N.Y.S.2d 942 (2d Dep't 1987). A cause of action for tortious interference accrues when the plaintiffs' alleged contractual relationship was harmed and not upon discovery of the tortious act. *Bib Constr. Co. v. City of Poughkeepsie*, 273 A.D.2d 186, 709 N.Y.S.2d 112 (2d Dep't 2000) (dismissing tortious interference claim for failure to file a notice of claim). Here, insofar as PMO has alleged a cause of action for tortious interference with PMO's unspecified contractual relationships based on the alleged effect of the content of the City's correspondence questioning PMO's ability to live up to its contractual obligations, that correspondence began no later than April 2006. By August 2006, the City had questioned PMO's ability to finance the project with DOE and private equity funds; by January 2007, PMO had already directly asserted that the City had interfered with its business relationships. If PMO believed it had a viable claim for tortious interference, it would have accrued, at the latest, in January 2007, when PMO itself accused the City of interfering with "PMO's ongoing financial relationships . . ." *See* Petition Exhibit I. PMO failed to file a notice of claim within 90 days of the accrual of this purported cause of action or, indeed, at anytime thereafter. Therefore, insofar as PMO asserts that the City tortiously interfered with PMO's prospective business relationship or contract, such a claim is time-barred. *See Bib Constr., supra.*; Petition ¶¶ 74-80.

- 15 -

69.    For identical reasons, this Court should stay PMO's claims that the City violated its state constitutional rights. Claims of state constitutional violations are subject to notice of claim requirements of General Municipal Law § 50-e. *See Mazzilli v. City of New York*, 154 A.D.2d 355, 545 N.Y.S.2d 833 (2d Dep't 1989). Although vaguely pled, this cause of action is based on the same alleged course of conduct as PMO's tortious interference claim. Because PMO failed to file a notice of claim for their purported causes of action alleging violations of the state constitution, this Court should stay the arbitration of those claims as well.

**D.    PMO's Constitutional Claims Are Beyond the Scope of the Dispute Resolution Clause and Are Not Arbitrable as a Matter of Public Policy**

70.    In the Arbitration Proceeding, PMO further alleges, among other things, that Petitioners violated PMO's constitutional rights under the Federal and New York state constitutions. "The question of arbitrability turns on whether the parties did agree by the terms of their particular arbitration clause to refer their differences in this specific area to arbitration." *In re City of Elmira*, 34 A.D.3d 1075, 824 N.Y.S.2d 778 (3d Dep't 2006) (citing *Matter of Board of Educ. of Watertown City School Dist.*, 93 N.Y.2d 132, 138, 688 N.Y.S.2d 463 (1999) (internal quotation marks omitted). A waiver of party's access to a judicial forum must be "clear[] and unmistakable[.]" *Conde v. Yeshiva Univ.*, 16 A.D.3d 185, 792 N.Y.S.2d 387 (1st Dep't 2005) (staying arbitration of employment and tort law claims where such claims were not within the purview of an arbitration clause providing for arbitration of claim "related to" wages). The Dispute Resolution provision of the City Agreements does not clearly and unmistakably waive the City's right to access a judicial forum for the resolution of disputes over the *constitutionality* of the actions of municipal officials. Rather, it compels arbitration of disputes "arising out of" the City Agreements. PMO's broad constitutional tort allegations go far beyond a dispute arising out of the City Agreements. Indeed, according to PMO, these claims involve PMO's "freedom of political association" and "rights to due process and equal protection under the Fourteenth

- 16 -

Amendment to the United States Constitution." *See* Petition, Exhibit A (Complaint in

Arbitration at 6). Under no circumstances can these allegations of unconstitutional conduct fall

within the Dispute Resolution clause of the City Agreements, which themselves are contracts

limited to the construction and operation of a waste-to-ethanol facility, and the provision of

waste disposal services. The Dispute Resolution clause was never intended to waive the

Petitioners' rights to access the courts where the constitutionality of municipal government

action is at stake.

71.    Naturally, in instances where the constitutionality of government action is at

issue, New York public policy favors the resolution of such claims by the courts, not by private

arbitrators. *See Wertheim & Co. v. Halpert*, 48 N.Y.2d 681, 421 N.Y.S.2d 876 (1979)(finding

constitutional discrimination claim not arbitrable where prohibited by public policy); *Rogers v.*

*New York University*, 220 F.3d 73, 75 (2d Cir. 2000) (arbitration clause not enforceable against

constitutional claims brought under the Americans with Disabilities Act and Family Medical

Leave Act); *Cf. Coppinger v. Metro-North C. R.R.*, 861 F.2d 33, 36 (2d Cir. 1988) (employee

could not be compelled to arbitrate civil rights claims because his civil rights claim has a "legally

independent origin[]" from his other, arbitrable claims). Here, the Court should recognize New

York's important public policy against arbitrating constitutional claims, especially where no

party has expressly consented to such an arbitration. As a result, this Court should stay PMO's

constitutional claims in the Arbitration Proceeding.

72.    For the foregoing reasons, Petitioners respectfully request that this Court stay the Arbitration Proceeding on the grounds that: (1) there is no valid arbitration agreement between the Individual Petitioners and PMO because the individuals named in the Arbitration Proceeding never consented to arbitration; (2) certain of the claims asserted in the Arbitration Proceeding are barred by the statute of limitations; and (3) the constitutional violations alleged in the Arbitration Proceeding are beyond the scope of the arbitration clause at issue and, in any event, the arbitration of those claims is against public policy.    Additionally, Petitioners request that this Court grant a temporary stay of the Arbitration Proceeding until such time as the Court can fully address the threshold issues raised in the Petition, along with any other relief this Court deem just, necessary and proper.

Dated: New York, New York
       July 6, 2007.



_____
Michael G. Murphy, Esq.

Beveridge & Diamond, P.C.
477 Madison Avenue, 15th Floor
New York, NY 10022-5802
Tel.: (212) 702-5400
Fax: (212) 702-5450

Attorney for Petitioners.

86068v7 NewYork 012753

**Exhibit 1**

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Northeast Case Management Center*
Catherine Shanks
Vice President
Christopher Fracassa, Yvonne L. Baglini
Assistant Vice Presidents

950 Warren Avenue, East Providence, RI 02914
telephone: 866-293-4053 facsimile: 401-435-6529
internet: http://www.adr.org/

<u>Via Email</u>

June 27, 2007

David N. Minkin
Powell Goldstein LLP
1201 West Peachtree Street, NW
14th Floor
Atlanta, GA  30309

Michael Murphy
Beverage & Diamond, PC
15th Floor, 477 Madison Avenue
New York, NY  10022-5802

Re: 13 192 Y 01324 07
    Pencor Masada OxyNol, LLC
    and
    The City of Middletown, New York
    Marlinda Duncanson, individually and as
    Major of Middletown in her official capacity
    Robert Moson, as President of the Common Council
    in his official capacity; Maxine Meyer and
    James Rollins, individually and as members of
    the city's Common Council in their official
    capacities, and Thomas J. Burr, John VanderVoort
    Gerald Kleiner, Raymond Depew, Miguel Rodrigues
    and Joel Sierra, as members of the City's Common
    Council in their official capacities

Dear Counsel:

This will acknowledge receipt on June 18, 2007, of a Demand for Arbitration dated June 18, 2007. We understand that a copy was sent to Respondent. This will also acknowledge receipt on June 25, 2007 of the contract clause providing for administration of a controversy arising out of a contract between the above-captioned parties and providing for administration by the American Arbitration Association (the Association). As the claim exceeds $500,000.00, the Large Complex Case Procedures will apply unless the parties agree otherwise.

Please refer to our website for a copy of our Commercial Arbitration and Mediation Procedures, as amended and in effect September 15, 2005, as well as a copy of our Guide to the Management of Large Complex Cases. The Guide to the Management of Large Complex Cases is an excellent resource to parties. This guide includes a comprehensive review of each of the Association's Large Complex Case Rules, related commentary, and useful tips and information about the arbitration process. If you would like a printed copy of the Rules, or the Guide to the Management of Large Complex Cases, please contact the undersigned.

This will confirm telephone conversations today with Messrs. Minkin and Murphy, wherein they acknowledged that the deadline for the parties to agree upon an arbitrator in accordance with the provisions of the parties' arbitration clause is June 29, 2007. Absent notification by that date, the Association may make the appointment as authorized by the contract. Should the parties desire a list of arbitrators to assist in the selection of the arbitrator, please contact me.

In accordance with the Rules, if Respondent does not answer on or before July 12, 2007, we will assume that the claim is denied. If Respondent wishes to counterclaim, file the appropriate number of copies, together with the initial filing fee to the attention of the undersigned. A copy should be directly sent to Claimant.

We note the parties' agreement stipulates the locale as New York, NY.

Enclosed is a Checklist for Conflicts to list those witnesses you expect to present, as well as any persons or entities with an interest in these proceedings. The Conflicts Checklist is due by July 12, 2007. The parties are to exchange copies of all correspondence except this checklist and the arbitrator list.

Additionally, the parties may desire to mediate this case prior to an arbitration hearing. Mediation is a private, non-binding process under which the parties submit their dispute to a third-party neutral. The mediator may suggest ways of resolving the dispute, but may not impose a settlement on the parties; the parties attempt to negotiate their own settlement agreement. Please contact the undersigned for further details regarding mediation.

We invite the parties to visit our website to learn more about how to file and manage your cases online. As part of our administrative service, AAA's WebFile allows parties to perform a variety of case related activities, including:

- File additional claims
- Complete the Checklist for Conflicts form
- View invoices and submit payment
- Share and manage documents
- Strike and rank listed neutrals
- Review case status

AAA WebFile provides flexibility because it allows you to work online as your schedule permits - day or night. Cases originally filed in the traditional offline manner can also be viewed and managed online.

In closing we wish to remind the parties that the Association has a refund schedule in the administrative fee section of the Rules. After 60 days or the appointment of the arbitrator the filing fees are non-refundable. If the parties enter settlement negotiations at any time after the Association has opened its file, you should take into consideration the refund schedule in the Rules. The Association will only refund filing fees as outlined in the Rules and does not refund neutral costs incurred when parties settle their dispute or withdraw their claims. We encourage parties to resolve their disputes as amicably as possible and this notice is just to alert you to this issue so that it doesn't become a concern in the future.

Please feel free to call if you have any questions.  We look forward to assisting you in this matter.

Sincerely,


Jennifer Eltahan
Case Manager
401 431 4738
Eltahanj@adr.org

*Supervisor Information: Heather Santo, 401 431 4702, SantoH@adr.org*

Encl.

# AMERICAN ARBITRATION ASSOCIATION
## CHECKLIST FOR CONFLICTS

In the Matter of the Arbitration between:
Re: 13 192 Y 01324 07

Pencor Masada OxyNol, LLC
and
The City of Middletown, New York
Marlinda Duncanson, individually and as
Major of Middletown in her official capacity
Robert Moson, as President of the Common Council
in his official capacity; Maxine Meyer and
James Rollins, individually and as members of
the city's Common Council in their official
capacities, and Thomas J. Burr, John VanderVoort
Gerald Kleiner, Raymond Depew, Miguel Rodrigues
and Joel Sierra, as members of the City's Common
Council in their official capacities

To avoid the possibility of a last-minute disclosure and/or disqualification of the arbitrator pursuant to the rules, we must advise the arbitrator of the names of all persons, firms, companies or other entities involved in this matter. Please list below all interested parties in this case, including, but not limited to, witnesses, consultants, and attorneys. In order to avoid conflicts of interest, parties are requested to also list subsidiary and other related entities. This form will only be used as a list for conflicts, not a preliminary or final witness list. Please note that the Association will not divulge this information to the opposing party, and the parties are not required to exchange this list. This form will, however, be submitted to the arbitrator, together with the filing papers. You should be aware that arbitrators would need to divulge any relevant information in order to make appropriate and necessary disclosures in accordance with the applicable arbitration rules.

NAME                    AFFILIATION                    ADDRESS

DATED: _____    PARTY: _____
                                         Please Print

Exhibit 2

IN RE: ARBITRATION PROCEEDINGS BEFORE THE AMERICAN
ARBITRATION ASSOCIATION

PENCOR MASADA OXYNOL, LLC,                )
                                          )
Plaintiff,                                )
                                          )
v.                                        )      Case No. 13 192 Y 01324 07
                                          )
City of Middletown, New York, et al,      )
                                          )
Defendants.                               )

## NOTICE OF APPEARANCE

The undersigned counsel hereby notifies the American Arbitration Association and
counsel for the defendants of their appearance on behalf of plaintiff Pencor-Masada
OxyNol, LLC. Copies of all pleadings and orders filed in the case should be provided to
the undersigned counsel.

Respectfully submitted,


 /s/ Kenneth L. Thomas
KENNETH L. THOMAS
klthomas@tmgslaw.com,

And


 /s/ Ramadanah S. Jones
RAMADANAH S. JONES
rsjones@tmgslaw.com,

Thomas, Means, Gillis & Seay
3121 Zelda Court (36106)
P.O. Box 5058
Montgomery, Alabama
36103-5058 (334) 270-
1033 (phone)
(334) 260-9396 (fax)
Attorneys for Plaintiff PMO

Of Counsel:

David N. Minkin
Powell Goldstein One
Atlantic Center
1201 West Peachtree Street, NW
Fourteenth Floor Atlanta, Georgia
30309
Counsel for Plaintiff PMO

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Notice has been served upon Michael Murphy and Christopher McKenzie, Beveridge & Diamond, PC, counsel of record for the defendants, via email on this 3rd day of July, 2007.

/s/ Kenneth L. Thomas

KENNETH L. THOMAS

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE

------------------------------------------------------------------X

CITY OF MIDDLETOWN, MARLINDA            :
DUNCANSON, INDIVIDUALLY AND IN HER   :
OFFICIAL CAPACITY AS MAYOR OF THE     :
CITY OF MIDDLETOWN, ROBERT MOSON,    :
IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE :
COMMON COUNCIL OF THE CITY OF        :
MIDDLETOWN, MAXINE MEYER,           :
INDIVIDUALLY AND IN HER OFFICIAL      :
CAPACITY AS A MEMBER OF THE COMMON  :
COUNCIL OF THE CITY OF MIDDLETOWN,   :
JAMES ROLLINS, INDIVIDUALLY AND IN HIS  :
OFFICIAL CAPACITY AS A MEMBER OF THE  :
COMMON COUNCIL OF THE CITY OF       :
MIDDLETOWN, THOMAS J. BURR, IN HIS    :
OFFICIAL CAPACITY AS A MEMBER OF THE  :
COMMON COUNCIL OF THE CITY OF       :
MIDDLETOWN, JOHN VANDERVOORT,     :
IN HIS OFFICIAL CAPACITY AS A MEMBER   :
OF THE COMMON COUNCIL OF THE CITY OF :
MIDDLETOWN, GERALD KLEINER, IN HIS   :
OFFICIAL CAPACITY AS A MEMBER OF THE  :
COMMON COUNCIL OF THE CITY OF       :
MIDDLETOWN, RAYMOND DEPEW, IN HIS   :
OFFICIAL CAPACITY AS A MEMBER OF THE  :
COMMON COUNCIL OF THE CITY OF       :
MIDDLETOWN, AND JOEL SIERRA, IN HIS    :
OFFICIAL CAPACITY AS A MEMBER OF THE  :
COMMON COUNCIL OF THE CITY OF       :
MIDDLETOWN,                       :

**VERIFIED PETITION
TO STAY ARBITRATION
PURSUANT TO ARTICLE
75 OF THE CIVIL
PRACTICE LAW
AND RULES**

Index No. __ - _____

Petitioners,

-against-

PENCOR-MASADA OXYNOL, LLC,

Respondent.

------------------------------------------------------------------X

## PETITION TO STAY ARBITRATION

The City of Middletown (the "City") and the above-captioned City officials (collectively with the City, the "Petitioners"), by and through their undersigned counsel, for their Petition to stay the arbitration proceeding captioned *Pencor-Masada Oxynol, LLC v. City of Middletown, New York, et al.*, case no. 13 192 Y 01324 07 (the "Arbitration Proceeding"), pursuant to CPLR 7502 and 7503(c), against Respondent Pencor-Masada Oxynol, LLC ("PMO"), allege as follows:

## NATURE OF THE ACTION

1.    This Petition seeks to stay the Arbitration Proceeding commenced by PMO against the City and the above-captioned City officials, both in their individual and official capacities, in order to prevent PMO from seeking improperly to intimidate public officials and to "constitutionalize" a simple contract dispute with the City.  A true and correct copy of PMO's Complaint in Arbitration is attached hereto as Exhibit A.

2.    Petitioners seek to stay the Arbitration Proceeding on the grounds that: (1) there is no valid arbitration agreement between the individual Petitioners and PMO because the individuals named in the Arbitration Proceeding never consented to arbitration; (2) certain of the claims asserted in the Arbitration Proceeding are barred by the statute of limitations; and (3) the constitutional violations alleged in the Arbitration Proceeding are beyond the scope of the arbitration clause at issue and, in any event, the arbitration of those claims is against public policy.

## PARTIES

3.    The City is a municipal corporation organized and existing under the laws of the State of New York, located in Orange County, New York, with an office located at 16 James Street, Middletown, New York.

- 2 -

4.    Petitioner Marlinda Duncanson is the Mayor of the City of Middletown and a resident of the State of New York, County of Orange.

5.    Petitioner Robert Moson is the President of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

6.    Petitioner Maxine Meyer is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

7.    Petitioner James Rollins is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

8.    Petitioner Thomas J. Burr is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

9.    Petitioner John VanderVoort is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

10.    Petitioner Gerald Kleiner is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

11.    Petitioner Raymond Depew is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

12.    Petitioner Miguel Rodrigues is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

13.    Petitioner Joel Sierra is a Member of the Common Council of the City of Middletown and a resident of the State of New York, County of Orange.

14.    Upon information and belief, Respondent PMO is a Delaware limited liability company, doing business in the State of New York, County of Orange, and has offices located at 2170 Highland Avenue S., Suite 100, Birmingham, Alabama.

- 3 -

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this special proceeding to stay an arbitration pursuant to CPLR 7502 and 7503(c).

16.     This Court has personal jurisdiction over PMO pursuant to CPLR 301 and 302 because PMO is a corporate entity doing business in New York.

17.     Venue properly lies in this Court pursuant CPLR 503(a) and (c), CPLR 504 and CPLR 7502(a).

## THE AGREEMENTS BETWEEN THE CITY AND PMO

18.     In 1994, the City issued a request for proposals ("RFP") pursuant to General Municipal Law § 120-w for a long-term, comprehensive, integrated and environmentally sound solution to its solid waste disposal needs that excluded incineration.

19.     In 1995, Pencor Orange Corporation ("Pencor"), a New York Corporation, responded to the RFP and was selected as the preferred bidder. Pencor's selection was based on its proposal for the construction of a materials recovery facility coupled with the conversion of the organic fraction of the waste into useful products with minimal residual waste. More specifically, the conversion component would utilize Pencor's "OxyNol" process to convert the organic constituents of municipal solid waste ("MSW") into ethanol.

20.     Upon information and belief, Pencor caused to be formed and/or otherwise became affiliated with PMO.

21.     PMO was designated as project developer, with Pencor as PMO's managing member.

- 4 -

22.    Between 1996 and 2003, the City and PMO negotiated the terms of several related agreements.  During this time period, the project was reviewed by the City, acting as lead agency, pursuant to the State Environmental Quality Review Act ("SEQRA"). The City's SEQRA findings statement expressly states that PMO would construct and operate a facility that "would utilize an innovative process, the CES OxyNol™ process, for converting municipal solid waste (MSW) and sewage sludge into ethanol and other valuable products" and that the facility was "expected to process 230,000 wet tons per year of MSW and up to 49,000 tons per year (dry solids basis) of sewage sludge and produce 7 million gallons per year or ethanol." All of the City's SEQRA findings were based on this assumption.

23.    In December 2003, almost 10 years after the City issued the RFP, and after the SEQRA process was complete, the City authorized then-Mayor Joseph DeStefano to execute certain agreements relating to the proposed PMO waste-to-ethanol project ("December 2003 Resolution").

24.    The agreements at issue had an effective date of December 9, 2003 and consisted of following: (1) City Waste Management Services Agreement (true and complete copy annexed as Exhibit B hereto); (2) Comprehensive Waste Management Services Agreement (true and complete copy annexed as Exhibit C hereto); (3) Lease Agreement (true and complete copy annexed as Exhibit D hereto); and (4) Host Community Agreement (true and complete copy annexed as Exhibit E hereto), (collectively, the "City Agreements").

25.    The City and PMO were the only two parties to the City Agreements.

26.    None of the individual members of the City Council nor the current Mayor signed the City Agreements, and none of them ever consented to submit to arbitration any claim against them individually or in their capacity as a public official, or to waive their right to defend themselves in Court.

- 5 -

27. Following the issuance of the December 2003 Resolution, the parties continued to finalize certain terms of the City Agreements relating to insurance and/or indemnification.

28. In March 2004, these remaining provisions were finalized and then-Mayor Joseph DeStefano executed the City Agreements on behalf of the City of Middletown.

29. The City forwarded the partially executed City Agreements to PMO in late March 2004.

30. Approximately one year and a half later, by letter dated October 11, 2005, PMO returned to the City the fully executed City Agreements, which, upon information and belief, had been executed by PMO in July 2005.

31. At no time prior to its execution or delivery of the fully-executed agreements to the City in October 2005 did PMO seek to revisit, amend or extend any of the provisions of the agreements.

32. The City Agreements contemplate the construction and operation by PMO on City property of an "integrated solid waste processing facility" available to receive MSW and sewage sludge, and separating such waste for recycling and producing marketable byproducts (*i.e.*, ethanol).

33. Under the City Agreements, the term "Facility" means "the integrated solid waste processing facility, together with all additions, replacements, appurtenant structures and equipment, to be designed, constructed and operated by the Company [PMO] on the Facility Site."

34. The City Agreements permit either party to terminate the City Agreements in the event PMO fails to have a fully operational Facility capable of, *inter alia*, accepting all of the MSW and sewage sludge generated by the City, by the "Service Date" deadline of December 9, 2008.

- 6 -

35.    The City Agreements include and/or incorporate certain Schedules, one of which sets forth certain "Common Contract Conditions." These Common Contract Conditions contain, *inter alia*, an "Entire Agreement; Modifications" provision, under which the Lease, City Waste Management Services Agreement, Comprehensive Waste Agreement and Host Community Agreement together constitute "the entire understanding of the parties with respect to the subject hereof and supersedes all prior agreements, understandings and commitments with respect thereto and . . . may be modified only by written agreement executed by both parties."

36.    The City Agreements also contain a "Dispute Resolution" clause, which states in pertinent part:

> Any claim, action dispute or controversy of any kind arising out of or relating to this Agreement or concerning any aspect of performance by the City or the Company [PMO] (each a "Party") under the terms of this Agreement ("Dispute") shall be resolved by mandatory and binding arbitration administered by the American Arbitration Association (the "AAA"). . . . To the extent that any inconsistency exists between this Agreement and the foregoing statutes or rules, this Agreement shall control. . . .

*See* Exhibit B (City Waste Management Services Agreement, Schedule 5, Dispute Resolution).

37.    The City Agreements expressly prohibit recovery of punitive damages:

> In no event, whether because of the breach of any provisions contained in this Agreement or for any other cause, whether based on contract, strict liability, tort, warranty, delay or otherwise, shall either the City or the Company be liable, or otherwise be obligated in any manner to pay to the other any incidental, special, punitive, consequential or indirect damages of any nature.

*See* Exhibit B (City Waste Management Services Agreement, Schedule 6, General Contract Conditions, § 4(c)).

## RELEVANT POST-AGREEMENT CONDUCT

38.    As of the first quarter of 2006, PMO had made no measurable progress with respect to the development of the Facility, despite the fact that the RFP process had commenced

in 1994, approximately 12 years earlier. Accordingly, in or about April 2006, the City began making certain inquiries of PMO in order to obtain reasonable assurances that PMO could fulfill its obligations under the City Agreements, including the Service Date deadline of December 9, 2008.

39.    By letter dated August 18, 2006, a true and correct copy of which is annexed hereto as Exhibit F, and on numerous occasions before and thereafter, the City raised several issues pertaining to PMO's ability to comply with its obligations under the City Agreements, including the Service Date deadline of December 9, 2008. The City also questioned the ongoing validity of key provisions of the City Agreements in light of a unilateral decision by PMO not to seek financing from the Middletown Industrial Development Agency ("MIDA"), as expressly contemplated by the City Agreements (e.g., the commencement of the term of the Lease is tied to closing on MIDA bond financing).

40.    PMO's responses were largely evasive and non-responsive.

41.    In December 2006, PMO provided a "2006 Year-End Report," in which PMO informed the City, that, among other things, it was filing a pre-application for construction loan financing from the United States Department of Energy ("DOE") under a program established by the Energy Policy Act of 2005 and that it intended to purchase from the Tennessee Valley Authority ("TVA") certain "biomass pilot plant equipment." Annexed hereto as Exhibit G is a true and correct copy of the 2006 Year-End Report.

42.    Subsequent correspondence from PMO confirmed that the outdated pilot plant equipment could process no more than two to four tons per day of MSW for conversion to ethanol, far less than the quantities of MSW and sewage sludge generated by the City.

43.    By letter dated January 4, 2007, a true and correct copy of which is annexed hereto as Exhibit H, the City informed PMO that it was "deeply troubled by PMO's sudden

- 8 -

announcement that it intends to relocate old 'pilot plant' equipment for use in Middletown" and expressed its position that such a proposal would not be "consistent with the scope or intent of the City/PMO agreements," which required a full-scale waste to ethanol facility to be operational by December 2008.

44.    The City also inquired into PMO's pre-application to the DOE for a construction loan guarantee pursuant to Title XVII of the Energy Policy Act, related to "innovative technologies," which contains specific statutory eligibility criteria, including air emission limits for sulfur dioxide and nitrogen oxides. Exhibit H.

45.    In its January 4, 2007 letter to PMO, the City sought an explanation of how PMO was eligible under the Title XVII program when its existing Air Permit appeared to authorize emissions of sulfur dioxide and nitrogen oxides in excess of the statutory limits set forth in the Energy Policy Act. *Id.* The City also inquired about the status of PMO's private equity financing and stated that the City did not have a reasonable basis to believe that PMO could meet its contractual obligations. *Id.*

46.    By letter dated January 5, 2007, a true and correct copy of which is annexed hereto as Exhibit I, PMO responded to the City's inquiry, but conflated two programs authorized under the Energy Policy Act. The first program described by PMO was authorized under Title XV, which DOE was not yet pursuing and which, upon information and belief, was inapplicable to PMO's financing application. The other program, authorized under Title XVII, which DOE was pursuing, contained the express statutory requirements for eligibility described above. PMO further asserted that the City had unreasonably or improperly attempted to "interfere with [PMO's] ongoing financial relationships," but did not substantively respond to the City's inquiry regarding PMO's eligibility under the DOE program.

47.    Concerning its representations regarding private equity financing, PMO responded to the City's inquiry by vaguely stating that it may pursue European private financing for the project. *See* Exhibit I. PMO also stated that it did not expect to close on private equity financing until a determination had been made regarding PMO's application to DOE.

48.    By letter dated January 17, 2007, a true and correct copy of which is annexed hereto as Exhibit J, the City informed PMO that it believed PMO's assertion of the City's improper interference with business relations was without merit and that the City stood by its reasonable requests for information concerning PMO's DOE construction loan guarantee application, as this issue was now directly related to PMO's ability to perform under the City Agreements.

49.    On May 22, 2007, PMO appeared before the City's Common Council to deliver a project status update.

50.    As of May 22, 2007, PMO still had not closed on any of its promised private financing, nor had PMO secured DOE financing, but now professed to be able to self-finance a portion of the project.

51.    At the May 22, 2007 meeting, PMO handed out a report entitled "Progress Report to the City of Middletown, New York on the Orange Recycling and Ethanol Production Facility by Pencor Masada OxyNol, LLC" (the "Progress Report"). A true and correct copy of the Progress Report is annexed hereto as Exhibit K.

52.    In the Progress Report, PMO stated its plan to "employ the transfer station on site to fulfill its contractual obligation" and to develop and build "PMO's full scale waste-to-ethanol facility in stages, starting with the reassembly and operation of the TVA facilities and equipment" and then, sometime after the Service Date deadline of December 9, 2008, "resume

PMO's preferred project development approach for its full-scale PMO facility in a manner that prudently advances PMO's original business objectives."

53.    This statement was inconsistent with PMO's obligations under the City Agreements.

54.    By letter dated June 6, 2007, PMO demanded that the City's Common Council adopt a resolution of support for PMO's application to DOE.

55.    On June 11, 2007, the Common Council adopted a resolution (the "June 11 Resolution") in support of PMO's application for DOE financing, contingent on PMO developing a Facility that fully complied with the City Agreements. The resolution expressly stated the City's position that the Service Date deadline was December 9, 2008, and that, pursuant to the City Agreements, PMO must have a full-scale waste-to-ethanol facility on the project site by that date. A true and correct copy of the June 11 Resolution is annexed hereto as Exhibit L.

56.    By letter dated June 12, 2007, a true and correct copy of which is annexed hereto as Exhibit M, the City restated its position, first stated in its January 4, 2007 letter to PMO, that PMO's proposed development of a transfer station and small-scale pilot waste-to-ethanol facility in lieu the promised full-scale waste-to-ethanol plant "would be a direct violation of the City/PMO agreements, and would eviscerate the basis for the City's decision to contract with PMO in the first place." The City further reiterated its consistent position that the Service Date deadline was December 9, 2008.

## THE ARBITRATION PROCEEDING

57.    On or about June 18, 2007, PMO filed a "Complaint in Arbitration" with the AAA against all of the Petitioners, including each member of the Common Council in his or her

- 11 -

official capacity and the Mayor and two Common Council members in their individual capacities, purportedly based on the Dispute Resolution clause contained in Schedule 5 to the City Agreements. Exhibit A.

58.    In its Complaint in Arbitration, PMO alleged, *inter alia*, that the Petitioners violated "PMO's rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution, which is actionable under 42 U.S.C. § 1983 . . .," that the Petitioners violated "PMO's freedom of political association guaranteed under the First Amendment of the United States Constitution, which is actionable under 42 U.S.C. § 1983 . . .," that Petitioners violated "PMO's rights under the laws of New York to be protect [sic] from tortious interference with the City's agreements and third-party relationships" and that the Petitioners violated "PMO's rights under New York law to due process and equal protection." *Id.*

59.    PMO's Complaint in Arbitration seeks, *inter alia*: (1) declarations that PMO's rights under "the City agreements, the laws of the State of New York, and the First and Fourteenth Amendments of the United States Constitution" have been violated; (2) certain monetary damages, including PMO's alleged project development costs; (3) punitive damages against individual Petitioners Duncanson, Meyer and Rollins; and (4) attorneys' fees "under 42 USC § 1988 for the violation of PMO's First and Fourteenth Amendment rights." *Id.*

### FIRST CLAIM FOR RELIEF

60.    Petitioners repeat and re-allege each and every allegation contained in paragraphs 1 through 59 as if fully set forth herein.

61.    The only parties to the City Agreements are the City and PMO.

62.    None of the individual Petitioners is a party to the City Agreements.

- 12 -

63.    None of the individual Petitioners has agreed to submit to arbitration any dispute of any kind arising between the individual Petitioner and PMO.

64.    None of the individual Petitioners has agreed to surrender his or her rights to defend himself or herself against claims alleged by PMO in Court.

65.    The City Agreements do not provide a basis for requiring the individual Petitioners to submit to arbitration.

66.    CPLR 7503(c) provides that any arbitration agreement or arbitration rules which waives the right to apply for a stay of arbitration is declared null and void.

67.    By reason of the foregoing, the individual Petitioners herein cannot be compelled to submit to arbitration of PMO's claims as defendants and are entitled to a permanent stay of arbitration by this Court.

## SECOND CLAIM FOR RELIEF

68.    Petitioners repeat and re-allege each and every allegation contained in paragraphs 1 through 67 as if fully set forth herein.

69.    As set forth above, the individual Petitioners were not properly named as defendants in PMO's Complaint in Arbitration and are therefore entitled to a permanent stay of arbitration.

70.    PMO's Complaint in Arbitration seeks punitive damages only as against individual Petitioners Duncanson, Meyer and Rollins, none of whom has agreed to submit to arbitration and none of whom is properly named as a defendant in PMO's Complaint in Arbitration.

71.    Punitive damages cannot be recovered from a municipality as a matter of law.

72.    Further, the City Agreements expressly preclude recovery of punitive damages.

73.    By reason of the foregoing, PMO's claim for punitive damages through arbitration must be permanently stayed and/or otherwise dismissed.

### THIRD CLAIM FOR RELIEF

74.    Petitioners repeat and re-allege each and every allegation contained in paragraphs 1 through 73 as if fully set forth herein.

75.    Insofar as PMO's Complaint in Arbitration seeks damages from the City for tortious interference with a prospective business relationship or contract, such a cause of action would have accrued, at the latest, in January 2007, more than ninety (90) days before PMO commenced the Arbitration Proceeding, when the City first informed PMO that the information it had provided regarding the DOE pre-application contained numerous discrepancies, that its proposal to relocate outdated pilot plant equipment was contrary to its obligations under the City Agreements, and that the City had a reasonable basis to believe that PMO would not meet its contractual obligations.

76.    In January 2007, PMO accused the City of interfering with "PMO's ongoing financial relationships . . ."

77.    PMO did not file a Notice of Claim with the City prior to filing its Complaint in Arbitration or at anytime thereafter, as required under General Municipal Law § 50-e.

78.    PMO's Complaint in Arbitration did not allege that any Notice of Claim had been served upon the City as required by General Municipal Law §§ 50-e and 50-i.

79.    PMO's claim for tortious interference is barred by the applicable statute of limitations.

80.    By reason of the foregoing, PMO's claim for relief through arbitration based on tortious interference must be permanently stayed and/or otherwise dismissed.

- 14 -

## FOURTH CLAIM FOR RELIEF

81.    Petitioners repeat and re-allege each and every allegation contained in paragraphs 1 through 80 as if fully set forth herein.

82.    PMO's Complaint in Arbitration alleges that Petitioners violated PMO's rights under the New York State Constitution, but does not specify how or when this violation is alleged to have occurred.

83.    Based on all of the allegations in PMO's Complaint in Arbitration, insofar as PMO's Complaint in Arbitration seeks damages from the City for such a violation of state constitutional rights, such a cause of action would have accrued, at the latest, in January 2007, more than ninety (90) days before PMO commenced the Arbitration Proceeding.

84.    PMO did not file a Notice of Claim with the City prior to filing its Complaint in Arbitration or at any time thereafter, as required under General Municipal Law § 50-e.

85.    PMO's Complaint in Arbitration did not allege that any Notice of Claim had been served upon the City as required by General Municipal Law §§ 50-e and 50-i.

86.    PMO's claim for violations of PMO's rights under the New York State Constitution is barred by the applicable statute of limitations.

87.    By reason of the foregoing, PMO's claim for relief through arbitration based on violations of the New York State Constitution must be permanently stayed and/or otherwise dismissed.

## FIFTH CLAIM FOR RELIEF

88.    Petitioners repeat and re-allege each and every allegation contained in paragraphs 1 through 87 as if fully set forth herein.

89.    PMO's Complaint in Arbitration does not specify how Petitioners' conduct is alleged to have violated PMO's constitutional rights.

- 15 -

90.    The City Agreements, including the arbitration provision contained therein, do not require or specify that claims based on alleged violations of constitutional rights are arbitrable.

91.    Public policy disfavors arbitration of constitutional claims.

92.    By reason of the foregoing, PMO's claims for relief through arbitration based on alleged violations of its constitutional rights must be permanently stayed and/or otherwise dismissed.

WHEREFORE, the Petitioners respectfully request that the Court permanently stay the Arbitration Proceeding and enter judgment in their favor as follows:

1.    Declaring that the individual Petitioners are not parties to the City Agreements and did not consent to arbitration of the claims brought by PMO against them and, therefore, those claims, including the claims for punitive damages against the individually named Petitioners, are not arbitrable under the Dispute Resolution provisions of the City Agreements;

2.    Declaring that PMO's cause of action for tortious interference with a prospective business relationship or contract is time-barred by General Municipal Law § 50-e because PMO failed to timely submit a Notice of Claim to the City and, therefore, that claim is not arbitrable;

3.    Declaring that PMO's causes of action for violations of the New York State constitution are time-barred by General Municipal Law § 50-e because PMO failed to timely submit a Notice of Claim to the City and, therefore, those claims are not arbitrable;

4.    Declaring that PMO's causes of action alleging the City's violation of PMO's constitutional rights, including their due process rights and equal protection rights under the Fourteenth Amendment to the United States Constitution and their First Amendment rights to political association, are not arbitrable because they are not within the scope of the Dispute Resolution clause contained in Schedule 5 of the City Agreements and because arbitration of such fundamental constitutional questions is against public policy;

- 16 -

5.    Granting the Petitioners reasonable costs and attorneys fees; and

6.    Granting the Petitioners any such further relief that the Court deems just,

necessary and proper.


Dated: New York, New York
      July 6, 2007.

                       Respectfully submitted,

                       BEVERIDGE & DIAMOND, P.C.


                       By: _____
                           Michael G. Murphy, Esq.
                           Christopher J. McKenzie, Esq.
                           Zackary D. Knaub, Esq.

                       477 Madison Avenue
                       15th Floor
                       New York, NY 10022-5802
                       Tel.: (212) 702-5400
                       Fax: (212) 702-5450

                       *Attorneys for Petitioners*

Of Counsel:    Alex Smith, Esq.
               Office of the Corporation Counsel
               City of Middletown
               16 James Street
               Middletown, New York 10940
               (845) 346-4140

## ATTORNEY VERIFICATION

MICHAEL G. MURPHY, an attorney duly admitted to practice law before the Courts of this State, affirms the following under penalties of perjury:

I am a member of the firm Beveridge & Diamond, P.C., and attorney for petitioners herein. I have read the annexed Verified Petition, know the contents thereof, and the same are true to my knowledge based on documents maintained by my office and my clients, except those matters therein which are stated to be alleged on information and belief, and as to those matters, I believe them to be true. The reason this verification is made by me and not by the petitioners is that (i) petitioners are not located in the county where I maintain my office, and (ii) petitioners consist of a governmental subdivision and public officers thereof.

Dated: New York, New York
      July 6, 2007

                                      Michael G. Murphy, Esq.

- 18 -

Exhibit A

POWELL
GOLDSTEIN LLP

Atlanta   •   Washington   •   Dallas

RESIDENT IN ATLANTA OFFICE
DIRECT DIAL: (404) 572-6771
CELL: (404) 307-3611
DMINKIN@PGFIRM.LAW.COM

June 18, 2007

VIA EMAIL (ShanksC@adr.org)

Ms. Catherine Shanks
Vice President, Case Management Center
950 Warren Avenue
East Providence, RI 02914

      Re:   Pencor-Masada OxyNol, LLC
           Waste-to-Ethanol Facility
           Middletown, New York

Dear Ms. Shanks:

Attached please find Commercial Arbitration Rules Demand for Arbitration submitted by Pencor-Masada OxyNol, LLC, attached to which is Pencor-Masada OxyNol, LLC's Complaint in Arbitration.

Our client has a question concerning the amount of the filing fee and will be sending to you by first class mail a check in the amount of $46,119.20 (which includes a $6,000.00 case service fee, after the question is answered by the Northeast Case Management Center).

Please do not hesitate to contact me if you have any questions.

Sincerely,

David N. Minkin

DNM/ko
Attachment

cc:   Mr. Donald V. Watkins
      Michael G. Murphy, Esq.
      Christopher McKenzie, Esq.
      Mr. Tim Judge

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

### COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

*MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

| Name of Respondent<br>The City of Middletown, New York, et al | | | Name of Representative (if known)<br>Michael Murphy | | |
|---|---|---|---|---|---|
| Address<br>Mayor's Office, City Hall | | | Name of Firm (if applicable)<br>Beverage & Diamond, PC | | |
| 16 James Street | | | Representative's Address<br>15th Floor, 477 Madison Avenue | | |
| City<br>Middletown | State<br>NY | Zip Code<br>10940-5710 | City<br>New York | State<br>NY | Zip Code<br>10022-5802 |
| Phone No.<br>845-346-4100 | Fax No.<br>845-343-7439 | | Phone No.<br>212-702-5436 | Fax No.<br>212-702-5450 | |
| Email Address:<br>mayor@middletown-ny.com | | | Email Address:<br>mmurphy@bdlaw.com | | |

The named claimant, a party to an arbitration agreement dated **December 2003**, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE
The claims in the case involve breach of contract, tortious interference with Claimant's business relationships, and the deprivation of Claimant's rights under the First and Fourteenth Amendments to the U.S. Constitution, as described more fully in the attached Complaint in Arbitration. The arbitration provisions of the agreement provide for a resolution by a single qualified arbitrator.

| Dollar Amount of Claim $286,192,000.00 | Other Relief Sought: ☒ Attorneys Fees  ☐ Interest<br>☒ Arbitration Costs ☒ Punitive/ Exemplary ☒ Other Dec. Judgment |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $46,119.20

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
The arbitrator must have recognized expertise in solid waste management, real estate law, municipal law, and constitutional rights.

| Hearing locale New York, New York | (check one) ☐ Requested by Claimant  ☒ Locale provision included in the contract |
|---|---|

| Estimated time needed for hearings overall:<br><br>_____ hours or  5  days | Type of Business: Claimant ____ Waste-to-ethanol conversion<br><br>Respondent _ a municipality |
|---|---|

Is this a dispute between a business and a consumer? ☐ Yes ☒ No  Does this dispute arise out of an employment relationship? ☐ Yes ☒ No
If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐ Less than $100,000. ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one) ☐ Atlanta, GA ☐ Dallas, TX ☒ East Providence, RI ☐ Fresno, CA ☐ International Centre, NY, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)    Date:<br>June 18, 2007 | Name of Representative<br>David N. Minkin |
|---|---|
| Name of Claimant<br>Pencor Masada OxyNol, LLC | Name of Firm (if applicable)<br>Powell Goldstein, LLP |
| Address (to be used in connection with this case)<br>2170 Highland Avenue S., Suite 100 | Representative's Address<br>One Atlantic Center, 14th Floor, 1201 West Peachtree St., N.W. |
| City<br>Birmingham | State<br>AL | Zip Code<br>35205- | City<br>Atlanta | State<br>GA | Zip Code<br>30309-3488 |
| Phone No.<br>205-558-4665 | Fax No.<br>877-558-4670 | | Phone No.<br>404-572-6771 | Fax No.<br>404-572-6999 | |
| Email Address:<br>donaldwwatkinspc@aol.com | | | Email Address:<br>dminkin@pogolaw.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA. Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online. AAA Customer Service can be reached at 800-778-7879

IN RE: ARBITRATION PROCEEDINGS BEFORE THE AMERICAN
ARBITRATION ASSOCIATION

| | |
|---|---|
| PENCOR-MASADA OXYNOL, LLC,   ) | |
|   ) | |
| Plaintiff,   ) | |
|   ) | |
| v.   ) | Case No. _____ |
|   ) | |
| CITY OF MIDDLETOWN,   ) | |
|     NEW YORK, et al,   ) | |
|   ) | |
| Defendants.   ) | |

### PENCOR-MASADA OXYNOL, LLC'S COMPLAINT IN ARBITRATION

#### Jurisdiction

Pencor-Masada OxyNol, LLC ("PMO") files this Complaint in Arbitration pursuant
to the mandatory arbitration requirements and jurisdiction conferred in
Schedule 5, "Dispute Resolution" of the City Waste Management Services
Agreement ("CWMSA") executed between the City of Middletown, New York
("City") and PMO. Accompanying this Complaint is the written notice of arbitration
required under Section 1(b) of Schedule 5. The case in controversy involves
claims, causes of action and disputes arising out of or relating to this agreement,
and three companion City agreements executed by the parties.

#### Parties

The plaintiff in the arbitration proceedings is PMO, an Alabama limited liability
company and party to the CWMSA. PMO's designated Manager is Pencor
Orange Corp. ("Pencor").

The defendants in the arbitration proceedings are: (1) the City, a municipality of
the State of New York; (2) Marlinda Duncanson, individually and as Mayor of
Middletown in her official capacity; (3) Robert Moson, as President of the
Common Council in his official capacity; (4) Maxine Meyer and James Rollins,
individually and as members of the City's Common Council in their official
capacities, and (5) Thomas J. Burr, John VanderVoort, Gerald Kleiner, Raymond
Depew, Miguel Rodrigues, and Joel Sierra, as members of the City's Common
Council in their official capacities. PMO's claims and causes of action against the
law firm of Beveridge & Diamond, PC ("B&D"), a relevant non-party to these
arbitration proceedings, will be pursued in the appropriate Federal Court of New
York, New York.

## Factual Allegations.

1.  On January 23, 1995, PMO was designated by the City as the "preferred vendor" for disposing of municipal solid waste (MSW) and sludge for the City and other municipalities in Orange County. PMO's long-term solution for waste disposal was the construction and operation of an innovative waste-to-ethanol facility to be located in Middletown on land leased from the City. The facility would convert MSW and non-hazardous sludge into ethanol and other useful products using PMO's patented CES OxyNol process. It would serve Middletown and surrounding municipalities.

2.  On January 22, 1996, the City unanimously adopted Resolution No. 20-96 which: (a) named PMO as the project developer; (b) designated the City's project team members; (c) pledged the City's full cooperation in assisting PMO with project financing; and (d) authorized the City's project team (including its special counsel) to assist PMO in pursuing the necessary approvals, permits, and other evidences of permission and authority necessary to develop, construct and acquire the project. Then-Councilwoman and current Mayor Marlinda Duncanson voted in favor of Resolution No. 20-96. At all times material to PMO's claims and causes of action against the defendants, the Resolution remained in effect.

3.  Following the adoption of Resolution 20-96, PMO worked diligently with the City and the municipalities in the Orange County area to obtain their support for the facility.  PMO and its representatives attended more than 200 public meetings to secure supply contracts or other commitments for the local municipalities' MSW and sludge and received overwhelming support for the planned facility. Formal approvals for the waste-to-ethanol project were obtained in December 2003 when the Common Council voted to ratify the four municipal agreements between PMO and the City, including the CWMSA in dispute. The signed City agreements were delivered by the City to PMO in April of 2004.

4.  PMO has secured all environmental permits, identified principal Engineering, Procurement & Construction ("EPC") providers, created a risk mitigation plan and assembled most of the key parties required for construction, start-up and operation.   PMO's development work has resulted in securing long-term commitments for a large portion of the primary revenue streams of the facility. PMO estimates that the target cost of development, construction and installation of the facility and of certain financing costs will total $287 million.

5.  The New York State Department of Environmental Conservation ("NYSDEC"), with approval of the Environmental Protection Agency ("EPA"), issued a Federal Title V Air Permit and a New York Part 360 Solid Waste Permit, among others. The facility has also concluded the State Environmental Quality Review process to assess the environmental impacts of the project.  Since PMO's facility is the first commercial MSW to ethanol project in the United States, the federal and state environmental agencies worked together for nearly two years to determine

2

the correct classification for the facility prior to issuing the appropriate permits. Importantly, these agencies concluded that the PMO Facility is not subject to provisions of the Clean Air Act that trigger Prevention of Significant Deterioration (PSD) in non-attainment areas since the project is not an incinerator or a chemical plant. All challenges to the permits that have asserted such claims have been denied in the courts, and the remaining public comment and appeal periods for any further challenges have expired.

6. In reliance on the good faith of City officials who adopted Resolution No. 20-96 and ratified the City agreements, PMO spent more than $41 million in pre-development work and development activities relating to the waste-to-ethanol facility. Throughout the project development period, PMO gave City project team members written and oral progress reports on all aspects of the project development.

7. In January of 2004, Daryl Harms, the founder and CEO of Masada, PMO's parent company, developed brain cancer and eventually died from his debilitating condition in July of 2005. PMO timely notified the City about Mr. Harms' prolonged illness and unfortunate death. Mr. Harms' illness and death had a "material adverse effect" on the PMO project and impacted the "ownership, possession or operation of the Project", as those terms are defined in the Section 14, "Uncontrollable Circumstances" of the CWMSA. PMO notified the City on several occasions about the "Uncontrollable Circumstances" PMO experienced because of Mr. Harms' illness and death. As such, PMO was entitled to extend the date by which PMO must begin accepting and disposing of the City's waste beyond the December 9, 2008 "Service Date" specified in the City agreements.

8. In December of 2005, the City was notified in writing that Pencor Orange Corp., a member of PMO, had been designated by the Masada shareholders to head all of the Masada companies, including PMO. The City was also informed that PMO was continuing its development of the waste-to-ethanol facility. Shortly thereafter, PMO was invited to meet with the Common Council.

9. In February of 2006, PMO met with the Common Council. The Mayor and Council were openly hostile to PMO's continued development of the project. Council members, including Alderman James Rollins and Maxine Meyers, voiced their extreme dissatisfaction with the City agreements which were ratified by the previous Common Council and signed by former Mayor Joseph DeStefano. At the time, PMO did not know that Mr. Rollins had an undisclosed conflict of interest because of his associations with potential competitors to PMO in the waste disposal business.

10. In spite of the City's new political and attitudinal sea-change and open hostility to the PMO project, PMO pledged during the February 2006 Council meeting to educate new Council members on the project, and pressed on with its

its development plans. It retained financial advisors, engineering firms, project consultants, research and development partners, and engaged in extensive due diligence worked with potential financing partners.

11. In April of 2006, PMO was notified that the City had hired B&D as special counsel on the PMO project. From April 20, 2006 through June 12, 2007, B&D, acting in concert with the City, engaged in an unrelenting and continuing letter writing campaign designed to undermine, obstruct and thwart PMO's ability to develop the waste-to-ethanol facility and obtain financing. B&D's actions were in complete disregard of the separate and independent affirmative duty imposed upon the firm by Resolution 20-96. The B&D body of PMO correspondence:

   a. deliberately and substantially mischaracterized PMO's development plans and related construction activities;

   b. declared (on June 12, 2007) the City's intent to "terminate the agreements" in the event PMO does not have "a fully operational waste-to-ethanol facility at the Facility Site" by December 9, 2008;

   c. arbitrarily and capriciously imposed new conditions restricting PMO's substantive rights and expanding its existing obligations under the City agreements;

   d. renounced (or otherwise ignored) B&D's separate and independent affirmative duty, as special counsel to the City, to provide PMO with the necessary project-related assistance and cooperation specified in Resolution No. 20-96 (which remains in effect);

   e. repudiated and unilaterally nullified all of PMO's prior and timely written notifications to the City of "Uncontrollable Circumstances" and PMO's commercially reasonable steps to reduce costs and time associated with these circumstances; and/or

   f. improperly attempted to interfere with PMO's duly issued Title V Air Permit and NYSDEC Part 360 Solid Waste Permit.

12. As the City's designated "preferred vendor" and "project developer", PMO politely and properly reserved its legal rights under the agreements while proceeding with its efforts to accommodate the City's repeated requests for information and erroneously issued mandate that PMO commence accepting the City's waste streams by December 9, 2008. PMO's good faith efforts to cooperate with the City were met with massive resistance and bad faith actions by the City at every turn.

13. On May 22, 2007, PMO attended the Common Council meeting and formally requested that Alderman Rollins, a leading opponent of the City's contractual

4

relationship with PMO, refrain from participating in any further Common Council discussions, deliberations and votes on matters pertaining to PMO. On information and belief, PMO alleges that Mr. Rollins had already participated in Common Council discussions, deliberations and votes prior to PMO's recusal request even though he had an undisclosed conflicts of interest. PMO also provided the City, on its own initiative, with a written progress report, along with a copy of its completed DOE loan guarantee pre-application submission form. The report detailed PMO's ongoing "commercially reasonable efforts to reduce costs and time associated with the 'Uncontrollable Circumstances' [relating to Mr. Harms death and the PMO project]."

14. On May 31, 2007, PMO provided the City with a notice of its indicative construction schedule prepared by PMO's engineers and a request for the City to implement the Work Plan for Investigation of the Middletown Landfill during construction of the Orange Recycling and Ethanol Production Facility, the project's official name.

15. Throughout the course of its dealings with the City, PMO repeatedly affirmed PMO's willingness and ability to meet its essential obligations to the City. These obligations are threefold: (a) acceptance and disposal of the City's waste streams, under the terms and conditions of the City agreements; (b) production of ethanol from the City's waste streams on the site leased by PMO from the City, in accordance with the requirements of PMO's Part 360 and Title V permits; and (c) remittance of payments to the City, in accordance with the terms and conditions of the City agreements.

16. On June 12, 2007, B&D sent PMO a private letter declaring the City's intent to "terminate the agreements" in the event PMO does not have "a fully operational waste-to-ethanol facility at the Facility Site" by December 9, 2008. This was the first time the City and B&D had threatened PMO with explicit adverse action that is detrimental to the very foundation for financing the facility. The private letter was sent to PMO one day after the City publicly adopted a Resolution (at PMO's request) announcing support for PMO's December 28, 2006 U.S. Department of Energy pre-application submission for a construction loan guarantee of $229 million for the project.

17. The June 12, 2007 B&D letter had the purpose and effect of undermining PMO's DOE and private equity financing. When authorizing the June 12 letter, the City defendants and B&D knew PMO had a duty to report the June 12 contract termination threat to DOE and the equity firms. They also knew PMO was one of 143 entities aggressively competing for limited DOE loan guarantee money, and that PMO's application enjoyed significant bipartisan support from senior members of Congress, including New York Senator Hillary Rodham Clinton. Finally, they knew that the PMO project was being financed from the revenue streams derived from its long-term waste contracts with the City and surrounding municipalities. In short, the defendants knew the letter would have a

5

chilling effect on PMO's financing efforts resulting in devastating consequences to PMO.

18.   On June 13, 2007, PMO demanded that the defendants withdraw and repudiate the June 12, 2207 letter. They have refused to do so. This defiant refusal leaves PMO in the unfortunate position of having to report the defendants' threatening conduct to DOE and other appropriate authorities or risk the appearance of perpetrating a financial fraud on the DOE. This course of action is certain to be the deathblow for PMO's pre-application submission.

19.   The actions and conduct of the defendants, as alleged in this Complaint, were done under color of law, were arbitrary and capricious, were contrary to the City's enunciated public policy and executed agreements with PMO, were taken in bad faith, and were intended to deny PMO of its contractual property rights without due process. The totality of the defendants' open and continuing hostility toward PMO since December of 2005 has irreparably harmed PMO's well-positioned chances for necessary third party project equity and debt financing. PMO's waste-to-ethanol project has, in effect, been sabotaged by its own business partner.

20.   The City agreements have a total economic value to PMO of several hundred million dollars. PMO's Title V Air Permit and Part 360 Permit have a separate estimated value to PMO of $41 million.

### Claims and Causes of Action

PMO avers that the defendants' actions and conduct, as alleged, in this Complaint has deprived PMO of the following substantive rights:

1.   PMO's rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution, which is actionable under 42 USC § 1983 (with attorney's fees provided to prevailing parties under 42 USC § 1988);

2.   PMO's freedom of political association guaranteed under the First Amendment to the United States Constitution, which is actionable under 42 USC § 1983 (with attorney's fees provided to prevailing parties under 42 USC § 1988);

3.   PMO's rights under the City agreements, including PMO's right to invoke "Uncontrollable Circumstances" and have the Service Date in the agreements extended because of the illness and death of Mr. Harms;

4.   PMO's rights under Resolution 20-96 and the City agreements to have the City's project team cooperate with PMO on obtaining financing and other matters related to the project;

6

5.   PMO's rights under the laws of New York to be protect from tortious interference with the City agreements and third party relationships; and

6.  PMO's rights under New York law to due process and equal protection.


### Relief Requested

Based upon the above referenced violations of rights, PMO is entitled to the following relief:

1.   A declaratory judgment that the actions and conduct of the municipal defendants and B&D, as described in this Complaint, violated rights conferred upon PMO under the City agreements, the laws of the State of New York, and the First and Fourteenth Amendments to the United States Constitution, as described more fully above;

2.  A declaratory judgment that the illness and death of Mr. Harms constituted "Uncontrollable Circumstances" for PMO within the meaning of Section 14 of the CWMSA;

3.  A declaratory judgment that defendants Duncanson, Meyers and Rollins acted outside the line and scope of their permissible authority as City officials when engaging in the bad faith actions and conduct described in this Complaint;

4.  A declaratory judgment that the actions of the defendants from December of 2005 to the present were and remain arbitrary and capricious;

5.   Monetary damages in an amount equal to PMO's project development expenses and loss of economic value under the City agreements, as described in the Complaint;

6.   Punitive damages (in their individual capacities) against those municipal defendants who acted outside the line and scope of their permissible authority as City officials;

7.  Attorney's fees under 42 USC §1988 for the violation of PMO's First and Fourteenth Amendment rights, as described in the Complaint;

8.  An award of PMO's litigation expenses, as provided for in Schedule 5 to the CWMSA; and

9.  Any and all further relief that the Arbitrator deems necessary and proper to remedy the violation of rights described in the Complaint.

7

Respectfully submitted this 18th day of June, 2007 by:

David Minkin
Powell Goldstein
One Atlantic Center
1201 West Peachtree Street, NW
Fourteenth Floor
Atlanta, Georgia  30309
Counsel for Plaintiff PMO

### Certificate of Service

I hereby certify that a copy of the foregoing Complaint, together with a written notice of arbitration, has been served upon Beveridge & Diamond, PC, counsel of record for the defendants, via email on this 18th day of June, 2007, as provided for in Schedule 5 of the CWMSA.

David Minkin

8

Exhibit B

# CITY WASTE MANAGEMENT SERVICES AGREEMENT

### between

## CITY OF MIDDLETOWN, NEW YORK

### and

## PENCOR-MASADA OXYNOL, LLC

# TABLE OF CONTENTS

                                                                                    Page

Section 1.    Conditions Precedent...................................................................................1
Section 2.    Delivery and Acceptance of Acceptable Waste. .......................................2
Section 3.    Unacceptable Waste. ...................................................................................2
Section 4.    Company's Rejection Rights.........................................................................3
Section 5.    Receiving and Operating Hours. ................................................................3
Section 6.    Alternate Disposal Facilities. ......................................................................4
Section 7.    Annual Service Fee. ....................................................................................4
Section 8.    Additional Amounts. ...................................................................................5
Section 9.    Billing and Payments...................................................................................5
Section 10.   Tonnage Requirements.................................................................................6
Section 11.   [Reserved] ....................................................................................................6
Section 12.   Termination for Company Event of Default. ..............................................6
Section 13.   Termination for City Event of Default........................................................8
Section 14.   Uncontrollable Circumstances. ...................................................................9
Section 15.   Term. ............................................................................................................11
Section 16.   Insurance and Indemnities...........................................................................11
Section 17.   Dispute Resolution. .....................................................................................11
Section 18.   General Contract Conditions.......................................................................11
Section 19.   Cross-Defaults; Terminations. ....................................................................11

## SCHEDULES

1    Tonnage Requirements
2    Waste Disposal Operations
3    Payments
4    Insurance and Indemnity
5    Dispute Resolution
6    General Contract Conditions

## CITY WASTE MANAGEMENT SERVICES AGREEMENT

This City Waste Management Services Agreement, is made as of December 9, 2003 by and between the CITY OF MIDDLETOWN, NEW YORK (the "City") and PENCOR-MASADA OXYNOL, LLC, a Delaware limited liability company (the "Company").

### Background

A.    The City desires a comprehensive, integrated and environmentally sound solution to its solid waste needs that maximizes recycling, materials reuse and value-added processing of such waste.

B.    Pursuant to N.Y. Gen. Mun. Law § 120-w, the City selected the Company to provide solid waste disposal services to the City (the "Procurement").

C.    The Company plans to design, construct, start up, operate and maintain an integrated solid waste processing facility (the "Facility") in the City for receiving Acceptable Waste, separating such waste for recycling and producing marketable byproducts.

D.    The City intends to maintain or establish and maintain a solid waste collection system, which may involve other municipalities in the County and desires to deliver, or cause to be delivered, to the Delivery Site, Acceptable Waste for disposal by the Company.

E.    Pursuant to N.Y. Gen. Mun. Law §§ 119-m - 119-o, the City is empowered to procure from the Company, and contract with the Company for, solid waste processing and disposal services.

F.    Capitalized terms used in this Agreement that are not defined above or elsewhere are defined in Section 1 of Schedule 6.

### Agreements

In consideration of the foregoing and the respective obligations undertaken herein, and intending to be legally bound, the parties hereto agree as follows:

Section 1.    Conditions Precedent

(a)    The obligations of each party to this Agreement, other than its obligations under Section 1 of Schedule 2 and Section 7 of Schedule 6, shall be subject to the satisfaction, or waiver by such party, of the following conditions precedent:

(i)    The Company shall have obtained suitable financing for the Facility.

(ii)    All necessary approvals shall have been secured to permit lawful disposal of all Acceptable Waste at the Facility.

(iii)     The Service Date must occur within five (5) years of the date of this Agreement.

(b)     The parties shall use their best efforts to satisfy the foregoing conditions precedent as soon as reasonably practicable. This Agreement may be terminated by either party upon written notice delivered to the other party if any conditions precedent in this Section 1 are not satisfied or waived on or before sixty (60) months from the date of this Agreement, which time period shall be extended due to Uncontrollable Circumstances. Neither party shall be liable to the other for the termination of this Agreement pursuant to this Section 1.

Section 2.     Delivery and Acceptance of Acceptable Waste.

(a)     In the event the Company determines there is a need for Acceptable Waste (except for Acceptable Construction Waste) during start-up and testing operations prior to the Service Date, the City has the obligation to furnish all Acceptable Waste collected by the City or its agents (except for Acceptable Construction Waste) or such portion of its Acceptable Waste (except for Acceptable Construction Waste) as is requested by the Company to be delivered to the Facility at the times requested by the Company. The Company shall give to the City, for informational purposes only, no later than ninety (90) days prior to the Start-up Date the Company's proposed schedule for such start-up and testing and shall update such schedule periodically thereafter as material changes become known to the Company. The Company shall give the City at least sixty (60) days prior written notice of the Start-Up Date and its request for the receipt of Acceptable Waste (except for Acceptable Construction Waste) quantities from the City required for such limited operations. During start-up and testing operations, the Company shall give the City at least five (5) days prior written notice of any change in such quantities. The City shall pay the per ton fees set forth in Sections 7(a)(i) and (iii) for the disposal of Acceptable Waste permitted to be delivered during startup and testing.

(b)     Beginning on the Service Date, the City shall cause all Acceptable Waste collected by the City or its agents, employees or contractors, including all recyclable components thereof, to be delivered to the Company at the Delivery Site or, if directed by the Company, at an Alternate Disposal Facility.  Subject to the Company's Rejection Rights, the Company shall accept and Dispose of all Acceptable Waste delivered under this Agreement. The City's failure to deliver or to cause to be delivered to the Company all Acceptable Waste collected by the City or its agents, employees or contractors after the Service Date shall not constitute a breach of this Agreement if it has paid the fees required by Section 7.

(c)     The Parties shall carry out their obligations under this Section in accordance with the provisions of Schedule 2.

(d)     The Company shall Dispose of all Residue in an Alternate Disposal Facility or otherwise, all in accordance with Applicable Law.

Section 3.     Unacceptable Waste.

(a)     The City shall not deliver, and shall use reasonable efforts to prevent the delivery on its behalf of, Unacceptable Waste to the Delivery Site or to an Alternate Disposal Facility.

(b)     The City shall pay Unacceptable Waste Costs arising from the delivery to or abandonment at the Delivery Site or Alternate Disposal Facility of Unacceptable Waste by the City or on its behalf or by any of its agents, employees or contractors.

(c)     The Company shall notify the City of any delivery to or abandonment at the Delivery Site of any Unacceptable Waste. The Company shall use its best efforts to identify the Person responsible for such delivery or abandonment. If such Person was the City or its agent, employee or contractor, the City shall clean up, contain and remove, or cause such agent, employee or contractor to clean up, contain and remove, any such waste from the Delivery Site, the Facility Site or the Alternate Disposal Site, as the case may be, and pay to the Company all associated Unacceptable Waste Costs.

(d)     It is expressly understood and agreed that the City shall not be liable to the Company in any way for any cost, damage, injury, claim or other consequence of the acceptance, processing or disposal of Unacceptable Waste which is delivered to the Facility but not rejected by the Company in the tipping area pursuant to Section 4(c) below.

Section 4.     **Company's Rejection Rights.** The Company may reject:

(a)     Acceptable Waste delivered at hours other than the receiving times established in Section 5(a) (except as provided in Section 5(b));

(b)     Acceptable Waste to the extent it is unable to Dispose of such waste as a result of an Uncontrollable Circumstance; and

(c)     Unacceptable Waste, provided that such rejection occurs as a result of an inspection of a load of material containing said Unacceptable Waste in the tipping area, conducted in the presence of the driver of the vehicle delivering said material, or by indisputable video, photo or other evidence that such Unacceptable Waste arose from material delivered to the Facility by the City. Any Unacceptable Waste not rejected in this manner shall be deemed accepted by the Company.

Section 5.     **Receiving and Operating Hours.**

(a)     On and after the Service Date, the Company shall cause the Delivery Site to be kept open for the receiving of Acceptable Waste between 6 a.m. and 6 p.m. Monday through Friday, and 6 a.m. and 1 p.m. on Saturday, excluding a holiday on which State or federally chartered banks are not open for business.

(b)     Upon thirty (30) days' prior written notice (or, in the event of the occurrence of a natural disaster or other emergency condition, such shorter notice as may be practicable) from the City, the Company shall use its reasonable efforts to accept deliveries of Acceptable Waste at other times. The City shall pay to the Company the Company Actual Cost of accepting Acceptable Waste during hours outside of the receiving time in response to such request.

Section 6.    Alternate Disposal Facilities.

(a)    If sufficient Facility capacity is not available for any reason, the Company (i) shall use the Facility as a transfer station to dispose of Acceptable Waste at Alternate Disposal Facilities, or (ii) direct the City to deliver Acceptable Waste to an Alternate Disposal Facility located within thirty-six (36) miles of the Facility.

(b)    If the Company uses the Facility as a transfer station and employs Alternate Disposal Facilities to dispose of Acceptable Waste or otherwise directs the City to deliver Acceptable Waste to an Alternate Disposal Facility for any reason other than an Uncontrollable Circumstance, the City shall continue to pay the Annual Service Fee, and the Company shall reimburse the City for any direct costs reasonably incurred by it in connection with the transportation and delivery of such waste to the Alternate Disposal Facility in excess of those costs that it would have incurred in delivering such waste to the Delivery Site.

(c)    If the Company uses the Facility as a transfer station and employs Alternate Disposal Facilities to dispose of Acceptable Waste or otherwise directs the City to deliver Acceptable Waste to an Alternate Disposal Facility due to an Uncontrollable Circumstance, the City shall pay the Company Actual Cost, if any, of transporting and Disposing of the City's Acceptable Waste in excess of the cost that would have been incurred by the Company had it accepted such waste at the Delivery Site.

(d)    If the Company uses the Facility as a transfer station and employs Alternate Disposal Facilities to dispose of Acceptable Waste or otherwise directs the City to deliver Acceptable Waste to an Alternate Disposal Facility, the tonnage so directed shall be credited against the City Minimum Tonnage as calculated in Schedule 3, Part B.

Section 7.    Annual Service Fee.

(a)    For each Operating Year or portion thereof after the Service Date, the City shall pay to the Company an Annual Service Fee equal to the sum of the following:

(i)    The Base Municipal Waste Fee ($65.00) times the Inflation Adjustor in effect at the time of delivery for each ton of Acceptable Municipal Waste delivered by or on behalf of the City during such Operating Year; plus

(ii)    The tipping fee then in effect for Disposal of Acceptable Construction Waste as announced by the Company from time to time for each ton of Acceptable Construction Waste delivered by or on behalf of the City during such Operating Year; plus

(iii)    For each ton of Acceptable Sludge delivered by or on behalf of the City during such Operating Year the following Base Sludge Fees (A) $22.50 if such ton contains less than 5 percent solids, (B) $45.00 if such ton contains at least 5 percent but less than 12 percent solids, (C) $59.50 if such ton contains at least 12 percent but less than 18 percent solids, (D) $68.50 if such ton contains at least 18 percent and less than 23 percent solids, and (E) $80.00 if such ton contains at least 23 percent but less than 30 percent solids: in each case times the Inflation Adjustor in effect at the time of delivery.

(b)    The Annual Service Fee will be increased by (i) the Allocated Excess Fee, if any, for each Operating Year in which the City delivers more than its Maximum Tonnage, or (ii) the Allocated Shortfall Fee, if any, for any Operating Year in which the City delivers less than its Minimum Tonnage, each calculated as described in Schedule 3.

(c)    Notwithstanding anything provided herein to the contrary, (i) if during the term hereof, at the request of the Company, the City enters into an agreement for the provision of solid waste management services with a municipality in Orange County, New York, and (ii) if such agreement provides for an Annual Service Fee (assuming that such term is defined and used in such agreement in a similar manner as it is defined and used herein) more favorable to such municipality than the Annual Service Fee is to the City herein, then and in such events the Company and the City shall promptly amend this Agreement to reduce going forward the Annual Service Fee payable by the City hereunder to the amount of Annual Service Fee provided in such other agreement.

**Section 8.    Additional Amounts.**  In addition to the Annual Service Fee, the City shall pay to the Company the following amounts: (i) any amounts payable under Section 3 with respect to Unacceptable Waste Costs, under Section 5 with respect to additional receiving hours and under Section 2 of Schedule 2 with respect to certain testing of the weighing facilities, (ii) the amount of any increase in costs of the Company or decrease in revenues payable by the Company as a result of any change in any law of the City, other than nondiscriminatory taxes and (iii) the City's Proportionate Share of any such amounts resulting from any change in any law of the County, other than nondiscriminatory taxes. The Company shall pay to the City the allowance, if any, described in Schedule 7.

**Section 9.    Billing and Payments.**

(a)    On or before the tenth day of each month, the Company will bill the City the Estimated Service Fee for that month following the procedures set forth in Schedule 3. The monthly statement will also include any additional amounts payable pursuant to Section 7 and/or Section 8 and certain adjustments as described in Schedule 3. The City shall pay the amount set forth on each monthly statement on or before the fifth day of the following month, except that amounts payable with respect to the quarterly adjustments described in Schedule 3 shall not be due until sixty (60) days following the City's receipt of the monthly statement.

(b)    In the event of a dispute as to any portion of any bill, the City shall unconditionally pay (i) the Estimated Service Fee and (ii) the additional amount not in dispute, but not less than sixty (60%) percent of the total additional amount of the bill in excess of the Estimated Service Fee when due and shall, within ten (10) days from the due date of the disputed bill, give the Company written notice of the dispute. Such notice shall identify the disputed bill, state the amount in dispute and set forth a full statement of the grounds which form the basis of such dispute. No adjustment shall be considered or made for disputed charges until such notice is given. No payment of any disputed charges shall be construed as a waiver of any rights in such dispute.

Section 10.    Tonnage Requirements.

(a)    The City's initial annual Minimum Tonnage and the calculation of its initial annual Maximum Tonnage and Proportionate Share are set forth in Part A of Schedule 1.

(b)    The City may increase its Minimum Tonnage for any Operating Year by giving ninety (90) days' notice prior to start of such Operating Year subject to the available capacity of the Facility. If the City gives such notice and the capacity of the Facility that is not committed under contracts of at least three years limits increases, the available capacity will be allocated to the City and the other Contract Municipalities giving similar notice pro rata in accordance with their then-current respective Minimum Tonnages.

(c)    Not later than forty-five (45) days prior to the beginning of each Operating Year, the Company shall deliver to the City a notice substantially in the form of Part B of Schedule 1 setting forth the City's Minimum Tonnage and the calculation of its Proportionate Share for such year.

(d)    If, in any Operating Year, the City expects to deliver less than its Minimum Tonnage and the Contract Municipalities anticipate a Net Municipal Shortfall (as defined in Schedule 3) for such Operating Year, the City may deliver or cause to be delivered to the Company, Acceptable Waste that was not generated within its boundaries.

Section 11.    [Reserved]

Section 12.    Termination for Company Event of Default.  Each of the following shall constitute an event of default on the part of the Company (each, a "Company Event of Default"):

(a)    The persistent or repeated failure by the Company to timely perform any material obligation under this Agreement (except obligations to pay money, as to which subsection (b) below shall apply) unless such failure shall be excused or justified by an act or omission by the City directly related to the performance of such material obligation, provided, however, that no such failure shall constitute a Company Event of Default unless and until:

(i)    The City shall have given written notice to the Company, together with written notice to any Leasehold Mortgagee, stating that in its opinion a particular default exists (to be described in reasonable detail in such notice) which will, unless cured, constitute a material breach of this Lease on the part of the Company; and

(ii)    The Company or any Leasehold Mortgagee, shall not have either remedied such default or commenced and pursued with diligence the cure of such default within a period of ninety (90) days after the City gives notice pursuant to clause (i) of this paragraph, provided that if the Company shall have commenced to take reasonable steps to cure such default within such ninety (90) day period, the same shall not constitute a Company Event of Default for as long as the Company continues to pursue with diligence the cure of such default;

(b)    If the Company fails to pay any sum payable under this Agreement within thirty (30) days after such payment was due, and if such failure is not completely cured within a period of ten (10) days after the City gives written notice to the Company of such failure, the City shall have the right to offset the amount so owing from the next payment of Estimated Service Fee due from the City.

(c)    If this Agreement is terminated by the City pursuant to this Section, subject to the provisions of Section 19 of Schedule 6, the Company shall pay to the City, as a contract termination fee, the excess of (i) the City's actual cost of disposal of Acceptable Waste for the 183-day period immediately following such termination over (ii) the amount which would have been payable by the City as part of the Annual Service Fee had the Company Disposed of such Acceptable Waste under this Agreement for the same period. The Company shall, from time to time upon written request from the City, provide to the City appropriate certification with respect to the availability of disposal space for such Acceptable Waste for such 183-day period, and the Company shall, at termination of this Agreement, assign to the City the Company's rights to such other disposal space.

(d)    Disposal Letter of Credit. The Company shall deliver to the City no later than thirty (30) calendar days prior to the Service Date an irrevocable letter of credit (or other financial instrument reasonably acceptable to the City and the Company) (the "Disposal Letter of Credit") in form and substance reasonably acceptable to City in an amount determined as provided below, and Company shall keep such Disposal Letter of Credit in effect, in its then applicable amount, throughout the term of this Agreement. The amount of the Disposal Letter of Credit shall be determined no later than sixty (60) calendar days prior to the Service Date and on each anniversary thereof throughout the term by R.W. Beck or any successor engineering firm reasonably acceptable to City and Company (the "Engineering Firm"), in accordance with the following:

(i)    The Engineering Firm shall make a good-faith estimate of the excess of (i) the City's actual cost of disposal of Acceptable Waste (assuming that such cost would be the result of a competitive bid process) for the 183-day period commencing on the ninetieth (90th) calendar day following the date of such determination over (ii) the amount which would have been payable by the City as part of the Annual Service Fee had the Company Disposed of such Acceptable Waste under this Agreement for the same period;

(ii)    In making such good-faith estimate, the Engineering Firm shall apply the tipping fees and hauling rates applicable at the landfill that at such time is providing to the Company the disposal space described in subsection (c) immediately hereinabove;

(iii)    The Engineering Firm shall deliver to the City and the Company in writing its calculation of such excess, if any. The amount of such excess shall be the amount of the Disposal Letter of Credit until the next calculation thereof;

(iv)    The Company shall pay the reasonable fees and expenses incurred by the Engineering Firm under this subsection (d); and

(v)      Notwithstanding the foregoing, if the Company is able, from time to time, to deliver to the City evidence reasonably satisfactory to the City that confirms the likely cost to the City under clause (i) above, such evidence to include, without limitation, copies of contracts in effect at such time with regard to disposal of Acceptable Waste and hauling rates, then in such event the City agrees that, in lieu of the provisions set forth immediately hereinabove with respect to the determination by the Engineering Firm of the amount of the Disposal Letter of Credit, the Company and the City shall mutually agree upon the amount of the Disposal Letter of Credit.

Section 13.    Termination for City Event of Default.  Each of the following shall constitute an event of default on the part of the City (each, a "City Event of Default"):

(a)      The persistent or repeated failure by the City to timely perform any material obligation under this Agreement (except obligations to pay money, as to which subsection (b) below shall apply) unless such failure shall be excused or justified by an act or omission by the Company directly related to the performance of such material obligation, provided, however, that no such failure shall constitute a Company Event of Default unless and until:

(i)      The Company shall have given written notice to the City, stating that in its opinion a particular default exists (to be described in reasonable detail in such notice) which will, unless cured, constitute a material breach of this Lease on the part of the City; and

(ii)      The City shall not have either remedied such default or commenced and pursued with diligence the cure of such default within a period of ninety (90) days after the Company gives notice pursuant to clause (i) of this paragraph, provided that if the City shall have commenced to take reasonable steps to cure such default within such ninety (90) day period, the same shall not constitute a City Event of Default for as long as the City continues to pursue with diligence the cure of such default;

(b)      If the City fails to pay any sum payable under this Agreement within thirty (30) days after such payment was due, and if such failure is not completely cured within a period of ten (10) days after the Company gives written notice to the City of such failure (such written notice is hereinafter referred to as the "First Notice"), the Company shall have the right to offset any sum so owing against amounts next owing to the City under the Host Agreement. If for any reason the amount of any such available offset does not completely pay the Company all sums so owing within ninety (90) days of the date of the First Notice, then the Company shall deliver to the City an additional written notice (such written notice is hereinafter referred to as the "Second Notice") of such failure of such offset to pay the Company in full. If the City does not pay to the Company all sums then owing within ten (10) days after the Second Notice, this Agreement shall terminate immediately upon written notice thereof by the Company to the City, subject to the provisions of Section 19 of Schedule 6.

(c)      If this Agreement is terminated pursuant to this Section 13, the City shall pay to the Company, as a contract termination fee, its Proportionate Share of the outstanding

principal amount of the Bonds as of the date of such termination, together with accrued interest to the date of such payment.

Section 14.    Uncontrollable Circumstances.

(a)    If, as a result of an Uncontrollable Circumstance, either party is prevented from performing or delayed in the performance of any of its obligations under this Agreement, such prevention of or delay in performance shall be, subject to such party's satisfaction of the conditions precedent in paragraph (b) of this Section 14, excused during any period in which such performance is prevented or delayed by an Uncontrollable Circumstance, and for such period thereafter as is necessary to correct the adverse effect of such Uncontrollable Circumstance; provided that the failure to pay any amounts owed under this Agreement (whether accruing prior to or during the Uncontrollable Circumstance) in a timely manner shall not be excused by an Uncontrollable Circumstance.

(b)    A party shall be excused from performance hereunder as a result of an Uncontrollable Circumstance only to the extent of and subject to the following conditions:

(i)    the non-performing party shall give the other party prompt written notice describing the particulars of the Uncontrollable Circumstance and the potential duration of the prevention of or delay in performance;

(ii)    the excuse of performance shall be of no greater scope and of no longer duration than is required to correct the adverse effect of the Uncontrollable Circumstance;

(iii)    no obligation of either party which was required to be performed or satisfied before the Uncontrollable Circumstance causing the suspension of performance shall be excused as a result of the Uncontrollable Circumstance;

(iv)    the non-performing party shall use its commercially reasonable efforts to reduce costs during any prevention of or delay in performance, to pursue insurance and any other third-party reimbursement which may reasonably be expected to be obtained with respect to the Uncontrollable Circumstance and to overcome the prevention of or delay in performance and performance shall be resumed at the earliest practicable time after cessation of the Uncontrollable Circumstance; and

(v)    if the non-performing party is the Company, it shall use its best efforts to accept and Dispose of as much Acceptable Waste as is practicable.

(c)    In this Agreement, "Uncontrollable Circumstance" means any act, event or condition that has a material adverse effect on the rights or the obligations of a party under this Agreement, or a material adverse effect on the Project or the ownership, possession or operation of the Project by the Company, if such act, event or condition is beyond the reasonable control of the party relying thereon as justification for not performing an obligation or complying with any condition required of such party under this Agreement. For the purpose of this Agreement, Uncontrollable Circumstances may include, but shall not be limited to, the following:

(i)    an act of God, landslide, lightning, earthquake, fire, explosion, flood, sabotage or similar occurrence, acts of a public enemy, extortion, war, blockade or insurrection, riot or civil disturbance;

(ii)    the order, judgment or legislative act of any Governmental Authority, provided that, if the non-performing party is the City, the order or judgment of the City or the County shall not constitute an Uncontrollable Circumstance;

(iii)    the failure to issue, suspension, termination, interruption, denial or failure of renewal of or the imposition of any new conditions upon any permit, license, consent, authorization or approval essential to the operation of the Project;

(iv)    a Change in Law;

(v)    the failure of any Governmental Authority or private utility to provide and maintain utilities, services, public streets, water and sewer lines and power transmission lines to the Facility Site or the Delivery Site (if other than the Facility Site);

(vi)    the failure of any subcontractor or supplier to furnish labor, services, materials or equipment on the dates agreed to; provided that such failure is caused by an act, event or condition that would be an Uncontrollable Circumstance if it directly affected the non-performing party;

(vii)    the condemnation, taking, seizure, involuntary conversion or requisition of title to or use of the Project or any material portion or part thereof by the action of any Governmental Authority; or

(viii)    (A) as to the Company, the negligence, willful misconduct or unexcused failure to perform of the City or its agents and (B) as to the City, the negligence, willful misconduct or unexcused failure to perform of the Company or its agents.

(d)    For the purpose of this Agreement, the following shall not constitute an Uncontrollable Circumstance:

(i)    adverse changes in the financial ability of either party to this Agreement to perform its obligations hereunder;

(ii)    the consequences of errors of design, construction, startup, operation or maintenance of the Facility on the part of the Company;

(iii)    the failure of the Company to secure or maintain patents or licenses in connection with the technology necessary to design, construct, maintain or operate the Facility; or

(iv)    any act or omission by the Company or any affiliate thereof relating to the design, construction, operation or maintenance of the Facility, including but not limited to any failure to adequately inspect incoming waste for the presence of Unacceptable Waste.

Section 15.    Term.  Unless sooner terminated in accordance with the terms hereof, the initial term of this Agreement shall continue in effect for twenty-five (25) years from the Service Date. The initial term is subject to renewal as provided in Section 10 of Schedule 6.

Section 16.    Insurance and Indemnities.  The parties agree to obtain and maintain or cause to be obtained and maintained the insurance set forth in Schedule 4 and to provide the indemnities set forth in Schedule 4.

Section 17.    Dispute Resolution.  The parties agree to submit any dispute under this Agreement to dispute resolution in accordance with Schedule 5.

Section 18.    General Contract Conditions.   The parties' obligations under this Agreement are subject to the general contract conditions set forth in Schedule 6.  Capitalized terms used in this Agreement and not otherwise defined have the meanings specified in Schedule 6.

Section 19.    Cross-Defaults; Terminations.  The occurrence of an Event of Default by either party that is not cured within the applicable cure period under the Lease, the Host Community Agreement, or the Comprehensive Waste Agreement shall also constitute an event of default under this Agreement, and termination of any of said Agreements shall, at the option of the non-defaulting party and subject to the provisions of Section 19 of Schedule 6, terminate this Agreement. In the event that this Agreement is so terminated, neither party shall have any further liability to the other hereunder other than any obligations or liabilities which shall expressly survive such termination in accordance with the terms hereof. Notwithstanding the foregoing, the Company shall not have the right to terminate the Comprehensive Waste Agreement because of an Event of Default by the City or the termination of any of such Agreements if the City shall, not later than the 180th calendar day following the termination of this Agreement, pay to the Company the contract termination fee described in Section 13(c) hereinabove.


[SIGNATURES ON FOLLOWING PAGE]

ATTEST:                                    CITY OF MIDDLETOWN, NEW YORK

                                           By: _____
                                           Name: _____
_____            Title: Mayor

                                           PENCOR-MASADA OXYNOL, LLC

                                           By:   Masada OxyNol, LLC
                                                 Manager

                                           By:   Masada Resource Group, LLC
                                                 Manager

                                           By: _____
                                           Name: _____
                                           Title: Manager