## SCHEDULE 1
### TONNAGE REQUIREMENTS

**Part A:**     Initial Tonnage Requirements and Proportionate Shares

The City's initial Minimum Tonnage is 13,000 tons of Acceptable Municipal Waste and 3,000 tons of Acceptable Sludge.

The City's **Maximum Tonnage** in any Operating Year is 108% of its Minimum Tonnage for such year.

The City's **Proportionate Share** in any Operating Year is its Minimum Tonnage for such year divided by the aggregate Minimum Tonnage of all Contract Municipalities for such year.

For purposes of determining Minimum Tonnage and Maximum Tonnages, tons of Acceptable Sludge delivered to the Company having a solids content higher than 23 or less than 18 percent shall be converted into Moisture Adjusted Tons as follows:

$$\text{Moisture Adjusted Tons} = \text{Actual Tons} \times \frac{\text{(solids content)}}{23}$$

Where "solids content" means the actual percentage of solids contained in Acceptable Sludge delivered by or on behalf of the City.

**Part B:**     Form of Annual Notice

To the City:

Based on the following Minimum Tonnages for all Contract Municipalities for the year, 20___, your Proportionate Share for year is ___%.

Annual Minimum Tonnage for Year

Contract Municipality #1
Contract Municipality #2
Contract Municipality #3
Contract Municipallty #4
Contract Municipality #5
Contract Municipality #6
Contract Municipality #7
Contract Municipality #8
Contract Municipality #9
Contract Municipality #10

Aggregate Minimum Tonnage for all Contract Municipalities     _____

## SCHEDULE 2
## WASTE DISPOSAL OPERATIONS

| Section | | Page |
|---|---|---|
| 1 | Permits | 2-1 |
| 2 | Inspection of Vehicles | 2-1 |
| 3 | Weighing of Waste Deliveries | 2-1 |
| 4 | Record keeping | 2-1 |
| 5 | Facility Operating Standards | 2-1 |
| 6 | Rules and Regulations | 2-2 |

1.     **Permits.** The Company shall, at its sole expense, obtain and maintain all permits necessary for the construction and operation of the Facility, provided that the City shall provide at its own expense all such cooperation in connection with obtaining and maintaining such permits.

2.     **Inspection of Vehicles.** The Company may inspect the contents of any vehicle delivering waste to the Delivery Site. The Company may require any person delivering waste to the Delivery Site to separate Unacceptable Waste from Acceptable Waste. The Company may reject any part of a load if it contains Unacceptable Waste or an entire such load if separating such waste from Acceptable Waste would be unduly burdensome. The contents of any partial or entire load so rejected shall be deemed Unacceptable Waste. Any Unacceptable Waste which is not rejected [as referenced in Section 4(c) above] shall be deemed accepted by the Company, and the City shall have no further responsibility or liability for said waste.

3.     **Weighing of Waste Deliveries.**

(a)     On and after the Service Date, the Company shall cause weighing facilities to be maintained and operated at the Delivery Site for the purpose of determining the number of tons of Acceptable Waste delivered to the Delivery Site.

(b)     The Company shall cause the weighing facilities to be tested at such frequency as is in accordance with Applicable Law and at the written request of the City, but in any event no less frequently than annually. If a test of the weighing facilities performed at the request of the City indicates that the scales meet the accuracy requirements of Applicable Law, the City shall reimburse the Company for the Company Actual Cost of performing such test. If such a test indicates that the weighing facilities do not meet the requirements of Applicable Law, the Company shall not be so reimbursed. If any test indicates that the weighing facilities do not meet the accuracy requirements of Applicable Law, the Company and the City agree to compute the number of days since the last test and divide that number of days by two, and the tonnage during that number of days shall be subject to such reasonable adjustment as shall be negotiated by the Company and the City to the extent such records relate to the City. If all weighing facilities are incapacitated or are being tested, the Company shall estimate the tons of Acceptable Waste delivered on the basis of truck volumes and estimated data obtained through historical information pertinent to the Persons making the deliveries which shall take the place of actual weighing records during the scale outage.

4.    Recordkeeping. On and after the Service Date, the Company shall establish and maintain an information system to provide storage and ready retrieval of Facility operating data, including all information necessary to verify calculations relating to amounts payable under this Agreement. The Company shall provide the City and its auditors with reasonable access to such records.

5.    Project Operating Standards.

(a)    The Company shall (i) cause safety procedures to be maintained at the Project at a level consistent with Applicable Law and normal plant practice for facilities such as the Facility; (ii) give all notices and comply with Applicable Law; and (iii) cause to be designated a qualified and responsible member of the Project staff whose duty shall be Project safety, the prevention of fires and accidents, and the coordination of such activities as shall be necessary with federal, State and municipal officials.

(b)    The Company shall cause the Project to be maintained at all times in good, clean, orderly condition, including the implementation of necessary repairs, the purchase of necessary replacement equipment or parts and clean-up consistent with meeting normal plant practice for facilities such as the Facility and industry standards relating to waste handling and disposal.

(c)    The Company shall (i) cause the Project to be operated in compliance with Applicable Law and in accordance with good waste industry practice and (ii) notify the City promptly if the Project is seriously damaged, irrespective of cause.

6.    Rules and Regulations.

(a)    The City shall comply, and cause its haulers and other agents to comply, with the Rules and Regulations set forth in Exhibit A to this Schedule 2. The Company may in its discretion revise such Rules and Regulations and shall notify the City in writing of any such revision which shall be effective no earlier than thirty (30) days following the Company's delivery of such notice to the City.

(b)    The Company may designate vehicle routes for use by the City, its agents and its designated haulers for the delivery of Acceptable Waste to Alternate Disposal Facilities.

(c)    The Company may refuse to receive Acceptable Waste from any hauler who repeatedly or intentionally or by negligent action violates the Rules and Regulations or fails to use the designated routes referred to above. The Company shall give the City at least thirty (30) days' prior written notice of its intent permanently to refuse deliveries from any of the City's haulers.

EXHIBIT A TO SCHEDULE 2

RULES AND REGULATIONS

1.  Only refuse collection vehicles owned or operated by the City or haulers authorized by the City are permitted to bring and discharge waste on behalf of the City at the Delivery Site. Each truck operator or passenger must identify him or herself and the authorized hauler that employs him or her to Company personnel on request.

2.  Obey all posted traffic control signs and devices.

3.  Obey the instructions of Company personnel.

4.  Have your vehicle identification clearly visible on vehicle for viewing by closed circuit TV cameras and Company personnel.

5.  No parking on the Delivery Site except in designated areas. Absolutely no parking in roadways. Avoid obstructing traffic on the Delivery Site or the tipping floor.

6.  Any waste which remains in vehicles after normal unloading procedures may be cleared from vehicles only in designated areas of the tipping floor. No external cleaning of vehicles or vehicle maintenance may be performed on the Delivery Site.

7.  No alcoholic beverages or drugs are permitted on the Delivery Site. You may not operate a vehicle on the Delivery Site while intoxicated or impaired to any extent by the use of alcohol or drugs.

8.  No firearms, explosives or other weapons are permitted on the Delivery Site.

9.  No smoking. All open flames and other sources of igniting fires (such as matches or lighters) are prohibited.

10. Burning or smoldering waste is not allowed on the Delivery Site.

11. No Hazardous Waste may be delivered to or disposed at the Delivery Site:

    "Hazardous Waste" means (a) any material or substance which, by reason of its composition or characteristics, is (i) regulated as a toxic or hazardous waste as defined in (A) either the Solid Waste Disposal Act 42 U.S.C. §§ 6901 et seq., or Section 6(e) of the Toxic Substances Control Act, 15 U.S.C. § 2605(e), as either may be replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (B) in N.Y. ECL § 27-0901 (McKinney 1984), as replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (ii) special nuclear or by-products materials within the meaning of the Atomic Energy Act of 1954; and (b) any other materials which any governmental authority having appropriate jurisdiction shall determine from time to time is ineligible for disposal whether by reasons of being harmful, toxic or dangerous, or otherwise.

All commercial and industrial establishments are required by federal and state law to determine whether any wastes which they generate are Hazardous Wastes, and to dispose of all Hazardous Wastes at a permitted Hazardous Waste disposal facility. You are responsible for assuring that industrial and commercial establishments from which you collect waste, have excluded all Hazardous Waste from waste which you collect for disposal at the Delivery Site.

12. In addition, the following types of waste are defined as Unacceptable Waste meaning Hazardous Waste or any other portion of solid waste if Disposed of at the Facility (or any Alternate Disposal Facility) may harm the Facility or impair its operation and therefore may not be disposed of at the Delivery Site as it would:

    (a) present a substantial endangerment to health or safety of the public or Facility employees; or

    (b) cause a violation of Applicable Law; or

    (c) adversely affect the equipment at or operation of the Facility.

Unacceptable Waste includes explosives, including hand grenades, blasting caps, shotgun shells, closed containers capable of exploding upon Processing and fireworks, gasoline, kerosene, turpentine, waste oil, ether, acetone, solvents, paints, alcohol, acids, hydraulic oil, petroleum, caustics, burning or smoldering materials, materials that have elevated temperatures or that may self-ignite, flammable or volatile liquids, any other liquids (other than as contained in Acceptable Sludge), pathological, chemotherapeutic and biological waste, radioactive materials, hospital waste, medical waste, red bag waste, ashes, foundry sand, sewage sludge other than Acceptable Sludge, construction and demolition debris that is not Acceptable Construction Waste, septage, cesspool and other untreated human waste, leachate, human and animal remains, kitchen sinks, motor vehicles, including such major motor vehicle parts as automobile transmissions, rear ends, springs and fenders, bulk loads of tires, agricultural and farm machinery and equipment, marine vessels and major parts thereof, any other large types of machinery or equipment, liquid wastes and asbestos or asbestos containing material.

13. Your vehicle is subject to inspection at any time to determine whether it contains Hazardous Waste or Unacceptable Waste.

14. You are required to certify that no Hazardous or Unacceptable Waste is known to be in your truckload. Your signature on the Company's form certifying scale weight will constitute your certification.

15. All incoming vehicles are automatically screened for radiation. If your vehicle registers positive on our radiation detector you must pull off for further inspection as directed. Vehicles still registering positive for radiation will be refused entry to the Delivery Site.

16. Upon request of Company personnel, you must empty the contents of your vehicle on the tipping floor or other designated location for inspection of the contents.

17. If your vehicle is found to contain Hazardous Waste or Unacceptable Waste, you must remain on the Delivery Site and await instructions of Company personnel as to disposition of the waste. You may be refused permission to dispose of any waste from your vehicle at the Delivery Site. You must promptly pay all costs incurred by the Company or any third party for the removal or disposal of such waste.

18. No waste may be unloaded except in the enclosed tipping area or other location designated by Company representatives.

19. All waste must be transported in enclosed or tightly covered vehicles. No littering.

20. All vehicles must be well maintained and clean so they do not leak or spill on the Delivery Site.

21. All hauler personnel using the Project will be informed of the Project's Hazardous and Unacceptable Waste Screening Program.

22. Any hauler bringing Hazardous or Unacceptable Waste to the Delivery Site is subject to permanent suspension of its use of the Project.

23. Violation of any of these regulations may also result in suspension of the use of the Facility by the individuals involved. Repeated violations by personnel of any hauler may result in suspension of such hauler's use of the Project.

## SCHEDULE 3
## PAYMENTS

Part A:    <u>Monthly Statement.</u>

(a)    The monthly statement for the City will set forth the Estimated Service Fee. The Estimated Service Fee for each month of the first Operating Year and, if the first Operating Year is shorter than three (3) months, the second Operating Year, will equal the product of (a) the Base Municipal Waste Fee times the Inflation Adjustor times (b) one-twelfth of the Minimum Tonnage. In each Operating Year thereafter, the Estimated Service Fee will equal one-twelfth of the prior Operating Year's Annual Service Fee unless the City's Minimum Tonnage has been changed, in which case the Estimated Service Fee will be adjusted proportionately.

(b)    The monthly statement for any month will also include amounts, if any, owed by the City to the Company under Section 8 with respect to the prior month. The monthly statement will include as a credit any amounts owed by the Company to the City under this Agreement. If the actual value of an item in any monthly statement cannot be accurately determined by the Company on or prior to the date of such statement, it will be billed on an estimated basis calculated in good faith and an adjustment will be made to reflect the difference between such estimated amount and the actual amount of such item on the next monthly statement following the date on which the Company learns the exact amount of such item.

(c)    The monthly statement submitted in April, July, and October of each Operating Year shall include an adjustment if, during the preceding calendar quarter, Acceptable Waste was delivered by or on behalf of the City in excess of one-quarter of the annual Maximum Tonnage. Such adjustment will be equal to the Base Municipal Waste Fee times the Inflation Adjustor times the number of tons of such excess waste.

Part B:    <u>Adjustments to Annual Service Fee.</u>

Calculation of Allocated Excess Fee and Allocated Shortfall Fee.

(a)    If the City delivers Excess Tons in any Operating Year, the Allocated Excess Fee will be an amount equal to the product of (i) the City's Allocated Share for such Operating Year times (ii) the Net Municipality Excess Tons for such Operating Year times (iii) the Excess Tonnage Surcharge.

(b)    If the City experiences a Shortfall in any Operating Year, the Allocated Shortfall Fee will be an amount equal to the product of (i) the City's Allocated Share for such Operating Year times (ii) the Net Municipality Shortfall for such Operating Year times (iii) the Base Municipal Waste Fee, times (iv) the Inflation Adjustor for such Operating Year.

(c)   Capitalized terms used in this Schedule 3 have the meanings set forth below. As used in these definitions, "tons of Acceptable Waste" assumes that the Acceptable Sludge component of such waste has been converted into Moisture Adjusted Tons.

**Allocated Share** means (i) in any Operating Year in which the City experiences a Shortfall, an amount equal to (A) such Shortfall divided by (B) by the aggregate Shortfall of all Contract Municipalities that experienced a Shortfall in such year and (ii) in any Operating Year in which the City delivers Excess Tons, an amount equal to (A) such Excess Tons divided by (B) the aggregate Excess Tons of all Contract Municipalities that delivered Excess Tons in such year.

**Excess Tonnage Surcharge** means (i) the amount, if any, by which (A) the average cost incurred by the Company to Dispose of an Excess Ton at an Alternate Disposal Facility exceeds (B) the Base Municipal Waste Fee times (ii) the Inflation Adjustor.

**Excess Tons** means, for any Contract Municipality in any Operating Year, the amount, if any, by which the tons of Acceptable Waste delivered by such Contract Municipality in such year exceeds its annual Maximum Tonnage.

**Net Municipality Excess Tons** means, for any Operating Year, the amount, if any, by which (i) the aggregate tons of Acceptable Waste delivered by or on behalf of all Contract Municipalities exceeds (ii) the aggregate annual Maximum Tonnages for all Contract Municipalities.

**Net Municipality Shortfall** means, for any Operating Year, the amount, if any, by which (i) the aggregate annual Minimum Tonnages for all Contract Municipalities exceeds (ii) the aggregate tons of Acceptable Waste delivered by or on behalf of all Contract Municipalities.

**Shortfall** means, for any Contract Municipality in any Operating Year, the amount, if any, by which such Contract Municipality's annual Minimum Tonnage exceeds the tons of Acceptable Waste it delivers in such year.

**Part C:**   **Annual Settlement Statement**

1.   **Annual Settlement Statement.**  Within ninety (90) days after the end of each Operating Year, the Company will deliver to the City an Annual Settlement Statement, which shall (i) show the computation of the City's Annual Service Fee for such year, showing all estimated monthly service fees and interim adjustments paid by the City in such year as a credit against the City's Annual Service Fee, provided that any amounts paid in respect of interest shall not be so credited and (ii) correct to actual values any remaining estimated amounts from monthly statements.

2.    **Payments.** If the Annual Settlement Statement reflects (i) any balance due to the City, then the Company shall, within sixty (60) days of delivery of such statement, pay to the City the balance due or (ii) any balance due to the Company, then the City shall, within sixty (60) days of receipt of the statement, pay to the Company the balance due.

**Part D:**    General

1.    **Overdue Obligations to Bear Interest.** Any amount owed to a party under the Agreement more than sixty (60) days beyond the date of the other party's receipt of the statement covering such amount shall accrue interest each day thereafter that such amount is not paid at the annual prime interest rate as published in The Wall Street Journal on the first day that such sum becomes past due .

2.    **Manner of Termination Payment.** Within sixty (60) days following termination of this Agreement under Section 12 or 13, the Company and the City as to which such termination is effective shall reconcile all amounts then due and payable to each other under the terms of this Agreement, including any amounts payable pursuant hereunder.    Within ninety (90) days after such reconciliation, the Company or the City, as the case may be, shall make final payment in complete discharge of its obligations under this Agreement, except those obligations which survive the termination of this Agreement.

## SCHEDULE 4
## INSURANCE AND INDEMNIFICATION

1.    Insurance.  Not less than thirty (30) days prior to the commencement of any work undertaken by the Company pursuant to this Agreement, and for the duration of construction, start-up and testing operations, and thereafter from and after the Service Date, the Company shall obtain and maintain insurance coverage as is prudent and customary in businesses such as that of the Company and as is required by the issuer of Bonds, including, without limitation, the insurance coverage described in Exhibit A to this Schedule 4. Concurrently with the provision of insurance coverage by the Company pursuant to this Schedule 4, the City shall obtain and maintain such insurance coverage as is prudent and customary with current limits of not less than $1,000,000 for General Liability Broad Form Coverage and not less than $1,000,000 of Automobile liability insurance and excess umbrella coverage of $5,000,000.  The City shall cause any Person (other than Contract Municipalities contracting with the City under the Comprehensive Waste Agreement, it being agreed that the Company shall have the responsibility to enforce such Contract Municipalities) with which it contracts to deliver Acceptable Waste to the Company to obtain and maintain such insurance coverage as is prudent and customary for Persons collecting and transporting solid waste, and such Person shall name the Company and the Company as additional insureds with coverage limits no less than those required of the City under this Agreement; provided, however that the City shall at all times require the Persons delivering Acceptable Waste to the Facility to provide coverage limits equal to the greater of (a) the highest coverage limits then offered by such Persons to other municipal customers or private customers in the Mid-Hudson Region, (being defined as Orange County and all adjoining counties) or (b) the amounts otherwise required by this Section 1.  The Company and the City shall meet at least sixty (60) days before the first, fifth, tenth and fifteenth anniversary date of the Service Date, or any five year extension of this Agreement, and review the insurance coverages to determine the coverages and the limits of coverage required of the City and each Person delivering Acceptable Waste during the next five (5) years of the Agreement.  If the Company and City are not able to resolve adjusted limits by the anniversary date, this matter shall be subject to the provisions of Schedule 5.  All such insurance coverage shall provide that such coverage cannot be canceled without thirty (30) days prior written notice to the City.  In addition, the Company shall deliver to the City at least thirty (30) days prior to the expiration of any insurance coverage evidence of either the renewal of such otherwise expiring coverage or the replacement of such expiring coverage with equivalent insurance coverage in compliance with the terms hereof.

2.    Company Indemnification.  The Company agrees that it shall protect, indemnify, and hold harmless the City and its respective officers, employees and agents (the "City Indemnified Parties") from and against all liabilities, actions, damages, claims, demands, judgments, losses, costs, expenses, suits, or actions and attorneys' fees, and shall defend the City Indemnified Parties in any suit, including appeals, for personal injury to, or death of, any person or persons, or loss or damage to property arising out of the negligence or willful misconduct of the Company or any of its agents or employees, contractors or subcontractors, in connection with its performance under this Agreement .  The Company is not, however, required to reimburse or indemnify any City Indemnified Party for loss or claim due to the negligence or willful misconduct of any City Indemnified Party, and the City Indemnified Party whose negligence or

willful misconduct is adjudged to have caused or contributed to such loss or claim shall reimburse the Company (or in the case of negligence or willful misconduct of a City Indemnified Party other than the City, the City shall cause such party to reimburse the Company) for the costs of defending any such suit.

3.    [Reserved]

4.    **City Indemnification.** The City agrees that it shall protect, indemnify, and hold harmless the Company, and its respective officers, directors, members, employees and agents (the "Company Indemnified Parties") from and against all liabilities, damages, claims, demands, judgments, losses, costs, expenses, suits, or actions and attorneys' fees, and shall defend the Company Indemnified Parties in any suit, including appeals, for personal injury to, or death of, any person or persons, or loss or damage to property arising out of the negligence or willful misconduct of the City or any of its agents or employees, contractors or subcontractors, in connection with their performance under this Agreement. The City is not required to reimburse or indemnify any Company Indemnified Party for loss or claim due to the negligence or willful misconduct of any Company Indemnified Party, and the Company Indemnified Party whose negligence or willful misconduct is adjudged to have caused or contributed to such loss or claim shall reimburse the City (or, in the case of negligence or willful misconduct of a Company Indemnified Party other than the Company, the Company shall cause such party to reimburse the City) for the costs of defending any such suit.

5.    **Comparative Negligence.** Notwithstanding any other provision of this Schedule 4, if negligence of any person seeking indemnification for a loss or claim is adjudged to have contributed to such loss or claim, (a) the person from whom indemnification is sought shall be required only to reimburse or indemnify the negligent indemnified person for such loss or claim pro rata to the extent that such negligence is not adjudged to have contributed to such loss or claim and (b) the Company (if the negligent party is a Company Indemnified Party) or the City (if the negligent party is a City Indemnified Party), as the case may be, shall only be obligated to reimburse the indemnifying person for the costs of defending any such suit to the extent such negligence is adjudged to have contributed to such loss or claim.

6.    **Cooperation Regarding Claims.** The Company and the City (who are hereinafter collectively referred to in this Section 6 as the "Indemnitors" or individually as an "Indemnitor") shall promptly inform one another of any claim, demand, action, suit or proceeding of which it has knowledge that may affect the performance by either of them of its respective obligations under this Agreement. If Indemnitor receives notice or has any knowledge of any claim, demand, action, suit or proceeding that may result in either a claim for indemnification for or against either of the Indemnitors pursuant to this Schedule 4, the Indemnitor shall, as promptly as possible, give notice of such claim, demand, action, suit or proceeding to the other Indemnitor, including a reasonably detailed description of the facts and circumstances relating to such claim, demand, action, suit or proceeding and a complete copy of all notices, pleadings and other papers related thereto, and, in the case of a claim for indemnification pursuant to this Schedule 4, such claim and the basis therefor in reasonable detail; provided that failure promptly to give such notice or to provide such information and documents shall not relieve the applicable Indemnitor of any obligation of indemnification it may have under this Agreement, unless such failure shall materially diminish the ability of such

Indemnitor to respond to, or to defend the Indemnitor failing to give such notice against, such claim, demand, action suit or proceeding. The Indemnitors shall consult with each other regarding and cooperate in respect of the response to and the defense of any such claim, demand, action, suit or proceeding, and, in the case of a claim for indemnification pursuant to this Schedule 4, the Indemnitor—against whom indemnification is claimed shall, upon its acknowledgment in writing of its obligation to indemnify with respect to such claim, be entitled to assume the defense or to represent the interests of the Indemnified party in respect of such claim, demand, action, suit or proceeding, which shall include the right to select and direct legal counsel and other consultants, appear in proceedings on behalf of such Indemnified party and to propose, accept or reject offers of settlement; provided, however, that the Indemnified party shall have the right to retain separate counsel in respect of such claim, demand, action, suit or proceeding, the retention of which counsel shall be at the Indemnified party's own expense, unless the retention of such counsel has been specifically authorized by the party against whom indemnification is claimed.

7.    **Survival.**    Notwithstanding any other provisions of this Agreement, the obligations of the parties pursuant to Sections 2 through 6 of Schedule 4 shall remain in full force and effect after the termination of this Agreement until the expiration of the period stated in the applicable statute of limitations during which a claim, cause of action or prosecution relating to the matters herein described may be brought and the payment in full or the satisfaction of such claim, cause of action or prosecution and the payment of all expenses, charges and costs incurred by the indemnified party relating thereto.

8.    **Indemnity Provisions in Lease.**    Notwithstanding anything provided to the contrary herein or in the Lease, and except as provided in Section 9 of this Schedule 4 immediately hereinbelow, the provisions of Section 11 of the Lease shall govern and control with respect to environmental matters arising under the Lease.

9.    **Letter of Credit.**    Not less than thirty (30) days prior to the commencement of any work undertaken by the Company pursuant to this Agreement, and for the duration of construction,, and thereafter from and after the Service Date, the Company shall obtain and deliver to the City a letter of credit (the "Letter of Credit") for the benefit of the City in the amount of $1,000,000, subject to the terms hereof. The Letter of Credit shall provide that the City shall have the right, from time to time, to draw upon the Letter of Credit, to the extent of any loss or damage incurred by the City, (i) if the Company is obligated to the City under the terms of Section 11.4 of the Lease arising as a result of a breach by the Company of its obligations under either Section 11.2(c) or Section 11.2(e) of the Lease, and (ii) if the City is not covered for any such loss or damage by any of the insurance policies delivered for the benefit of the City under the provisions of Exhibit A to this Schedule 4. Notwithstanding the foregoing, the City and the Company agree that, no later than sixty (60) days prior to the commencement of any work undertaken by the Company pursuant to this Agreement, they shall mutually agree upon a nationally recognized insurance consultant (the "Insurance Consultant") that shall promptly thereafter be retained by the Company at the sole expense of the Company (not to exceed $10,000) to review the terms and provisions of this Schedule 4 as well as Exhibit A attached hereto and the relevant provisions of the Lease and to advise the City and the Company in writing on or before thirty (30) days prior to the commencement of any work undertaken by the Company pursuant to this Agreement of, in the reasonable commercial judgment of the

Insurance Consultant, the amount of the potential gap between the amount of the coverage provided to the City by the insurance policies to be delivered for the benefit of the City under the provisions of Exhibit A to this Schedule 4, and the likely potential liability of the City that could arise as a result of a breach by the Company of its obligations under either Section 11.2(c) or Section 11.2(e) of the Lease. If the Insurance Consultant determines that the amount of such potential gap is less than $1,000,000, then in such event the City agrees that the Company shall have the right to reduce the amount of the Letter of Credit to the amount of such potential gap as so determined by the Insurance Consultant.

EXHIBIT A
TO SCHEDULE 4

INSURANCE PROVISIONS

A.    Environmental Insurance

With respect to environmental liability insurance to be provided by the City under 14(a) of the Lease:

The Company, on behalf of the City, and subject to the reasonable approval of the City, and at the expense of the Company, will provide a one-year, claims-made pollution/environmental liability insurance policy for pollution conditions not known to the responsible insured with a policy limit of $5.0 million. This coverage shall include bodily injury, property damage and shall have the following endorsements subject to insurance availability and insurance market conditions.

     1.    The Company shall be named as Additional Insured.

     2.    The insurance shall cover property damage costs for the Site.

With respect to insurance coverage to be provided by the Company under Section 14 of the Lease:

The Company shall provide continuous claims-made pollution/environmental liability insurance for pollution incidents commencing after the policy date, with a policy limit of not less than $5.0 million. This coverage shall include bodily injury, property damage and remediation costs and it shall have the following endorsements:

     A.    The City shall be named as an Additional Insured.

     B.    The insurance shall cover any contractual liability that either the City or the Company may have assumed under the Lease, the Voluntary Cleanup Agreement and the Work Plan.

     C.    The insurance shall cover costs incurred by reason of governmental mandates to perform remediation.

B.    Other Insurance

The Company shall obtain and maintain insurance against its contractual liability created under this Agreement, from an insurer reasonably satisfactory to the City in the following amounts:

     1.    Workers compensation insurance for the benefit of the employees as required by law; and

2.     Comprehensive general liability coverage with a limit of liability of not less than a $1,000,000 CSL with respect to any occurrence and $2,000,000 in aggregate; and

3.     All-risk insurance, standard extended coverage, replacement value, without co-insurance factor (full replacement value of Facility and Company's personal property); and

4.     Business auto liability, including all owned, non-owned and hired autos, with a limit of liability of not less than $1,000,000 CSL for personal injury, including bodily injury or death, and property damage; and

5.     "Umbrella" coverage providing liability insurance in excess of the coverage required by these Paragraphs 'A,' 'B,' 'C,' and 'D,' with a limit of not less than $5,000,000.

The Company will provide Certificates and Policies of Insurance for above listed insurance to the City for its approval   no later than thirty   (30) days prior to commencement of construction of the Facility.  Such insurance coverage shall be written so that it shall not lapse or terminate without at least thirty (30) days' written notice to the City.

The Company's insurance shall have no right of recovery or subrogation against the City. The Company's policies shall be **primary** coverage for any and all losses covered by said policies.

## SCHEDULE 5
## DISPUTE RESOLUTION

1.    **Dispute Resolution.**

(a)    Any claim, action, dispute or controversy of any kind arising out of or relating to this Agreement or concerning any aspect of performance by the City or the Company (each a "Party") under the terms of this Agreement ("Dispute") shall be resolved by mandatory and binding arbitration administered by the American Arbitration Association (the "AAA") pursuant to the Federal Arbitration Act (Title 9 of the United States Code) in accordance with this Agreement and the then-applicable Commercial Arbitration Rules of the AAA. The Parties acknowledge and agree that the transactions evidenced and contemplated hereby involve "commerce" as contemplated in Section 2 of the Federal Arbitration Act. If Title 9 of the United States Code is inapplicable to any such Dispute for any reason, such arbitration shall be conducted pursuant to this Agreement and the then-applicable Commercial Arbitration Rules of the AAA. To the extent that any inconsistency exists between this Agreement and the foregoing statutes or rules, this Agreement shall control. Judgment upon the award rendered by the arbitrator acting pursuant to this Agreement may be entered in, and enforced by, any court having jurisdiction, absent manifest disregard by such arbitrator of applicable law; provided, however, that the arbitrator shall not amend, supplement or reform in any manner any of the rights or obligations of any Party hereunder or the enforceability of any of the terms or provisions of this Agreement. Any arbitration proceedings under this Agreement shall be conducted in New York, New York before a single arbitrator who has no direct or indirect relationship with any Party or any Party's Affiliate and who has recognized expertise in solid waste management and real estate law.

(b)    Any Party may commence an arbitration provided for in Section (a) by serving a written notice of arbitration. Within ten (10) days after a Party's receipt of such notice, the Parties who are parties to the Dispute shall agree upon a qualified arbitrator. If the Parties cannot agree within such 10-day period, an arbitrator shall be appointed by the AAA. If a replacement arbitrator is necessary for any reason, such replacement arbitrator shall be appointed by the AAA.

(c)    Any Party may bring summary proceedings (including, without limitation, a plea in abatement or motion to stay further proceedings) in court to compel arbitration of any Dispute in accordance with this Agreement.

(d)    All statutes of limitation that would otherwise be applicable shall apply to any arbitration proceeding. Reasonable discovery (which shall not include the discovery of any proprietary or confidential information) shall be available to the parties under the supervision of the arbitrator. Any attorney-client privilege and other protection against disclosure of privileged or confidential information (including, without limitation, any protection afforded the work-product of any attorney) that could otherwise be claimed by any Party shall be available to, and may be claimed by, any such Party in any arbitration proceeding. No Party waives any attorney-client privilege or any other protection against disclosure of privileged or confidential information by reason of anything contained in, or done pursuant to, the arbitration provisions of this Agreement.

(e)    The arbitration shall be conducted and concluded as soon as is reasonably practicable, based on a schedule established by the arbitrator. Any arbitration award shall be based on and accompanied by findings of fact and conclusions of law, shall be conclusive as to the facts so found and shall be confirmable by any court having jurisdiction over the Dispute, provided that such award, findings and conclusions are not in manifest disregard of applicable law.

(f)    Each Party shall bear its own expenses of the arbitration, including, without limitation, fees and expenses of counsel incident to any mediation or arbitration. The fees and expenses of the arbitrator and the AAA shall be borne equally by the Parties. The arbitrator shall have the power and authority to award expenses to the prevailing Party if the arbitrator elects to do so.

(g)    In order for an arbitration award to be conclusive, binding and enforceable under this Agreement, the arbitration must follow the procedures set forth in the portions of this Agreement relating to such arbitration and any award or determination shall not be in manifest disregard of applicable law. The obligation to arbitrate any Dispute shall be binding upon the successors and assigns of each of the Parties.

2.    The City agrees to consolidate any dispute it may have under this Agreement with the active dispute of any other similarly situated Contract Municipality and to be bound by any decisions of the arbitrators with respect to such dispute.

## SCHEDULE 6
## GENERAL CONTRACT CONDITIONS

| Section | | Page |
|---|---|---|
| 1 | Definitions | 6-1 |
| 2 | Conventions | 6-4 |
| 3 | Consent to Assignment | 6-5 |
| 4 | Remedies | 6-5 |
| 5 | Limited Obligation | 6-5 |
| 6 | Confidentiality | 6-5 |
| 7 | Cooperation in Financing | 6-5 |
| 8 | Relationship of the Parties | 6-6 |
| 9 | Assignment | 6-6 |
| 10 | Renewal Terms | 6-6 |
| 11 | Notices | 6-7 |
| 12 | Waiver | 6-7 |
| 13 | Entire Agreement; Modifications | 6-7 |
| 14 | Severability | 6-8 |
| 15 | Headings | 6-8 |
| 16 | Governing Law | 6-8 |
| 17 | Venue | 6-8 |
| 18 | Counterparts | 6-8 |

1.    **Definitions.**  Unless otherwise required by the context in which any defined term appears, the following defined terms shall have the meanings as specified below:

**Acceptable Construction Waste** means solid waste arising from the construction or demolition of a structure by or on behalf of the City that (a) comports with the requirements of all permits for the Project regarding such waste and otherwise meets the requirements of Applicable Law, and (b) is separated from other waste prior to delivery to the Delivery Site and excluding (i) construction or demolition debris that is Hazardous Waste, asbestos or asbestos containing material or otherwise is Unacceptable Waste, (ii) solid waste resulting from construction or demolition of roads, sidewalks and parking areas, and (iii) solid waste resulting from the construction or demolition of equipment or anything else other than a structure or from construction or demolition which is not conducted by or on behalf of the City.

**Acceptable Municipal Waste** means that portion of solid waste which has characteristics such as that collected and disposed of as part of normal municipal collection of solid waste in the City, including white goods, but excluding (a) sludge, (b) construction and demolition debris, (c) tires delivered as part of a bulk load of tires, and (d) Unacceptable Waste.

**Acceptable Sludge** means sewage sludge generated at a wastewater treatment plant owned or operated by or on behalf of the City that (a) is derived from treatment of sewage consisting predominantly of domestic sewage and otherwise having the characteristics of

wastewater treated at publicly owned treatment works, (b) meets all requirements related to sewage sludge contained in any applicable permits for the wastewater treatment plant at which it is generated, (c) comports with the requirements of all permits for the Facility regarding sewage sludge, (d) otherwise meets the requirements of Applicable Law, (e) is processed utilizing standard processing techniques, as defined in Chapter 12 of the Third Edition of Metcalf and Eddy's book entitled, "Wastewater Engineering", (f) has properties and compositions within the ranges defined in Chapter 12 of the Third Edition of Metcalf and Eddy's book entitled, "Wastewater Engineering" and (g) is less than 30 percent solids, and expressly excluding (i) sewage sludge which is Hazardous Waste, has not been properly characterized by appropriate testing to determine that it is not Hazardous Waste or otherwise is Unacceptable Waste, and (ii) sewage sludge that has a specific gravity of less than one.

Sewage sludge that has been classified, through documented tests, as not being Hazardous Waste, yet has been excluded due to the aforementioned criteria, may be deemed to be acceptable provided that testing carried out by the Company proves its compatibility with the Process.

Acceptable Waste means Acceptable Construction Waste, Acceptable Municipal Waste and Acceptable Sludge.

Agreement means this City Waste Management Services Agreement between the Company and the City, including the Schedules and any written amendments hereto.

Alternate Disposal Facility means a landfill or other facility, equipment or site other than the Facility or other Delivery Site that (a) the Company designates as an Alternate Disposal Facility, (b) is used by the Company to accept, transport, store or dispose of Acceptable Waste or Residue under this Agreement, and (c) has all permits required by Applicable Law for the acceptance and disposal of the type and quantities of solid waste for which it is used by the Company.

Annual Service Fee means the fee described in Section 7.

Applicable Law means any law, regulation, requirement or order of any federal, State or local government agency, court or other governmental body, or the terms and conditions of any permit, license or governmental approval, applicable from time to time to the construction of the Facility or the performance of any obligation under this Agreement.

Base Fees means the Base Municipal Waste Fee and the Base Sludge Fees, collectively.

Base Municipal Waste Fee means, during the initial term of this Agreement, $65.00, the amount set forth in Section 7(a)(i), and, thereafter, the amount determined pursuant to Section 10 of Schedule 6 for the Disposal of Acceptable Waste other than Acceptable Construction Waste and Acceptable Sludge.

Base Sludge Fees means, during the initial term of this Agreement, the unadjusted dollar amounts set forth in Section 7(a)(iii) and, thereafter, the amounts determined pursuant to Section 10 of Schedule 6 for the Disposal of Acceptable Sludge.

**Bonds** means the bonds issued to finance, in part, the design, construction and testing of the Facility and related costs, including any additional bonds or refunding bonds issued in accordance with the same indenture.

**Calculation Year** has the meaning set forth in the definition of the Inflation Adjustor in this Schedule 6.

**Change in Law** means (a) the adoption, promulgation or modification or reinterpretation (including any change in enforcement policy) after the Contract Date of any federal, State, county, Company or municipality statute, ordinance, permit, code or regulation not adopted, promulgated, modified and officially published, as appropriate, in The Congressional Record, The Federal Register, or similar publication of the State, County or City on or before the Contract Date, or (b) the imposition after the Contract Date of any material conditions or change in government or judicial policy in connection with the issuance, renewal, modification or enforcement of any official permit, license or approval, which in the case of either (a) or (b) establishes requirements affecting the obligation of either party under this Agreement (other than payment obligations) or the design, construction, start-up, acceptance testing, operation, maintenance, cost or construction of the Project more burdensome than the most stringent requirements (i) in effect as of the Contract Date, (ii) agreed to in any applications of the Company for official permits, licenses or approvals pending as of the date of this Agreement or (iii) contained in any official permits, licenses, or approvals with respect to the Project obtained as of the date of this Agreement, or (c) the failure of any applicable federal, state or local governmental agency or unit having jurisdiction over the Project to issue any permit, license or approval after the Contract Date necessary for the operation of the Project, which permit, license or approval was not issuable on or before the Contract Date; provided that a change in any law of the City or the County will not be a Change in Law with respect to the City.

**City** means the City of Middletown, New York.

**Company** means Pencor-Masada OxyNol, LLC, a Delaware limited liability company.

**Company Actual Cost** means, with respect to any material or service, the amount the Company pays for such material or service.

**Comprehensive Waste Agreement** means the Comprehensive Waste Management Services Agreement between the City and the Company.

**Contract Municipality** means (a) the City in its role as a party to this Agreement, and (b) any municipality that has entered into an agreement with the City for the provision of solid waste management services, which municipalities are listed on Attachment - Background H of the Host Community Agreement.

**County** means Orange County, New York.

**CPI** means the Consumer Price Index for all Urban Wage Earners for the New York Region, all items, as published by the Bureau of Labor Statistics of the U.S. Department of Labor. For the purposes of determining the Inflation Adjustor, if the CPI is no longer published

or the method of computation thereof is substantially modified, an agreed upon alternative index of similar geographic focus and substantially identical economic criteria shall be substituted therefor.

**CPI Fraction** means a fraction the numerator of which is the sum of (i) the CPI for January of the preceding Operating Year immediately preceding the Calculation Year plus (ii) the product of multiplying 64% times the difference of (A) the CPI for the Calculation Year minus (B) CPI for January of the immediately preceding Operating Year, and the denominator of which is the CPI for January of the Operating Year immediately preceding the Calculation Year.

**Delivery Site** means the Facility Site, an Alternate Disposal Facility or any other site agreed to in writing by the parties.

**Disposal Letter of Credit** is defined in Section 12 above.

**Dispose, Disposed, Disposing** means treatment, processing or disposal by the Company in accordance with Applicable Law of (a) Acceptable Waste delivered to the Company in accordance with this Agreement by the following means in the order of priority listed: (i) Processing, (ii) transporting Residue to an Alternate Disposal Facility, (iii) transporting Acceptable Waste to an Alternate Disposal Facility, and (iv) directing the City to deliver Acceptable Waste to an Alternate Disposal Facility for disposal if for any reason the Facility is not available.

**Estimated Service Fee** is defined in Schedule 3.

**Facility** means the integrated solid waste processing facility, together with all additions, replacements, appurtenant structures and equipment, to be designed, constructed and operated by the Company on the Facility Site.

**Facility Operating Costs** means all costs and expenses incurred by the Company for operation of the Facility provided, however, that such expenses shall not include costs incurred with respect to the issuance of the Bonds, interest payable with respect to the outstanding principal indebtedness of the Bonds, or any allowance or expense for depreciation of the Facility. For purposes of determining Facility Operating Costs, there shall be included all amounts reserved for capital improvements, maintenance and other operating reserves. Facility Operating Costs shall be determined in accordance with generally accepted accounting principles consistently applied and shall be submitted to the Company in a certified statement prepared by the independent accounting firm engaged by the Company.

**Facility Site** means the real property upon which the Facility is located.

**Governmental Authority** means (a) the federal, state or any local government, (b) any agency, Authority, special district or political subdivision thereof and (c) any court or other government tribunal.

**Ground Lease** means the Lease for the Facility Site between the City as landlord and the Company as tenant.

**Hazardous Waste** means (a) any material or substance which, by reason of its composition or characteristics, is (i) regulated as a toxic or hazardous waste as defined in (A) either the Solid Waste Disposal Act 42 U.S.C. §§ 6901 et seq., or Section 6(e) of the Toxic Substances Control Act, 15 U.S.C. § 2605(e), as either may be replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (B) in N.Y. ECL § 27-0901 (McKinney 1984), as replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (ii) special nuclear or by-products materials within the meaning of the Atomic Energy Act of 1954; and (b) any other materials which any Governmental Authority having appropriate jurisdiction shall determine from time to time is ineligible for Disposal whether by reasons of being harmful, toxic or dangerous, or otherwise.

**Host Community Agreement** means the Host Community Agreement between the City and the Company

**Inflation Adjustor** means the number multiplied by the Base Fees to determine the Annual Service Fee as provided in Section 7. The Inflation Adjustor shall be effective as of the first day of April in each Operating Year and the twelve (12) consecutive calendar months thereafter. (The Operating Year in which the Inflation Adjustor is calculated and goes into effect shall be referred to as the "Calculation Year.") The Inflation Adjustor shall be determined in the Calculation Year as provided in one of the following alternatives, whichever is applicable:

(a)     The Inflation Adjustor shall, subject to the provisions of paragraph (b) below, be a fraction the numerator of which is the sum of (i) the CPI for January of the year following the December 31 prior to the Acceptance Date, which is the date upon which the performance test established by the Facility financing party is satisfied (the "CPI Base") plus (ii) the product of multiplying (A) 64% times (B) the amount, if any, the CPI for January of the Calculation Year exceeds the CPI Base, and the denominator of which is the CPI Base.

(b)     If the Inflation Adjustor as calculated for the Calculation Year under paragraph (a) is less than the Inflation Adjustor determined in the Operating Year immediately preceding the Calculation Year, the Inflation Adjustor shall be the greater of the following:

(i)     the number which is the product of multiplying the Inflation Adjustor determined in the Operating Year immediately preceding the Calculation Year, times the CPI Fraction; or

(ii)     the number which is the product of multiplying the Inflation Adjustor determined in the Operating Year immediately preceding the Calculation Year, times the Operating Costs Fraction.

Notwithstanding anything in this Agreement to the contrary, the Inflation Adjustor shall not be less than 1.00.

An example of the calculation of the Inflation Adjustor is attached hereto as Schedule 7.

**Lease** means the Lease Agreement between the City and the Company.

Maximum Tonnage and Minimum Tonnage are defined with respect to the City in Part A of Schedule 1. When such terms are used with reference to another Contract Municipality, they mean that municipality's tonnage requirements under its contract with the City as reflected in the Company's notice delivered pursuant to Schedule 1.

Moisture Adjusted Tons is defined in Part A of Schedule 1.

Operating Costs Fraction means a fraction the numerator of which is the Facility Operating Costs for the Operating Year immediately preceding the Calculation Year and the denominator of which is the Facility Operating Costs for the Operating Year immediately preceding the Operating Year used in the numerator of the Operating Costs Fraction.

Operating Year means (i) the period beginning on the Service Date and ending on the following December 31 and (ii) each calendar year thereafter, except that the last Operating Year shall begin on January 1 immediately preceding the end of the term of this Agreement and end on the last day of the term of this Agreement. All annual amounts set forth in this Agreement shall be adjusted pro rata for the first and last Operating Years.

Person means a corporation, limited liability company, partnership, business trust, trust, joint venture, company, firm, individual, city, municipality or other governmental entity.

Process, Processed or Processing means the recovery of recyclable materials, the processing of cellulosic waste material to produce ethanol and $CO_2$ using the CES OxyNol™ Process, or the beneficial use of residual materials.

Project means the Facility, the Facility Site and the Delivery Site (if other than the Facility Site).

Proportionate Share is defined in Schedule 1.

Residue means any material derived from Acceptable Waste which remains after the Processing of Acceptable Waste which the Company is unable to sell or give away.

Service Date means the date the City shall commence the delivery of all its Acceptable Waste to the Facility, notice of which date shall be provided in writing by the Company.

Start-Up Date means the first day prior to the Service Date upon which the City is required to deliver Acceptable Waste collected by the City (except for Acceptable Construction Waste) to the Company for start-up and testing operations.

State means the State of New York.

Unacceptable Waste means Hazardous Waste or any other portion of solid waste which, if Disposed of at the Facility (or any Alternate Disposal Facility), may harm the Facility or impair its operation or otherwise may not be Disposed of at a Delivery Site as it would:

      (a)    present a substantial endangerment to health or safety of the public or Facility employees; or

      (b)    cause a violation of Applicable Law; or

      (c)    adversely affect the equipment at or operation of the Facility.

Unacceptable Waste includes explosives, including hand grenades, blasting caps, shotgun shells, closed containers capable of exploding upon Processing and fireworks, gasoline, kerosene, turpentine, waste oil, ether, acetone, solvents, paints, alcohol, acids, hydraulic oil, petroleum, caustics, burning or smoldering materials, materials that have elevated temperatures or that may self-ignite, flammable or volatile liquids, any other liquids (other than as contained in Acceptable Sludge), pathological, chemotherapeutic and biological waste, radioactive materials, hospital waste, medical waste, red bag waste, ashes, foundry sand, sewage sludge other than Acceptable Sludge, construction and demolition debris that is not Acceptable Construction Waste, septage, cesspool and other untreated human waste, leachate, human and animal remains, kitchen sinks, motor vehicles, including such major motor vehicle parts as automobile transmissions, rear ends, springs and fenders, bulk loads of tires, agricultural and farm machinery and equipment, marine vessels and major parts thereof, any other large types of machinery or equipment, liquid wastes and asbestos or asbestos containing material.

Unacceptable Waste Costs means the Company Actual Cost of removing from the Delivery Site or Alternate Disposal Site and disposing of Unacceptable Waste.

2.     **Conventions.** Unless otherwise limited in this Agreement, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form on paper; any references to agreements and other contractual instruments shall be deemed to include all subsequent amendments thereto, restatements or replacements thereof, or changes therein duly entered into and effective among the parties thereto or their permitted successors and assigns; references to persons include their permitted successors and assigns; the term "including" shall mean including without limitation; references to schedules and sections mean the Schedules to and Sections of this Agreement and references to this Agreement mean this Agreement including all Schedules; the term "day" means a calendar day and includes Saturdays, Sundays and holidays, except that, in the event that any payment obligation to be performed under this Agreement falls due on a Saturday, Sunday or a holiday on which State or federally chartered banks are not open for business, the obligation shall be deemed due on the next business day thereafter; the term "prompt" means as soon as is practicable but in any event not to exceed seven days from the day of the event with respect to which action is to be taken; and the term "ton" means a short ton of 2,000 pounds.

3.     [Reserved]

4. Remedies.

(a)    To the extent that specific remedies, damages or adjustments are set forth in this Agreement, such remedies, damages or adjustments shall be the sole and exclusive remedy available in the circumstances giving rise to such remedy, damage or adjustment.

(b)    It is understood and agreed between the parties that the calculations of the contract termination fees under Sections 12 and 13 are intended to provide a consistent method for the determination of the actual damages that the City or the Company, as the case may be, will sustain in the event this Agreement is terminated pursuant to Section 12 or 13, and that these calculations are agreed upon and fixed as liquidated damages and not as a penalty.

(c)    In no event, whether because of the breach of any provisions contained in this Agreement or for any other cause, whether based upon contract, strict liability, tort, warranty, delay or otherwise, shall either the City or the Company be liable, or otherwise be obligated in any manner to pay to the other any incidental, special, punitive, consequential or indirect damages of any nature (whether such damages occur prior to or after the expiration or termination of this Agreement), except as specifically provided in Sections 12 and 13 regarding contract termination fees. Nothing in this Section shall be deemed to affect the obligations of the Company and the City under Schedule 4.

(d)    Any obligation for the payment of money arising from the conduct of the parties pursuant to this Agreement prior to termination shall not be affected by any termination and shall remain in full force and effect.

5.    Limited Obligation.    NO RECOURSE SHALL BE HAD FOR THE PAYMENT OF THE PRINCIPAL OF ANY BONDS ISSUED FOR THE FACILITY OR FOR THE PERFORMANCE OF ANY OF THE OBLIGATIONS UNDER THIS AGREEMENT AGAINST THE CITY [EXCEPT AS OTHERWISE PROVIDED IN SECTION 13(C) ABOVE] ANY PAST, PRESENT OR FUTURE MEMBER, OFFICER, EMPLOYEE OR AGENT OF THE CITY OR THE ISSUER OF THE BONDS OR ANY PREDECESSOR OR SUCCESSOR CORPORATION, EITHER DIRECTLY OR INDIRECTLY, THROUGH THE CITY OR OTHERWISE, WHETHER BY VIRTUE OF ANY CONSTITUTION, STATUTE, OF LAW OR BY THE ENFORCEMENT OF ANY ASSESSMENT OR PENALTY, OR OTHERWISE, ALL SUCH LIABILITY BEING, BY ACCEPTANCE HEREOF, EXPRESSLY WAIVED AND RELIEVED.

6.    Confidentiality.    Any information or materials furnished to a City or its auditor pursuant to this Agreement with respect to the operation of the Project shall be treated as confidential and maintained in strict confidence, and the City shall take all reasonable steps to prevent disclosure to third parties to the extent permitted by law, except to the extent such information is already in the public domain at the time furnished.

7.    Cooperation in Financing.    The City agrees to make available, to the prospective issuer of the Bonds, its underwriters, their counsel, bond counsel, the rating agencies, independent engineers or feasibility consultants, credit facility providers and other financing institutions or parties involved in the financing process and the issuance of bonds, such

information in the control of the City (including financial information concerning the City) as may reasonably be requested. The City agrees to make available to the independent engineer and the feasibility consultant designated by the Company such information concerning the City as they reasonably request so they can render opinions concerning the City's abilities to perform its obligations under this Agreement. The City further agrees that, in connection with the financing of the Facility, it shall (i) provide an opinion of counsel as to the enforceability against the City of this Agreement and as to such other matters reasonably requested in connection with such financing and (ii) grant to the Company's senior lenders or their trustees such rights to cure a default by the Company hereunder as they may reasonably request in connection with the financing of the Facility and provide such certificates as are customary in connection with such financings. The Company agrees to reimburse all reasonable costs incurred by City's counsel in providing the information required in connection with the financing as set forth herein. The City does not, by virtue of entering into this Agreement, assume any liability for the Bonds or the issuer of, the holders of or the trustee for the holders of the Bonds. Except as provided in this Section and in Section 13(c) in connection with a default by the City hereunder, the City shall have no obligations to the Company with respect to the Bonds.

8. **Relationship of the Parties.** Neither party to this Agreement shall by virtue of this Agreement have any responsibility whatsoever with respect to services provided or contractual obligations assumed by the other party, and nothing in this Agreement shall be deemed to constitute either party a partner, agent or legal representative of the other party or to create any fiduciary relationship between the parties.

9. **Assignment.**

(a) This Agreement may not be assigned by the Company without the prior written consent of the City, which consent shall not be unreasonably withheld or delayed; provided that the Company may, without such consent, assign this Agreement in connection with the financing and refinancing from time to time of the Facility and/or may assign this Agreement to an affiliate of the Company. Nothing in this section shall prevent the Company from subcontracting or assigning its obligations or rights under this Agreement to third parties, provided that the Company remains liable for the performance of its obligations hereunder.

(b) This Agreement may not be assigned by the City without the prior consent of the Company, which consent shall not be unreasonably withheld or delayed.

(c) This Agreement shall be binding upon and inure to the benefit of the permitted successors and assigns of the parties hereto pursuant to this Section. Any attempted assignment made contrary to this Section shall be void.

10. **Renewal Terms.**

(a) The term of this Agreement shall be extended under the terms set forth in this paragraph (a) if, prior to the anniversary dates of the Service Date of the Facility (each, an "Anniversary") identified below, the City provides notice to the Company pursuant to paragraph (c).

    (i) On the fifth Anniversary, this Agreement shall be extended until the thirtieth Anniversary on its existing terms.

    (ii) After the fifth Anniversary but on or before the tenth Anniversary, this Agreement shall be extended until the thirty-fifth Anniversary on its existing terms, except that, for the period of the extension, the Base Fees shall be as announced by the Company pursuant to paragraph (b) of this Section.

    (iii) After the tenth Anniversary but on or before the fifteenth Anniversary, this Agreement shall be extended until the fortieth Anniversary on its existing terms, except that, for the period of the extension, the Base Fees shall be as announced by the Company pursuant to paragraph (b) of this Section.

  (b) At least six (6) months prior to the tenth Anniversary and fifteenth Anniversary, the Company shall give notice to the City stating the Base Fees that will be in effect for the period of the extension under paragraph (a)(ii) or (iii) above, as the case may be. The Base Fees announced by the Company under paragraph (a)(ii) shall not exceed 125% of the Base Fees. The Base Fees announced by the Company under paragraph (a)(iii) shall not be less than 110% of the Base Fees in effect at the time the Company gives such notice.

  (c) At any time prior to the fifth, tenth and fifteenth Anniversaries [in accordance with the provisions of paragraphs (a)(ii) and (a)(iii) above], the City may provide written notice to the Company that it desires to extend this Agreement at such time, and this Agreement shall be extended at such time.

  (d) Notwithstanding anything to the contrary in this Section 10, if at the twenty-fifth, thirtieth or thirty-fifth Anniversary, the Company does not have contracts with the Contract Municipalities for an aggregate Minimum Tonnage for the next five years of at least 80 percent of the then existing operating capacity of the Facility, the Company may terminate this Agreement by providing at least six (6) months' prior written notice to the City.

11. **Notices.**

  (a) Any notice given pursuant to this Agreement shall be in writing and may be cabled, telecopied, delivered by hand, mailed by first class, certified mail, return receipt requested, postage prepaid, or dispatched by next day delivery service and, in any case, shall be addressed as follows:

 If delivered to the Company:

    Pencor-Masada OxyNol, LLC
    2170 Highland Avenue
    Suite 200
    Birmingham, Alabama  35205
    Attention: Daryl Harms
    Telephone: 205-558-7900
    Fax:  205-558-7911

<u>With a copy to:</u>

        Pencor-Masada OxyNol, LLC
        2170 Highland Avenue
        Suite 200
        Birmingham, Alabama  35205
        Attention:    General Counsel
        Telephone:    205-558-7900
        Fax:         205-558-7911

<u>If delivered to the City:</u>

        City of Middletown
        16 James Street
        Middletown, New York  10940
        Attention:    Joseph DeStefano
                     Mayor
        Telephone:    845-346-4100
        Fax:         845-343-7439

<u>With a Copy to:</u>

        Alex Smith, Esq.
        Corporation Counsel
        City of Middletown, New York
        16 James Street
        Middletown, New York 10940
        Telephone:    845-346-4139
        Fax:         845-346-4146

Either party may change the address to which its communications are delivered by notice to the other parties.

        (b)    Any communication given in accordance with this Section shall be deemed to have been given to a party upon its receipt by such party or upon such party's refusal to accept its delivery.

        12.    **Waiver.** The waiver by either party of a default or a breach of any provision of this Agreement by the other party shall not operate or be construed to operate as a waiver of any subsequent default or breach. The making or the acceptance of a payment by either party with knowledge of the existence of a default or breach shall not operate or be construed to operate as a waiver of any default or breach.

        13.    **Entire Agreement; Modifications.** This Agreement, together with the Host Community Agreement, the Comprehensive Waste Agreement and the Ground Lease, (i) is the entire understanding of the parties with respect to the subject hereof and supersedes all prior

agreements, understandings and commitments with respect thereto and (ii) may be modified only by written agreement executed by both parties.

14.    **Severability.**  In the event that any provision of this Agreement, or the application of such provision to any Person or circumstance shall, for any reason, be determined to be invalid, illegal, or unenforceable in any respect, the parties shall negotiate in good faith and agree to such amendments, modifications, or supplements of or to this Agreement or such other appropriate actions as shall, to the maximum extent practicable in light of such determination, implement and give effect to the intentions of the parties as reflected herein, and other provisions of this Agreement shall, as so amended, modified, or supplemented, or otherwise affected by such action, remain in full force and effect.

15.    **Headings.**  Captions and headings in this Agreement are for ease of reference only and do not constitute a part of this Agreement.

16.    **Governing Law.**  This Agreement and any question concerning its validity, construction or performance shall be governed by the laws of the State, irrespective of the place of execution or of the order in which the signatures of the parties are affixed or of the place or places of performance.

17.    **Venue.**  The Company and the City hereby agree that any action, suit or proceeding arising out of this Agreement or any transaction contemplated hereby shall be brought in a court of competent jurisdiction in the State, and that neither the Company nor the City shall object to the institution or maintenance of any such action, suit or proceeding in such court based on improper venue, forum non conveniens or any other ground relating to the appropriate forum for such action, suit or proceeding.  Notwithstanding the foregoing, the provisions of Schedule 5 shall govern and control.

18.    **Counterparts.**  This Agreement may be executed in more than one counterpart, each of which shall be deemed to be an original but all of which taken together shall be deemed a single instrument.

19.    **Leasehold Financing.**  The Company will be entering into Leasehold Mortgages (as defined in the Ground Lease) with Leasehold Mortgagees in connection with the financing of the Facility.  If the Company or any Leasehold Mortgagee shall send to the City a true copy of any such Leasehold Mortgage, together with written notice specifying the name and address of the Leasehold Mortgagee, the City agrees that after receipt of such notice and so long as any such Leasehold Mortgage shall remain unsatisfied of record or until written notice of satisfaction is given by the holder to the City, the following provisions shall apply:

(a)    There shall be no cancellation, surrender, amendment, or modification of this Agreement by joint action of the City and the Company without the prior written consent of the Leasehold Mortgagee.

(b)    The City shall, upon mailing or giving to the Company any notice of default or any other notice hereunder, simultaneously send a copy of such notice to the

Leasehold Mortgagee at the address furnished in said written notice or in any subsequent written notice to the City changing such address.

(c)    The City agrees that the City will not terminate this Agreement following any default by the Company hereunder and the expiration of any grace or notice period granted to the Company hereunder for the cure of such event of default provided that:

(i)    If such default can be cured by the payment or expenditure of money or reasonably can be cured within ninety (90) days and without possession of the Site, the Leasehold Mortgagee cures the default or breach described in such notice within ninety (90) days following receipt of written notice that the Company has failed to timely cure such default; or

(ii)    If such default or breach cannot be cured by the payment or expenditure of money or cannot reasonably be cured within ninety (90) days, the Leasehold Mortgagee commences the cure of such default within the ninety (90) day period after receipt of written notice that the Company has failed to timely cure such default, and thereafter diligently pursues such cure to completion, even if completion of such cure requires a longer period of time; or

(iii)    If such default or breach cannot be cured without possession of the Site, the Leasehold Mortgagee commences proceedings for foreclosure and sale under the Leasehold Mortgage within the ninety (90) day period after receipt of written notice that the Company has failed to timely cure such default, which period shall be deemed extended by the number of days of delay occasioned by judicial restriction against commencement of foreclosure, including, without limitation, a stay imposed by a bankruptcy petition, or occasioned by other circumstances beyond the Leasehold Mortgagee's control, and thereafter the Leasehold Mortgagee diligently pursues such proceedings to completion and, upon obtaining possession of the Site, diligently pursues the cure of such default to completion.

(d)    If a Leasehold Mortgagee shall fail to comply with any of the requirements of this Section 19, then and thereupon the City shall be released from the covenant of forbearance herein contained as to such Leasehold Mortgagee, and City shall be entitled to proceed to terminate this Agreement. Nothing herein contained shall preclude the City from terminating this Agreement following completion of any proceedings for foreclosure or assignment in lieu of foreclosure to any Leasehold Mortgagee if within ninety (90) days thereafter any default hereunder which can be cured is not cured.

(e)    The City shall give the Leasehold Mortgagee prompt notice of any intended termination of this Lease no later than ninety (90) days prior to the intended date of such termination and of the amount owing to the City as of the date of termination of the Lease.

(f)    In the event a Leasehold Mortgagee succeeds to the rights of Company hereunder by foreclosure or assignment in lieu of foreclosure or otherwise, said Leasehold Mortgagee shall be released from any liability hereunder from and after the date of any assignment of its interest hereunder. The City acknowledges and confirms that the

Leasehold Mortgagee shall have the full and absolute right to assign the rights and obligations of the Company hereunder to any party or entity. No Leasehold Mortgagee shall become liable for the performance or observance of any covenants to be performed by the Company hereunder unless and until such Leasehold Mortgagee becomes the owner of the Company's interest hereunder. Notwithstanding anything herein contained to the contrary, the Leasehold Mortgagee or any person or entity acquiring such leasehold estate shall be liable to perform the obligations imposed on the Company by this Lease only during the period such person has ownership of said leasehold estate or possession of the Premises.

(g)    All of the provisions contained in this Agreement with respect to Leasehold Mortgages and the rights of the Leasehold Mortgagees shall survive the termination of this Agreement for such period of time as shall be necessary to effectuate the rights granted to all Leasehold Mortgagees by the provisions of this Agreement.

(h)    Nothing herein contained shall require any Leasehold Mortgagee to cure any default by the Company hereunder; provided, however, that the City agrees to accept the performance by any Leasehold Mortgagee of any obligation under this Agreement in lieu of performance by the Company.

(i)    In the event two or more Leasehold Mortgagees each exercise their rights hereunder and there is a conflict which renders it impossible for the City to comply with all such requests, the Leasehold Mortgagee whose Leasehold Mortgage would be senior in priority if there were a foreclosure shall prevail.

(j)    Upon the reasonable request of any Leasehold Mortgagee, the City and the Company shall cooperate in including in this Agreement by suitable amendment from time to time any provisions reasonably requested by any Leasehold Mortgagee for the purpose of implementing the protective provisions contained in this Section 19 for the benefit of such Leasehold Mortgagee. The City and the Company shall execute, deliver and acknowledge any amendment reasonably necessary to effect any such requirement; provided, however, that any such amendment shall not in any way affect the term nor otherwise in any material respect adversely affect any rights of the City under this Agreement.

Exhibit C



# COMPREHENSIVE WASTE MANAGEMENT SERVICES AGREEMENT

between

## CITY OF MIDDLETOWN, NEW YORK

and

## PENCOR-MASADA OXYNOL, LLC



## COMPREHENSIVE WASTE MANAGEMENT SERVICES AGREEMENT

This Comprehensive Waste Management Services Agreement, is made as of December 9, 2003, by and between the CITY OF MIDDLETOWN, NEW YORK (the "City"), and PENCOR-MASADA OXYNOL, LLC, a Delaware limited liability company (the "Company").

### Background

A.     Pursuant to N.Y. Gen. Mun. Law § 120-w, the City issued a Request for Proposals in 1994 to select a firm to provide solid waste disposal services to the City, and in January of 1995, Pencor Orange Corp., which became one of the members of the Company, was selected as the City's choice vendor, and, subsequently with the City's approval, assigned its negotiating rights with the City to the Company.

B.     The City and the Company agreed to expand the capacity of the contemplated integrated solid waste processing facility (the "Facility") for the disposal of municipal solid waste and sewage sludge by recycling various components of those waste streams and processing other components to produce ethanol and carbon dioxide beyond that needed for the City's need alone, in order to achieve economies of scale.

C.     The City of Middletown Industrial Development Agency (the "Agency") will issue bonds (the "Bonds") under an Indenture of Trust and will make the proceeds of the Bonds available to the Company to finance, in part, the construction of the Facility.

D.     The Facility will be constructed on certain real property in the City (the "Site") to be leased by the City to the Company under a Lease Agreement dated as of December 9, 2003 (the "Ground Lease").

E.     The Agency will own the Facility and lease it to the Company under an Operating Lease to be entered into hereafter.

F.     The City intends to maintain or establish and maintain a solid waste collection system, which may involve other municipalities in Orange County, New York, and desires to deliver, or cause to be delivered, to the Facility, acceptable waste for disposal by the Company.

G.     The City and the Company are entering into a City Waste Management Services Agreement dated as of December 9, 2003 (the "City Waste Agreement") in which the Company has agreed to dispose of solid waste generated within the City.

H.     The City has entered into agreements (the "Municipal Waste Agreements") with certain municipalities (the "Municipalities") under N.Y. Gen. Mun. Law Art. 5G and as listed on Attachment - Background H hereto, pursuant to which the City will provide solid waste disposal services to the Municipalities, thereby using the expanded capacity within the Facility, and with respect to which the Company will be a third-party beneficiary.

I.     The City and the Company are entering into a Host Community Agreement (the "Host Community Agreement") dated as of December 9, 2003.

# TABLE OF CONTENTS

|   |   | Page |
|---|---|------|
| 1. | Article 5-G Municipal Waste Agreements | 2 |
| 2. | Term | 5 |
| 3. | Dispute Resolution | 5 |
| 4. | General Contract Conditions | 5 |

---

## SCHEDULES

1    GENERAL CONTRACT CONDITIONS

<u>Agreements</u>

In consideration of the foregoing and the respective obligations undertaken herein, and intending to be legally bound, the parties hereto agree as follows:

Section 1.     Article 5-G Municipal Waste Agreements.

(a)     The Company acknowledges that the City is entering into this Agreement in reliance on the performance by the Municipalities of their respective obligations under the Municipal Waste Agreements.

(b)     The City and the Company shall each use commercially reasonable efforts and shall cooperate with one another in order to encourage other municipalities to deliver their Acceptable Waste to the Facility, and the City agrees that it shall refrain from actively discouraging any municipality from delivering its Acceptable Waste to the Facility.     In furtherance of those efforts and that cooperation, the City acknowledges that the Company, as agent for the City, will be approaching other municipalities to deliver their Acceptable Waste to the Facility, and agrees that, upon delivery to it by the Company of an agreement executed by a municipality and substantially in the form of the draft Municipal Waste Agreement attached hereto as Attachment 1(b), the City shall take all necessary action to approve and to execute such agreement within 45 days of its receipt from the Company (upon full execution of any such agreements by the parties thereto, such agreements shall be included among the "Municipal Waste Agreements" hereunder and the other municipalities executing such agreements shall be included among the "Municipalities" hereunder).     The City acknowledges that its failure to comply with this Section 1(b) will harm the Company and agrees to pay to the Company liquidated damages on the following basis:

(i)     With respect to a prospective Municipal Waste Agreement covering municipal waste, a per diem liquidated damages fee of $120 times the Inflation Adjustor per Ton of Acceptable Municipal Waste anticipated to be delivered to the Facility on a daily basis during the first year of the term of such prospective Municipal Waste Agreement, based upon a 286-day year (e.g., if prospective Municipal Waste Agreement anticipates annual delivery of 3,650 Tons of Municipal Waste, the daily delivery would be 12.76 [3,650 ÷ 286] Tons of Municipal Waste, assuming an Inflation Adjustor of 1.0, the per diem liquidated damages fee would be $1,531 [$120 x 12.76 Tons of Municipal Waste], and the total liquidated damages fee would be the product of (x) $1,531 and (y) the number of days beyond 45 days such prospective Municipal Waste Agreement remained unexecuted by the City.

(ii)     With respect to a prospective Municipal Waste Agreement covering municipal sludge, a per diem liquidated damages fee of $150 times the Inflation Factor per Ton of Acceptable Sludge anticipated to be delivered to the Facility on a daily basis during the first year of the term of such prospective Municipal Waste Agreement, based upon a year of 365 days, with such liquidated damages fee being calculated in a similar manner to the calculation under subsection (i) immediately hereinabove.

The City and the Company agree that (x) the Company's damages will be difficult to ascertain, (y) they have made a good faith determination that $120 per Ton of Acceptable Municipal Waste and $150 per Ton of Acceptable Sludge are the appropriate figures to use in subsections (i) and (ii) respectively immediately hereinabove, and (z) the liquidated damages fees calculated as provided above constitute reasonable liquidations thereof in connection with the City's default under this Section 1(b), and the same is intended not as a penalty, but as full liquidated damages. The City agrees not to initiate any proceeding challenging the Company's right to receive such liquidated damages fee as so calculated, and the Company agrees not to initiate any proceeding to recover damages from the City in excess of such liquidated damages fee as so calculated.

(c)    The Company agrees that, notwithstanding any provision of this Agreement, the Municipal Waste Agreements, or any other agreement, contract or instrument to the contrary, the liability of the City to the Company for the performance of those City obligations under this Agreement that arise from the obligations of the Municipalities under the Municipal Waste Agreements (the "City Municipal Obligations") shall be limited to the performance by each of the Municipalities of its obligations under its Municipal Waste Agreement and that the remedies available to the Company for the City's failure to perform the City Municipal Obligations shall be limited to the remedies available to the City under the respective Municipal Waste Agreements for the failures of the Municipalities to perform their obligations under such agreements. Without limiting the generality of the foregoing, the Company acknowledges and confirms that, with respect to the obligations of the Municipalities under the Municipal Waste Agreements, the City shall have no obligation of any kind (i) to advance any moneys on behalf of the Municipalities, (ii) to make any payment to the Company unless the City has previously received the corresponding payment from the applicable Municipality under the applicable Municipal Waste Agreement, or (iii) to deliver Acceptable Waste to the Facility in the event a Municipality fails to deliver its agreed-upon Minimum Tonnage to the Facility.

(d)    Upon notice from the Company that a Municipality is in breach of its obligations under such Municipality's Municipal Waste Agreement, the City shall, in full cooperation with, and with direction from, the Company, exercise its right to enforce such Municipal Waste Agreement against such Municipality at the sole expense of the Company. The City agrees that it shall take no actions to enforce such Municipal Waste Agreement without the prior written approval of the Company (which approval may be given or withheld in the Company's sole discretion), and that it shall take all actions requested of the City by the Company to enable the Company to enforce such Municipal Waste Agreement.

(e)    The City acknowledges that the Company is entering into this Agreement in reliance on the performance by each of the Municipalities of their obligations under the respective Municipal Waste Agreements. The City hereby assigns to the Company all of the City's right, title and interest in and to the Municipal Waste Agreements, other than those aspects of the Municipal Waste Agreements that pertain to the City's authority over public health matters pertaining to the City. The City acknowledges and confirms that the Company shall have the unfettered right to assign the Municipal Waste Agreements to the Leasehold Mortgagee (as defined in the Ground Lease) and that if the Leasehold Mortgagee shall succeed to the rights of the Company under the Municipal Waste Agreements, the Leasehold Mortgagee shall have the further unfettered right of assignment. The City agrees that it will not modify, amend or

terminate, or take any action with respect to, any Municipal Waste Agreement without the prior written consent of the Company and the Leasehold Mortgagee, which consent may be given or withheld in the Company's and the Leasehold Mortgagee's sole discretion.

(f)      The Company acknowledges and agrees that it shall, as agent of the City, perform the City's obligations and exercise the City's rights under the Municipal Waste Agreements.

(g)      The Company shall bill the Municipalities in accordance with the Municipal Waste Agreements and shall have the right to receive and retain payments made by the Municipalities thereunder.

(h)      The City and the Company shall cooperate fully with one another in connection with any dispute, dispute resolution proceedings, arbitration proceedings or claim for indemnity under the Municipal Waste Agreements.

(i)      Notwithstanding the foregoing provisions of this Section 1, the City shall be obligated to perform any obligations under this Agreement undertaken directly by the City and not in reliance on the performance by a Municipality under a Municipal Waste Agreement, including, without limitation, its obligations under Section 1(b) hereinabove, and the City shall be entitled to receive for its own account amounts paid by any Municipality under a Municipal Waste Agreement intended to indemnify the City or reimburse it for costs directly incurred by it, and not intended to be paid to the Company.

(j)      The City and the Company shall indemnify one another in accordance with the provisions of Schedule 4 of the City Waste Agreement.

(k)      (i)      The Company shall, from time to time upon written request from the City, provide to the City appropriate certification with respect to the availability of disposal space for Acceptable Waste under all then-current Municipal Waste Agreements for the 183-day period immediately following the termination of this Agreement, and the Company shall, at termination of this Agreement, assign to the City the Company's rights to such other disposal space.

(ii)      The Company shall deliver to the City no later than thirty (30) calendar days prior to the Service Date an irrevocable letter of credit (or other financial instrument reasonably acceptable to the City and the Company) (the "Disposal Letter of Credit") in form and substance reasonably acceptable to City in an amount determined as provided below, and Company shall keep such Disposal Letter of Credit in effect, in its then applicable amount, throughout the Term. The amount of the Disposal Letter of Credit shall be determined no later than sixty (60) calendar days prior to the Service Date and on each anniversary thereof throughout the term by R.W. Beck or any successor engineering firm reasonably acceptable to City and Company (the "Engineering Firm"), in accordance with the following:

a)      The Engineering Firm shall make a good-faith estimate of the excess of (i) the actual cost (assuming that such cost would be the result of a competitive bid process) to the Municipalities under then-current

Municipal Waste Agreements of disposal of Acceptable Waste for the 183-day period commencing on the ninetieth (90th) calendar day following the date of such determination over (ii) the amount which would have been payable by such Municipalities as part of the Annual Service Fee payable by the Municipalities under their respective Municipal Waste Agreements had the Company Disposed of such waste under the Municipal Waste Agreements for the same period;

b)   In making such good-faith estimate, the Engineering Firm shall apply the tipping fees and hauling rates applicable at the landfill that at such time is providing to the Company the disposal space described in subsection (i) hereinabove in this subsection (k);

c)   The Engineering Firm shall deliver to the City and the Company in writing its calculation of such excess, if any. The amount of such excess shall be the amount of the Disposal Letter of Credit until the next calculation thereof;

d)   The Company shall pay the reasonable fees and expenses incurred by the Engineering Firm under this subsection (k)(ii); and

e)   Notwithstanding the foregoing, if the Company is able, from time to time, to deliver to the City evidence reasonably satisfactory to the City that confirms the likely cost to the Municipalities under clause (a) above, such evidence to include, without limitation, copies of contracts in effect at such time with regard to disposal of Acceptable Waste and hauling rates, then in such event the City agrees that, in lieu of the provisions set forth immediately hereinabove with respect to the determination by the Engineering Firm of the amount of the Disposal Letter of Credit, the Company and the City shall mutually agree upon the amount of the Disposal Letter of Credit.

**Section 2.**    **Term.** Unless sooner terminated in accordance with the terms hereof, the initial term of this Agreement shall be co-terminus with the Ground Lease.

**Section 3.**    **Dispute Resolution.** The parties agree to submit any dispute or claim under this Agreement to dispute resolution in accordance with Schedule 5 of the City Waste Agreement.

**Section 4.**    **General Contract Conditions.** The parties' obligations under this Agreement are subject to the general contract conditions set forth in Schedule I. Capitalized terms used in this Agreement and not otherwise defined have the meanings specified in Schedule I.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement the day and year first above written.

CITY OF MIDDLETOWN, NEW YORK

By: _____

Name: _____

Title: Mayor

PENCOR-MASADA OXYNOL, LLC

By:  Masada OxyNol, LLC
     Manager

By:  Masada Resource Group, LLC
     Manager

By: Daryl E. Harris by Terry W. Johnson

Name: DARYL E. HARRIS                    attorney in fact

Title: MANAGER

## SCHEDULE 1

### GENERAL CONTRACT CONDITIONS

| Section | | Page |
|---|---|---|
| 1 | Definitions | S-1 |
| 2 | Conventions | S-5 |
| 3 | Confidentiality | S-6 |
| 4 | Cooperation in Financing | S-6 |
| 5 | Relationship of the Parties | S-6 |
| 6 | Assignment | S-7 |
| 7 | Notices | S-7 |
| 8 | Waiver | S-8 |
| 9 | Entire Agreement; Modifications | S-8 |
| 10 | Severability | S-8 |
| 11 | Headings | S-9 |
| 12 | Governing Law | S-9 |
| 13 | Counterparts | S-9 |
| 14 | Leasehold Financing | S-9 |

1.    **Definitions.** Unless otherwise required by the context in which any defined term appears, the following defined terms shall have the meanings as specified below:

**Acceptable Construction Waste** means solid waste arising from the construction or demolition of a structure by or on behalf of a Contract Municipality that (a) comports with the requirements of all permits for the Project regarding such waste and otherwise meets the requirements of Applicable Law, and (b) is separated from other waste prior to delivery to the Delivery Site and excluding (i) construction or demolition debris that is Hazardous Waste, asbestos or asbestos containing material or otherwise is Unacceptable Waste, (ii) solid waste resulting from construction or demolition of roads, sidewalks and parking areas, and (iii) solid waste resulting from the construction or demolition of equipment or anything else other than a structure or from construction or demolition which is not conducted by or on behalf of the City.

**Acceptable Municipal Waste** means that portion of solid waste which has characteristics such as that collected and disposed of as part of normal municipal collection of solid waste in the Contract Municipalities, including white goods, but excluding (a) sludge, (b) construction and demolition debris, (c) tires delivered as part of a bulk load of tires, and (d) Unacceptable Waste.

**Acceptable Sludge** means sewage sludge generated at a wastewater treatment plant owned or operated by or on behalf of the City that (a) is derived from treatment of sewage consisting predominantly of domestic sewage and otherwise having the characteristics of wastewater treated at publicly owned treatment works, (b) meets all requirements related to sewage sludge contained in any applicable permits for the wastewater treatment plant at which it

is generated, (c) comports with the requirements of all permits for the Facility regarding sewage sludge, (d) otherwise meets the requirements of Applicable Law, (e) is processed utilizing standard processing techniques, as defined in Chapter 12 of the Third Edition of Metcalf and Eddy's book entitled, "Wastewater Engineering", (f) has properties and compositions within the ranges defined in Chapter 12 of the Third Edition of Metcalf and Eddy's book entitled, "Wastewater Engineering" and (g) is less than 30 percent solids, and expressly excluding (i) sewage sludge which is Hazardous Waste, has not been properly characterized by appropriate testing to determine that it is not Hazardous Waste or otherwise is Unacceptable Waste, and (ii) sewage sludge that has a specific gravity of less than one.

Sewage sludge that has been classified, through documented tests, as not being Hazardous Waste, yet has been excluded due to the aforementioned criteria, may be deemed to be acceptable provided that testing carried out by the Company proves its compatibility with the Process.

**Acceptable Waste** means Acceptable Construction Waste, Acceptable Municipal Waste and Acceptable Sludge.

**Agreement** means this Comprehensive Waste Management Services Agreement between the Company and the City, including the Schedules and any written amendments hereto.

**Alternate Disposal Facility** means a landfill or other facility, equipment or site other than the Facility or other Delivery Site that (a) the Company designates as an Alternate Disposal Facility, (b) is used by the Company to accept, transport, store or dispose of Acceptable Waste or Residue under this Agreement and (c) has all permits required by Applicable Law for the acceptance and disposal of the type of solid waste for which it is used by the Company.

**Applicable Law** means any law, regulation, requirement or order of any federal, state or local government agency, court or other governmental body, or the terms and conditions of any permit, license or governmental approval, applicable from time to time to the construction of the Facility or the performance of any obligation under this Agreement.

**Bonds** means the bonds issued to finance, in part, the design, construction and testing of the Facility and related costs, including any additional bonds or refunding bonds issued in accordance with the same indenture.

**City** means the City of Middletown, New York.

**Company** means Pencor-Masada OxyNol, LLC, a Delaware limited liability company.

**Contract Municipality** means (a) the City in its role as a party to this Agreement, and (b) any municipality that has entered into an agreement with the City for the provision of solid waste management services, which municipalities are listed on Attachment – Background H of this Agreement.

**CPI** means the Consumer Price Index for all Urban Wage Earners for the New York Region, all items, as published by the Bureau of Labor Statistics of the U.S. Department of

Labor. For the purposes of determining the Inflation Adjustor, if the CPI is no longer published or the method of computation thereof is substantially modified, an agreed upon alternative index of similar geographic focus and substantially identical economic criteria shall be substituted therefor.

CPI Fraction means a fraction the numerator of which is the sum of (i) the CPI for January of the preceding Operating Year immediately preceding the Calculation Year plus (ii) the product of multiplying 64% times the difference of (A) the CPI for January of the Calculation Year minus (B) CPI for January of the immediately preceding Operating Year, and the denominator of which is the CPI for January of the Operating Year immediately preceding the Calculation Year.

Delivery Site means the Facility Site, an Alternate Disposal Facility or any other site agreed to in writing by the parties.

Disposal Letter of Credit is defined in Section 1(k) above.

Dispose, Disposed, Disposing means treatment, processing or disposal by the Company in accordance with Applicable Law of (a) Acceptable Waste delivered to the Company in accordance with this Agreement by the following means in the order of priority listed: (i) Processing, (ii) transporting Residue to an Alternate Disposal Facility, (iii) transporting Acceptable Waste to an Alternate Disposal Facility, and (iv) directing the City to deliver Acceptable Waste to an Alternate Disposal Facility for disposal if for any reason the Facility is not available.

Facility means the integrated solid waste processing facility, together with all additions, replacements, appurtenant structures and equipment, to be designed, constructed and operated by the Company on the Facility Site.

Facility Site means the real property upon which the Facility is located.

Governmental Authority means (a) the federal, state or any local government, (b) any agency, authority, special district or political subdivision thereof and (c) any court or other government tribunal.

Ground Lease means the ground lease between the City as landlord and the Company as tenant.

Hazardous Waste means (a) any material or substance which, by reason of its composition or characteristics, is (i) regulated as a toxic or hazardous waste as defined in (A) either the Solid Waste Disposal Act 42 U.S.C. §§ 6901 et seq., or Section 6(e) of the Toxic Substances Control Act, 15 U.S.C. § 2605(e), as either may be replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (B) in N.Y. ECL § 27-0901 (McKinney 1984), as replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (ii) special nuclear or by-products materials within the meaning of the Atomic Energy Act of 1954; and (b) any other materials which any

Governmental Authority having appropriate jurisdiction shall determine from time to time is ineligible for Disposal whether by reasons of being harmful, toxic or dangerous, or otherwise.

Host Community Agreement means the Host Community Agreement between the City and the Company.

Inflation Adjustor means the number multiplied by the applicable liquidated damages fee as provided in Section 1(b) above. The Inflation Adjustor shall be effective as of the first day of April in each Operating Year and the twelve (12) consecutive calendar months thereafter. (The Operating Year in which the Inflation Adjustor is calculated and goes into effect shall be referred to as the "Calculation Year.") The Inflation Adjustor shall be determined in the Calculation Year as provided in one of the following alternatives, whichever is applicable:

(a)     The Inflation Adjustor shall, subject to the provisions of paragraph (b) below, be a fraction the numerator of which is the sum of (i) the CPI for January of the year following the December 31 prior to the Acceptance Date, which is when the performance test established by the Facility financing party is passed (the "CPI Base") plus (ii) the product of multiplying (A) 64% times (B) the amount, if any, the CPI for January of the Calculation Year exceeds the CPI Base, and the denominator of which is the CPI Base.

(b)     If the Inflation Adjustor as calculated for the Calculation Year under paragraph (a) is less than the Inflation Adjustor determined in the Operating Year immediately preceding the Calculation Year, the Inflation Adjustor shall be the greater of the following:

(i)     the number which is the product of multiplying the Inflation Adjustor determined in the Operating Year immediately preceding the Calculation Year, times the CPI Fraction; or

(ii)     the number which is the product of multiplying the Inflation Adjustor determined in the Operating Year immediately preceding the Calculation Year, times the Operating Costs Fraction.

Notwithstanding anything in this Agreement to the contrary, the Inflation Adjustor shall not be less than 1.00.

Minimum Tonnage means the minimum number of tons of Acceptable Municipal Waste and tons of Acceptable Sludge that a Municipality agrees to deliver to the Facility under its Municipal Waste Agreement.

Operating Costs Fraction means a fraction the numerator of which is the Facility Operating Costs for the Operating Year immediately preceding the Calculation Year and the denominator of which is the Facility Operating Costs for the Operating Year immediately preceding the Operating Year used in the numerator of the Operating Costs Fraction.

Operating Year means the period beginning on the Service Date and ending on the following December 31 and (ii) each calendar year thereafter, except that the last Operating Year shall begin on January 1 immediately preceding the end of the term of this Agreement and

end on the last day of the term of this Agreement. All annual amounts set forth in this Agreement shall be adjusted pro rata for the first and last Operating Years.

Process, Processed or Processing means the recovery of recyclable materials, the processing of cellulosic waste material to produce ethanol and $CO_2$ using the CES OxyNol™ Process, or the beneficial use of residual materials.

Residue means any material derived from Acceptable Waste which remains after the Processing of Acceptable Waste which the Company is unable to sell or give away.

Service Date means the date the City shall commence the delivery of all its Acceptable Waste to the Facility, notice of which date shall be provided in writing by the Company.

State means the State of New York.

Ton of Acceptable Municipal Waste means tons of Acceptable Municipal Waste processed at the Facility.

Tons of Acceptable Sludge means tons of Acceptable Sludge processed at the Facility.

Unacceptable Waste means Hazardous Waste or any other portion of solid waste which, if Disposed of at the Facility (or any Alternate Disposal Facility), may harm the Facility or impair its operation or otherwise may not be Disposed of at a Delivery Site as it would:

(a)     present a substantial endangerment to health or safety of the public or Facility employees; or

(b)     cause a violation of Applicable Law; or

(c)     adversely affect the equipment at or operation of the Facility.

Unacceptable Waste includes explosives, including hand grenades, blasting caps, shotgun shells, closed containers capable of exploding upon Processing and fireworks, gasoline, kerosene, turpentine, waste oil, ether, acetone, solvents, paints, alcohol, acids, hydraulic oil, petroleum, caustics, burning or smoldering materials, materials that have elevated temperatures or that may self-ignite, flammable or volatile liquids, any other liquids (other than as contained in Acceptable Sludge), pathological, chemotherapeutic and biological waste, radioactive materials, hospital waste, medical waste, red bag waste, ashes, foundry sand, sewage sludge other than Acceptable Sludge, construction and demolition debris that is not Acceptable Construction Waste, septage, cesspool and other untreated human waste, leachate, human and animal remains, kitchen sinks, motor vehicles, including such major motor vehicle parts as automobile transmissions, rear ends, springs and fenders, bulk loads of tires, agricultural and farm machinery and equipment, marine vessels and major parts thereof, any other large types of machinery or equipment, liquid wastes and asbestos or asbestos containing material.

2.    **Conventions.** Unless otherwise limited in this Agreement, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form on paper; any references to agreements and other contractual instruments shall be deemed to include all subsequent amendments thereto, restatements or replacements thereof, or changes therein duly entered into and effective among the parties thereto or their permitted successors and assigns; references to persons include their permitted successors and assigns; the term "including" shall mean including without limitation; references to schedules and sections mean the Schedules to and Sections of this Agreement and references to this Agreement mean this Agreement including all Schedules; the term "day" means a calendar day and includes Saturdays, Sundays and holidays, except that, in the event that any payment obligation to be performed under this Agreement falls due on a Saturday, Sunday or a holiday on which State or federally chartered banks are not open for business, the obligation shall be deemed due on the next business day thereafter; the term "prompt" means as soon as is practicable but in any event not to exceed seven days from the day of the event with respect to which action is to be taken; and the term "ton" means a short ton of 2,000 pounds.

3.    **Confidentiality.** Any information or materials furnished to a City or its auditor pursuant to this Agreement with respect to the operation of the Project shall be treated as confidential and maintained in strict confidence, and the City shall take all reasonable steps to prevent disclosure to third parties to the extent permitted by law, except to the extent such information is already in the public domain at the time furnished.

4.    **Cooperation in Financing.** The City agrees to make available, to the prospective issuer of the Bonds, its underwriters, their counsel, bond counsel, the rating agencies, independent engineers or feasibility consultants, credit facility providers and other financing institutions or parties involved in the financing process and the issuance of bonds, such information in the control of the City (including financial information concerning the City) as may reasonably be requested. The City agrees to make available to the independent engineer and the feasibility consultant designated by the Company such information concerning the City as they reasonably request so they can render opinions concerning the City's abilities to perform its obligations under this Agreement. The City further agrees that, in connection with the financing of the Facility, it shall (i) provide an opinion of counsel as to the enforceability against the City of this Agreement and as to such other matters reasonably requested in connection with such financing and (ii) grant to the Company's senior lenders or their trustees such rights to cure a default by the Company hereunder as they may reasonably request in connection with the financing of the Facility and provide such certificates as are customary in connection with such financings. The Company agrees to reimburse all reasonable costs incurred by City's counsel in providing the information required in connection with the financing as set forth herein. The City does not, by virtue of entering into this Agreement, assume any liability for the Bonds or the issuer of, the holders of or the trustee for the holders of the Bonds.

5.    **Relationship of the Parties.** Neither party to this Agreement shall by virtue of this Agreement have any responsibility whatsoever with respect to services provided or contractual obligations assumed by the other party, and nothing in this Agreement shall be

deemed to constitute either party a partner, agent or legal representative of the other party or to create any fiduciary relationship between the parties.

6.    Assignment.

(a)    This Agreement may not be assigned by the Company without the prior written consent of the City, which consent shall not be unreasonably withheld or delayed; provided that the Company may, without such consent, assign this Agreement in connection with the financing and refinancing from time to time of the Facility and/or may assign this Agreement to an affiliate of the Company. Nothing in this section shall prevent the Company from subcontracting or assigning its obligations or rights under this Agreement to third parties, provided that the Company remains liable for the performance of its obligations hereunder.

(b)    This Agreement may not be assigned by the City without the prior consent of the Company, which consent shall not be unreasonably withheld or delayed.

(c)    This Agreement shall be binding upon and inure to the benefit of the permitted successors and assigns of the parties hereto pursuant to this Section. Any attempted assignment made contrary to this Section shall be void.

7.    Notices.

(a)    Any notice given pursuant to this Agreement shall be in writing and may be cabled, telecopied, delivered by hand, mailed by first class, certified mail, return receipt requested, postage prepaid, or dispatched by next day delivery service and, in any case, shall be addressed as follows:

If delivered to the Company:

        Pencor-Masada OxyNol, LLC
        2170 Highland Avenue
        Suite 200
        Birmingham, Alabama  35205
        Attention:    Daryl Harms
        Telephone:    205-558-7900
        Fax:          205-558-7911

With a copy to:

        Pencor-Masada OxyNol, LLC
        2170 Highland Avenue
        Suite 200
        Birmingham, Alabama  35205
        Attention:    General Counsel
        Telephone:    205-558-7900
        Fax:          205-558-7911

If delivered to the City:

> City of Middletown
> 16 James Street
> Middletown, New York  10940
> Attention:    Joseph DeStefano
>               Mayor
> Telephone:    845-346-4100
> Fax:          845-343-7439

With a Copy to:

> Alex Smith, Esq.
> Corporation Counsel
> City of Middletown, New York
> 16 James Street
> Middletown, New York 10940
> Telephone:    845-346-4139
> Fax:          845-346-4146

Either party may change the address to which its communications are delivered by notice to the other parties.

(b)    Any communication given in accordance with this Section shall be deemed to have been given to a party upon its receipt by such party or upon such party's refusal to accept its delivery.

8.    **Waiver.**  The waiver by either party of a default or a breach of any provision of this Agreement by the other party shall not operate or be construed to operate as a waiver of any subsequent default or breach.  The making or the acceptance of a payment by either party with knowledge of the existence of a default or breach shall not operate or be construed to operate as a waiver of any default or breach.

9.    **Entire Agreement; Modifications.**  This Agreement, together with the City Waste Agreement, the Host Community Agreement and the Ground Lease, (i) is the entire understanding of the parties with respect to the subject hereof and supersedes all prior agreements, understandings and commitments with respect thereto and (ii) may be modified only by written agreement executed by both parties.

10.    **Severability.**  In the event that any provision of this Agreement, or the application of such provision to any Person or circumstance shall, for any reason, be determined to be invalid, illegal, or unenforceable in any respect, the parties shall negotiate in good faith and agree to such amendments, modifications, or supplements of or to this Agreement or such other appropriate actions as shall, to the maximum extent practicable in light of such determination, implement and give effect to the intentions of the parties as reflected herein, and other provisions of this Agreement shall, as so amended, modified, or supplemented, or otherwise affected by such action, remain in full force and effect.

11.    **Headings.** Captions and headings in this Agreement are for ease of reference only and do not constitute a part of this Agreement.

12.    **Governing Law.** This Agreement and any question concerning its validity, construction or performance shall be governed by the laws of the State, irrespective of the place of execution or of the order in which the signatures of the parties are affixed or of the place or places of performance.

13.    **Counterparts.** This Agreement may be executed in more than one counterpart, each of which shall be deemed to be an original but all of which taken together shall be deemed a single instrument.

14.    **Leasehold Financing.** The Company will be entering into Leasehold Mortgages (as defined in the Ground Lease) with Leasehold Mortgagees in connection with the financing of the Facility. If the Company or any Leasehold Mortgagee shall send to the City a true copy of any such Leasehold Mortgage, together with written notice specifying the name and address of the Leasehold Mortgagee, the City agrees that after receipt of such notice and so long as any such Leasehold Mortgage shall remain unsatisfied of record or until written notice of satisfaction is given by the holder to the City, the following provisions shall apply:

(a)    There shall be no cancellation, surrender, amendment, or modification of this Agreement by joint action of the City and the Company without the prior written consent of the Leasehold Mortgagee.

(b)    The City shall, upon mailing or giving to the Company any notice of default or any other notice hereunder, simultaneously send a copy of such notice to the Leasehold Mortgagee at the address furnished in said written notice or in any subsequent written notice to the City changing such address.

(c)    The City agrees that the City will not terminate this Agreement following any default by the Company hereunder and the expiration of any grace or notice period granted to the Company hereunder for the cure of such event of default provided that:

(i)    If such default can be cured by the payment or expenditure of money or reasonably can be cured within ninety (90) days and without possession of the Site, the Leasehold Mortgagee cures the default or breach described in such notice within ninety (90) days following receipt of written notice that the Company has failed to timely cure such default; or

(ii)    If such default or breach cannot be cured by the payment or expenditure of money or cannot reasonably be cured within ninety (90) days, the Leasehold Mortgagee commences the cure of such default within the ninety (90) day period after receipt of written notice that the Company has failed to timely cure such default, and thereafter diligently pursues such cure to completion, even if completion of such cure requires a longer period of time; or

(iii)    If such default or breach cannot be cured without possession of the Site, the Leasehold Mortgagee commences proceedings for foreclosure and sale under the

Leasehold Mortgage within the ninety (90) day period after receipt of written notice that the Company has failed to timely cure such default, which period shall be deemed extended by the number of days of delay occasioned by judicial restriction against commencement of foreclosure, including, without limitation, a stay imposed by a bankruptcy petition, or occasioned by other circumstances beyond the Leasehold Mortgagee's control, and thereafter the Leasehold Mortgagee diligently pursues such proceedings to completion and, upon obtaining possession of the Site, diligently pursues the cure of such default to completion.

(d)    If a Leasehold Mortgagee shall fail to comply with any of the requirements of this Section 14, then and thereupon the City shall be released from the covenant of forbearance herein contained as to such Leasehold Mortgagee, and City shall be entitled to proceed to terminate this Agreement. Nothing herein contained shall preclude the City from terminating this Agreement following completion of any proceedings for foreclosure or assignment in lieu of foreclosure to any Leasehold Mortgagee if within ninety (90) days thereafter any default hereunder which can be cured is not cured.

(e)    The City shall give the Leasehold Mortgagee prompt notice of any intended termination of this Lease no later than ninety (90) days prior to the intended date of such termination and of the amount owing to the City as of the date of termination of the Lease.

(f)    In the event a Leasehold Mortgagee succeeds to the rights of Company hereunder by foreclosure or assignment in lieu of foreclosure or otherwise, said Leasehold Mortgagee shall be released from any liability hereunder from and after the date of any assignment of its interest hereunder. The City acknowledges and confirms that the Leasehold Mortgagee shall have the full and absolute right to assign the rights and obligations of the Company hereunder to any party or entity. No Leasehold Mortgagee shall become liable for the performance or observance of any covenants to be performed by the Company hereunder unless and until such Leasehold Mortgagee becomes the owner of the Company's interest hereunder. Notwithstanding anything herein contained to the contrary, the Leasehold Mortgagee or any person or entity acquiring such leasehold estate shall be liable to perform the obligations imposed on the Company by this Lease only during the period such person has ownership of said leasehold estate or possession of the Premises.

(g)    All of the provisions contained in this Agreement with respect to Leasehold Mortgages and the rights of the Leasehold Mortgagees shall survive the termination of this Agreement for such period of time as shall be necessary to effectuate the rights granted to all Leasehold Mortgagees by the provisions of this Agreement.

(h)    Nothing herein contained shall require any Leasehold Mortgagee to cure any default by the Company hereunder; provided, however, that the City agrees to accept the performance by any Leasehold Mortgagee of any obligation under this Agreement in lieu of performance by the Company.

(i)    In the event two or more Leasehold Mortgagees each exercise their rights hereunder and there is a conflict which renders it impossible for the City to comply with all such

requests, the Leasehold Mortgagee whose Leasehold Mortgage would be senior in priority if there were a foreclosure shall prevail.

(j)     Upon the reasonable request of any Leasehold Mortgagee, the City and the Company shall cooperate in including in this Agreement by suitable amendment from time to time any provisions reasonably requested by any Leasehold Mortgagee for the purpose of implementing the protective provisions contained in this Section 14 for the benefit of such Leasehold Mortgagee. The City and the Company shall execute, deliver and acknowledge any amendment reasonably necessary to effect any such requirement; provided, however, that any such amendment shall not in any way affect the term nor otherwise in any material respect adversely affect any rights of the City under this Agreement.

15.    **Cross-Defaults; Terminations.** The occurrence of an Event of Default by either party that is not cured within the applicable cure period under the Lease, the Host Community Agreement, or the City Waste Agreement shall also constitute an event of default under this Agreement, and termination of any of said Agreements shall, at the option of the non-defaulting party and subject to the provisions of Section 14, terminate this Agreement. In the event that this Agreement is terminated, neither party shall have any further liability to the other hereunder other than any obligations or liabilities which shall expressly survive such termination in accordance with the terms hereof. Notwithstanding the foregoing, the Company shall not have the right to terminate this Agreement because of an Event of Default by the City or the termination of any of such Agreements if the City shall, not later than the 180th calendar day following the termination of the City Waste Agreement, pay to the Company the contract termination fee described in Section 13(c) of the City Waste Agreement.

# ATTACHMENT - BACKGROUND H

## LIST OF MUNICIPAL WASTE AGREEMENTS

Town of Chester
Village of Chester
Town of Cornwall
Town of Crawford
Town of Goshen
Village of Highland Falls
Town of Highlands
Town of Monroe
Village of Montgomery
Village of Otisville
City of Port Jervis
Town of Tuxedo
Village of Walden
Village of Warwick
Town of Woodbury

# ATTACHMENT 1(b)

FORM OF

## MUNICIPAL WASTE MANAGEMENT SERVICES AGREEMENT

between

## CITY OF MIDDLETOWN, NEW YORK

and

―――――――――――――――――

# TABLE OF CONTENTS

Page

1.   Conditions Precedent ................................................................................................ 2
2.   Delivery and Acceptance of Acceptable Waste ...................................................... 3
3.   Unacceptable Waste ................................................................................................ 4
4.   City's Rejection Rights ........................................................................................... 4
5.   Receiving and Operating Hours .............................................................................. 4
6.   Alternate Disposal Facilities. ................................................................................. 5
7.   Annual Service Fee ................................................................................................. 5
8.   Additional Amounts ................................................................................................ 6
9.   Billing and Payments .............................................................................................. 6
10.  Tonnage Requirements ............................................................................................ 7
11.  Performance of Obligations ..................................................................................... 7
12.  Termination for City Event of Default .................................................................... 8
13.  Termination for Municipality Event of Default ...................................................... 8
14.  Uncontrollable Circumstances ................................................................................ 10
15.  Term ........................................................................................................................ 10
16.  Insurance and Indemnities ....................................................................................... 10
17.  Dispute Resolution .................................................................................................. 10
18.  General Contract Conditions ................................................................................... 10

---

SCHEDULES

1    Tonnage Requirements
2    Waste Disposal Operations
3    Payments
4    Insurance and Indemnity
5    Dispute Resolution
6    General Contract Conditions
7.   Transport Credit

WATL-SRV02\379704v14\81504.000016

# MUNICIPAL WASTE MANAGEMENT SERVICES AGREEMENT

This Municipal Waste Management Services Agreement, is made as of _____,
200__, by and between the CITY OF MIDDLETOWN, NEW YORK (the "City") and the
_____, ORANGE   COUNTY,   NEW
YORK (the "Municipality"). ——

## Background

A.    The Municipality desires a comprehensive, integrated and environmentally sound
solution to its solid waste needs that maximizes recycling, materials reuse and value-added
processing of such waste.

B.    Pursuant to N.Y. Gen. Mun. Law § 120-w, the City of Middletown (the "City") selected
Pencor Masada OxyNol, L.L.C. (the "Company") to provide solid waste disposal services to the
City (the "Procurement").

C.    Pursuant to the Procurement and subject to the Conditions Precedent enumerated in
Section 1 (a)(I), (iii) and (iv) hereof, the City will enter into a Comprehensive Waste
Management Services Agreement with the Company pursuant to which the Company has agreed
to provide solid waste management services to the City, the Municipality and to the other
municipalities that have entered into agreements with the City and to perform, as a contractor of
the City, the obligations of the City under this Agreement except certain rights reserved to the
City.

D.    The Company plans to design, construct, start up, operate and maintain an integrated
solid waste processing facility (the "Facility") in the Host Community for receiving Acceptable
Waste, separating such waste for recycling and producing marketable byproducts.

E.    The Municipality intends to maintain or establish and maintain a Solid Waste Collection
District under N.Y. Town Law § 12A, with certain other municipalities, or otherwise desires to
deliver, or cause to be delivered, to the Delivery Site, Acceptable Waste for disposal by the City.

F.    Pursuant to N.Y. Gen. Mun. Law §§ 119-m - 119-o, the Municipality is empowered to
procure from the City, and contract with the City for, solid waste processing and disposal
services.

G.    Capitalized terms used in this Agreement that are not defined above are defined in
Section 1 of Schedule 6.

<u>Agreements</u>

In consideration of the foregoing and the respective obligations undertaken herein, and intending to be legally bound, the parties hereto agree as follows:

1.    Conditions Precedent.

(a)    The obligations of each party to this Agreement, other than its obligations under Section 1 of Schedule 2 and Section 7 of Schedule 6, shall be subject to the satisfaction, or waiver by such party, of the following conditions precedent:

(i)    The Company shall have obtained suitable financing for the Facility.

(ii)    All necessary approvals shall have been secured to permit lawful disposal of all Acceptable Waste at the Facility.

(iii)    A Final Environmental Impact Statement shall have been prepared, and all necessary and appropriate findings under the State Environmental Quality Review Act shall have been issued with respect to the Facility.

(iv)    If the City enters into any Municipal Waste Management Services Agreement with any other Municipality in Orange County, New York which provides for an Annual Service Fee (as defined in Section 7(a)(i), (ii) and (iii)) more favorable than that contained in this Agreement, the City shall promptly notify the Municipality and amend this Agreement as provided in Schedule 6, Section 13 to provide the Municipality with the same more favorable Annual Service Fee.

(b)    The parties shall use their best efforts to satisfy the foregoing conditions precedent as soon as reasonably practicable. This Agreement may be terminated by either party upon written notice delivered to the other party if any conditions precedent in this Section 1 are not satisfied or waived on or before sixty (60) months from the date of this Agreement, which time period shall be extended due to Uncontrollable Circumstances. Neither party shall be liable to the other for the termination of this Agreement pursuant to this Section 1.

2.    Delivery and Acceptance of Acceptable Waste.

(a)    In the event the City determines there is a need for Acceptable Waste (except for Acceptable Construction Waste) during start-up and testing operations prior to the Service Date, the Municipality has the obligation to furnish all Acceptable Waste collected by the Municipality or its agents (except for Acceptable Construction Waste) or such portion of its Acceptable Waste (except for Acceptable Construction Waste) as is requested by the City to be delivered to

the Facility at the times requested by the City. The City shall give the Municipality at least sixty (60) days prior written notice of the commencement of start-up and testing operations at the Facility and its request for the receipt of Acceptable Waste (except for Acceptable Construction Waste) quantities from the Municipality required for such limited operations. During start-up and testing operations, the City shall give the Municipality at least five (5) days prior written notice of any change in such quantities. The Municipality shall pay the per ton fees set forth in Sections 7(a)(i) and (iii) for the disposal of Acceptable Waste permitted to be delivered during startup and testing.

(b)     Beginning on the Service Date, the Municipality shall cause all Acceptable Waste collected by the Municipality or its agents, employees or contractors, including all recyclable components thereof, to be delivered to the City at the Delivery Site or, if directed by the City, at an Alternate Disposal Facility. Subject to the City's Rejection Rights, the City shall accept and Dispose of all Acceptable Waste delivered under this Agreement. The Municipality's failure to deliver or to cause to be delivered to the City all Acceptable Waste collected by the Municipality or its agents, employees or contractors after the Service Date shall not constitute a breach of this Agreement if it has paid the fees required by Section 7.

(c)     The Parties shall carry out their obligations under this Section in accordance with the provisions of Schedule 2.

3.    Unacceptable Waste.

(a)     The Municipality shall not deliver, and shall use reasonable efforts to prevent the delivery on its behalf of, Unacceptable Waste to the Delivery Site or to an Alternate Disposal Facility.

(b)     The Municipality shall pay Unacceptable Waste Costs arising from the delivery to or abandonment at the Delivery Site or Alternate Disposal Facility of Unacceptable Waste by the Municipality or on its behalf or by any of its agents, employees or contractors.

(c)     The City shall notify the Municipality of any delivery to or abandonment at the Delivery Site of any Unacceptable Waste. The City shall use its best efforts to identify the Person responsible for such delivery or abandonment. If such Person was the Municipality or its agent, employee or contractor, the Municipality shall clean up, contain and remove, or cause such agent, employee or contractor to clean up, contain and remove, any such waste from the Delivery Site, the Facility Site or the Alternate Disposal Site, as the case may be, and pay to the City all associated Unacceptable Waste Costs.

4.     **City's Rejection Rights.** The City may reject:

(a)     Acceptable Waste delivered at hours other than the receiving times established in Section 5(a) (except as provided in Section 5(b));

(b)     Acceptable Waste to the extent it is unable to Dispose of such waste as a result of an Uncontrollable Circumstance; and

(c)     Unacceptable Waste.

5.     **Receiving and Operating Hours.**

(a)     On and after the Service Date, the City shall cause the Delivery Site to be kept open for the receiving of Acceptable Waste between 6 a.m. and 6 p.m. Monday through Friday, and 6 a.m. and 1 p.m. on Saturday, excluding a holiday on which State or federally chartered banks are not open for business.

(b)     Upon thirty (30) days' prior written notice (or, in the event of the occurrence of a natural disaster or other emergency condition, such shorter notice as may be practicable) from the Municipality, the City shall use its reasonable efforts to accept deliveries of Acceptable Waste at other times. The Municipality shall pay to the City the City Actual Cost of accepting Acceptable Waste during hours outside of the receiving time in response to such request.

6.     **Alternate Disposal Facilities.**

(a)     If sufficient Facility capacity is not available for any reason, the City may use Alternate Disposal Facilities to fulfill its obligations under this Agreement and may direct the Municipality to deliver Acceptable Waste to an Alternate Disposal Facility.

(b)     If the City directs the Municipality to deliver Acceptable Waste to an Alternate Disposal Facility for any reason other than an Uncontrollable Circumstance, the Municipality shall continue to pay the Annual Service Fee and the City shall reimburse the Municipality for any direct costs reasonably incurred by it in connection with the transportation and delivery of such waste to the Alternate Disposal Facility in excess of those costs that it would have incurred in delivering such waste to the Delivery Site.

(c)     If the City directs the Municipality to deliver Acceptable Waste to an Alternate Disposal Facility due to an Uncontrollable Circumstance, the Municipality shall pay the City Actual Cost, if any, of transporting and Disposing of the Municipality's Acceptable Waste in excess of the cost that would have been incurred by the City had it accepted such waste at the Delivery Site. If the Municipality identifies to the City, a waste disposal alternative with a lower overall cost to the Municipality than the cost of the Alternate Disposal Facility

designated by the City, the City will designate the disposal alternative identified by the Municipality as the Alternate Disposal Facility if such designation does not interfere with contractual arrangements made by or on behalf of the City.

(d)     If the City directs the Municipality to deliver Acceptable Waste to an Alternate Disposal Facility, the tonnage so directed shall be credited against the Municipality Minimum Tonnage as calculated in Schedule 3, Part B.

7.     Annual Service Fee.

(a)     For each Operating Year or portion thereof after the Service Date, the Municipality shall pay to the City an Annual Service Fee equal to the sum of the following:

(i)     The Base Municipal Waste Fee ($_____.00) times the Inflation Adjustor in effect at the time of delivery for each ton of Acceptable Municipal Waste delivered by or on behalf of the Municipality during such Operating Year; plus

(ii)     The tipping fee then in effect for Disposal of Acceptable Construction Waste as announced by the City from time to time for each ton of Acceptable Construction Waste delivered by or on behalf of the Municipality during such Operating Year; plus

(iii)     For each ton of Acceptable Sludge delivered by or on behalf of the Municipality during such Operating Year the following Base Sludge Fees (A) $_____ if such ton contains less than 5 percent solids , (B) $_____ if such ton contains at least 5 percent but less than 12 percent solids, (C) $_____ if such ton contains at least 12 percent but less than 18 percent solids, (D)$_____ if such ton contains at least 18 percent and less than 23 percent solids, and (E) $_____ if such ton contains at least 23 percent but less than 30 percent solids; in each case times the Inflation Adjustor in effect at the time of delivery.

(b)     The Annual Service Fee will be adjusted as follows:

The Annual Service Fee shall be (A) increased by the Allocated Excess Fee, if any, for each Operating Year in which the Municipality delivers more than its Maximum Tonnage, or (B) increased by the Allocated Shortfall Fee, if any, for any Operating Year in which the Municipality delivers less than its Minimum Tonnage, each calculated as described in Schedule 3.

8.     Additional Amounts.  In addition to the Annual Service Fee, the Municipality shall pay to the City the following amounts: (i) any amounts payable under Section 3 with respect to Unacceptable Waste Costs, under Section 5 with respect to additional receiving hours

and under Section 2 of Schedule 2 with respect to certain testing of the weighing facilities, (ii) the amount of any increase in costs of the City or decrease in revenues payable by the City as a result of any change in any law of the Municipality, other than nondiscriminatory taxes and (iii) the Municipality's Proportionate Share of any such amounts resulting from any change in any law of the County, other than nondiscriminatory taxes. The City shall pay to the Municipality the allowance, if any, described in Schedule 7.

9.      Billing and Payments.

(a)     On or before the tenth date of each month, the City will bill the Municipality the Estimated Service Fee for that month following the procedures set forth in Schedule 3. The monthly statement will also include any additional amounts payable pursuant to Section 7 and certain adjustments as described in Schedule 3. The Municipality shall pay the amount set forth on each monthly statement on or before the fifth day of the following month, except that amounts payable with respect to the quarterly adjustments described in Schedule 3 shall not be due until sixty (60) days following the Municipality's receipt of the monthly statement.

(b)     In the event of a dispute as to any portion of any bill, the Municipality shall unconditionally pay the amount not in dispute, but not less than sixty (60) percent of the total bill, when due and shall, within ten (10) days from the due date of the disputed bill, give the City written notice of the dispute. Such notice shall identify the disputed bill, state the amount in dispute and set forth a full statement of the grounds which form the basis of such dispute. No adjustment shall be considered or made for disputed charges until such notice is given.

10.     Tonnage Requirements.

(a)     The Municipality's initial annual Minimum Tonnage and the calculation of its initial weekly, monthly and annual Maximum Tonnage and Proportionate Share are set forth in Part A of Schedule 1.

(b)     The Municipality may increase its Minimum Tonnage for any Operating Year by giving ninety (90) days' notice prior to start of such Operating Year subject to the available capacity of the Facility. If the Municipality gives such notice and the capacity of the Facility that is not committed under contracts of at least three years limits increases, the available capacity will be allocated to the Municipality and the other Contract Municipalities giving similar notice pro rata in accordance with their then-current respective Minimum Tonnages.

(c)     Not later than forty-five (45) days prior to the beginning of each Operating Year, the City shall deliver to the Municipality a notice substantially in the form of Part B of Schedule 1 setting forth the Municipality's Minimum Tonnage and the calculation of its Proportionate Share for such year.

(d)    If, in any Operating Year, the Municipality expects to deliver less than its Minimum Tonnage and the Contract Municipalities anticipate a Net Municipality Shortfall for such Operating Year, the Municipality may deliver or cause to be delivered to the City, Acceptable Waste that was not generated within its boundaries.

11.    **Performance of Obligations.**

(a)    The liability of the City under this Agreement is strictly limited as follows:

(i)    The City shall indemnify the Municipality as provided in Section 2, Schedule 4.

(ii)    The City shall provide to the Municipality the Indemnity by and on behalf of the Company as provided in Section 3, Schedule 4.

(iii)    The City shall use its reasonable efforts to enforce the obligations of the Company as set forth in paragraph (b) below.

(b)    Notwithstanding anything herein to the contrary, the Municipality acknowledges and agrees that: (i) all of the obligations of the City under this Agreement are to be performed by the Company, (ii) the City and its officers, directors, members, agents and attorneys shall have no liability for the performance or nonperformance by the Company and (iii) in addition to the indemnification provided in Schedule 4, the Municipality's only other remedy against the City under this Agreement shall be the right to terminate this Agreement pursuant to Section 12(c) and receive the contract termination fee payment described therein.

12.    **Termination for City Event of Default.**

(a)    If, within a period of ninety (90) days after the Municipality gives written notice to the City that the City or the Company has persistently and repeatedly failed to timely perform any material obligation under this Agreement and the City or the Company has not remedied or commenced and pursued with diligence the cure of such failure, this Agreement shall terminate upon written notice of such termination by the Municipality to the City.

(b)    If the City fails to pay any sum payable under this Agreement within thirty (30) days after such payment was due, and if such failure is not completely cured within a period of ten (10) days after the Municipality gives written notice to the City of such failure, this Agreement shall terminate immediately upon written notice thereof by the Municipality to the City.

(c)    If this Agreement is terminated pursuant to this Section 12, the City shall pay to the Municipality, as a contract termination fee, the excess of (i) the

Municipality's actual cost of disposal of Acceptable Waste for the 183-day period immediately following such termination over (ii) the amount which would have been payable by the Municipality as part of the Annual Service Fee had the City Disposed of such Acceptable Waste under this Agreement for the same period.

13.    Termination for Municipality Event of Default.

(a)     If, within a period of ninety (90) days after the City gives written notice to the Municipality that the Municipality has persistently and repeatedly failed to perform any material obligation under this Agreement and the Municipality has not remedied or commenced and pursued with diligence the cure of such Failure, this Agreement shall terminate upon written notice of such termination by the City to the Municipality.

(b)     If the Municipality fails to pay any sum payable under this Agreement within thirty (30) days after such payment was due, and if such failure is not completely cured within a period of ten (10) days after the City gives written notice to the Municipality of such failure this Agreement shall terminate immediately upon written notice thereof by the City to the Municipality.

(c)     If this Agreement is terminated pursuant to this Section 13 the Municipality shall pay to the City, as a contract termination fee, its Proportionate Share of the outstanding principal amount of the Bonds together with accrued interest to the date of such payment.

14.    Uncontrollable Circumstances.

(a)     If, as a result of an Uncontrollable Circumstance, either party is prevented from performing or delayed in the performance of any of its obligations under this Agreement, such prevention of or delay in performance shall be, subject to such party's satisfaction of the conditions precedent in paragraph (b) of this Section 14, excused during any period in which such performance is prevented or delayed by an Uncontrollable Circumstance, and for such period thereafter as is necessary to correct the adverse effect of such Uncontrollable Circumstance; provided that the failure to pay any amounts owed under this Agreement (whether accruing prior to or during the Uncontrollable Circumstance) in a timely manner shall not be excused by an Uncontrollable Circumstance.

(b)     A party shall be excused from performance hereunder as a result of an Uncontrollable Circumstance only to the extent of and subject to the following conditions:

(i)     the non-performing party shall give the other party prompt written notice describing the particulars of the Uncontrollable Circumstance and the potential duration of the prevention of or delay in performance;

(ii)    the excuse of performance shall be of no greater scope and of no longer duration than is required to correct the adverse effect of the Uncontrollable Circumstance;

(iii)    no obligation of either party which was required to be performed or satisfied before the Uncontrollable Circumstance causing the suspension of performance shall be excused as a result of the Uncontrollable Circumstance;

(iv)    the non-performing party shall use its commercially reasonable efforts to reduce costs during any prevention of or delay in performance, to pursue insurance and any other third-party reimbursement which may reasonably be expected to be obtained with respect to the Uncontrollable Circumstance and to overcome the prevention of or delay in performance and performance shall be resumed at the earliest practicable time after cessation of the Uncontrollable Circumstance; and

(v)    if the non-performing party is the City, it shall use its best efforts to accept and Dispose of as much Acceptable Waste as is practicable.

(c)    In this Agreement, "Uncontrollable Circumstance" means any act, event or condition that has a material adverse effect on the rights or the obligations of a party under this Agreement, or a material adverse effect on the Project or the ownership, possession or operation of the Project by the Company, if such act, event or condition is beyond the reasonable control of the party relying thereon as justification for not performing an obligation or complying with any condition required of such party under this Agreement. Notwithstanding the foregoing, the City shall not claim that a breach by the Company of the Comprehensive Waste Agreement is an Uncontrollable Circumstance.    For the purpose of this Agreement, Uncontrollable Circumstances may include, but shall not be limited to, the following:

(i)    an act of God, landslide, lightning, earthquake, fire, explosion, flood, sabotage or similar occurrence, acts of a public enemy, extortion, war, blockade or insurrection, riot or civil disturbance;

(ii)    the order, judgment or legislative act of any Governmental Authority, provided that, if the non-performing party is the Municipality, the order or judgment of the Municipality or the County shall not constitute an Uncontrollable Circumstance;

(iii)    the failure to issue, suspension, termination, interruption, denial or failure of renewal of or the imposition of any new conditions upon any permit, license, consent, authorization or approval essential to the operation of the Project;

(iv)    a Change in Law;

(v)    the failure of any Governmental Authority or private utility to provide and maintain utilities, services, public streets, water and sewer lines and power transmission lines to the Facility Site or the Delivery Site (if other than the Facility Site);

(vi)    the failure of any subcontractor or supplier to furnish labor, services, materials or equipment on the dates agreed to; provided that such failure is caused by an act, event or condition that would be an Uncontrollable Circumstance if it directly affected the non-performing party;

(vii)    the condemnation, taking, seizure, involuntary conversion or requisition of title to or use of the Project or any material portion or part thereof by the action of any Governmental Authority; or

(viii)    (A) as to the City, the negligence, willful misconduct or unexcused failure to perform of any Contract Municipality or its agents and (B) as to the Municipality, the negligence, willful misconduct or unexcused failure to perform of the City or its agents.

15.    **Term.** Unless sooner terminated in accordance with the terms hereof, the initial term of this Agreement shall continue in effect for twenty (20) years from the Service Date. The initial term is subject to renewal as provided in Section 10 of Schedule 6.

16.    **Insurance and Indemnities.** The parties agree to obtain and maintain or cause to be obtained and maintained the insurance set forth in Schedule 4 and to provide the indemnities set forth in Schedule 4.

17.    **Dispute Resolution.** The parties agree to submit any dispute under this Agreement to dispute resolution in accordance with Schedule 5.

18.    **General Contract Conditions.** The parties' obligations under this Agreement are subject to the general contract conditions set forth in Schedule 6. Capitalized terms used in this Agreement and not otherwise defined have the meanings specified in Schedule 6.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement the day and year first above written.

[NAME OF MUNICIPALITY]          CITY OF MIDDLETOWN, NEW YORK

ORANGE COUNTY, NEW YORK

By: _____      By: _____

Title: _____         Joseph DeStefano
                                      Mayor

## SCHEDULE 1

## TONNAGE REQUIREMENTS

**Part A:**     <u>Initial Tonnage Requirements and Proportionate Shares</u>

The Municipality's initial Minimum Tonnage is _____ tons of Acceptable Municipal Waste and _____ tons (at 20% solids) of Acceptable Sludge.

The Municipality's Maximum Tonnage in any Operating Year is 108% of its Minimum Tonnage for such year, and its monthly and weekly Maximum Tonnages are 1/12 and 1/50 of its annual Maximum Tonnage, respectively.

The Municipality's Proportionate Share in any Operating Year is its Minimum Tonnage for such year divided by the aggregate Minimum Tonnage of all Contract Municipalities for such year.

For purposes of determining Minimum Tonnage and Maximum Tonnages, tons of Acceptable Sludge delivered to the City having a solids content higher than 23 or less than 18 percent shall be converted into Moisture Adjusted Tons as follows:

$$\text{Moisture Adjusted Tons} = \text{Actual Tons} \times \frac{(\text{solids content})}{23}$$

Where "solids content" means the actual percentage of solids contained in Acceptable Sludge delivered by or on behalf of the Municipality.

**Part B:**     <u>Form of Annual Notice</u>

<u>To the Municipality</u>:

Based on the following Minimum Tonnages for all Contract Municipalities for year, your Proportionate Share for year is ___%.

<u>Annual Minimum Tonnage for Year</u>

Contract Municipality #1

Contract Municipality #2

Contract Municipality #3

Contract Municipality #4

Contract Municipality #5

Contract Municipality #6

Contract Municipality #7

Contract Municipality #8

Contract Municipality #9

Contract Municipality #10                    _____

       Aggregate Minimum Tonnage
       for all Contract Municipalities        _____