## SCHEDULE 2
## WASTE DISPOSAL OPERATIONS

| Section | | Page |
|---|---|---|
| 1 | Permits | 2-1 |
| 2 | Inspection of Vehicles | 2-1 |
| 3 | Weighing of Waste Deliveries | 2-1 |
| 4 | Record keeping | 2-1 |
| 5 | Facility Operating Standards | 2-2 |
| 6 | Rules and Regulations | 2-2 |

1.    **Permits.** The City shall, at its sole expense, cause the Company to obtain and maintain all permits necessary for the construction and operation of the Facility, provided that the Municipality shall provide at its own expense all such cooperation in connection with obtaining and maintaining such permits.

2.    **Inspection of Vehicles.** The City may inspect the contents of any vehicle delivering waste to the Delivery Site. The City may require any person delivering waste to the Delivery Site to separate Unacceptable Waste from Acceptable Waste. The City may reject any part of a load if it contains Unacceptable Waste or an entire such load if separating such waste from Acceptable Waste would be unduly burdensome. The contents of any partial or entire load so rejected shall be deemed Unacceptable Waste.

3.    **Weighing of Waste Deliveries.**

(a)    On and after the Service Date, the City shall cause weighing facilities to be maintained and operated at the Delivery Site for the purpose of determining the number of tons of Acceptable Waste delivered to the Delivery Site.

(b)    The City shall cause the weighing facilities to be tested at such frequency as is in accordance with Applicable Law and at the written request of the Municipality. If a test of the weighing facilities performed at the request of the Municipality indicates that the scales meet the accuracy requirements of Applicable Law, the Municipality shall reimburse City for City Actual Cost of performing such test. If such a test indicates that the weighing facilities do not meet the requirements of Applicable Law, the City shall not be so reimbursed. If any test indicates that the weighing facilities do not meet the accuracy requirements of Applicable Law, the City and the Municipality agree to compute the number of days since the last test and divide that number of days by two, and the tonnage during that number of days shall be subject to such reasonable adjustment as shall be negotiated by the City and the Municipality to the extent such records relate to the Municipality. If all weighing facilities are incapacitated or are being tested, the City shall estimate the tons of Acceptable Waste delivered on the basis of truck volumes and estimated data obtained through historical

information pertinent to the Persons making the deliveries which shall take the place of actual weighing records during the scale outage.

4.    Recordkeeping.  On and after the Service Date, the City shall establish and maintain an information system to provide storage and ready retrieval of Facility operating data, including all information necessary to verify calculations relating to amounts payable under this Agreement. The City shall provide the Municipality and its auditors with reasonable access to such records.

5.    Project Operating Standards.

(a)    The City shall (i) cause safety procedures to be maintained at the Project at a level consistent with Applicable Law and normal plant practice for facilities such as the Facility; (ii) give all notices and comply with Applicable Law; and (iii) cause to be designated a qualified and responsible member of the Project staff whose duty shall be Project safety, the prevention of fires and accidents, and the coordination of such activities as shall be necessary with federal, State and municipal officials.

(b)    The City shall cause the Project to be maintained at all times in good, clean, orderly condition, including the implementation of necessary repairs, the purchase of necessary replacement equipment or parts and clean-up consistent with meeting normal plant practice for facilities such as the Facility and industry standards relating to waste handling and disposal.

(c)    The City shall (i) cause the Project to be operated in compliance with Applicable Law and in accordance with good waste industry practice and (ii) notify the Municipality promptly if the Project is seriously damaged, irrespective of cause.

6.    Rules and Regulations.

(a)    The Municipality shall comply, and cause its haulers and other agents to comply, with the Rules and Regulations set forth in Exhibit A to this Schedule 2. The City may in its discretion revise such Rules and Regulations and shall notify the Municipality in writing of any such revision which shall be effective no earlier than thirty (30) days following the City's delivery of such notice to the Municipality.

(b)    The City may designate vehicle routes for use by the Municipality, its agents and its designated haulers for the delivery of Acceptable Waste.

(c)    The City may refuse to receive Acceptable Waste from any hauler who repeatedly or intentionally or by negligent action violates the Rules and Regulations or fails to use the designated routes referred to above.  The City shall

give the Municipality at least thirty (30) days' prior written notice of its intent to refuse deliveries from any of the Municipality's haulers.

## EXHIBIT A TO SCHEDULE 2

### RULES AND REGULATIONS

1.  Only refuse collection vehicles owned or operated by the Municipality or haulers authorized by the Municipality are permitted to bring and discharge waste on behalf of the Municipality at the Delivery Site. Each truck operator or passenger must identify him or herself and the authorized hauler that employs him or her to Company personnel on request.

2.  Obey all posted traffic control signs and devices.

3.  Obey the instructions of Company personnel.

4.  Have your vehicle identification clearly visible on vehicle for viewing by closed circuit TV cameras and Company personnel.

5.  No parking on the Delivery Site except in designated areas. Absolutely no parking in roadways. Avoid obstructing traffic on the Delivery Site or the tipping floor.

6.  Any waste which remains in vehicles after normal unloading procedures may be cleared from vehicles only in designated areas of the tipping floor. No external cleaning of vehicles or vehicle maintenance may be performed on the Delivery Site.

7.  No alcoholic beverages or drugs are permitted on the Delivery Site. You may not operate a vehicle on the Delivery Site while intoxicated or impaired to any extent by the use of alcohol or drugs.

8.  No firearms, explosives or other weapons are permitted on the Delivery Site.

9.  No smoking. All open flames and other sources of igniting fires (such as matches or lighters) are prohibited.

10. Burning or smoldering waste is not allowed on the Delivery Site.

11. No Hazardous Waste may be delivered to or disposed at the Delivery Site:

    "Hazardous Waste" means (a) any material or substance which, by reason of its composition or characteristics, is (i) regulated as a toxic or hazardous waste as defined in (A) either the Solid Waste Disposal Act 42 U.S.C. §§ 6901 et seq., or Section 6(e) of the Toxic Substances Control Act, 15 U.S.C. § 2605(e), as either may be replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (B) in N.Y. ECL § 27-0901 (McKinney 1984), as replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (ii) special nuclear or by-products materials within the meaning of the Atomic Energy

Act of 1954; and (b) any other materials which any governmental authority having appropriate jurisdiction shall determine from time to time is ineligible for disposal whether by reasons of being harmful, toxic or dangerous, or otherwise.

All commercial and industrial establishments are required by federal and state law to determine whether any wastes which they generate are Hazardous Wastes, and to dispose of all Hazardous Wastes at a permitted Hazardous Waste disposal facility. You are responsible for assuring that industrial and commercial establishments from which you collect waste, have excluded all Hazardous Waste from waste which you collect for disposal at the Delivery Site.

12. In addition, the following types of waste are defined as Unacceptable Waste meaning Hazardous Waste or any other portion of solid waste if Disposed of at the Facility (or any Alternate Disposal Facility) may harm the Facility or impair its operation and therefore may not be disposed of at the Delivery Site as it would:

    i) present a substantial endangerment to health or safety of the public or Facility employees; or

    (ii) cause a violation of Applicable Law; or

    iii) adversely affect the equipment at or operation of the Facility.

Unacceptable Waste includes explosives, including hand grenades, blasting caps, shotgun shells, closed containers capable of exploding upon Processing and fireworks, gasoline, kerosene, turpentine, waste oil, ether, acetone, solvents, paints, alcohol, acids, hydraulic oil, petroleum, caustics, burning or smoldering materials, materials that have elevated temperatures or that may self-ignite, flammable or volatile liquids, any other liquids (other than as contained in Acceptable Sludge), pathological, chemotherapeutic and biological waste, radioactive materials, hospital waste, medical waste, red bag waste, ashes, foundry sand, sewage sludge other than Acceptable Sludge, construction and demolition debris that is not Acceptable Construction Waste, septage, cesspool and other untreated human waste, leachate, human and animal remains, kitchen sinks, motor vehicles, including such major motor vehicle parts as automobile transmissions, rear ends, springs and fenders, bulk loads of tires, agricultural and farm machinery and equipment, marine vessels and major parts thereof, any other large types of machinery or equipment, liquid wastes and asbestos or asbestos containing material.

13. Your vehicle is subject to inspection at any time to determine whether it contains Hazardous Waste or Unacceptable Waste.

14. You are required to certify that no Hazardous or Unacceptable Waste is known to be in your truckload. Your signature on the City's form certifying scale weight will constitute your certification.

15.    All incoming vehicles are automatically screened for radiation. If your vehicle registers positive on our radiation detector you must pull off for further inspection as directed. Vehicles still registering positive for radiation will be refused entry to the Delivery Site.

16.    Upon request of Company personnel you must empty the contents of your vehicle on the tipping floor or other designated location for inspection of the contents.

17.    If your vehicle is found to contain Hazardous Waste or Unacceptable Waste, you must remain on the Delivery Site and await instructions of Company personnel as to disposition of the waste. You may be refused permission to dispose of any waste from your vehicle at the Delivery Site. You must promptly pay all costs incurred by the Company or any third party for the removal or disposal of such waste.

18.    No waste may be unloaded except in the enclosed tipping area or other location designated by Company representatives.

19.    All waste must be transported in enclosed or tightly covered vehicles. No littering.

20.    All vehicles must be well maintained and clean so they do not leak or spill on the Delivery Site.

21.    All hauler personnel using the Project will be informed of the Project's Hazardous and Unacceptable Waste Screening Program.

22.    Any hauler bringing Hazardous or Unacceptable Waste to the Delivery Site is subject to permanent suspension of its use of the Project.

23.    Violation of any of these regulations may also result in suspension of the use of the Facility by the individuals involved. Repeated violations by personnel of any hauler may result in suspension of such hauler's use of the Project.

SCHEDULE 3

PAYMENTS

Part A:    Monthly Statement.

a)    The monthly statement for the Municipality will set forth the Estimated Service Fee. The Estimated Service Fee for each month of the first Operating Year and, if the first Operating Year is shorter than three (3) months, the second Operating Year, will equal the product of (a) the Base Municipal Waste Fee times the Inflation Adjustor times (b) one-twelfth of the Minimum Tonnage. In each Operating Year thereafter, the Estimated Service Fee will equal one-twelfth of the prior Operating Year's Annual Service Fee unless the Municipality's Minimum Tonnage has been changed, in which case the Estimated Service Fee will be adjusted proportionately.

(b)    The monthly statement for any month will also include amounts, if any, owed by the Municipality to the City under Section 8 with respect to the prior month. The monthly statement will include as a credit any amounts owed by the City to the Municipality under this Agreement. If the actual value of an item in any monthly statement cannot be accurately determined by the City on or prior to the date of such statement, it will be billed on an estimated basis calculated in good faith and an adjustment will be made to reflect the difference between such estimated amount and the actual amount of such item on the next monthly statement following the date on which the City learns the exact amount of such item.

(c)    The monthly statement submitted in April, July, and October of each Operating Year shall include an adjustment if, during the preceding calendar quarter, Acceptable Waste was delivered by or on behalf of the Municipality in excess of one-quarter of the annual Maximum Tonnage. Such adjustment will be equal to the Base Municipal Waste Fee times the Inflation Adjustor times the number of tons of such excess waste.

Part B:    Adjustments to Annual Service Fee.

1.    Calculation of Allocated Excess Fee and Allocated Shortfall Fee.

(a)    If the Municipality delivers Excess Tons in any Operating Year, the Allocated Excess Fee will be an amount equal to the product of (i) the Municipality's Allocated Share for such Operating Year times (ii) the Net Municipal Excess Tons for such Operating Year times (iii) the Excess Tonnage Surcharge.

(b)    If the Municipality experiences a Shortfall in any Operating Year, the Allocated Shortfall Fee will be an amount equal to the product of (i) the Municipality's Allocated Share for such Operating Year times (ii) the Net Municipality Shortfall for such Operating Year times (iii) the Base Municipal Waste Fee, times (iv) the Inflation Adjustor for such Operating Year.

(c)    Capitalized terms used in this Schedule 3 have the meanings set forth below. As used in these definitions, "tons of Acceptable Waste" assumes that the Acceptable Sludge component of such waste has been converted into Moisture Adjusted Tons.

Allocated Share means (i) in any Operating Year in which the Municipality experiences a Shortfall, an amount equal to (A) such Shortfall divided by (B) by the aggregate Shortfall of all Contract Municipalities that experienced a Shortfall in such year and (ii) in any Operating Year in which the Municipality delivers Excess Tons, an amount equal to (A) such Excess Tons divided by (B) the aggregate Excess Tons of all Contract Municipalities that delivered Excess Tons in such year.

Excess Tonnage Surcharge means (i) the amount, if any, by which (A) the average cost incurred by the City to Dispose of an Excess Ton at an Alternate Disposal Facility exceeds (B) the Base Municipal Waste Fee times (ii) the Inflation Adjustor.

Excess Tons means, for any Contract Municipality in any Operating Year, the amount, if any, by which the tons of Acceptable Waste delivered by such Contract Municipality in such year exceeds its annual Maximum Tonnage.

Net Municipality Excess Tons means, for any Operating Year, the amount, if any, by which (i) the aggregate tons of Acceptable Waste delivered by or on behalf of all Contract Municipalities exceeds (ii) the aggregate annual Maximum Tonnages for all Contract Municipalities.

Net Municipality Shortfall means, for any Operating Year, the amount, if any, by which (i) the aggregate annual Minimum Tonnages for all Contract Municipalities exceeds (ii) the aggregate tons of Acceptable Waste delivered by or on behalf of all Contract Municipalities.

Shortfall means, for any Contract Municipality in any Operating Year, the amount, if any, by which such Contract Municipality's annual Minimum Tonnage exceeds the tons of Acceptable Waste it delivers in such year.

**Part C:**    <u>Annual Settlement Statement</u>

1.    **Annual Settlement Statement.**  Within ninety (90) days after the end of each Operating Year, the City will deliver to the Municipality an Annual Settlement Statement, which shall (i) show the computation of its Annual Service Fee for such year, showing all estimated monthly service fees and interim adjustments paid by it in such year as a credit against its Annual Service Fee, provided that any amounts paid in respect of interest shall not be so credited and (ii) correct to actual values any remaining estimated amounts from monthly statements.

2.    **Payments.**  If the Annual Settlement Statement reflects (i) any balance due to the Municipality, then the City shall, within sixty (60) days of delivery of such statement, pay to the Municipality the balance due or (ii) any balance due to the City, then the Municipality shall, within sixty (60) days of receipt of the statement, pay to the City the balance due.

**Part D:**    <u>General</u>

1.    **Overdue Obligations to Bear Interest.**  Any amount owed to a party under the Agreement more than sixty (60) days beyond the date of the other party's receipt of the statement covering such amount shall accrue interest each day thereafter that such amount is not paid at the annual prime interest rate as published in <u>The Wall Street Journal</u> on the first day that such sum becomes past due .

2.    **Manner of Termination Payment.**  Within sixty (60) days following termination of this Agreement under Section 12 or 13, the City and the Municipality as to which such termination is effective shall reconcile all amounts then due and payable to each other under the terms of this Agreement, including any amounts payable pursuant hereunder. Within ninety (90) days after such reconciliation, the City or the Municipality, as the case may be, shall make final payment in complete discharge of its obligations under this Agreement, except those obligations which survive the termination of this Agreement.

## SCHEDULE 4

## INSURANCE AND INDEMNIFICATION

1.    **Insurance.** From and after the date on which the conditions precedent in Section 1 of this Agreement are satisfied, the City shall obtain and maintain insurance coverage and shall cause the Company to obtain and maintain such insurance coverage as is prudent and customary in businesses such as that of the Company and as is required by the issuer of Bonds.    The Municipality shall obtain and maintain such insurance coverage as is prudent and customary with current limits of not less than $1,000,000 for General Liability Broad Form Coverage and not less than $1,000,000 of Automobile liability insurance and excess umbrella coverage of $1,000,000.    The Municipality shall cause any Person with which it contracts to deliver Acceptable Waste to the City to obtain and maintain such insurance coverage as is prudent and customary for Persons collecting and transporting solid waste, and such Person shall name the City and the Company as additional insureds with coverage limits no less than those required of the Municipality under this Agreement; provided, however that the Municipality shall at all times require the Persons delivering Acceptable Waste to the Facility to provide coverage limits equal to the greater of (a) the highest coverage limits then offered by such Persons to other municipal customers or private customers in the Mid-Hudson Region, (being defined) as Orange County and all adjoining counties or (b) the amounts otherwise required by this Section 1. The City and the Municipality shall meet at least sixty (60) days before the first, fifth, tenth and fifteenth anniversary date of the Service Date, or any five year extension of this Agreement, and review the insurance coverages to determine the coverages and the limits of coverage required of the Municipality and each Person delivering Acceptable Waste during the next five (5) years of the Agreement.    If the City and Municipality are not able to resolve adjusted limits by the anniversary date, this matter shall be subject to the provisions of Schedule 5.

2.    **City Indemnification.** The City agrees that it shall protect, indemnify, and hold harmless the Municipality and its respective officers, employees and agents (the "Municipal Indemnified Parties") from and against all liabilities, actions, damages, claims, demands, judgments, losses, costs, expenses, suits, or actions and attorneys' fees, and shall defend the Municipal Indemnified Parties in any suit, including appeals, for personal injury to, or death of, any person or persons, or loss or damage to property arising out of the  negligence or willful misconduct of the City or any of its agents or employees, contractors or subcontractors, in connection with its performance under this Agreement . The City is not, however, required to reimburse or indemnify any Municipal Indemnified Party for loss or claim due to the negligence or willful misconduct of any Municipal Indemnified Party, and the Municipal Indemnified Party whose negligence or willful misconduct is adjudged to have caused or contributed to such loss or claim shall reimburse the City (or in the case of negligence or willful misconduct of a Municipal Indemnified Party other than the Municipality, the Municipality shall cause such party to reimburse the City) for the costs of defending any such suit.

3.    **Company Indemnification.** The City shall deliver to the Municipality an indemnity of the Company that shall protect, indemnify and hold harmless the Municipality and its subcontractors of any tier and their respective officers, employees and agents (the "Municipal Indemnified Parties") from and against all liabilities, , damages, claims, demands, judgments,

losses, costs, expenses, suits, or actions and attorneys' fees, and shall defend the Municipal Indemnified Parties in any suit, including appeals, for personal injury to, or death of, any person or persons, or loss or damage to property arising out of the negligence or willful misconduct of the Company or any of its agents or employees, contractors or subcontractors, in connection with their performance under the Comprehensive Waste Agreement. The Company is not, however, required to reimburse or indemnify any Municipal Indemnified Party for loss or claim due to the negligence or willful misconduct of any Municipal Indemnified Party, and the Municipal Indemnified Party whose negligence or willful misconduct is adjudged to have caused or contributed to such loss or claim shall reimburse the Company (or, in the case of negligence or willful misconduct of a Municipal Indemnified Party other than the Municipality, the Municipality shall cause such party to reimburse the Company) for the costs of defending any such suit.

4.    **Municipality Indemnification.**    The Municipality agrees that it shall protect, indemnify, and hold harmless the City, and its respective officers, members, employees and agents (the "City Indemnified Parties") from and against all liabilities, damages, claims, demands, judgments, losses, costs, expenses, suits, or actions and attorneys' fees, and shall defend the City Indemnified Parties in any suit, including appeals, for personal injury to, or death of, any person or persons, or loss or damage to property arising out of the negligence or willful misconduct of the Municipality or any of its agents or employees, contractors or subcontractors, in connection with their performance under this Agreement. The Municipality is not required to reimburse or indemnify any City Indemnified Party for loss or claim due to the negligence or willful misconduct of any City Indemnified Party, and the City Indemnified Party whose negligence or willful misconduct is adjudged to have caused or contributed to such loss or claim shall reimburse the Municipality (or, in the case of negligence or willful misconduct of a City Indemnified Party other than the City, the City shall cause such party to reimburse the Municipality) for the costs of defending any such suit.

5.    **Comparative Negligence.**    Notwithstanding any other provision of this Schedule 4, if negligence of any person seeking indemnification for a loss or claim is adjudged to have contributed to such loss or claim, (a) the person from whom indemnification is sought shall be required only to reimburse or indemnify the negligent indemnified person for such loss or claim pro rata to the extent that such negligence is not adjudged to have contributed to such loss or claim and (b) the City (if the negligent party is a City Indemnified Party) or the Municipality (if the negligent party is a Municipal Indemnified Party), as the case may be, shall only be obligated to reimburse the indemnifying person for the costs of defending any such suit to the extent such negligence is adjudged to have contributed to such loss or claim.

6.    **Cooperation Regarding Claims.**    Each of the City, the Company and the Municipality (who are hereinafter collectively referred to in this Section 6 as the "Indemnitors" or individually as an "Indemnitor") shall promptly inform one another of any claim, demand, action, suit or proceeding of which it has knowledge that may affect the performance by any of them of their respective obligations under this Agreement. If Indemnitor receives notice or has any knowledge of any claim, demand, action, suit or proceeding that may result in either a claim for indemnification for or against any of the Indemnitors pursuant to this Schedule 4,    the Indemnitor shall, as promptly as possible, give notice of such claim, demand, action, suit or

proceeding to the other Indemnitors, including a reasonably detailed description of the facts and circumstances relating to such claim, demand, action, suit or proceeding and a complete copy of all notices, pleadings and other papers related thereto, and, in the case of a claim for indemnification pursuant to this Schedule 4, such claim and the basis therefor in reasonable detail; provided that failure promptly to give such notice or to provide such information and documents shall not relieve any Indemnitor of any obligation of indemnification it may have under this Agreement, unless such failure shall materially diminish the ability of such Indemnitor to respond to, or to defend the Indemnitor failing to give such notice against, such claim, demand, action suit or proceeding. The Indemnitors shall consult with each other regarding and cooperate in respect of the response to and the defense of any such claim, demand, action, suit or proceeding and, in the case of a claim for indemnification pursuant to this Schedule 4, the Indemnitor against whom indemnification is claimed shall, upon its acknowledgment in writing of its obligation to indemnify with respect to such claim, be entitled to assume the defense or to represent the interests of the Indemnified party in respect of such claim, demand, action, suit or proceeding, which shall include the right to select and direct legal counsel and other consultants, appear in proceedings on behalf of such Indemnified party and to propose, accept or reject offers of settlement; provided, however, that the Indemnified party shall have the right to retain separate counsel in respect of such claim, demand, action, suit or proceeding, the retention of which counsel shall be at the Indemnified party's own expense, unless the retention of such counsel has been specifically authorized by the party against whom indemnification is claimed.

7.    Survival.    Notwithstanding any other provisions of this Agreement, the obligations of the parties pursuant to Sections 2 through 6 of Schedule 4 shall remain in full force and effect after the termination of this Agreement until the expiration of the period stated in the applicable statute of limitations during which a claim, cause of action or prosecution relating to the matters herein described may be brought and the payment in full or the satisfaction of such claim, cause of action or prosecution and the payment of all expenses, charges and costs incurred by the indemnified party relating thereto.

## SCHEDULE 5
## DISPUTE RESOLUTION

1.    **Dispute Resolution**

(a)    If a dispute arises from or relates to this contract or the breach thereof and if the dispute cannot be settled through discussions, the parties agree to endeavor first to settle the dispute in an amicable manner by mediation administered by the American Arbitration Association under its Commercial Mediation Rules before resorting to arbitration. Thereafter, any unresolved controversy or claim arising from or relating to this contract or breach thereof shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(b)    The arbitrators shall award to the prevailing party, if any, as determined by the arbitrators, all of its costs and fees. "Costs and fees" mean all reasonable pre-award expenses of the arbitration, travel expenses, out-of-pocket expenses such as copying and telephone, court costs, witness fees, and attorneys' fees. In addition, the arbitrators shall award interest on an award for money payable under this Agreement, to the extent this Agreement provides for the payment of such interest.

## SCHEDULE 6

## GENERAL CONTRACT CONDITIONS

| Section | | Page |
|---|---|---|
| 1 | Definitions | 6-1 |
| 2 | Conventions | 6-7 |
| 3 | Consent to Assignment | 6-8 |
| 4 | Remedies | 6-8 |
| 5 | Limited Obligation | 6-8 |
| 6 | Confidentiality | 6-9 |
| 7 | Cooperation in Financing | 6-9 |
| 8 | Relationship of the Parties | 6-9 |
| 9 | Assignment | 6-10 |
| 10 | Renewal Terms | 6-10 |
| 11 | Notices | 6-11 |
| 12 | Waiver | 6-12 |
| 13 | Entire Agreement; Modifications | 6-12 |
| 14 | Severability | 6-12 |
| 15 | Headings | 6-13 |
| 16 | Governing Law | 6-13 |
| 17 | Venue | 6-13 |
| 18 | Counterparts | 6-13 |

1.    **Definitions.**  Unless otherwise required by the context in which any defined term appears, the following defined terms shall have the meanings as specified below:

**Acceptable Construction Waste** means solid waste arising from the construction or demolition of a structure by or on behalf of a Contract Municipality that (a) comports with the requirements of all permits for the Project regarding such waste and otherwise meets the requirements of Applicable Law, and (b) is separated from other waste prior to delivery to the Delivery Site and excluding (i) construction or demolition debris that is Hazardous Waste, asbestos or asbestos containing material or otherwise is Unacceptable Waste, (ii) solid waste resulting from construction or demolition of roads, sidewalks and parking areas, and (iii) solid waste resulting from the construction or demolition of equipment or anything else other than a structure or from construction or demolition which is not conducted by or on behalf of the Municipality.

Acceptable Municipal Waste means that portion of solid waste which has characteristics such as that collected and disposed of as part of normal municipal collection of solid waste in the Contract Municipalities, including white goods, but excluding (a) sludge, (b) construction and demolition debris, (c) tires delivered as part of a bulk load of tires, and (d) Unacceptable Waste.

Acceptable Sludge means sewage sludge generated at a wastewater treatment plant owned or operated by or on behalf of the Municipality that (a) is derived from treatment of sewage consisting predominantly of domestic sewage and otherwise having the characteristics of wastewater treated at publicly owned treatment works, (b) meets all requirements related to sewage sludge contained in any applicable permits for the wastewater treatment plant at which it is generated, (c) comports with the requirements of all permits for the Facility regarding sewage sludge, (d) otherwise meets the requirements of Applicable Law, (e) is processed utilizing standard processing techniques, as defined in Chapter 12 of the Third Edition of Metcalf and Eddy's book entitled, "Wastewater Engineering", (f) has properties and compositions within the ranges defined in Chapter 12 of the Third Edition of Metcalf and Eddy's book entitled, "Wastewater Engineering" and (g) is less than 30 percent solids, and expressly excluding (i) sewage sludge which is Hazardous Waste, has not been properly characterized by appropriate testing to determine that it is not Hazardous Waste or otherwise is Unacceptable Waste, and (ii) sewage sludge that has a specific gravity of less than one.

Sewage sludge that has been classified, through documented tests, as not being Hazardous Waste, yet has been excluded due to the aforementioned criteria, may be deemed to be acceptable provided that testing carried out by the Company proves its compatibility with the Process.

Acceptable Waste means Acceptable Construction Waste, Acceptable Municipal Waste and Acceptable Sludge.

Agreement means this Municipal Waste Management Services Agreement between the City and the Municipality, including the Schedules and any written amendments hereto.

Alternate Disposal Facility means a landfill or other facility, equipment or site other than the Facility or the Disposal Site that (a) the City designates as an Alternate Disposal Facility, (b) is used by the City to accept, transport, store or dispose of Acceptable Waste or Residue under this Agreement and (c) has all permits required by Applicable Law for the acceptance and disposal of the type of solid waste for which it is used by the City.

Annual Service Fee means the fee described in Section 7.

Applicable Law means any law, regulation, requirement or order of any federal, State or local government agency, court or other governmental body, or the terms and conditions of any permit, license or governmental approval, applicable from time to time to the construction of the Facility or the performance of any obligation under this Agreement.

Base Fees means the Base Municipal Waste Fee and the Base Sludge Fees, collectively.

Base Municipal Waste Fee means, during the initial term of this Agreement, $65.00, the amount set forth in Section 7(a)(I), and, thereafter, the amount determined pursuant to Section 10 of Schedule 6 for the Disposal of Acceptable Waste other than Acceptable Construction Waste and Acceptable Sludge.

Base Sludge Fees means, during the initial term of this Agreement, the unadjusted dollar amounts set forth in Section 7(a)(iii) and, thereafter, the amounts determined pursuant to Section 10 of Schedule 6 for the Disposal of Acceptable Sludge.

Bonds means the bonds issued to finance, in part, the design, construction and testing of the Facility and related costs, including any additional bonds or refunding bonds issued in accordance with the same indenture.

Calculation Year has the meaning set forth in the definition of the Inflation Adjustor in this Schedule 6.

Change in Law means (a) the adoption, promulgation or modification or reinterpretation (including any change in enforcement policy) after the Contract Date of any federal, State, county, City or municipality statute, ordinance, permit, code or regulation not adopted, promulgated, modified and officially published, as appropriate, in The Congressional Record, The Federal Register, or similar publication of the State, County, City or Municipality on or before the Contract Date, or (b) the imposition after the Contract Date of any material conditions or change in government or judicial policy in connection with the issuance, renewal, modification or enforcement of any official permit, license or approval, which in the case of either (a) or (b) establishes requirements affecting the obligation of either party under this Agreement (other than payment obligations) or the design, construction, start-up, acceptance testing, operation, maintenance, cost or construction of the Project more burdensome than the most stringent requirements (i) in effect as of the Contract Date, (ii) agreed to in any applications of the Company for official permits, licenses or approvals pending as of the date of this Agreement or (iii) contained in any official permits, licenses, or approvals with respect to the Project obtained as of the date of this Agreement, or (c) the failure of any applicable federal, state or local governmental agency or unit having jurisdiction over the Project to issue any permit, license or approval after the Contract Date necessary for the operation of the Project, which permit, license or approval was not issuable on or before the Contract Date; provided that a change in any law of the Municipality or the County will not be a Change in Law with respect to the Municipality.

City means the City of Middletown, New York.

City Actual Cost means, with respect to any material or service, the amount the City pays for such material or service.

Company means Pencor-Masada OxyNol, L.L.C., a Delaware limited liability company.

Comprehensive Waste Agreement means the Comprehensive Waste Management Services Agreement between the City and the Company entered into as contemplated by Recital C. of this Agreement.

Contract Municipality means the Municipality and any other municipality that has entered into an agreement with the City for the provision of solid waste management services.

County means Orange County, New York.

CPI means the Consumer Price Index for all Urban Wage Earners for the New York Region, all items, as published by the Bureau of Labor Statistics of the U.S. Department of Labor. For the purposes of determining the Inflation Adjustor, if the CPI is no longer published or the method of computation thereof is substantially modified, an agreed upon alternative index of similar geographic focus and substantially identical economic criteria shall be substituted therefor.

CPI Fraction means a fraction the numerator of which is the sum of (i) the CPI for January of the preceding Operating Year immediately preceding the Calculation Year plus (ii) the product of multiplying 64% times the difference of (A) the CPI for the Calculation Year minus (B) CPI for January of the immediately preceding Operating Year, and the denominator of which is the CPI for January of the Operating Year immediately preceding the Calculation Year.

Delivery Site means the Facility Site or any other site agreed to in writing by the parties.

Dispose, Disposed, Disposing means treatment, processing or disposal by the City in accordance with Applicable Law of (a) Acceptable Waste delivered to the City in accordance with this Agreement by the following means in the order of priority listed: (i) Processing, (ii) transporting Residue to an Alternate Disposal Facility, (iii) transporting Acceptable Waste to an Alternate Disposal Facility, and (iv) directing the Municipality to deliver Acceptable Waste to an Alternate Disposal Facility for disposal if for any reason the Facility is not available.

Estimated Service Fee is defined in Schedule 3.

Facility means the integrated solid waste processing facility, together with all additions, replacements, appurtenant structures and equipment, to be designed, constructed and operated by the Company on the Facility Site.

Facility Operating Costs means all costs and expenses incurred by the Company for operation of the Facility provided, however, that such expenses shall not include costs incurred with respect to the issuance of the Bonds, interest payable with respect to the outstanding principal indebtedness of the Bonds, or any allowance or expense for depreciation of the Facility. For purposes of determining Facility Operating Costs, there shall be included all amounts reserved for capital improvements, maintenance and other operating reserves. Facility Operating Costs shall be determined in accordance with generally accepted accounting principles consistently applied and shall be submitted to the City in a certified statement prepared by the independent accounting firm engaged by the Company.

Facility Site means the real property upon which the Facility is located.

Governmental Authority means (a) the federal, state or any local government, (b) any agency, Authority, special district or political subdivision thereof and (c) any court or other government tribunal.

Hazardous Waste means (a) any material or substance which, by reason of its composition or characteristics, is (i) regulated as a toxic or hazardous waste as defined in (A) either the Solid Waste Disposal Act 42 U.S.C. §§ 6901 et seq., or Section 6(e) of the Toxic Substances Control Act, 15 U.S.C. § 2605(e), as either may be replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (B) in N.Y. ECL § 27-0901 (McKinney 1984), as replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (ii) special nuclear or by-products materials within the meaning of the Atomic Energy Act of 1954; and (b) any other materials which any Governmental Authority having appropriate jurisdiction shall determine from time to time is ineligible for Disposal whether by reasons of being harmful, toxic or dangerous, or otherwise.

Host Community means the City of Middletown.

Inflation Adjustor means the number multiplied by the Base Fees to determine the Annual Service Fee as provided in Section 7. The Inflation Adjustor shall be effective as of the first day of April in each Operating Year and the twelve (12) consecutive calendar months thereafter. (The Operating Year in which the Inflation Adjustor is calculated and goes into effect shall be referred to as the "Calculation Year.") The Inflation Adjustor shall be determined in the Calculation Year as provided in one of the following alternatives, whichever is applicable:

(a)     The Inflation Adjustor shall, subject to the provisions of paragraph (b) below, be a fraction the numerator of which is the sum of (i) the CPI for January of the year following the December 31 prior to the Acceptance Date, which is when the performance test established by the Facility financing party is passed (the "CPI Base") plus (ii) the product of multiplying (A) 64% times (B) the amount, if any, the CPI for January of the Calculation Year exceeds the CPI Base, and the denominator of which is the CPI Base.

(b)     If the Inflation Adjustor as calculated for the Calculation Year under paragraph (a) is less than the Inflation Adjustor determined in the Operating Year immediately preceding the Calculation Year, the Inflation Adjustor shall be the greater of the following:

(i)     the number which is the product of multiplying the Inflation Adjustor determined in the Operating Year immediately preceding the Calculation Year, times the CPI Fraction; or

(ii)    the number which is the product of multiplying the Inflation Adjustor determined in the Operating Year immediately preceding the Calculation Year, times the Operating Costs Fraction.

Notwithstanding anything in this Agreement to the contrary, the Inflation Adjustor shall not be less than 1.00.

**Maximum Tonnage** and **Minimum Tonnage** are defined with respect to the Municipality in Part A of Schedule 1. When such terms are used with reference to another Contract Municipality, they mean that Contract Municipality's tonnage requirements under its contract with the City as reflected in the City's notice delivered pursuant to Schedule 1.

**Moisture Adjusted Tons** is defined in Part A of Schedule 1.

**Municipality** means Town of Cornwall, Orange County, New York.

**Operating Costs Fraction** means a fraction the numerator of which is the Facility Operating Costs for the Operating Year immediately preceding the Calculation Year and the denominator of which is the Facility Operating Costs for the Operating Year Immediately preceding the Operating Year used in the numerator of the Operating Costs Fraction.

**Operating Year** means (i) the period beginning on the Service Date and ending on the following December 31 and (ii) each calendar year thereafter, except that the last Operating Year shall begin on January 1 immediately preceding the end of the term of this Agreement and end on the last day of the term of this Agreement. All annual amounts set forth in this Agreement shall be adjusted pro rata for the first and last Operating Years.

**Person** means a corporation, limited liability company, partnership, business trust, trust, joint venture, company, firm, individual, city, municipality or other governmental entity.

**Process, Processed** or **Processing** means the recovery of recyclable materials, the processing of cellulosic waste material to produce ethanol and $CO_2$ using the CES OxyNol™ Process, or the beneficial use of residual materials.

**Project** means the Facility, the Facility Site and the Delivery Site (if other than the Facility Site).

**Proportionate Share** is defined in Schedule 1.

**Residue** means any material derived from Acceptable Waste which remains after the Processing of Acceptable Waste which the Company is unable to sell or give away.

**Service Date** means the date the Municipality shall commence the delivery of all its Acceptable Waste to the Facility, notice of which date shall be provided in writing by the City.

State means the State of New York.

Unacceptable Waste means Hazardous Waste or any other portion of solid waste which, if Disposed of at the Facility (or any Alternate Disposal Facility), may harm the Facility or impair its operation and therefore may not be Disposed of at the Delivery Site as it would:

    (i)    present a substantial endangerment to health or safety of the public or Facility employees; or

    (ii)    cause a violation of Applicable Law; or

    (iii)    adversely affect the equipment at or operation of the Facility.

Unacceptable Waste includes explosives, including hand grenades, blasting caps, shotgun shells, closed containers capable of exploding upon Processing and fireworks, gasoline, kerosene, turpentine, waste oil, ether, acetone, solvents, paints, alcohol, acids, hydraulic oil, petroleum, caustics, burning or smoldering materials, materials that have elevated temperatures or that may self-ignite, flammable or volatile liquids, any other liquids (other than as contained in Acceptable Sludge), pathological, chemotherapeutic and biological waste, radioactive materials, hospital waste, medical waste, red bag waste, ashes, foundry sand, sewage sludge other than Acceptable Sludge, construction and demolition debris that is not Acceptable Construction Waste, septage, cesspool and other untreated human waste, leachate, human and animal remains, kitchen sinks, motor vehicles, including such major motor vehicle parts as automobile transmissions, rear ends, springs and fenders, bulk loads of tires, agricultural and farm machinery and equipment, marine vessels and major parts thereof, any other large types of machinery or equipment, liquid wastes and asbestos or asbestos containing material.

Unacceptable Waste Costs means the sum of (a) the City Actual Cost of removing from the Delivery Site or Alternate Disposal Site and disposing of Unacceptable Waste plus (b) all other costs, liabilities and revenue losses associated with or arising from the delivery, removal or disposal of such waste.

    2.    **Conventions.** Unless otherwise limited in this Agreement, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form on paper; any references to agreements and other contractual instruments shall be deemed to include all subsequent amendments thereto, restatements or replacements thereof, or changes therein duly entered into and effective among the parties thereto or their permitted successors and assigns; references to persons include their permitted successors and assigns; the term "including" shall mean including without limitation; references to schedules and sections mean the Schedules to and Sections of this Agreement and references to this Agreement mean this Agreement including all Schedules; the term "day" means a calendar day and includes Saturdays, Sundays and holidays, except that, in the event that any obligation to be performed under this Agreement falls due on a Saturday, Sunday or a holiday on which State or federally chartered banks are not open for business, the

obligation shall be deemed at the next business day thereafter; the term "prompt" means as soon as is practicable but in any event not to exceed seven days from the day of the event with respect to which action is to be taken; and the term "ton" means a short ton of 2,000 pounds.

3.      Consent to Assignment. The Municipality hereby consents to the assignment by the   City to the Company, its successors and assigns (and such further assignment by the Company), as security for the performance by the City of its obligations under the Comprehensive Waste Agreement, of all of the City's right, title and interest in this Agreement.

4.      Remedies.

(a)     To the extent that specific remedies, damages or adjustments are set forth in this Agreement, such remedies, damages or adjustments shall be the sole and exclusive remedy available in the circumstances giving rise to such remedy, damage or adjustment.

(b)     It is understood and agreed between the parties that the calculations of the contract termination fees under Sections 12 and 13 are intended to provide a consistent method for the determination of the actual damages that the Municipality or the City, as the case may be, will sustain in the event this Agreement is terminated pursuant to Section 12 or 13, and that these calculations are agreed upon and fixed to permit the orderly administration of this Agreement and are not intended as liquidated damages or as a penalty.

(c)     In no event, whether because of the breach of any provisions contained in this Agreement or for any other cause, whether based upon contract, strict liability, tort, warranty, delay or otherwise, shall either the Municipality or the City be liable, or otherwise be obligated in any manner to pay to the other any incidental, special, punitive, consequential or indirect damages of any nature (whether such damages occur prior to or after the expiration or termination of this Agreement), except as specifically provided in Sections 13 and 14 regarding contract termination fees.  Nothing in this Section shall be deemed to affect the obligations of the City and the Municipality under Schedule 4.

(d)     Any obligation for the payment of money arising from the conduct of the parties pursuant to this Agreement prior to termination shall not be affected by any termination and shall remain in full force and effect.

5.      Limited Obligation.

(a)     NO RECOURSE SHALL BE HAD FOR THE PAYMENT OF THE PRINCIPAL OF ANY BONDS ISSUED FOR THE FACILITY OR FOR THE PERFORMANCE OF ANY OF THE OBLIGATIONS UNDER THIS AGREEMENT AGAINST ANY PAST, PRESENT OR FUTURE MEMBER, OFFICER, EMPLOYEE OR AGENT OF THE HOST COMMUNITY OR THE ISSUER OR ANY PREDECESSOR OR SUCCESSOR

CORPORATION, EITHER DIRECTLY OR INDIRECTLY, THROUGH THE CITY OR OTHERWISE, WHETHER BY VIRTUE OF ANY CONSTITUTION, STATUTE, OF LAW OR BY THE ENFORCEMENT OF ANY ASSESSMENT OR PENALTY, OR OTHERWISE, ALL SUCH LIABILITY BEING, BY ACCEPTANCE HEREOF, EXPRESSLY WAIVED AND RELIEVED.

(b) The obligations of the City under this Agreement are limited obligations of the City as set forth in Section 11(a) and are not general obligations of the Host Community or the Issuer, and the City's obligations are <u>not</u> guaranteed by the Issuer or any other municipality or governmental entity.

6. **Confidentiality.** Any information or materials furnished to a Municipality or its auditor pursuant to this Agreement with respect to the operation of the Project shall be treated as confidential and maintained in strict confidence, and the Municipality shall take all reasonable steps to prevent disclosure to third parties to the extent permitted by law, except to the extent such information is already in the public domain at the time furnished.

7. **Cooperation in Financing.** The Municipality agrees to make available, to the prospective issuer of the Bonds, its underwriters, their counsel, bond counsel, the rating agencies, independent engineers or feasibility consultants, credit facility providers and other financing institutions or parties involved in the financing process and the issuance of bonds, such information in the control of the Municipality (including financial information concerning the Municipality) as may reasonably be requested. The Municipality agrees to make available to the independent engineer and the feasibility consultant designated by the City such information concerning the Municipality as they reasonably request so they can render opinions concerning the Municipality's abilities to perform its obligations under this Agreement. The Municipality further agrees that, in connection with the financing of the Facility, it shall (i) provide an opinion of counsel as to the enforceability against the Municipality of this Agreement and as to such other matters reasonably requested in connection with such financing and (ii) grant to the Company's senior lenders or their trustees such rights to cure a default by the City hereunder as they may reasonably request in connection with the financing of the Facility and provide such certificates as are customary in connection with such financings. The City agrees to reimburse all reasonable costs incurred by Municipality's counsel in providing the information required in connection with the financing as set forth herein. The Municipality does not, by virtue of entering into this Agreement, assume any liability for the Bonds or the issuer of, the holders of or the trustee for the holders of the Bonds. Except as provided in this Section and in Section 13(c) in connection with a default by the Municipality hereunder, the Municipality shall have no obligations to the City with respect to the Bonds

8. **Relationship of the Parties.** Except as otherwise provided in Section 12, (a) neither party to this Agreement shall by virtue of this Agreement have any responsibility whatsoever with respect to services provided or contractual obligations assumed by the other party and (b) nothing in this Agreement shall be deemed to constitute either party a partner, agent or legal representative of the other party or to create any fiduciary relationship between the parties.

9.    Assignment.

(a)    This Agreement and the rights, obligations and responsibilities hereunder may be assigned by the City and its assignees without the prior consent of the Municipality; without limiting the generality of the foregoing, the City and its assignees may assign their interest hereunder as collateral for or otherwise in connection with any obligations any of them may have under the Comprehensive Waste Agreement or otherwise.  If the City, through the New York State Legislature, forms a solid waste authority, the City, its successors or assigns shall assign all of its rights, obligations and responsibilities hereunder to such authority.

(b)  This Agreement may not be assigned by the Municipality without the prior consent of the City.

(c)  This Agreement shall be binding upon and inure to the benefit of the permitted successors and assigns of the parties hereto pursuant to this Section. Any attempted assignment made contrary to this Section shall be void.

10.    Renewal Terms.

(a)    The term of this Agreement may be extended under the terms set forth in this paragraph (a) if, prior to the anniversary dates of the Service Date of the Facility (each, an "Anniversary") identified below, the Municipality provides notice to the City pursuant to paragraph (c).

(i)    On the fifth Anniversary, this Agreement shall be extended until the twenty-fifth Anniversary on its existing terms.

(ii)    On the tenth Anniversary, this Agreement shall be extended until the thirtieth Anniversary on its existing terms, except that, for the period of the extension, the Base Fees shall be as announced by the City pursuant to paragraph (b) of this Section.

(iii)    On the fifteenth Anniversary, this Agreement shall be extended until the thirty-fifth Anniversary on its existing terms, except that, for the period of the extension, the Base Fees shall be as announced by the City pursuant to paragraph (b) of this Section.

(b)    At least six (6) months prior to the tenth and fifteenth Anniversary, the City shall give notice to the Municipality stating the Base Fees that will be in effect for the period of the extension under paragraph (a)(ii) or (iii) above, as the case may be.  The Base Fees announced by the City under paragraph (a)(ii) shall not exceed 125% of the Base Fees.  The Base Fees announced by the City under paragraph (a)(iii) shall not be less than 110% of the Base Fees in effect at the time the City gives such notice.

(c)    At any time prior to the fifth, tenth and fifteenth Anniversaries the Municipality may provide written notice to the City that it desires to extend this Agreement at such time, and this Agreement shall be extended at such time.

(d)    Notwithstanding anything to the contrary in this Section 10, if at the twentieth, twenty-fifth or thirtieth Anniversary, the City does not have contracts with the Contract Municipalities for an aggregate Minimum-Tonnage for the next five years of at least 80 percent of the then existing operating capacity of the Facility, the City may terminate this Agreement by providing at least six (6) months' prior written notice to the Municipality.

11.    **Notices.**

(a)    Any notice given pursuant to this Agreement shall be in writing and may be cabled, telecopied, delivered by hand, mailed by first class, certified mail, return receipt requested, postage prepaid, or dispatched by next day delivery service and, in any case, shall be addressed as follows:

If delivered to the City:

> City of Middletown
> 16 James Street
> Middletown, New York  10940
> Attention:    Joseph DeStefano
>                      Mayor
> Telephone:    845-346-4100
> Fax:              845-343-7439

with a copy to:

> Alex Smith, Esq.
> Corporation Counsel
> City of Middletown, New York
> 16 James Street
> Middletown, New York  10940
> Telephone:    845-346-4139
> Fax:              845-346-4146

Pencor-Masada OxyNol, LLC
2170 Highland Avenue
Suite 200
Birmingham, Alabama  35205
Attention:      Daryl Harms
Telephone:     205-558-7900
Fax:             205-558-7911

<u>If delivered to the Municipality</u>:

_____

_____

_____

Attention:      _____
Telephone:     845-_____
Fax:             845-_____

Either party may change the address to which its communications are delivered by notice to the other parties.

b)    Any communication given in accordance with this Section shall be deemed to have been given to a party upon its receipt by such party or upon such party's refusal to accept its delivery.

12.    **Waiver**. The waiver by either party of a default or a breach of any provision of this Agreement by the other party shall not operate or be construed to operate as a waiver of any subsequent default or breach. The making or the acceptance of a payment by either party with knowledge of the existence of a default or breach shall not operate or be construed to operate as a waiver of any default or breach.

13.    **Entire Agreement; Modifications**. The provisions of this Agreement, including the present and all future Schedules, together with the agreements incorporated by reference, shall (a) constitute the entire agreement between the parties, superseding all prior agreements and negotiations, and (b) be modified, unless provided herein to the contrary, only by written agreement duly executed by all parties.

14.    **Severability**. In the event that any provision of this Agreement, or the application of such provision to any Person or circumstance shall, for any reason, be determined to be invalid, illegal, or unenforceable in any respect, the parties shall negotiate in good faith and agree to such amendments, modifications, or supplements of or to this Agreement or such other appropriate actions as shall, to the maximum extent practicable in light of such determination, implement and give effect to the intentions of the parties as reflected herein, and other provisions

of this Agreement shall as so amended, modified, or supplemented, or otherwise affected by such action, remain in full force and effect.

15.    **Headings.** Captions and headings in this Agreement are for ease of reference only and do not constitute a part of this Agreement.

16.    **Governing Law.** This Agreement and any question concerning its validity, construction or performance shall be governed by the laws of the State, irrespective of the place of execution or of the order in which the signatures of the parties are affixed or of the place or places of performance.

17.    **Venue.** The City and the Municipality hereby agree that any action, suit or proceeding arising out of this Agreement or any transaction contemplated hereby shall be brought in a court of competent jurisdiction in the State, and that neither the City nor the Municipality shall object to the institution or maintenance of any such action, suit or proceeding in such court based on improper venue, forum non convenience or any other ground relating to the appropriate forum for such action, suit or proceeding.

18.    **Counterparts.** This Agreement may be executed in more than one counterpart, each of which shall be deemed to be an original but all of which taken together shall be deemed a single instrument.

## SCHEDULE 4

### TRANSPORT CREDIT

In the event the transfer station to which the Municipality currently delivers the Acceptable Waste is unavailable under this Agreement as a delivery site during the start-up period (as described in Section 2(a)) or Operating Year, and if the Facility or another site designated by the City requires transporting such waste at least two (2) miles further than presently existing transportation routes, then the City shall pay to the Municipality an allowance for the actual, increased costs necessarily and reasonably incurred by the Municipality in transporting to the Facility or other designated site, which costs shall be determined by use of industry recognized operating expense standards for comparable transportation equipment.

Exhibit D

# LEASE AGREEMENT

between

## CITY OF MIDDLETON

and

## PENCOR-MASADA OXYNOL, LLC

\\ATL-SRV02\379706v22\12/4/03\81504.000016

## TABLE OF CONTENTS

LEASE AGREEMENT ................................................................................................ 1

BACKGROUND ....................................................................................................... 1

1.  Lease of the Site; Term ................................................................................... 1
    1.1  Basic Term. ............................................................................................ 2
    1.2  Early Termination .................................................................................. 2

2.  Rent ................................................................................................................ 2
    2.1  Basic Rent. ............................................................................................ 2
    2.2  Additional Rent. .................................................................................... 2
    2.3  Invoice. ................................................................................................. 2

3.  Access; Easements ......................................................................................... 2
    3.1  Ingress and Egress. ............................................................................... 3
    3.2  Utilities. ................................................................................................ 3
    3.3  City Property Excavation. ..................................................................... 3
    3.4  Private Property Easements. .................................................................. 3
    3.5  Location. ............................................................................................... 3

4.  Use of the Site. .............................................................................................. 3

5.  Ownership and Maintenance of the Facility .................................................. 3
    5.1  Effect on Operating Lease. ................................................................... 3
    5.2  Limitations on Waste and Sludge. ........................................................ 4
    5.3  Enforcement of DEC Permit. ................................................................ 4
    5.4  City Inspection. ..................................................................................... 4
    5.5  No Amendment of Operating Lease. ..................................................... 4

6.  Potable Water ................................................................................................. 4
    6.1  Quantity. ............................................................................................... 4
    6.2  Interconnection Work. .......................................................................... 4
    6.3  Tariff. .................................................................................................... 4

7.  Process Water and Sewage. ............................................................................ 4
    7.1  Quantity of Permitted Effluent Discharge. ........................................... 5
    7.2  Quantity of Unconsumed Permitted Effluent Discharge. ...................... 5
    7.3  Boiler Make-up Water. .......................................................................... 5
    7.4  Sanitary Sewage. ................................................................................... 5
    7.5  Delivery Points. .................................................................................... 5
    7.6  Integrating Operations. ......................................................................... 5

8.  Relationship of Parties. ................................................................................. 5

9.  Compliance with Laws. .................................................................................. 5
    9.1  Compliance. ........................................................................................... 5
    9.2  Odor Control. ........................................................................................ 7

10. Permit Matters ............................................................................................... 7
    10.1  City Cooperation. ................................................................................ 7
    10.2  Maintaining Bond. .............................................................................. 

WATL-SRV02\379706v22\12/4/03\81504.000016

11.     Environmental Matters .......................................................... 7
        11.1    Compliance With Law ........................................... 8
        11.2    Site Contamination ................................................ 9
        11.3    City's Indemnification with Respect to Environmental Matters ............... 10
        11.4    Company's Indemnification with Respect to Environmental Matters ............ 10
        11.5    Response Actions. ................................................ 11
        11.6    Reservation of Appeal Right ................................... 11
        11.7    Coordination of Response Action ............................. 13
        11.8    Comparative Negligence. ...................................... 13
        11.9    Inspections. ....................................................... 14
        11.10   Remedies ........................................................... 14
        11.11   Survival. ............................................................ 14

12.     Surrender ............................................................................ 15

13.     Taxes .................................................................................. 15
        13.1    Taxes. ................................................................ 15
        13.2    Empire Zone Designation. ..................................... 15

14.     Insurance and Indemnification ............................................ 16

15.     Liens. ................................................................................. 16

16.     Eminent Domain. ................................................................ 16

17.     Termination and Default ..................................................... 16
        17.1    Remedies. .......................................................... 16
        17.2    Default. .............................................................. 18
        17.3    Leasehold Financing. ............................................ 21

18.     Notices. .............................................................................. 22

19.     Assignment and Subletting. ................................................ 22

20.     Subordination and Nondisturbance. .................................... 22

21.     Governing Law and Dispute Resolution ............................... 22
        21.1    Governing Law. ................................................... 22
        21.2    Dispute Resolution .............................................. 24

22.     Recording of Lease. ........................................................... 24

23.     Right of Setoff. .................................................................. 24

24.     Miscellaneous. ................................................................... 24
        24.1    Exclusivity. ......................................................... 24
        24.2    Time of the Essence. ........................................... 24
        24.3    Entire Agreement. ............................................... 24
        24.4    Severability. ....................................................... 24
        24.5    Counterparts. ..................................................... 24
        24.6    Headings. ........................................................... 24
        24.7    Conventions. ...................................................... 25

25.     Local Union Building Trade Labor. ......................................

THIS LEASE AGREEMENT (also known as a ground lease), made this _____ day of _____, 2003, by and between the City of Middletown, a municipality located in Orange County, New York ("City") and Pencor-Masada OxyNol, LLC, a Delaware limited liability company ("Company").

BACKGROUND

A.      City is the owner of real property upon which Company desires to design, construct, equip and operate an integrated solid waste processing facility (the "Facility"), in Middletown, Orange County, New York.

B.      City desires to lease to Company such real property as more particularly shown and outlined on Attachment A attached hereto (the "Site").

C.      The Facility will be owned by the City of Middletown Industrial Development Agency which will finance the Facility through the issuance of its tax-exempt bonds (the "Financing") and lease the Facility to Company pursuant to an operating lease (the "Operating Lease") to be entered into in connection with the Financing.

D.      Company shall operate the Facility pursuant to the Operating Lease, the City Waste Management Services Agreement between Company and City (the "City Waste Agreement"), the Comprehensive Waste Management Services Agreement between Company and City (the "Comprehensive Waste Agreement") and the Host Community Agreement between Company and City (the "Host Community Agreement") and, together with the City Waste Agreement, the "City Agreements").

NOW, THEREFORE, the parties, in consideration of these premises and the mutual promises set forth below, and intending to be legally bound, agree as follows:

1. Lease of the Site; Term

1.1     Basic Term. City leases the Site, together with all rights, easements and other appurtenances thereto and income and profits derived therefrom, to Company for the purposes contained herein, for a term beginning on the date of closing of the Financing (the "Commencement Date"), and ending on the later to occur of (i) the first anniversary of the date of termination of the Operating Lease, or (ii) the twenty-fifth (25th) anniversary of the Service Date (as defined in the City Waste Agreement) unless earlier terminated in accordance with the terms of this Lease (the "Term"). Notwithstanding the foregoing, if the term of the City Waste Agreement is extended in accordance with the provisions of Section 10 of Schedule 6 of the City Waste Agreement or otherwise, then the "twenty-fifth anniversary" term in clause (ii) above shall be extended by the same number of years as the extension of the City Waste Agreement. This Lease shall terminate upon the completion of the Term.

1.2    Early Termination

(a)    Subject to the terms of the Operating Lease and the City Waste Agreement, if the term of the City Waste Agreement has expired and is neither extended nor renewed by City, Company may, with the prior written consent of the Leasehold Mortgagee (as defined below), terminate this Lease and its obligation to pay rent hereunder at any time upon 60 days written notice to City.

(b)    This Lease is also subject to earlier termination as provided in Section 17 below.

2.    Rent

2.1    Basic Rent. Company shall pay City rent for the Term as follows: (a) for the period beginning on the Commencement Date and ending on the day prior to the Service Date, a one-time payment of $100,000 payable at the closing of the Financing; and (b) for the period beginning on the Service Date and ending on the last day of the Term, the amount of $100 per year times the Inflation Adjustor [as calculated under the City Waste Agreement, except that the number is multiplied by the $100 to determine the rent payable under this clause (b)], which shall be paid in equal quarterly installments in arrears. The amount set forth in clause (b) shall be prorated for the years in which the Service Date occurs and the Term ends, to the extent that the periods to which the payments relate are shorter than calendar years.

2.2    Additional Rent. Company shall pay City as additional rent (i) the cost of obtaining the surety bond required to be obtained by City pursuant to Section 11.2(b) and (ii) an amount equal to the annual premium for the environmental liability insurance policy required to be obtained and maintained by City pursuant to Section 11.2(d).

2.3    Invoice. City shall from time to time invoice Company for the payment of the rent or additional rent then due and payable, as the case may be, and the amount so owing shall be paid by Company to City within thirty (30) days of receipt of such invoice.

3.    Access; Easements

3.1    Ingress and Egress. City agrees to provide Company, and any and all subcontractors, agents, other representatives of Company and customers of Company, with unrestricted ingress and egress over, across and through City's adjoining property as Company requires for the construction, modification, inspection, operation and maintenance of the Facility and any construction, modification, inspection, operation and maintenance of additions thereto, including, but not limited to, designating avenues of ingress and egress capable of supporting heavy equipment. Company shall be responsible for repairs of any damage to City's property resulting from such use by Company or Company's subcontractors, agents, other representatives of Company and customers of Company. City shall provide to Company, and any and all subcontractors, agents and other representatives of Company, all information necessary, in Company's reasonable opinion, to allow Company and Company's subcontractors, agents, and other representatives access to the Site. City will also grant to Company all necessary easements on, over, under and across City's adjoining property or other authority to construct, install, operate, and maintain the utility, communication, water and sewer lines located on and off the

Site that will service the Facility. In furtherance of the foregoing, and in connection with the construction of the Facility, Company shall provide City (i) reasonable advance prior notice of its first entry onto City's adjoining property and (ii) with a mobilization and construction plan that identifies more precisely the timing of the usage of City's adjoining property. In addition thereto, City and Company acknowledge that City shall, upon commencement of construction of the Facility, be permitted to have a City employee at the Site to monitor the course of construction of the Facility and to attend regularly scheduled construction meetings among Company's EPC contractor, Company's design engineer and Company as an observer.

3.2    Utilities. Utility, communication, water and sewer lines constructed or installed by Company will constitute part of the Facility for which City shall have no responsibility for maintenance and repair.

3.3    City Property Excavation. In furtherance of the construction and operation of the Facility, the construction and operation of pipelines for the delivery of water, sewerage, or gas to or from the Facility, City hereby grants to Company the right to excavate in, occupy and use any and all dedicated streets, alleys, viaducts, bridges, roads, lanes and public ways within City's property adjoining the Site, and certain other properties described in Attachment B attached to this Agreement.

3.4    Private Property Easements. In addition, Company shall have the right to utilize any easement across private property granted to City for utility purposes, provided (i) the prior written consent of the Director of the City department that controls such easement is obtained in each case, and (ii) the documents granting such easement to City authorize such use. Company shall not, pursuant to this Agreement, excavate in, occupy or use any City park, pleasure grounds, other recreational areas or other property owned by City; provided that City may grant a revocable permit for such purpose, with the express written consent of the Director of the City department which controls such property.

3.5    Location. In all cases, the precise location of Company's facilities within, on, over, across or through any City street, alley, viaduct, bridge, road, lane, public way or other property shall be subject to City approval, and the right to use such City streets and other property shall be subject to the terms of this Agreement, and all applicable City ordinances, rules and regulations now existing or from time to time adopted or promulgated. City will timely process any request under this Section, and will not unreasonably withhold its written consent.

4.    Use of the Site. Company shall not use or occupy the Site for any purpose other than for the construction, modification, operation, maintenance and removal (if removal ever occurs) of the Facility.

5.    Ownership and Maintenance of the Facility

5.1    Effect on Operating Lease. No provision contained herein shall affect Company's leasehold interest in the Facility pursuant to the Operating Lease.

5.2    Limitations on Waste and Sludge. Company shall not knowingly accept, or permit to be accepted, at the Facility (i) municipal solid waste from any county that is not contiguous with Orange County or (ii) sludge from any location that is more than 150 miles from

the Site, except, in either case, to the extent that it is obligated to accept such waste and sludge under the Municipal Waste Agreements (as defined in the Comprehensive Waste Agreement) or the City Waste Agreement.

5.3    Enforcement of DEC Permit.  If, at any time, (i) the DEC has issued a notice of a violation under the Permit No. 3-3309-00101-1 but is not enforcing the conditions of such permit and (ii) City reasonably believes that the circumstances causing the violation present an imminent danger to the public health and safety, then City shall have the right to enforce the conditions of such permit against Company in the courts of the State of New York.

5.4    City Inspection.  City and its duly authorized agents, including the City employees referred to in Section 7(d) of the Host Community Agreement, shall have the right, at all reasonable times and upon reasonable notice, to enter upon the Site and examine and inspect the Facility, provided that they follow the safety rules in effect at the Facility and do not unreasonably interfere with Facility operations.

5.5    No Amendment of Operating Lease.  Without City's prior written consent, not to be unreasonably withheld or delayed, Company shall not amend or permit to be amended any provision of the Operating Lease or the Indenture which provision (i) relates to Company's capital budget or its obligation to make deposits to a capital maintenance reserve fund, and (ii) which provision if so amended would increase City's costs with respect to the Facility beyond increases either (x) presently contemplated, (y) covered for reimbursement to City by other provisions in the applicable amendment, or (2) resulting from changes in Applicable Law or changes arising from force majeure activities.

## 6.  Potable Water

6.1    Quantity.  Commencing on the Start-Up Date (as defined in the City Waste Agreement), City shall provide potable water to the Facility in such quantities as Company may require, but in no event in excess of an average of 40,000 gallons per day after the Service Date (as defined in the City Waste Agreement), as measured over any six-month period.

6.2    Interconnection Work.  The Company shall, at its own expense, be responsible for performing all interconnection work necessary for the delivery of potable water in accordance with the Middletown Department of Public Works' normal policies and procedures.

6.3    Tariff.  Company shall pay for potable water under such terms as may be in effect, from time to time, under the applicable tariff.

## 7.  Process Water and Sewage

7.1    Quantity of Permitted Effluent Discharge.  Commencing on the Start-Up Date, City shall deliver, at no charge to Company, permitted effluent discharge to the Facility from City's wastewater treatment plant, in such quantities as Company may require, but in no event in excess of an average of 1,000,000 gallons per day after the Service Date, as measured over any six-month period.

7.2    Quant. of Unconsumed Permitted Effluent Discharge. Company may return to City's wastewater treatment plant up to 500,000 gallons per day of unconsumed permitted effluent discharge at no charge to Company, provided that, by doing so, Company does not cause City to violate City's National Pollutant Discharge Elimination System Permit.

7.3    Boiler Make-up Water. Company may deliver all used boiler makeup water to City at no charge to City or Company.

7.4    Sanitary Sewage. Company may choose to deliver sanitary sewage to City's wastewater treatment plant and, in such case, it shall do so under such terms as may be in effect, from time to time, under the applicable tariff.

7.5    Delivery Points. Company and City shall act diligently and reasonably to agree, no later than one hundred twenty (120) days prior to the commencement of construction of the Facility, on the location for the delivery points for permitted effluent discharge and boiler make-up water. Company shall, at its own expense, be responsible for performing all interconnection work necessary for the delivery of permitted effluent discharge and boiler make-up water.

7.6    Integrating Operations. Company and City shall jointly study the feasibility of integrating the operations of the Facility's wastewater treatment system and City's wastewater treatment plant and, if each in its sole discretion believes such integration is feasible, they will work together to implement it.

8.    Relationship of Parties. The relationship of the parties hereto is exclusively that of lessor/lessee. No provision contained herein shall be construed to constitute an agency, joint venture, partnership or similar relationship.

9.    Compliance with Laws

9.1    Compliance. Company shall materially comply with all material requirements of the constituted public authorities, and with the provisions of any state or federal statute or local ordinance or regulation applicable to its use of the Site. In connection therewith, no later than one hundred twenty (120) days prior to the commencement of construction of the Facility, City shall deliver to Company in writing any requirements City has with respect to off-Site traffic control devices relating to the Facility. Without limiting the generality of the foregoing, the list attached hereto as Attachment C sets forth all requirements of City with respect to approvals and permits to be obtained by Company in connection with its contemplated usage of the Site and construction and operation of the Facility.

9.2    Odor Control. Company shall operate and maintain the Facility in a manner so as not to constitute a nuisance to the surrounding community, and to control the generation and dissemination of noxious odor at the Site. Company and City agree to the following procedures for the management of odor at the Facility:

(a)    Not less than 120 days prior to the Start-Up Date (as defined in the City Waste Agreement), Company shall prepare and submit for the approval of the City Commissioner of the Department of Public Works (the "Commissioner"), such approval not to

be unreasonably withheld, an Odor Control Plan (the "Plan") which shall describe in reasonable detail the potential sources of odor at all waste receiving, storage and processing areas, together with the daily operational and housekeeping standards which Company shall employ to prevent, manage and control such odors. The Plan shall also describe contingency measures, including, but not limited to, procedures for removal or treatment of waste or other substances which may cause the generation of noxious odors, and changes in operating procedures or capital improvements to provide additional controls, which Company shall employ in the event that an "Odor Problem" shall exist. The Plan shall also specify the method and procedure of any objective measure of relative odor intensity, including, but not limited to, methods published by the American Society of Testing and Materials (ASTM), which Company will employ to assist in the implementation of contingency measures.

(b)    The Commissioner, upon the receipt and investigation of one or more public complaints regarding an alleged dissemination of noxious odor from the Facility, shall notify Company in writing of the existence of an Odor Problem.

(c)    Upon such notification, Company shall immediately undertake such remedial action as called for under the Plan. Company may, in connection with such remedial action, undertake to employ methods and procedures to objectively quantify the intensity of the odor as called for in the Plan, and shall afford City the opportunity of observing the implementation of such measures and procedures.

(d)    If, after ten (10) days after such notification, the Odor Problem persists and has not been diminished pursuant to remedial action, Company shall

(1)    upon the request of the Commissioner, implement such additional remedial measures as are called for in the Plan; or

(2)    pursue relief in appropriate judicial forums.

(e)    In the event that, in the reasonable judgment of the Commissioner, the additional remedial measures employed by Company have failed to eliminate the Odor Problem after an additional ten (10) days, City may seek relief in appropriate judicial forums, including, but not limited to, a direction to Company that additional remediation measures, including capital improvements, whether or not specified in the Plan, be undertaken by Company.

(f)    In the event that the Odor Problem is not resolved despite actions undertaken by Company as directed through final, non-appealable judgment of a court with appropriate jurisdiction, an Event of Default by Company shall be deemed to have occurred hereunder.

(g)    Nothing in this provision shall be construed as a qualification or limitation upon the obligations of Company to comply with the conditions of permit issued by the New York State Department of Environmental Conservation, and in case of conflict, the provisions of said permit shall control.

6

10. Permit Matters

10.1    City Cooperation. City agrees to cooperate with Company in obtaining any required licenses, permits and zoning variances or approvals pursuant to this Lease, the Operating Lease and the City Waste Agreement. City agrees that it shall act reasonably, diligently and in good faith in providing all of such approvals, licenses, variances and permits for Company.

10.2    Maintaining Bond. Company (a) understands that, as a condition to the issuance by the New York State Department of Environmental Conservation ("NYSDEC") of Permit No. 3-3309-00101-1, NYSDEC is requiring Company to post a bond in the initial amount of approximately $1.5 million in order to assure cleanup of the Facility at the end of its useful life and (b) agrees that it will keep such bond in effect in accordance with the terms of such permit.

11. Environmental Matters

11.1    Compliance With Law

(a)    Company shall cause all of its activities at the Site and the Facility during the term of this Lease to be conducted in material compliance with all federal, state and local statutes, ordinances, regulations, orders, and requirements of common law concerning: (1) those activities; (2) repairs or construction of any improvements made by Company; and (3) discharges by Company or its operations to the air, soil, surface, or groundwater ("Environmental Laws"). Company shall cause all permits, licenses, or approvals required for Company or its activities or operations to be obtained and shall make all notifications and registrations required by Environmental Laws. Company shall at all times materially comply with the terms and conditions of any such permits, licenses, approvals, notifications or registrations. Nothing herein shall be deemed to prevent Company from contesting or appealing the terms of any agency action or determination.

(b)    During the term of this Lease, Company shall make available to City for inspection: (1) applications or other materials submitted to any governmental agency in compliance with Environmental Laws including all plans for construction work required as a part of an application for a building permit or environmental approval; (2) any notification to any person pursuant to Environmental Laws; (3) any permit, license, approval, or amendment or modification thereto granted pursuant to Environmental Laws; (4) any record or manifest required to be maintained pursuant to Environmental Laws; and (5) any correspondence, notice of violation, summons, order, complaint, or other document received by Company pertaining to compliance with Environmental Laws.

(c)    Company shall promptly comply with any request by City that Company: (1) provide information or access to the Site reasonably necessary to enable City to demonstrate to a third person or governmental agency that no violation of Environmental Laws or Contamination as defined in Section 11.2(b) hereof has existed that has not been corrected or does exist at the Site; or (2) provide signatures, acknowledgments, affidavits, or otherwise cooperate in the manner reasonably required by City to obtain any governmental approvals

necessary to transfer any interest in the Site to Company under Environmental Laws, if such transfer is consistent with the terms hereof.

Case 7:07-cv-06872-CLB     Document 14-4     Filed 09/07/2007     Page 39 of 61

11.2    Site Contamination

(a)      The parties acknowledge that the Site was previously operated by the City as a municipal landfill, and has been classified by NYSDEC a Class 3 hazardous waste site. NYSDEC has required as a condition to further development of the Site that the City enter into a Voluntary Cleanup Agreement which requires, among other things, that the City provide financial assurances or a surety bond (the "Surety Bond") to secure performance by the City of its obligations under the agreement.

(b)      City agrees to obtain the Surety Bond.

(c)      Company shall, at its own expense, execute the "Work Plan for the Investigation of the Middletown Landfill during Construction of Orange Recycling and Ethanol Production Facility" approved by the NYSDEC pursuant to the Voluntary Cleanup Agreement (the "Work Plan").

(d)      City agrees to obtain and maintain environmental liability insurance on terms acceptable to Company with respect to existing Contamination (as defined in Section 9.2(f) below) on or released from the Site as appropriate to the activities being conducted on the Site and will name Company as an additional insured. In addition thereto, City acknowledges that, except to the extent that such Contamination is to be remediated pursuant to Company's execution of the Work Plan, (i) City shall have full responsibility for all of such existing Contamination (regardless of whether such Contamination is known as of the date hereof or discovered subsequent to the date hereof as a result of the execution of such Work Plan or otherwise) and (ii) Company shall not bear any risk or liability with respect to the existing Contamination.

(e)      Company shall not cause, by its actions or activities, Contamination of the Site. Company shall at all times handle Hazardous Substances, as defined below, and cause Hazardous Substances (as defined in Section 11.2(g) below) to be handled, in a manner which will not cause an undue risk of Contamination of the Site. City acknowledges that Company may use one or more of the following materials in its operation of the Facility in a manner which will not cause undue risk of Contamination of the Site and will be in accordance with the Environmental Laws: sulfuric acid, lime, caustic soda, urea, ammonia and other materials required for the Process and associated environmental controls.

(f)      For purposes of this Lease, the term "Contamination" shall mean the uncontained presence of Hazardous Substances at the Site or arising from the Site at a location and in a state which will require remediation under Environmental Laws.

(g)      For purposes of this Lease, "Hazardous Substances" means any material defined as a hazardous substance, pollutant or contaminant under the Comprehensive Environmental Response Action, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.), or any material defined as a regulated substance within the meaning of Solid Waste Disposal Act, 42 U.S.C. §§ 6991-6991i, or any material defined as solid waste or hazardous

waste under the Solid Waste Disposal Act, 15 U.S.C. §§ 6901-6991, or any material regulated under Section 6(e) of the Toxic Substances Control Act, 15 U.S.C. § 2605(e), or any material defined as solid waste, hazardous waste, hazardous substance, regulated waste, acute hazardous waste, pollutant, or substance acutely hazardous to public health, safety or the environment under the New York Environmental Conservation Law, §§ 1-0101 et seq. (McKinney 1997 & Supp. 1998), and the rules, regulations and policies promulgated thereunder, or any other substance determined to be harmful to human health or the environment by the United States Environmental Protection Agency, NYSDEC or any other government agency having appropriate jurisdiction.

## 11.3    City's Indemnification with Respect to Environmental Matters

(a)    City agrees that it shall defend, indemnify and hold harmless Company, its affiliates and their respective officers, directors, employees and agents (collectively, the "Company Indemnified Parties"), from and against any and all claims (including reasonable expenses and attorney's fees) to the extent that any of the foregoing arise out of, or by reason of, the negligence or willful misconduct of City or anyone acting on City's behalf or under its instructions, including City's suppliers, subcontractors and vendors, their subcontractors and subvendors, and the employees and agents of any of the foregoing in connection with, or incident to, City's obligations hereunder. City is not, however, required to reimburse or indemnify any Company Indemnified Party for loss or claim due to the sole negligence or willful misconduct of any Company Indemnified Party.

(b)    City further agrees that it shall defend, indemnify and hold harmless the Company Indemnified Parties from and against:

(i)    Any claims (including reasonable expenses and attorney's fees) relating to violation of, or failure of compliance with, Environmental Laws arising out of (i) the conduct or operations of City, its agents, employees, contractors or predecessors at the Site, or the use of the Site by City, its agents, employees, contractors or predecessors, prior to the Commencement Date; (ii) any activity undertaken by City or its affiliates at the Site after the Commencement Date; or (iii) the conduct of the business or operations of City or its agents, employees, contractors or predecessors at other properties, or the use of other properties by City or its agents, employees, contractors or predecessors.

(ii)    Any claims (including reasonable expenses and attorney's fees) relating to: (i) personal injury to employees or third parties or damage to the property of third parties arising from the actual or threatened spilling, leaking, pumping, pouring, emitting, discharging, injecting, escaping, leaching, dumping, or disposal of any Hazardous Substance (a "Release") or any Contamination at, on, or migrating from the Site prior to the Commencement Date or migrating from the Site after the Commencement Date due to Contamination at or on the Site prior to the Commencement Date; (ii) any Release or Contamination from those facilities at the Site for which City retains control and responsibility after the Commencement Date, or arising from any other activity undertaken by City or its affiliates at the Site after the Commencement

operated by City or its affiliates.

## 11.4 Company's Indemnification with Respect to Environmental Matters

(a) Company agrees that it shall defend, indemnify and hold harmless City, its affiliates and their respective officers, directors, employees and agents (collectively, the "City Indemnified Parties"), from and against any and all claims (including reasonable expenses and attorney's fees) to the extent that any of the foregoing arise out of, or by reason of, the negligence or willful misconduct of Company or anyone acting on Company's behalf or under its instructions, including Company's suppliers, subcontractors and vendors, their subcontractors and subvendors, and the employees and agents of any of the foregoing in connection with, or incident to, Company's obligations hereunder. Company is not, however, required to reimburse or indemnify any City Indemnified Party for loss or claim due to the sole negligence or willful misconduct of any City Indemnified Party.

(b) Company further agrees that it shall defend, indemnify and hold harmless the City Indemnified Parties from and against any and all claims (including reasonable expenses and attorneys' fees) to the extent that any of the foregoing arise out of, or by reason of: (1) any claims relating to violation of, or failure of compliance with, Environmental Laws arising out of the conduct or operation of the business and operations of Company and its affiliates at the Site after the Commencement Date; (2) any claims relating to personal injury to employees or third parties or damage to property of third parties arising from any Contamination or any Response Action (defined below) thereto at, on, or migrating from the Site after the Commencement Date resulting from the operations or use of the Site by Company or its affiliates; and (3) any claims relating to personal injury to employees or third parties or damage to property of third parties arising from the construction, operation or removal of the Facility by Company. Company is not, however, required to reimburse or indemnify any City Indemnified Party for loss or claim due to the sole negligence or willful misconduct of any City Indemnified Party.

## 11.5 Response Actions. The following provisions shall govern any claims for indemnification with respect to Response Actions:

(a) If either Company or City believes there is a need to undertake the investigation, removal, confinement, remediation or clean up (each a "Response Action") for which such party intends to seek indemnification from the other party, the party seeking indemnification shall promptly provide written notice to the other party and to NYSDEC.

(b) City and Company agree to support and advocate to the maximum extent practicable adoption of a regulatory remediation standard that reflects a Site-specific, risk-based cleanup standard based on future industrial use of the subject property (or such other cleanup standards as both parties agree are cost-effective to implement) (the "Regulatory Remediation Standard"). City and Company agree that they shall mutually request NYSDEC to propose an applicable Regulatory Remediation Standard, and in the event that NYSDEC does so prior to the parties agreeing on another standard, then such standard so proposed by NYSDEC shall be the Regulatory Remediation Standard hereunder.

extent practicable the proposal and implementation of Response Actions reflecting that alternative for meeting Regulatory Remediation Standard that (1) has the least costs (considering the present discounted value of both capital cost and operating and maintenance cost); and (2) does not unreasonably interfere with operations at the Site.

### 11.6 Reservation of Appeal Right

(a)     With respect to any matter arising under this Article 9, where the claim giving rise to the obligation of the indemnifying party arises out of an order, directive, or mandate of a federal or state environmental agency or other federal or state governmental body, the parties agree that the indemnifying party shall have the right to appeal or otherwise contest the terms and conditions of such order, directive or mandate, and may postpone compliance with its terms pending final disposition of the appeal (provided that the terms and conditions of such order, directive or mandate are stayed by operation of law or action of the relevant authority during the pendancy of such appeal and that, in any event, the construction or operation of the Facility is not stayed or impaired as a result of noncompliance). The indemnified party agrees to cooperate with the indemnifying party to the extent necessary to effectuate the right of appeal. The indemnifying party that exercises the option to appeal hereby agrees to indemnify, defend, save and hold harmless the indemnified party and its officers, directors, employees, agents, successors and permitted assigns from and against any liabilities or damages (including reasonable expenses and attorney's fees and penalties) arising as a consequence.     The indemnified party shall promptly, but in no event later than thirty (30) days, notify the indemnifying party of such claim in writing, and upon receipt of notice of such claim the indemnifying party shall be obligated to assume the defense thereof, including all appeals. The indemnifying party shall be deemed to have notice of a claim directed to both the indemnifying party and the indemnified party from the date of receipt if the indemnified party thereafter requests indemnification in writing within a reasonable time. If the indemnified party willfully withholds notice of a claim, or if the indemnified party's late notice of a claim materially prejudices the indemnifying party, the indemnifying party is not required to undertake the defense and indemnity obligation with respect to such claim. If the indemnifying party assumes the defense and indemnity obligation despite late notice, the indemnified party shall reimburse the indemnifying party for any additional costs, including but not limited to attorneys fees solely related to defense of the claim, resulting from or attributable to the late notice.

(b)     At its sole discretion the indemnified party may participate in the defense of such claims or in such causes of action with counsel of its own choosing, provided that the costs and attorneys' fees associated with such participation shall be borne by the indemnified party.

### 11.7 Coordination of Response Action

(a)     With respect to any Response Action to any Contamination at, on, or migrating from the Site, the parties agree to coordinate any and all actions and communications regarding such conditions and Response Actions, consistent with the following principles:

Where either or both City or Company is made a party to proceedings under any Environmental Laws under which a Response Action may be required, but one of the parties acknowledges and agrees that it is responsible for at least 75% of the aggregate costs of the Response Action for which either City or Company is responsible, then the party acknowledging such indemnification obligations shall, upon notice to the party to whom such indemnification is owed, have the right to assume control of the defense of the matter and shall be the "**Lead Party**" for the Response Action; provided that the other party (the "**Non-Lead Party**") shall have the right to participate in any such proceedings with separate counsel and consultants retained at the sole cost of the Non-Lead Party.

(ii)     Where only one of City or Company, but not the other, is made a party to proceedings under any applicable Environmental Laws under which a Response Action is claimed to be required, and the other party does not acknowledge and agree that it is responsible for at least 75% of the aggregate costs of the Response Action for which either City or Company is responsible, then the party which is the party to the proceedings shall be the Lead Party.

(iii)     Where a Response Action is required to remediate any Contamination whose origin is uncertain or for which responsibility is disputed, or where neither party acknowledges and agrees it is responsible for at least 75% of the aggregate cost of the Response Action for which either City or Company is responsible, the parties agree to consult and agree upon interim arrangements for allocation of responsibilities between them with respect to such Response Action and for coordination of communications with involved agencies or other persons. Under such circumstances, each party shall have the right to be represented by separate counsel and technical consultants, and each party shall reserve any claims it may have against the other with respect to indemnification obligations. Any claims or disputes between the parties regarding who is responsible for the Response Action shall be resolved in accordance with Section 19.2 of this Agreement.

(b)     Where a party is designated the Lead Party with respect to a Response Action, unless the parties otherwise agree, the Lead Party shall be responsible for:

(i)     the provision of all notices to governmental authorities required by law;

(ii)     engagement of such consultants or other professionals to prepare any required studies, assessments, or plans;

(iii)     consulting with, and obtaining the comments of the Non-Lead Party, with respect to any draft studies, assessments, or plans;

(iv)     submission of any correspondence to, and coordination of communications with, any involved governmental agencies; and

(v)     leading any negotiations with involved governmental agencies.

copies of any correspondence to or from any governmental agency concerning the Response Action or the conditions giving rise to the Response Action. The Non-Lead Party shall be advised of, and have the opportunity to attend, any meetings or other communications with any involved governmental agency.

(d)     Each party agrees to refrain, to the maximum extent practicable, from any communications with any involved governmental agency or other entity or person regarding the Response Action or the conditions giving rise to the Response Action, without notice to and the opportunity by the other party to participate in such communication. Either party may engage in a communication with an involved governmental agency, without notice to the other party, if:

(i)     the party is required by law to make a notification to the governmental agency within a time period that does not practicably allow an opportunity to first notify the other party, provided that the party undertaking the communication notifies the other party of any such notification as soon as practicable following the provision of such a notice; or

(ii)     a governmental agency conducts an inspection or otherwise initiates a communication with the party, provided that the party receiving such contact notifies the other party as soon as practicable following such communication. In making any such notification or engaging in any communication, in no event shall such party advocate or take any action that would significantly hinder, render more difficult or render more expensive the Response Action to be undertaken in accordance with the terms of this Lease.

(e)     Neither party shall engage in any communication nor take any action that would significantly hinder, render more difficult or render more expensive any Response Action undertaken in accordance with the terms of the Agreement. If a party breaches these covenants, such party shall release, indemnify, save and hold harmless the Company Indemnified Parties, if City is in breach, or the City Indemnified Parties, if Company is in breach, for any additional costs incurred as a result of such communication or action.

11.8     Comparative Negligence.  Notwithstanding any other provision of this Article 11, if negligence of any party seeking indemnification for a claim is adjudged (or otherwise finally determined) to have contributed to such claim:  (a) the party from whom indemnification is sought shall only be required to reimburse or indemnify the negligent party for such claim pro rata to the extent that such negligence is not adjudged to have contributed to such claim; and (b) Company (if the negligent party is a Company Indemnified Party) or City (if the negligent party is a City Indemnified Party) shall only be obligated to reimburse the other party for the costs of defending any such suit to the extent such negligence is adjudged (or otherwise finally determined) to have contributed to such claim.

11.9     Inspections.  City may, at reasonable times following reasonable prior written notice, enter the Site to conduct reasonable inspections, tests, samplings, or other investigations to satisfy itself that Company has complied with the provisions of this Article 11.

11.10  Remedi____

(a)    The parties recognize that no adequate remedy at law may exist for a breach of this Article 11. Accordingly, City or Company may obtain specific performance of any provision of this Article 11.

(b)    This Article 11 shall not be construed to limit any remedies which either party may have against the other at law or equity for a breach of this Article 11.

11.11  Survival. The provisions of this Article 11 shall survive the termination of Company's tenancy or of this Lease. No subsequent modification or termination of this Lease by agreement of the parties or otherwise shall be construed to waive or to modify any provisions of this Article 11 unless the termination or modification agreement or other document so states in writing.

12.  Surrender

(a)    Upon the expiration or termination of this Lease, Company shall peaceably leave and surrender the Site to City in the same condition in which the Site was received from City, except that as improved, repaired, rebuilt, restored, altered or added to, as provided in, permitted by or required by any provision of this Lease, the Operating Lease or the City Waste Agreement, and except for ordinary wear and tear. City acknowledges that Company is the lessee of the Facility and any additions or improvements thereto, and that such equipment is the property of the lessor of the Facility and not part of the Site. Within twelve (12) months after the expiration of the Term or sooner termination of this Lease, Company, subject to the Operating Lease, shall, unless Company and City mutually agree otherwise, remove all equipment associated with and constituting the Facility and raze the Facility. Company shall, no later than thirty (30) calendar days prior to the Service Date, post a performance bond (the "Demolition Bond") in the penal sum of $500,000 (subject to the provisions of Section 12(b) below) to assure delivery of the Site in a clean and safe condition and free of Contamination except as may have resulted from Contamination of the Site prior to the Commencement Date. City acknowledges that the Demolition Bond covers the cost of removal of all equipment and razing of the Facility. Accordingly, notwithstanding the foregoing, City agrees that if Company removes the equipment from the Facility, Company shall have the right to draw against such Demolition Bond (or reduce the amount thereof, at Company's option) in the amount so incurred by Company in connection with such removal. In addition, City and Company agree, at the end of the term of this Lease, to execute and deliver such releases or other documents, in recordable form, as the other party may reasonably request for the purpose of further evidencing the expiration and termination, or of clearing record title, or any and all rights, leasehold, easements and other rights hereunder which shall then have expired or been terminated pursuant to the provisions hereof. The provisions of this paragraph shall survive the expiration or termination of this Lease.

(b)    The amount of the Demolition Bond shall be re-determined on each anniversary of that date that is sixty (60) calendar days prior to the Service Date throughout the term by R.W. Beck or any successor engineering firm reasonably acceptable to City and Company (the "Engineering Firm"), in accordance with the following:

the actual cost (assuming that such cost would be the result of a competitive bid process) of the removal of all equipment and razing of the Facility;

(ii)    The Engineering Firm shall deliver to the City and the Company in writing its calculation of such cost. The amount of the Demolition Bond shall be the greater of $500,000 or the cost as determined by the Engineering Firm, until the next calculation thereof;

(iii)    The Company shall pay the reasonable fees and expenses incurred by the Engineering Firm under this Section 12(b); and

(iv)    Notwithstanding the foregoing, if the Company is able, from time to time, to deliver to the City evidence reasonably satisfactory to the City that confirms the likely cost to the City of the removal of all equipment and razing of the Facility, then in such event the City agrees that, in lieu of the provisions set forth immediately hereinabove with respect to the determination by the Engineering Firm of the amount of the Demolition Bond, the Company and the City shall mutually agree upon the amount of the Demolition Bond.

## 13. Taxes

13.1    **Taxes.** During the Term of this Lease, Company shall be responsible to pay to City prior to the assessment of any penalties, increases in taxes, and any interest and penalties thereon, if any, which are levied or assessed as a result of the Facility and any other improvements constructed or modified by Company or the personal property of Company on the Site, but Company shall not be responsible for the payment of any other taxes, including, but not limited to, any state or local real estate or property taxes associated with the Site before the Commencement Date. Company may bring a proceeding to contest the validity or amount of any imposition against the Site as to recover payments therefor. City shall cooperate with Company with respect to such proceedings to the extent reasonably necessary or appropriate.

13.2    **Empire Zone Designation.** Nothing herein contained shall prevent the Company and/or the City from pursuing such benefits as may be available to either of them in the event that the Site is hereafter designated to be situated within an "Empire Zone," or Economic Development Zone as defined in Article 18b of the General Municipal Law of the State of New York; provided however, that such designation of the Site or participation by the Company in any program arising from such designation shall not relieve the Company of its obligations under this Lease, the Host Community Agreement, the City Waste Agreement, or the Comprehensive Waste Agreement.

## 14. Insurance and Indemnification

(a)    Company shall obtain insurance on the Site, including City as a named insured, as required under the provisions of Schedule 4 of the City Waste Agreement.

(b) except as set forth below, City and Company agree that the indemnification provisions in Schedule 4 of the City Waste Agreement shall govern and control. With respect to matters arising only under the Environmental Laws, the indemnification provisions in Section 11 hereof shall govern and control.

15. <u>Liens</u>. Company shall promptly remove and discharge any charge, lien, security interest, or encumbrance filed against the Site by reason of work performed for Company other than by City. Company may mortgage, pledge, or encumber this Lease, the Facility or other improvements constructed on the Site, without the consent of City, in connection with the financing and any refinancing of the Facility. During the Term of this Lease, City shall not cause any charge, lien, security interest, or encumbrance upon the Site that would interfere with the operation or conduct of Company's business.

16. <u>Eminent Domain</u>. If, during the Term, the Site or any portion thereof is taken by eminent domain or destroyed by the action of any public or quasi-public authority or in the event of a conveyance in lieu thereof so as, in each case, to render continued economic operation of the Facility impracticable (collectively referred to as a "Taking"), this Lease shall terminate as of the date possession shall be taken by the authority and all rent shall be adjusted as of that date. All sums received or recovered by either City or Company or any other person as a result of such Taking shall be applied and paid in the following order or precedence:

    (a)    To City, of the award attributable to the Site and the Facility the proportion which (i) the fair market value in the Site at the date of the Taking bears to (ii) the fair market value of the Site plus the Facility determined as though the Taking in question had not occurred and without regard to the Lease;

    (b)    To Company, the balance of all sums so recovered.

17. <u>Termination and Default</u>

    17.1    <u>Remedies</u>. During the term of the City Waste Agreement, including any extension thereof, failure of City or Company to perform any of their respective obligations under this Lease shall not result in or permit the termination of this Lease or exclusion of Company from occupancy of the Site, except in accordance with Section 17.2. This Section, however, shall not preclude the parties from enforcing their respective rights hereunder by means other than termination of this Lease or exclusion of Company from occupancy of the Site.

    17.2    <u>Default</u>

    (a)    City Default. Each of the following shall constitute an event of default on the part of City (each, a "City Event of Default"):

    (i)    The persistent or repeated failure by City to timely perform any material obligation under this Agreement (except obligations to pay money, as to which subsection (ii) below shall apply) unless such failure shall be excused or justified by an act or omission by Company directly related to the performance of such material obligation, provided, however, that no such failure shall constitute a City Event of Default unless and until:

(A)    Company shall have given written notice to City stating that in its opinion a particular default exists (to be described in reasonable detail in such notice) which will, unless cured, constitute a material breach of this Lease on the part of City; and

(B)    City shall not have either remedied such default or commenced and pursued with diligence the cure of such default within a period of ninety (90) days after Company gives notice pursuant to clause (A) of this paragraph, provided that if City shall have commenced to take reasonable steps to cure such default within such ninety (90) day period, the same shall not constitute a City Event of Default for as long as City continues to pursue with diligence the cure of such default.

(ii)    If City fails to pay any sum payable under this Agreement within thirty (30) days after such payment was due, and if such failure is not completely cured within a period of ten (10) days after Company gives written notice to the City of such failure (such written notice is hereinafter referred to as the "First Notice"), Company shall have the right to offset any sum so owing against amounts next owing to City under the Host Agreement. If for any reason the amount of any such available offset does not completely pay Company all sums so owing within ninety (90) days of the date of the First Notice, then Company shall deliver to City an additional written notice (such written notice is hereinafter referred to as the "Second Notice") of such failure of such offset to pay Company in full. If City does not pay to Company all sums then owing within ten (10) days after the Second Notice, this Agreement shall terminate immediately upon written notice thereof by the Company to the City, subject to the provisions of Section 17.3.

(b)    Company Default.    Each of the following shall constitute an event of default on the part of Company (each, a "Company Event of Default"):

(i)    The persistent or repeated failure by Company to timely perform any material obligation under this Agreement (except obligations to pay money, as to which subsection (ii) below shall apply) unless such failure shall be excused or justified by an act or omission by City directly related to the performance of such material obligation, provided, however, that no such failure shall constitute a Company Event of Default unless and until:

(A)    City shall have given written notice to Company, together with written notice to any Leasehold Mortgagee (as defined in Schedule 6?), stating that in its opinion a particular default exists (to be described in reasonable detail in such notice) which will, unless cured, constitute a material breach of this Lease on the part of Company; and

(B)    Company or any Leasehold Mortgagee shall not have either remedied such default or commenced and pursued with diligence the cure of such default within a period of ninety (90) days after City gives notice pursuant to clause (A) of this paragraph, provided that if Company shall have commenced to take reasonable steps to cure such default within such ninety (90) day period, the same shall

not constitute a Company Event of Default for as long as Company continues to pursue with diligence the cure of such default;

(ii)    If Company fails to pay any sum payable under this Agreement within thirty (30) days after such payment was due, and if such failure is not completely cured within a period of ten (10) days after City gives written notice to Company of such failure, City shall have the right to offset the amount so owing from the next payment of Estimated Service Fee (as defined in the City Waste Agreement) due from City.

(c)    The occurrence of an event of default that is not cured within the applicable cure period by either party under the City Waste Agreement, the Host Community Agreement, or the Comprehensive Waste Agreement shall also constitute an event of default under this Agreement, and termination of any of said Agreements shall, at the option of the non-defaulting party, terminate this Agreement, subject to the provisions of Section 17.3. In the event that this Agreement is terminated, neither party shall have any further liability to the other hereunder other than any obligations or liabilities which shall expressly survive or arise out of such termination in accordance with the terms hereof. Notwithstanding the foregoing, Company shall not have the right to terminate the Comprehensive Waste Agreement because of an Event of Default by City or the termination of any of such Agreements if City shall, not later than the 180th calendar day following the termination of the City Waste Agreement, pay to Company the contract termination fee described in Section 13(c) of the City Waste Agreement.

17.3    Leasehold Financing. Company shall have the right and power at any time and from time to time during the term of this Lease to execute and deliver one or more mortgages, deeds of trust, collateral assignments, or similar security instruments (hereinafter a "Leasehold Mortgage") encumbering its leasehold interest in the Premises and/or the Improvements, without obtaining the consent of City. If Company or any Leasehold Mortgagee shall send to City a true copy of any such Leasehold Mortgage, together with written notice specifying the name and address of the Leasehold Mortgagee, City agrees that after receipt of such notice and so long as any such Leasehold Mortgage shall remain unsatisfied of record or until written notice of satisfaction is given by the holder to City, the following provisions shall apply:

(a)    There shall be no cancellation, surrender, amendment, or modification of this Lease by joint action of City and Company without the prior written consent of the Leasehold Mortgagee.

(b)    City shall, upon mailing or giving to Company any notice of default or any other notice hereunder, simultaneously send a copy of such notice to the Leasehold Mortgagee at the address furnished in said written notice or in any subsequent written notice to City changing such address.

(c)    City agrees that City will not terminate this Lease following any default by Company hereunder and the expiration of any grace or notice period granted to Company hereunder for the cure of such event of default provided that:

(i)    If such default can be cured by the payment or expenditure of money or reasonably can be cured within ninety (90) days and without possession of the Premises, the Leasehold Mortgagee cures the default or breach described in such notice within ninety (90) days following receipt of written notice that Company has failed to timely cure such default; or

(ii)    If such default or breach cannot be cured by the payment or expenditure of money or cannot reasonably be cured within ninety (90) days, the Leasehold Mortgagee commences the cure of such default within the ninety (90) day period after receipt of written notice that Company has failed to timely cure such default, and thereafter diligently pursues such cure to completion, even if completion of such cure requires a longer period of time; or

(iii)    If such default or breach cannot be cured without possession of the Premises, the Leasehold Mortgagee commences proceedings for foreclosure and sale under the Leasehold Mortgage within the ninety (90) day period after receipt of written notice that Company has failed to timely cure such default, which period shall be deemed extended by the number of days of delay occasioned by judicial restriction against commencement of foreclosure, including, without limitation, a stay imposed by a bankruptcy petition, or occasioned by other circumstances beyond the Leasehold Mortgagee's control, and thereafter the Leasehold Mortgagee diligently pursues such proceedings to completion and, upon obtaining possession of the Premises, diligently pursues the cure of such default to completion.

(d)    If a Leasehold Mortgagee shall fail to comply with any of the requirements of this Section 17.3, then and thereupon City shall be released from the covenant of forbearance herein contained as to such Leasehold Mortgagee, and City shall be entitled to proceed to terminate this Lease. Nothing herein contained shall preclude City from terminating this Lease following completion of any proceedings for foreclosure or assignment in lieu of foreclosure to any Leasehold Mortgagee if within ninety (90) days thereafter any default hereunder which can be cured is not cured.

(e)    City shall give the Leasehold Mortgagee prompt notice of any intended termination of this Lease no later than ninety (90) days prior to the intended date of such termination and of the amount owing to City as of the date of termination of the Lease.

(f)    In the event a Leasehold Mortgagee succeeds to the rights of Company hereunder by foreclosure or assignment in lieu of foreclosure or otherwise, said Leasehold Mortgagee shall be released from any liability hereunder from and after the date of any assignment of its interest hereunder. City acknowledges and confirms that the Leasehold Mortgagee shall have the full and absolute right to assign the rights and obligations of Company hereunder to any party or entity. No Leasehold Mortgagee shall become liable for the performance or observance of any covenants to be performed by Company hereunder unless and until such Leasehold Mortgagee becomes the owner of Company's interest hereunder. Notwithstanding anything herein contained to the contrary, the Leasehold Mortgagee or any person or entity acquiring such leasehold estate shall be liable to perform the obligations

imposed on Company by this lease only during the period such person was owner of the leasehold estate or possession of the Premises.

(g)    City agrees that in the event of the termination of this Lease by reason of any default by Company, City will enter into a new lease of the Premises with any Leasehold Mortgagee or its nominee for the remainder of the term of this Lease, effective as of the date of such termination, at the rent and upon the terms, options, provisions, covenants and agreements as herein contained, provided that such Leasehold Mortgagee shall make written request upon City for such new lease prior to or within thirty (30) days after the date of such Leasehold Mortgagee's receipt of written notice of such termination, and such written request is accompanied by payment to City of all sums due to City hereunder through the date of such termination, as set forth in City's written notice under subsection (e) immediately hereinabove.

(h)    All of the provisions contained in this Lease with respect to Leasehold Mortgages and the rights of the Leasehold Mortgagees shall survive the termination of this Lease for such period of time as shall be necessary to effectuate the rights granted to all Leasehold Mortgagees by the provisions of this Lease.

(i)    Nothing herein contained shall require any Leasehold Mortgagee to cure any default by Company hereunder; provided, however, that City agrees to accept the performance by any Leasehold Mortgagee of any obligation under this Lease in lieu of performance by Company.

(j)    Notwithstanding anything provided herein, City's right, title and interest in the Premises shall not be subordinated to the lien, priority or security title of any Leasehold Mortgage.

(k)    In the event two or more Leasehold Mortgagees each exercise their rights hereunder and there is a conflict which renders it impossible for City to comply with all such requests, the Leasehold Mortgagee whose Leasehold Mortgage would be senior in priority if there were a foreclosure shall prevail.

(l)    Upon the reasonable request of any Leasehold Mortgagee, City and Company shall cooperate in including in this Lease by suitable amendment from time to time any provisions reasonably requested by any Leasehold Mortgagee for the purpose of implementing the protective provisions contained in this Section 17.3 for the benefit of such Leasehold Mortgagee. City and Company shall execute, deliver and acknowledge any amendment reasonably necessary to effect any such requirement; provided, however, that any such amendment shall not in any way affect the term or rental under this Lease nor otherwise in any material respect adversely affect any rights of City under this Lease.

(m)    Casualty; Condemnation – [This subsection (m) will be completed through negotiations among the City, the Company and the Leasehold Mortgagee, after the Leasehold Mortgagee has been identified]

shall have the right to intervene in and be a party to any arbitration or litigation affecting the Site or any Leasehold Mortgagee.

18. <u>Notices</u>. Any notice given pursuant to this Lease shall be in writing and may be cabled, telecopied, delivered by hand, mailed by first class, registered mail, return receipt requested, postage prepaid, or dispatched by next day delivery service and, in any case, shall be addressed as follows:

<u>If delivered to the Company</u>:

> Pencor-Masada OxyNol, LLC
> 2170 Highland Avenue
> Suite 200
> Birmingham, Alabama 35205
> Attention:   Daryl Harms
> Telephone:  205-558-7900
> Fax:        205-558-7911

<u>With a copy to</u>:

> Pencor-Masada OxyNol, LLC
> 2170 Highland Avenue
> Suite 200
> Birmingham, Alabama 35205
> Attention:   General Counsel
> Telephone:  205-558-7900
> Fax:        205-558-7911

<u>If delivered to the City</u>:

> City of Middletown
> 16 James Street
> Middletown, New York 10940
> Attention:   Joseph DeStefano
>              Mayor
> Telephone:  845-346-4100
> Fax:        845-343-7439

Alex Smith, Esq.
Corporation Counsel
City of Middletown, New York
16 James Street
Middletown, New York 10940
Telephone:    845-346-4139
Fax:          845-346-4146

Either party may change the address to which its communications are delivered by notice to the other parties. Any communication given in accordance with this Section shall be deemed to have been given to a party upon its receipt by such party or upon such party's refusal to accept its delivery.

### 19. Assignment and Subletting

(a)    This Lease may not be assigned by Company and the Site may not be sublet without the prior written consent of City, which consent shall not be unreasonably withheld or delayed; provided that Company may, without such consent, assign this Agreement, sublet the Site or mortgage the leasehold interest under this Lease in connection with the financing and refinancing from time to time of the Facility and/or may assign this Lease to an affiliate of Company. Nothing in this section shall prevent Company from subcontracting or assigning its obligations or rights under this Lease to third parties, provided that Company remains liable for the performance of its obligations hereunder.

(b)    This Lease may not be assigned by City without the prior consent of Company, which consent shall not be unreasonably withheld or delayed.

(c)    This Lease shall be binding upon and inure to the benefit of the permitted successors and assign of the parties hereto pursuant to this Section. Any attempted assignment made contrary to this Section shall be void.

### 20. Subordination and Nondisturbance.

Provided City obtains a nondisturbance agreement from the mortgagee benefiting Company and satisfactory to Company, the Lease shall be subordinate to any mortgage upon the Site.

### 21. Governing Law and Dispute Resolution

21.1    Governing Law.    All claims, disputes, and other matters concerning the interpretation and enforcement of this Lease shall be finally decided pursuant to New York law, without the application of its choice of law rules.

21.2    Dispute Resolution

(a)    Except as otherwise provided herein, any claim, action, dispute or controversy of any kind arising out of or relating to this Lease or concerning any aspect of performance by City or Company (each a "Party") under the terms of this Agreement

("Dispute") shall be resolved by mandatory and binding arbitration, administered by the American Arbitration Association (the "AAA") pursuant to the Federal Arbitration Act (Title 9 of the United States Code) in accordance with this Lease and the then-applicable Commercial Arbitration Rules of the AAA. The Parties acknowledge and agree that the transactions evidenced and contemplated hereby involve "commerce" as contemplated in Section 2 of the Federal Arbitration Act. If Title 9 of the United States Code is inapplicable to any such Dispute for any reason, such arbitration shall be conducted pursuant to this Lease and the then-applicable Commercial Arbitration Rules of the AAA. To the extent that any inconsistency exists between this Lease and the foregoing statutes or rules, this Lease shall control. Judgment upon the award rendered by the arbitrator acting pursuant to this Lease may be entered in, and enforced by, any court having jurisdiction, absent manifest disregard by such arbitrator of applicable law; provided, however, that the arbitrator shall not amend, supplement or reform in any manner any of the rights or obligations of any Party hereunder or the enforceability of any of the terms or provisions of this Lease. Any arbitration proceedings under this Lease shall be conducted in New York, New York before a single arbitrator who has no direct or indirect relationship with any Party or any Party's Affiliate and who has recognized expertise in solid waste management and real estate law practice.

(b)     Any Party may commence an arbitration provided for in Section (a) by serving a written notice of arbitration. Within ten (10) days after a Party's receipt of such notice, the Parties who are parties to the Dispute shall agree upon a qualified arbitrator. If the Parties cannot agree within such 10-day period, an arbitrator shall be appointed by the AAA. If a replacement arbitrator is necessary for any reason, such replacement arbitrator shall be appointed by the AAA.

(c)     Any Party may bring summary proceedings (including, without limitation, a plea in abatement or motion to stay further proceedings) in court to compel arbitration of any Dispute in accordance with this Lease.

(d)     All statutes of limitation that would otherwise be applicable shall apply to any arbitration proceeding. Any attorney-client privilege and other protection against disclosure of privileged or confidential information (including, without limitation, any protection afforded the work-product of any attorney) that could otherwise be claimed by any Party shall be available to, and may be claimed by, any such Party in any arbitration proceeding. No Party waives any attorney-client privilege or any other protection against disclosure of privileged or confidential information by reason of anything contained in, or done pursuant to, the arbitration provisions of this Lease.

(e)     The arbitration shall be conducted and concluded as soon as is reasonably practicable, based on a schedule established by the arbitrator. Any arbitration award shall be based on and accompanied by findings of fact and conclusions of law, shall be conclusive as to the facts so found and shall be confirmable by any court having jurisdiction over the Dispute, provided that such award, findings and conclusions are not in manifest disregard of applicable law.

(f)     Each Party shall bear its own expenses of the arbitration, including, without limitation, fees and expenses of counsel incident to any mediation or arbitration. The

fees and expenses of the arbitrator and document shall be filed by the Parties. The arbitrator shall have the power and authority to award expenses to the prevailing Party if the arbitrator elects to do so.

(g)    In order for an arbitration award to be conclusive, binding and enforceable under this Lease, the arbitration must follow the procedures set forth in the portions of this Lease relating to such arbitration and any award or determination shall not be in manifest disregard of applicable law. The obligation to arbitrate any Dispute shall be binding upon the successors and assigns of each of the Parties.

22. Recording of Lease. This Lease, or a memorandum thereof, may be recorded or filed of record in any public office for recording of deeds.

23. Right of Setoff. Notwithstanding anything herein to the contrary, the Company may set off against amounts payable to the City under this Agreement in accordance with the terms of Section 3(f) of the Host Community Agreement.

24. Miscellaneous

24.1    Exclusivity. No persons other than the parties hereto shall be deemed to have any interest under this Lease.

24.2    Time of the Essence. Time shall be of the essence in the performance of this Lease.

24.3    Entire Agreement. This Lease, together with the City Waste Agreement, the Comprehensive Waste Agreement and the Host Community Agreement, (i) is the entire understanding of the parties with respect to the subject hereof and supersedes all prior agreements, understandings and commitments with respect thereto and (ii) may be modified only by written agreement executed by both parties.

24.4    Severability. If any provision of this Lease is found to be unenforceable, the balance of this Lease shall continue to be in full force and effect.

24.5    Counterparts. This Lease may be executed in two or more counterparts, each of which shall be an original. It shall not be necessary in making proof of the contents of this Lease to produce or account for more than one such counterpart.

24.6    Headings. The section headings of this Lease are for convenience only and shall not be construed as defining or limiting in any way the scope or intent of the provisions hereof.

24.7    Conventions. Unless otherwise specifically provided in this Lease:

(a)    Terms defined in the singular have the corresponding plural meaning when used in the plural, and terms defined in the plural have the corresponding singular meaning when used in the singular;

(b)   Words importing any gender include the other genders;

(c)   References to agreements, certificates and other legal instruments include all subsequent amendments thereto, and changes to, and restatements or replacements of, such agreements, certificates or instruments that are duly entered into and effective against the parties thereto or their permitted successors and assigns;

(d)   References to a party or parties means a party or the parties to this Lease;

(e)   References to Persons include their permitted successors and assigns; where "Person" means a corporation, limited liability company, partnership, business trust, trust, joint venture, company, firm, individual, company, municipality or other governmental entity;

(f)   The term "include", "includes" and "including" means, include, includes and including without limitation (as the case may be);

(g)   References to attachments and sections mean the attachments to, and sections of, this Lease;

(h)   References to this Lease mean this Lease, including all attachments;

(i)   The term "day" means a calendar day and includes Saturdays, Sundays and holidays, except that, if any payment obligation to be performed under this Lease falls due on a Saturday, Sunday or a holiday on which State banks are not open for business, the obligation shall be due on the next business day thereafter;

(j)   A reference to a statute or to a regulation issued by a governmental authority includes the statute or regulation in force as of the date hereof, together with all amendments and supplements thereto and any statute or regulation substituted for such statute or regulations; and

(k)   A reference to a governmental agency, department, board, commission or other public body or to a public officer includes an entity or officer that or who succeeds to substantially the same functions as those performed by such public body or officer as of the date of this Lease.

25. Local Union Building Trade Labor.

The Company hereby acknowledges and confirms to and agrees with the City that, unless prohibited from doing so by applicable law, the Company shall use local union building trade labor in the construction of the Facility.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first above written.

PENCOR-MASADA OXYNOL, LLC

By: _Daryl F. Harms by Terry W. Johnson_

Name: _attorney-in-fact_

Title: _Daryl F. Harms_
_Manager_

CITY OF MIDDLETOWN

By: _____

Name:

Title: _Mayor_

## ATTACHMENT A

[Site Description]

## [TO BE ATTACHED PRIOR TO FINANCIAL CLOSING]

- From the City owned parcel containing the City wastewater treatment plan located on Orange County tax map Section 49, Block 1, Parcel 8 to the City boundary including existing City right-of-ways ("ROWs") now used for wastewater treatment effluent water conveyance inside or outside the City; and

- Any City ROW available, if any, on the parcel shown on Section 49, Block 1, Parcel 7.42, reportedly owned by the Middletown Board of Education, and connection to Abe Issecks Drive; and

- Any City ROWs, if any, on property owned by the Middletown and New Jersey Rail Road Company or its successor; and

- Any City ROWs, if any, on property owned by Orange and Rockland Utilities or its successor; and

- On all lands conveyed to the City from the Consolidated Rail Corporation inside or outside the City; and

- Any existing and future easements, ROWs, or similar rights controlled by the City and extending from inside or outside the City to Dolsontown Road, Town of Wawayanda, Orange County, New York.

[ City Requirements Regarding Approvals and Permits]

1. The City reserves the right to require proof of compliance with the approved site plan, including but not limited to the installation of traffic control devices and/or street improvements, on or before the start of construction.

2. The Company must obtain an extension of special use permit and site plan approval from the Middletown Planning Board.

3. Prior to construction, the Company must obtain necessary permits, including but not limited to building permits, from the Middletown Department of Public Works.

4. The Company agrees to adhere to field construction conditions imposed by the Middletown Department of Public Works.