Exhibit E

# HOST COMMUNITY AGREEMENT

This HOST COMMUNITY AGREEMENT is entered into as of December 9, 2003, by PENCOR-MASADA OXYNOL, LLC, a Delaware limited liability company (the "**Company**"), and the CITY OF MIDDLETOWN, NEW YORK (the "**City**").

## Background

A.     Pursuant to N.Y. Gen. Mun. Law § 120-w, the City issued a Request for Proposals in 1994 to select a firm to provide solid waste disposal services to the City, and in January of 1995, Pencor Orange Corp., which became one of the members of the Company, was selected as the City's choice vendor, and, subsequently with the City's approval, assigned its negotiating rights with the City to the Company.

B.     The City and the Company agreed to expand the capacity of the contemplated integrated solid waste processing facility (the "**Facility**") for the disposal of municipal solid waste and sewage sludge by recycling various components of those waste streams and processing other components to produce ethanol and carbon dioxide beyond that needed for the City's need alone, in order to achieve economies of scale.

C.     The City of Middletown Industrial Development Agency (the "**Agency**") will issue bonds (the "**Bonds**") under an Indenture of Trust (the "**Indenture**") and will make the proceeds of the Bonds available to the Company to finance, in part, the construction of the Facility.

D.     The Facility will be constructed on certain real property in the City (the "**Site**") to be leased by the City to the Company under a Lease Agreement dated as of December 9, 2003 (the "**Ground Lease**").

E.     The Agency will own the Facility and lease it to the Company under an Operating Lease to be entered into hereafter (the "**Operating Lease**").

F.     The City intends to maintain or establish and maintain a solid waste collection system, which may involve other municipalities in Orange County, New York, and desires to deliver, or cause to be delivered, to the Facility, acceptable waste for disposal by the Company.

G.     The City and the Company are entering into a Comprehensive Waste Management Services Agreement dated as of December 9, 2003 (the "**Comprehensive Waste Agreement**") in which the Company agrees to approve and execute new Municipal Waste Agreements (as defined below) that comply with the terms of the Comprehensive Waste Agreement.

H.    The City and the Company are entering into a City Waste Management Services Agreement dated as of Dece. Jer 9, 2003 (the "City Waste Agreement") in which the Company agrees to dispose of solid waste generated within the City.

I.    The City has entered into agreements (the "Municipal Waste Agreements") with certain municipalities (the "Municipalities") under N.Y. Gen. Mun. Law Art. 5G and as listed on Attachment - Background H to the Comprehensive Waste Agreement, pursuant to which the City will provide solid waste disposal services to the Municipalities, thereby using the expanded capacity within the Facility, and with respect to which the Company will be a third-party beneficiary.

J.    To induce the City (i) to enter into the City Waste Agreement, the Comprehensive Waste Agreement, new Municipal Waste Agreements and the Ground Lease, and (ii) to cause the Agency to issue the Bonds and to enter into the Operating Lease, the Company has agreed to enter into this Agreement providing for, among other things, the making by the Company of certain payments to or for the benefit of the City.

## Agreement

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, undertakings and conditions set forth below, the parties, intending to be legally bound, agree as follows:

**Section 1.    Definitions**

Each of the following capitalized terms has the meaning given it below:

**Acceptable Construction Waste** means solid waste arising from the construction or demolition of a structure by or on behalf of a Municipality that (a) comports with the requirements of all permits for the Facility regarding such waste and otherwise meets the requirements of Applicable Law, and (b) is separated from other waste prior to delivery to the Delivery Site and excluding (i) construction or demolition debris that is Hazardous Waste, asbestos or asbestos containing material or otherwise is Unacceptable Waste, (ii) solid waste resulting from construction or demolition of roads, sidewalks and parking areas, and (iii) solid waste resulting from the construction or demolition of equipment or anything else other than a structure or from construction or demolition which is not conducted by or on behalf of a Municipality.

**Acceptable Municipal Waste** means that portion of solid waste which has characteristics such as that collected and disposed of as part of normal municipal collection of solid waste in the Municipalities, including white goods, but excluding (a) sludge, (b) construction and demolition debris, (c) tires delivered as part of a bulk load of tires, and (d) Unacceptable Waste.

**Acceptable Sludge** means sewage sludge generated at a wastewater treatment plant owned or operated by or on behalf of a Municipality that (a) is derived from treatment of sewage consisting predominantly of domestic sewage and otherwise having the characteristics of

wastewater treated at public owned treatment works, (b) meets all requirements related to sewage sludge contained in any applicable permits for the wastewater treatment plant at which it is generated, (c) comports with the requirements of all permits for the Facility regarding sewage sludge, (d) otherwise meets the requirements of Applicable Law, and (e) is less than 30 percent solids, and expressly excluding (i) sewage sludge which is Hazardous Waste, has not been properly characterized by appropriate testing to determine that it is not Hazardous Waste or otherwise is Unacceptable Waste, and (ii) sewage sludge that has a specific gravity of less than one.

Additional Host Fee has the meaning given to it in Section 7(b).

Alternate Disposal Facility means a landfill or other facility, equipment or site other than the Facility or the Disposal Site that (a) the Company designates as an Alternate Disposal Facility, (b) is or can be used by the Company (or by the City and the Municipalities as described in the City Waste Agreement or Municipal Waste Agreements, as the case may be, to accept, transport, store or dispose of Acceptable Waste or Residue and (c) has all permits required by Applicable Law for the acceptance and disposal of the type of solid waste for which it is used by the Company.

Applicable Law means any law, regulation, requirement or order of any federal, State or local government agency, court or other governmental body, or the terms and conditions of any permit, license or governmental approval, applicable from time to time to the construction of the Facility or the performance of any obligation under this Agreement, the City Waste Agreement or Municipal Waste Agreements, as the case may be.

Base Host Fee has the meaning given to it in Section 7(a).

City Waste Agreement has the meaning given to it in Paragraph H of the Background.

Comprehensive Waste Agreement has the meaning given it in Paragraph G of the Background.

DEC (or NYSDEC) means the New York State Department of Environmental Conservation.

Delivery Site means the Facility Site, an Alternate Disposal Facility or any other site agreed to in writing by the parties.

Dispose, Disposed, Disposing means treatment, processing or disposal by the Company in accordance with Applicable Law of (a) Acceptable Waste delivered to the Company in accordance with the City Waste Agreement or Municipal Waste Agreements, as the case may be, by the following means in the order of priority listed: (i) Processing, (ii) transporting Residue to an Alternate Disposal Facility, (iii) transporting Acceptable Waste to an Alternate Disposal Facility, and (iv) directing the City or a Municipality to deliver Acceptable Waste to an Alternate Disposal Facility for disposal if for any reason the Facility is not available.

Facility has the meaning given it in Paragraph B of the Background.

**Governmental Authority** means (a) the federal, state any local government, (b) any agency, authority, special district or political subdivision thereof and (c) any court or other government tribunal.

**Ground Lease** has the meaning given it in Paragraph D of the Background.

**Hazardous Waste** means (a) any material or substance which, by reason of its composition or characteristics, is (i) regulated as a toxic or hazardous waste as defined in (A) either the Solid Waste Disposal Act 42 U.S.C. §§ 6901 et seq., or Section 6(e) of the Toxic Substances Control Act, 15 U.S.C. § 2605(e), as either may be replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (B) in N.Y. Envtl. Conserv. Law § 27-0901 (McKinney 1984), as replaced, amended, expanded or supplemented, or any laws of similar purpose or effect, and any rules, regulations or policies promulgated thereunder, or (ii) special nuclear or by-products materials within the meaning of the Atomic Energy Act of 1954; and (b) any other materials which any Governmental Authority having appropriate jurisdiction shall determine from time to time is ineligible for Disposal whether by reasons of being harmful, toxic or dangerous, or otherwise.

**Indenture** has the meaning given it in Paragraph C of the Background.

**Inflation Adjustor** has the meaning given it in the City Waste Agreement, provided that it means the number multiplied to determine the various amounts as provided in this Agreement.

**Municipal Waste Agreements** has the meaning given it in Paragraph I of the Background.

**Municipalities** has the meaning given it in Paragraph I of the Background.

**Person** means a corporation, limited liability company, partnership, business trust, trust, joint venture, company, firm, individual, company, municipality or other governmental entity.

**Process, Processed or Processing** means the recovery of recyclable materials, the processing of cellulosic waste material to produce ethanol and $CO_2$ using the CES OxyNol™ Process, or the beneficial use of residual materials.

**Residue** means any material derived from Acceptable Waste which remains after the Processing of Acceptable Waste which the Company is unable to sell or give away.

**Service Date** means the date the City shall commence to cause the delivery of all its Acceptable Waste to the Facility, notice of which date shall be provided in writing by the Company.

**Site** means the real property described on Attachment A to the Ground Lease.

**Tons of Acceptable Municipal Waste** means tons of Acceptable Municipal

Waste processed at the Facility.

**Tons of Waste** means tons of Acceptable Sludge (measured on a dry-solids basis) and Tons of Acceptable Municipal Waste processed at the Facility.

**Unacceptable Waste** means Hazardous Waste or any other portion of solid waste if Disposed of at the Facility (or any Alternate Disposal Facility) may harm the Facility or impair its operation and therefore may not be Disposed of at the Delivery Site as it would:

    (a)    present a substantial endangerment to health or safety of the public or Facility employees; or

    (b)    cause a violation of Applicable Law; or

    (c)    adversely affect the equipment at or operation of the Facility.

Unacceptable Waste includes explosives, including hand grenades, blasting caps, shotgun shells, closed containers capable of exploding upon Processing and fireworks, gasoline, kerosene, turpentine, waste oil, ether, acetone, solvents, paints, alcohol, acids, hydraulic oil, petroleum, caustics, burning or smoldering materials, materials that have elevated temperatures or that may self-ignite, flammable or volatile liquids, any other liquids (other than as contained in Acceptable Sludge), pathological, chemotherapeutic and biological waste, radioactive materials, hospital waste, medical waste, red bag waste, ashes, foundry sand, sewage sludge other than Acceptable Sludge, construction and demolition debris that is not Acceptable Construction Waste, septage, cesspool and other untreated human waste, leachate, human and animal remains, kitchen sinks, motor vehicles, including such major motor vehicle parts as automobile transmissions, rear ends, springs and fenders, bulk loads of tires, agricultural and farm machinery and equipment, marine vessels and major parts thereof, any other large types of machinery or equipment, liquid wastes and asbestos or asbestos containing material.

**Section 2.**    **Fees**

    (a)    For each calendar quarter ending after the Service Date, the Company shall pay a fee (the "**Base Host Fee**") to the City in an amount equal to $250,000 times the Inflation Adjustor

    (b)    Beginning on the Service Date and continuing until date on which the City Waste Agreement terminates, the Company shall pay an annual fee (the "**Additional Host Fee**") to the City that, in any calendar year, will be in an amount equal to the excess, if any, of (i) the product of (A) $3.643 times the Inflation Adjustor times (B) the number of Tons of Waste (but based upon sludge being 100% solid) delivered to the Facility in such year over (ii) the amount payable under subsection (a), above, for such year.

    (c)    Beginning on the third anniversary of the Service Date and continuing until the earlier of (i) the date on which the City Waste Agreement terminates and (ii) the date, if any, as of which property taxes are levied on the Site or the Facility, the Company shall make an annual payment in lieu of taxes to the City, and to such other governmental agencies as the City may designate, each year in an aggregate amount of $100,000.

(d)    Beginning on the Start-Up Date and continuing until the date on which the City Waste Agreement terminates, the Company will reimburse the City for the salaries (including payroll burdens) up to a maximum of $100,000 per year (times the Inflation Adjustor) of two City employees who shall, among other duties, monitor the operation of the Facility and serve as liaisons between the City and the Company.

(e)    The Company shall make a one-time payment to the City in the amount of $50,000 either at the closing of the Bonds financing or earlier, in the Company's sole discretion, to cover the site plan approval, the building permit and all other fees payable to the City and in any way related to the construction of the Facility.

(f)    Each of the annual amounts set forth in this Section 2 shall be adjusted *pro rata* if the period as to which it is payable is shorter than a calendar year and each of the quarterly amounts set forth in this Section 2 shall be adjusted *pro rata* if the period as to which it is payable is shorter than a calendar month.

### Section 3.    Payment Terms

(a)    The Company shall pay the Base Host Fee on or before the 90th day following the calendar quarter to which such payment relates.

(b)    The Company shall pay the Additional Host Fee on or before the 90th day after the end of the calendar year to which such payment relates. Notwithstanding the foregoing, payment of the Additional Host Fee will subordinated to:

(i)    payment of Facility operating expenses;

(ii)    payment of debt service on the Bonds;

(iii)    deposits that are made to the debt service reserve fund as required under the Indenture;

(iv)    payment of subordinated Facility operating expenses, including any deposit to an operating reserve account required under the Indenture; and

(v)    payment of debt service on any subordinated debt incurred in the financing of the Facility.

Any amount in respect of the Additional Host Fee not paid because of such subordination when it otherwise would have been payable shall accrue interest at the rate of interest borne by the Bonds.

(c)    The Company shall pay fifty percent (50%) of the amount due under Section 2(c), with respect to any year, no later than December 31 of such year, and the remaining fifty percent (50%) no later than May 31 of the following year.

(d)    The City shall, from time to time but not more frequently than monthly, invoice the Company for amounts due under Section 2(d). The Company shall pay the amount

of the invoice with 30 days of receipt.

(e)    Any amount owed under this Agreement, other than the Additional Host Fee, for more than 30 days beyond the date such amount is due and payable shall accrue interest each day thereafter that such amount is not paid at the prime interest rate as published in The Wall Street Journal on the first day that such sum becomes past due.

(f)    The Company may set off against any amounts due to the City under this Agreement any amounts due to the Company pursuant to the Community Waste Agreement and any amounts due to the Company under the City Waste Agreement.

Section 4.    Termination for Company Event of Default.

Each of the following shall constitute an event of default on the part of the Company (each, a "Company Event of Default"):

(a)    The persistent or repeated failure by the Company to timely perform any material obligation under this Agreement (except obligations to pay money, as to which subsection (b) below shall apply) unless such failure shall be excused or justified by an act or omission by the City directly related to the performance of such material obligation, provided, however, that no such failure shall constitute a Company Event of Default unless and until:

(i)    The City shall have given written notice to the Company, together with written notice to any Leasehold Mortgagee, stating that in its opinion a particular default exists (to be described in reasonable detail in such notice) which will, unless cured, constitute a material breach of this Lease on the part of the Company; and

(ii)    The Company or any Leasehold Mortgagee, shall not have either remedied such default or commenced and pursued with diligence the cure of such default within a period of ninety (90) days after the City gives notice pursuant to clause (i) of this paragraph, provided that if the Company shall have commenced to take reasonable steps to cure such default within such ninety (90) day period, the same shall not constitute a Company Event of Default for as long as the Company continues to pursue with diligence the cure of such default;

(b)    If the Company fails to pay any sum payable under this Agreement within thirty (30) days after such payment was due, and if such failure is not completely cured within a period of ten (10) days after the City gives written notice to the Company of such failure, the City shall have the right to offset the amount so owing from the next payment of Estimated Service Fee due from the City under the City Waste Agreement.

Section 5.    Termination for City Event of Default.

Each of the following shall constitute an event of default on the part of the City (each, a "City Event of Default"):

(a)    The persistent or repeated failure by the City to timely perform any material obligation under this Agreement (except obligations to pay money, as to which

subsection (b) below shall apply) unless such failure shall be excused or justified by an act or omission by the Company directly related to the performance of such material obligation, provided, however, that no such failure shall constitute a Company Event of Default unless and until:

        (i)    The Company shall have given written notice to the City, stating that in its opinion a particular default exists (to be described in reasonable detail in such notice) which will, unless cured, constitute a material breach of this Lease on the part of the City; and

        (ii)    The City shall not have either remedied such default or commenced and pursued with diligence the cure of such default within a period of ninety (90) days after the Company gives notice pursuant to clause (i) of this paragraph, provided that if the City shall have commenced to take reasonable steps to cure such default within such ninety (90) day period, the same shall not constitute a City Event of Default for as long as the City continues to pursue with diligence the cure of such default;

    (b)    If the City fails to pay any sum payable under this Agreement within thirty (30) days after such payment was due, and if such failure is not completely cured within a period of ten (10) days after the Company gives written notice to the City of such failure (such written notice is hereinafter referred to as the "First Notice"), the Company shall have the right to offset any sum so owing against amounts next owing to the City under this Agreement. If for any reason the amount of any such available offset does not completely pay the Company all sums so owing within ninety (90) days of the date of the First Notice, then the Company shall deliver to the City an additional written notice (such written notice is hereinafter referred to as the "Second Notice") of such failure of such offset to pay the Company in full. If the City does not pay to the Company all sums then owing within ten (10) days after the Second Notice, this Agreement shall terminate immediately upon written notice thereof by the Company to the City, subject to the provisions of Section 7 below.

Section 6.    Miscellaneous

    (a)    Any notice given pursuant to this Agreement shall be in writing and may be cabled, telecoped, delivered by hand, mailed by first class, registered mail, return receipt requested, postage prepaid, or dispatched by next day delivery service and, in any case, shall be addressed as follows:

If delivered to the Company:

        Pencor-Masada OxyNol, LLC
        2170 Highland Avenue
        Suite 200
        Birmingham, Alabama  35205
        Attention:    Daryl Harms
        Telephone:    205-558-7900
        Fax:        205-558-7911

<u>With a copy to:</u>

        Pencor-Masada OxyNol, LLC
        2170 Highland Avenue
        Suite 200
        Birmingham, Alabama  35205
        Attention:    General Counsel
        Telephone:   205-558-7900
        Fax:         205-558-7911

<u>If delivered to the City</u>:

        City of Middletown
        16 James Street
        Middletown, New York  10940
        Attention:    Joseph DeStefano
                       Mayor
        Telephone:   845-346-4100
        Fax:         845-343-7439

<u>With a Copy to</u>:

        Alex Smith, Esq.
        Corporation Counsel
        City of Middletown, New York
        16 James Street
        Middletown, New York 10940
        Telephone:   845-346-4139
        Fax:         845-346-4146

Either party may change the address to which its communications are delivered by notice to the other parties.

Any communication given in accordance with this Section shall be deemed to have been given to a party upon its receipt by such party or upon such party's refusal to accept its delivery.

       (b)    This Agreement, together with the City Waste Agreement, the Community Waste Agreement and the Ground Lease, (i) is the entire understanding of the parties with respect to the subject hereof and supersedes all prior agreements, understandings and commitments with respect thereto and (ii) may be modified only by written agreement executed by both parties.

       (c)    The following provisions shall govern an assignment of this Agreement:

           (i)    This Agreement may not be assigned by the Company without the prior written consent of the City, which consent shall not be unreasonably withheld or delayed; provided that the Company may, without such consent, assign this Agreement in connection with the financing and refinancing from time to time of the Facility and/or

may assign this Agreement to an affiliate of the Company. Nothing in this Section shall prevent the Company from subcontracting or assigning its obligations or rights under this Agreement to third parties, provided that the Company remains liable for the performance of its obligations hereunder.

(ii)    This Agreement may not be assigned by the City without the prior consent of the Company, which consent shall not be unreasonably withheld or delayed. The City shall have the right to assign its interest hereunder in connection with the issuance by the City of revenue bonds.

(iii)    This Agreement shall be binding upon and inure to the benefit of the permitted successors and assigns of the parties hereto pursuant to this Section. Any attempted assignment made contrary to this Section shall be void.

(d)    If any provision of this Agreement is, for any reason, determined to be invalid, illegal, or unenforceable in any respect, the parties shall negotiate in good faith and agree to such amendments, modifications, or supplements of or to this Agreement or such other appropriate actions as shall, to the maximum extent practicable in light of such determination, implement and give effect to the intentions of the parties as reflected herein, and the other provisions of this Agreement shall, as so amended, modified, or supplemented, or otherwise affected by such action, remain in full force and effect.

(e)    The laws of the State of New York shall govern the validity, interpretation, construction and performance of this Agreement.

(f)    This Agreement may be executed in counterparts, each of which shall be an original instrument, but all of which together shall constitute but one Agreement.

(g)    This Agreement shall terminate upon the termination of the City Waste Agreement.

(h)    Time shall be of the essence in the performance of this Agreement.

## Section 7.    Leasehold Financing

The Company will be entering into Leasehold Mortgages (as defined in the Ground Lease) with Leasehold Mortgagees in connection with the financing of the Facility. If the Company or any Leasehold Mortgagee shall send to the City a true copy of any such Leasehold Mortgage, together with written notice specifying the name and address of the Leasehold Mortgagee, the City agrees that after receipt of such notice and so long as any such Leasehold Mortgage shall remain unsatisfied of record or until written notice of satisfaction is given by the holder to the City, the following provisions shall apply:

(a)    There shall be no cancellation, surrender, amendment, or modification of this Agreement by joint action of the City and the Company without the prior written consent of the Leasehold Mortgagee.

(b)    The City shall, upon mailing or giving to the Company any notice of

default or any other notice hereunder, simultaneously send a copy of such notice to the Leasehold Mortgagee at the address furnished in said written notice or in any subsequent written notice to the City changing such address.

(c)     The City agrees that the City will not terminate this Agreement following any default by the Company hereunder and the expiration of any grace or notice period granted to the Company hereunder for the cure of such event of default provided that:

(i)     If such default can be cured by the payment or expenditure of money or reasonably can be cured within ninety (90) days and without possession of the Site, the Leasehold Mortgagee cures the default or breach described in such notice within ninety (90) days following receipt of written notice that the Company has failed to timely cure such default; or

(ii)     If such default or breach cannot be cured by the payment or expenditure of money or cannot reasonably be cured within ninety (90) days, the Leasehold Mortgagee commences the cure of such default within the ninety (90) day period after receipt of written notice that the Company has failed to timely cure such default, and thereafter diligently pursues such cure to completion, even if completion of such cure requires a longer period of time; or

(iii)     If such default or breach cannot be cured without possession of the Site, the Leasehold Mortgagee commences proceedings for foreclosure and sale under the Leasehold Mortgage within the ninety (90) day period after receipt of written notice that the Company has failed to timely cure such default, which period shall be deemed extended by the number of days of delay occasioned by judicial restriction against commencement of foreclosure, including, without limitation, a stay imposed by a bankruptcy petition, or occasioned by other circumstances beyond the Leasehold Mortgagee's control, and thereafter the Leasehold Mortgagee diligently pursues such proceedings to completion and, upon obtaining possession of the Site, diligently pursues the cure of such default to completion.

(d)     If a Leasehold Mortgagee shall fail to comply with any of the requirements of this Section 7, then and thereupon the City shall be released from the covenant of forbearance herein contained as to such Leasehold Mortgagee, and the City shall be entitled to proceed to terminate this Agreement. Nothing herein contained shall preclude the City from terminating this Agreement following completion of any proceedings for foreclosure or assignment in lieu of foreclosure to any Leasehold Mortgagee if within ninety (90) days thereafter any default hereunder which can be cured is not cured.

(e)     The City shall give the Leasehold Mortgagee prompt notice of any intended termination of this Lease no later than ninety (90) days prior to the intended date of such termination and of the amount owing to the City as of the date of termination of the Lease.

(f)     In the event a Leasehold Mortgagee succeeds to the rights of Company hereunder by foreclosure or assignment in lieu of foreclosure or otherwise, said Leasehold Mortgagee shall be released from any liability hereunder from and after the date of any

assignment of its interest hereunder. The City acknowledges and confirms that the Leasehold Mortgagee shall have the full and absolute right to assign the rights and obligations of the Company hereunder to any party or entity. No Leasehold Mortgagee shall become liable for the performance or observance of any covenants to be performed by the Company hereunder unless and until such Leasehold Mortgagee becomes the owner of the Company's interest hereunder. Notwithstanding anything herein contained to the contrary, the Leasehold Mortgagee or any person or entity acquiring such leasehold estate shall be liable to perform the obligations imposed on the Company by this Lease only during the period such person has ownership of said leasehold estate or possession of the Premises.

(g)    All of the provisions contained in this Agreement with respect to Leasehold Mortgages and the rights of the Leasehold Mortgagees shall survive the termination of this Agreement for such period of time as shall be necessary to effectuate the rights granted to all Leasehold Mortgagees by the provisions of this Agreement.

(h)    Nothing herein contained shall require any Leasehold Mortgagee to cure any default by the Company hereunder; provided, however, that the City agrees to accept the performance by any Leasehold Mortgagee of any obligation under this Agreement in lieu of performance by the Company.

(i)    In the event two or more Leasehold Mortgagees each exercise their rights hereunder and there is a conflict which renders it impossible for the City to comply with all such requests, the Leasehold Mortgagee whose Leasehold Mortgage would be senior in priority if there were a foreclosure shall prevail.

(j)    Upon the reasonable request of any Leasehold Mortgagee, the City and the Company shall cooperate in including in this Agreement by suitable amendment from time to time any provisions reasonably requested by any Leasehold Mortgagee for the purpose of implementing the protective provisions contained in this Section 7 for the benefit of such Leasehold Mortgagee. The City and the Company shall execute, deliver and acknowledge any amendment reasonably necessary to effect any such requirement; provided, however, that any such amendment shall not in any way affect the term nor otherwise in any material respect adversely affect any rights of the City under this Agreement.

### Section 8.    Dispute Resolution

The parties agree to submit any dispute or claim under this Agreement to dispute resolution in accordance with Schedule 5 of the City Waste Agreement.

### Section 9.    Conventions

Unless otherwise specifically provided in this Agreement:

(a)    Terms defined in the singular have the corresponding plural meaning when used in the plural, and terms defined in the plural have the corresponding singular meaning when used in the singular;

(b)    Words supporting any gender include the other genders;

(c)    References to agreements, certificates and other legal instruments include all subsequent amendments thereto, and changes to, and restatements or replacements of, such agreements, certificates or instruments that are duly entered into and effective against the parties thereto or their permitted successors and assigns;

(d)    References to a party or parties means a party or the parties to this Agreement;

(e)    References to Persons include their permitted successors and assigns;

(f)    The term "include", "includes" and "including" means, include, includes and including without limitation (as the case may be);

(g)    References to attachments and sections mean the Attachments to, and Sections of, this Agreement;

(h)    References to this Agreement mean this Agreement, including all Attachments;

(i)    The term "day" means a calendar day and includes Saturdays, Sundays and holidays, except that, if any payment obligation to be performed under this Agreement falls due on a Saturday, Sunday or a holiday on which State banks are not open for business, the obligation shall be due on the next business day thereafter;

(j)    A reference to a statute or to a regulation issued by a governmental authority includes the statute or regulation in force as of the date hereof, together with all amendments and supplements thereto and any statute or regulation substituted for such statute or regulations; and

(k)    A reference to a governmental agency, department, board, commission or other public body or to a public officer includes an entity or officer that or who succeeds to substantially the same functions as those performed by such public body or officer as of the date of this Agreement.

### Section 10.    Cross-Defaults; Terminations.

The occurrence of an Event of Default by either party that is not cured within the applicable cure period under the Lease, the City Waste Agreement, or the Comprehensive Waste Agreement shall also constitute an Event of Default by the applicable party under this Agreement, and termination of any of said Agreements shall, at the option of the non-defaulting party and subject to the provisions of Section 7 hereof, terminate this Agreement. In the event that this Agreement is terminated, neither party shall have any further liability to the other hereunder other than any obligations or liabilities which shall expressly survive such termination in accordance with the terms hereof. Notwithstanding the foregoing, the Company shall not have the right to terminate the Comprehensive Waste Agreement because of an Event of Default by the City or the termination of any of such Agreements if the City shall, not later than the 180th

calendar day following the termination of the City Waste Agreement, ly to the Company the contract termination fee described in Section 13(c) of the City Waste Agreement.

IN WITNESS WHEREOF, the Company and the City have caused this Host Community Agreement to be executed as of the date set forth above.

PENCOR-MASADA OXYNOL, LLC

By:     Masada OxyNol, LLC
        Manager

By:     Masada Resource Group, LLC
        Manager

By:     _Dwight E. Harris by Terry W. Johnson_
Name:   _Terry W. Johnson_          _attorney in fact_
Title:  _Manager_

CITY OF MIDDLETOWN, NEW YORK

By:     _____
Title:  _Mayor_

Exhibit F



BEVERIDGE
&DIAMOND PC

Michael G. Murphy
15th Floor
477 Madison Avenue
New York, NY 10022-5802
Direct: (212) 702-5436
Fax: (212) 702-5450
mmurphy@bdlaw.com

August 18, 2006

**VIA E-MAIL & FAX**

David N. Minkin, Esq.
Powell Goldstein, LLP
One Atlantic Center, 14th Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488

Re:    PMO Solid Waste Processing Facility: Middletown, New York
       PMO Facility: Notice Contacts and Follow-Up to August 8th Meeting

Dear David:

Thank you for your August 9, 2006 letter. It was also our pleasure to meet you in person at the August 8th public meeting. The City certainly appreciated Mr. Watkins, Mr. Judge, Mr. Stukes and you coming to update the City on Pencor Masada OxyNol, LLC's ("PMO") activities with respect to the proposed waste-to-ethanol facility.

Per your request, please update your records regarding notices to the City under the City/PMO agreements as follows:

Honorable Marlinda Duncanson, Mayor
City of Middletown
16 James Street
Middletown, New York 10940

with a copy to

Thomas Farrell, Esq.
Corporation Counsel
16 James Street
Middletown, New York 10940

with a copy to

Washington, D.C.      Maryland      New York      Massachusetts      New Jersey      Texas      California

David N. Minkin, Esq.
August 18, 2006
Page 2

Michael Murphy, Esq.
Christopher McKenzie, Esq.
Beveridge & Diamond, P.C.
477 Madison Avenue, 15th Floor
New York, New York 10022

With respect to the information PMO provided at the August 8th meeting, the City appreciates that PMO cannot provide design and engineering information it does not have. The City was under the impression that PMO was further along in the process. In light of the current status of the project, it seems there are now several new concerns with respect to PMO's ability to meet the Service Date deadline and implement certain provisions of the City/PMO agreements. They are addressed below.

### Service Date

We understand that you believe that resolution of the parties' divergent views over Service Date deadline should wait until a later date. The City contends that the Service Date deadline is December 9, 2008. As you know, several rights afforded under the agreements are tied to the Service Date. The City therefore believes the issue of the Service Date deadline should be resolved as soon as possible.

### Change to Evaporator/Condenser

On another issue, if you recall, the primary reason we sought clarification from PMO regarding its use of an evaporative/condensation system instead of a pretreatment/discharge system for the facility's process wastewater was because the City was attempting to finalize its engineering plans with respect to potential upgrades to the City's wastewater treatment facility ("WWTF"). The Department of Environmental Conservation ("DEC") has been pressuring the City to finalize its plans for some time now, and a meeting with the agency is expected as soon as this week. Specific information concerning the anticipated quantity and quality of the PMO facility's discharges to the system was, and is, critical to enable the City and DEC to agree on an appropriate course of action.

Timothy Judge's June 28, 2006 letter to the DEC was informative.[1] The letter indicates that PMO does not feel it will be able to meet the City's biological oxygen demand and total

---

[1] As we noted during the August 8th meeting, we request that the City be copied on future submissions to and communications with DEC concerning the PMO facility. This will ensure that the City, as lead agency under the State Environmental Quality Review Act and a party to the agreements, is kept informed.

BEVERIDGE & DIAMOND PC

David N. Minkin, Esq.
August 18, 2006
Page 3

suspended solids WWTF influent limits[2] or the quantity limits in the City/PMO agreements. Thus, unless the City's influent limits are changed (which, as you might imagine, is not likely to occur given DEC's oversight role) and the agreements are amended, it seems PMO must switch to an evaporation/condensation system at its facility. Even assuming the switch to the new system eliminates the facility's process wastewater discharge, the City still needs information regarding the quantity and content of other wastewater discharges from the facility as soon as possible so the City can complete its negotiations with DEC regarding the WWTF.

The change to the evaporation/condensation system seems to have some benefits in terms of environmental impacts, although, as you can appreciate, the City, like DEC, will need to wait until more detailed information is available before completing its evaluation. As we have acknowledged before, not every change to a project after a final EIS is issued requires the preparation of a supplemental EIS. Whether the change in design results in significantly different or larger structures, for instance, or a new emissions source or a change in existing source parameters such that updated air dispersion modeling and downwash/cavity analysis are required by DEC, will be relevant to the City's SEQRA determination.[3]

Regardless, it appears the change to an evaporator will require an amended site plan approval because the layout of at least a portion of the facility and equipment will be altered. Moreover, processing of a building permit application must be based on construction plans consistent with an approved site plan. Attachment C to the City/PMO Lease Agreement specifies that necessary permits, including a building permit, must be obtained before construction may commence. It does not appear that the project schedule recently provided to the City by PMO factors in these sequential approvals, even if a supplemental EIS is not required.

### Change in Financing

Perhaps a more difficult issue to square with the terms of the City/PMO agreements is PMO's announcement for the first time at the August 8th meeting that it no longer intends to obtain financing through the City of Middletown Industrial Development Agency ("IDA"). PMO indicated that it was pursuing an alternative to IDA financing due to the time the IDA process takes. PMO's concern about the IDA process may be justified in light of the looming Service Date deadline. However, as you know, the City Waste Management Services

---

[2] Mr. Judge's letter to DEC was the first time the City learned that process wastewater to be discharged from the pretreatment system could not meet the influent limits. Certainly, there is no indication that this could be the case in the project's environmental impact statement ("EIS").

[3] The decision whether the change will require DEC's permits to be modified will be made by DEC after it obtains the necessary information from PMO. Any increase in nitrogen oxide or sulfur dioxide emissions also could trigger the need to obtain a prevention of significant deterioration permit from the United States Environmental Protection Agency.

BEVERIDGE & DIAMOND PC

David N. Minkin, Esq.
August 18, 2006
Page 4

Agreement, the Comprehensive Waste Management Services Agreement, the Lease Agreement, the Host Community Agreement, and the Municipal Waste Management Services Agreements all clearly contemplate the issuance of IDA bonds to finance the project. Indeed, the term "Financing" itself is defined to mean that the IDA will finance the facility through the issuance of tax-exempt bonds.

A number of provisions in the agreements hinge on IDA financing. For example, the Term of the Lease Agreement and the Comprehensive Waste Management Services Agreement, as well as other obligations under the agreements, are based on the date of closing of IDA bond financing or the date of termination of the Operating Lease between the IDA and PMO as a result of anticipated IDA ownership. Similarly, the existence of a PILOT agreement addressed in the Host Community Agreement is based on the assumption that the facility would not be subject to taxation due to ownership by the IDA. In the absence of IDA ownership, PMO would be required to pay taxes on all improvements based on the full assessed value. While this arrangement could make the project more attractive, it was not contemplated in the agreements. Another example is the remedy for a default by the City, which is based on the City's "Proportionate Share" of the outstanding principal amount of the IDA Bonds. Absent IDA Bonds, this remedy obviously would no longer be available.

PMO's change in financing affects fundamental assumptions in the City/PMO agreements and would render several provisions meaningless. Accordingly, a number of amendments to the agreements will be required if IDA financing is to be avoided. It is certainly not too early to begin to discuss those amendments for due consideration by the Common Council.

### Power of Attorney

We also sent a copy of Darryl Harms's personal Power of Attorney for Terry Anderson to the City Corporation Counsel, Tom Farrell. Mr. Farrell continues to have questions about the legality and enforceability of the Agreements signed by Terry Anderson.

Mr. Farrell assumes Pencor/Masada Oxynol, LLC, as a limited liability corporation, has rules of governance concerning official acts such as entering into contracts by corporate officers like Mr. Harms. Despite the apparent breadth of the Power of Attorney, Mr. Farrell questions whether the LLC's own rules would nevertheless limit the authority of someone acting on behalf of a duly elected officer of the corporation. Please address this issue, from the standpoint of Pencor/Masada Oxynol, LLC's own rules of governance (including documentation of the LLC's authorization for Terry Anderson to bind the LLC), as well as the applicable state law governing this transaction.

BEVERIDGE & DIAMOND PC

David N. Minkin, Esq.
August 18, 2006
Page 5

Please note that I will be out of the office from August 23d through September 4th.
Correspondence should be directed to the attention of Christopher McKenzie during that time.
We look forward to hearing from you in the near future.

Very truly yours,

Michael Murphy

cc:  Honorable Marlinda Duncanson, Mayor        (via fax & U.S. mail)
     Thomas Farrell, Esq., Corporation Counsel   (via fax & U.S. mail)
     Donald Watkins, PMO                          (via fax & E-mail)
     Christopher J. McKenzie, Esq.

49151v1 New York 012753

Exhibit G

POWELL
GOLDSTEIN LLP

Atlanta  ▪  Washington  ▪  Dallas

RESIDENT IN ATLANTA OFFICE
DIRECT DIAL: (404) 572-6771
CELL: (404) 307-3611
DMINKIN@POGOLAW.COM

December 6, 2006

**VIA FACSIMILE AND EMAIL**

Michael G. Murphy, Esq.
Beveridge & Diamond PC
477 Madison Avenue, 15th Floor
New York, New York 10022-5802

Re:    2006 Year-End Report
       PMO Solid Waste Processing Facility
       Middletown, New York

Dear Mike:

Hope that all has been going well for you.

We have received your letter dated December 5, 2006. We are still on a schedule that we believe will meet the Service Date requirement under the City Agreements. We have set forth below several aspects of actions that PMO has been taking since we last communicated:

1. The U.S. Department of Energy (DOE) issued its initial solicitation (No. DE-PS01-06LG00001) on August 8, 2006 for federal loan guarantees for projects like PMO that employ innovative technologies in support of the President's advanced energy initiative. The deadline for submitting pre-application forms and required information was originally set for November 6, 2006, but was extended by DOE until December 31, 2006. PMO has prepared its pre-application submission package for DOE construction loan guarantees for the PMO project and will submit it by the specified deadline.

2. Also, in August, Congress appropriated $2 billion to fund DOE Solicitation No. DE-PS01-06LG000001. As we have previously reported to the City, the Energy Policy Act of 2005 expressly authorized appropriations for construction loan guarantees for up to four projects to commercially demonstrate the feasibility and viability of producing cellulosic biomass ethanol, including at least one project that uses municipal solid waste as a feed stock. The Act also requires that these projects, like PMO, are fully permitted.

3. For the City's information, we are attaching a copy of the Title VII loan guarantee guidelines that are applicable to the PMO project.

Michael G. Murphy, Esq.
December 6, 2006
Page 2

4. The funding letters PMO obtained from the three private equity firms in May remain in place. PMO anticipates a simultaneous closing of equity and debt financing upon receipt of the DOE construction loan guarantee.

5. In September, Masada hired a London-based investment banker to go forward with its equity raise-up for the European waste-to-ethanol target markets. It is expected, however, that a portion of these equity funds will also be used to fund certain aspects of the PMO project. The confidential informational memorandum for this funding initiative was issued earlier this month.

6. As part of Masada's continuing time and cost savings initiatives, the Company has begun the process of acquiring key equipment and plant components needed for its process in a cost-efficient way. For example, on October 20, 2006, Masada, in a joint venture with Auburn University, submitted a proposal to the Tennessee Valley Authority ("TVA") in response to TVA RFP No. 052206 to acquire TVA's biomass pilot plant facilities and equipment. Masada will: (a) dismantle the TVA pilot plant; (b) transport the plant facilities and necessary CES OxyNol process equipment to the PMO facility in Middletown; (c) retrofit the plant facilities and equipment; and (d) integrate them with other major facilities and components of the process needed to completely build out its PMO waste-to-ethanol commercial plant operation. As you know, Masada had used the TVA facilities to test its technology, and to test vendor equipment and systems in actual operating conditions. Masada expects its TVA proposal to be accepted and the transaction to be completed by early next year. We presently anticipate that this acquisition, coupled with other prudent time and cost-saving measures and business strategies, will enable PMO to begin accepting waste from Middletown and surrounding municipalities on or before the Service Date.

Please treat this letter as PMO's 2006 year-end update to the Common Council.

With kindest regards,

David N. Minkin

DNM/wp

Attachment

cc:    Mr. Donald V. Watkins
       Christopher McKenzie, Esq.
       Mr. Tim Judge

1077818

APPENDIX B – LOAN GUARANTEES FOR PROJECTS THAT EMPLOY

INNOVATIVE TECHNOLOGIES; GUIDELINES FOR PROPOSALS SUBMITTED IN

RESPONSE TO THE FIRST SOLICITATION UNDER TITLE XVII OF THE

ENERGY POLICY ACT OF 20056450-01-P

**DEPARTMENT OF ENERGY**

**Loan Guarantees for Projects that Employ Innovative Technologies; Guidelines for**

**Proposals Submitted in Response to the First Solicitation**

**AGENCY:** Department of Energy (DOE).

**ACTION:** Notice.

**SUMMARY:** DOE publishes policy guidelines that DOE intends to use in connection

with the first solicitation of proposals for a loan guarantee for Eligible Projects under

Title XVII of the Energy Policy Act of 2005 that are expected to contribute to the goals

of the President's Advanced Energy Initiative.

**EFFECTIVE DATE:** The guidelines in this Notice are effective August 8, 2006.

**FOR FURTHER INFORMATION CONTACT:**

Director
DOE Loan Guarantee Program Office
1000 Independence Avenue, S.W.
Washington, D.C. 20585-0121
Phone: 202-586-8336
Email: lgprogram@hq.doe.gov

With a copy to:
Warren Belmar
Deputy General Counsel for Energy Policy
Office of the General Counsel
1000 Independence Avenue, S.W.
Washington, D.C. 20585-0121

**SUPPLEMENTARY INFORMATION:**

**Introduction**

Title XVII of the Energy Policy Act of 2005 (42 U.S.C. 16511-16514) authorizes the Secretary of Energy, after consultation with the Secretary of the Treasury, to make loan guarantees for projects that "avoid, reduce, or sequester air pollutants or anthropogenic emissions of greenhouse gases; and employ new or significantly improved technologies as compared to commercial technologies in service in the United States at the time the guarantee is issued." Commercial technology is defined as a technology in general use in the marketplace. More specifically, Title XVII identifies ten discrete categories of projects that are eligible for a loan guarantee, including those that employ:

1. Renewable energy systems;

2. Advanced fossil energy technology (including coal gasification meeting the criteria in subsection 1703(d));

3. Hydrogen fuel cell technology for residential, industrial, or transportation applications;

4. Advanced nuclear energy facilities;

5. Carbon capture and sequestration practices and technologies, including agricultural and forestry practices that store and sequester carbon;

6. Efficient electrical generation, transmission, and distribution technologies;

7. Efficient end-use energy technologies;

8. Production facilities for fuel efficient vehicles, including hybrid and advanced diesel vehicles;

9. Pollution control equipment; and

10. Refineries, meaning facilities at which crude oil is refined into gasoline.

A principal purpose of the Title XVII loan guarantee program is to encourage early commercial use in the United States of new or significantly improved technologies in energy projects. DOE's loan guarantee program is not intended for technologies in research and development. Indeed as section 1702(d) requires a "reasonable prospect of payment" of any loan or debt obligation issued to a project, technologies for project proposals should be mature enough to assure dependable commercial operations and generate sufficient revenues, and not solely a demonstration project (i.e., a project designated to demonstrate feasibility of a technology on any scale). DOE believes that accelerated commercial use of these new or improved technologies will help to sustain economic growth, yield environmental benefits, and produce a more stable and secure energy supply.

Today, DOE begins implementation of Title XVII with two actions. First, DOE publishes guidelines in the nature of a general statement of policy that DOE intends to apply only to the first solicitation of projects. Second, DOE makes available the first solicitation for Pre-Applications for Federal Loan Guarantees for Projects that Employ Innovative Energy Technologies by posting it on the internet at: http://www.LGProgram.energy.gov/. Neither a procurement action (under Title 48 of the Code of Federal Regulations) nor a financial assistance award (under 10 CFR Part 600) is contemplated by these guidelines and the solicitation. As further described in the solicitation, interested parties are being asked to file an initial Pre-Application for review by DOE. If the Pre-Application meets the suggested requirements of these guidelines, DOE may invite the interested party to submit a comprehensive Application.

DOE anticipates receiving a significant volume of interest in the loan guarantee program, and therefore plans to issue multiple solicitations, following adoption of final regulations within the next year, that will cover the broad array of eligible projects under Title XVII. Applicants who respond to the solicitation but are not approved for a loan guarantee may submit a new or revised proposal in response to future solicitations under the final regulations DOE plans to adopt. DOE does not intend to review Pre-Applications or approve loan guarantees for any proposal that is outside the scope and does not conform with the specific requirements of the initial solicitation. Likewise, only comprehensive applications submitted by interested parties that were invited by DOE to submit a comprehensive application for a Title XVII loan guarantee as a result of the initial solicitation will be considered for a loan guarantee.

While most provisions of today's guidelines are not legally binding, please note that some provisions of these guidelines are based on non-discretionary provisions of law in Title XVII and under the Federal Credit Reform Act of 1990, 2 U.S.C. 661 et seq. ("FCRA"). For example, section 1702(f) of Title XVII specifically limits the term of the loan guarantee by stating that "the term of an obligation shall require full repayment over a period not to exceed the lesser of (i) 30 years or (ii) 90 percent of the projected useful life of the physical asset to be financed by the obligation (as determined by the Secretary)." Hence, Applicants should provide a detailed analysis of the expected and generally accepted life cycle of the primary technology and project facility that is the focus of the financing as DOE cannot issue a guarantee that will extend beyond 90 percent of such life cycle or a 30-year term, whichever is shorter.

Moreover, FCRA requires that Congress must authorize Federal loan guarantees in an appropriations act in advance of the execution of a final binding loan guarantee agreement. See 2 U.S.C. 661c(b). This requirement applies even though Title XVII allows for the cost of a loan guarantee, as defined in 2 U.S.C. 661a(5)(C), to be paid by the recipient, see 42 U.S.C. 16512(b)(2), and even though today's guidelines provide for a Conditional Commitment that will precede the execution of a final binding Loan Guarantee Agreement. As a result, DOE is currently restricted only to reviewing Pre-Applications and Applications and entering into Conditional Commitments until it obtains the requisite authorization in an appropriations act. DOE may not enter into a binding Loan Guarantee Agreement or issue any loan guarantees until this appropriations authority has been granted.

**Discussion of the Guidelines**

In this portion of the **SUPPLEMENTARY INFORMATION**, DOE highlights key provisions and, as appropriate, explains the basis for them.

For the first solicitation, these guidelines set forth the type of information that interested parties are expected to include in a Pre-Application and, if invited by DOE, the type of information that Applicants should additionally include in an Application. Information is also provided in these guidelines as to the determining factors that DOE expects to apply in its review of project proposals. DOE intends to evaluate each Pre-Application and Application taking into consideration, among other things, the requirements and conditions contained in the solicitation, the criteria specified under Title XVII to identify Eligible Projects, the project's ability to optimize the probability of repayment of Guaranteed Obligations, and how the project furthers the goals of the

President's Advanced Energy Initiative.[1] Please note that even if a Pre-Application or Application contains all of the information specified in these guidelines, DOE retains the right, in its sole discretion, to inform any Applicant that their project proposal has been denied further review.

The guidelines, in accordance with Section 1702(c), provide that any loan guarantee issued by DOE may not exceed 80 percent of total Project Costs. Section VII of the guidelines generally defines Project Costs as those that are necessary, reasonable, and directly related to the design, construction, and startup of a project. Conversely, excluded costs which are also described with greater specificity in Section VII of the guidelines include initial research and development costs and operating costs after the facility has been constructed.

In addition, DOE notes that the Subsidy Cost of the loan guarantee, as well as fees paid for by the Borrower for the Administrative Cost of Issuing a Loan Guarantee, are excluded from Project Costs. As defined in 2 U.S.C. 661a(5)(C), the Subsidy Cost is not a tangible cost associated with the financing or construction of the project facility. Rather, it constitutes the expected long-term liability to the Federal government in issuing the loan guarantee. In addition, DOE believes that it would be undesirable to allow Borrowers to count the Subsidy Cost (including the financing cost of a Borrower paid Subsidy Cost) as a Project Cost, whether funded by an appropriation or by payment made by the Borrower. To do so could have the effect of including the Subsidy Cost as an

---

[1] One factor that warrants mentioning here is that a proposed project should be constructed and operated in the United States. DOE believes that the environmental benefits and deployment of new and/or enhanced technologies associated with projects should reside within the United States. In such circumstances it will be easier for DOE to monitor the project, ensure repayment of guaranteed debt in accordance with section 1702(d), and enforce its rights in the event of default.

allowable cost under the loan guarantee, and thus put the Federal government at risk for up to 80 percent of its Subsidy Cost requirement. Additionally, the Borrower paid Subsidy Cost can not be paid from the proceeds of federally guaranteed or funded debt. For similar reasons, fees required under Section 1702(h) of the Act to cover DOE's administrative expenses are also disallowed from Project Costs, thereby ensuring that the loan guarantee does not place the Federal government at risk for up to 80% of these statutorily required fees.

Consistent with section 1702(b), the guidelines specify that DOE must receive either an appropriation for the Subsidy Cost or payment of that cost by the Borrower. No funds have been appropriated for the Subsidy Cost of loan guarantees; therefore DOE anticipates that the project(s) approved pursuant to the first solicitation will require the Borrower to pay this cost. The guidelines specify that a Project Sponsor should include an estimate of the Subsidy Cost in an Application. In accordance with 2 U.S.C. 661b(a), DOE will then perform its own independent calculation of the Subsidy Cost and will consult and obtain the approval of the Office of Management and Budget for this computation prior to entering into any Loan Guarantee Agreement. DOE will also consult with the Secretary of Treasury prior to entering into any Loan Guarantee Agreement. The Applicant will be required to provide updated information at the time of the Loan Guarantee Agreement, should any of the terms of the project financing or project terms change between Conditional Commitment and the Loan Guarantee Agreement.

In addition to the Subsidy Cost, section 1702(h) also requires DOE to collect fees to cover the administrative expenses of issuing loan guarantees. The guidelines specify

that DOE will collect fees for administrative expenses as provided for in the Conditional Commitment, as well as additional fees during the term of a loan guarantee. These fees will consist of the administrative expenses that DOE incurs during:

    (i)    The evaluation of the Pre-Application and Application;

    (ii)    The offering, negotiation, and closing of a loan guarantee; and

    (iii)    The servicing of the loan guarantee and monitoring the progress of a project.

Title XVII, and section 1702(h) in particular, afford DOE discretion with respect to how it imposes fees to cover applicable administrative costs. For this first solicitation, DOE has elected not to impose such fees in connection with the Pre-Application stage. In effect, this means that Project Sponsors who submit Pre-Applications and are denied further consideration will not be charged any fees for expenses incurred by DOE in reviewing their Pre-Application materials. For project proposals that progress to the Application stage, the invitation to submit an Application that DOE will send to Project Sponsors will specify whether DOE is charging an Application fee, and the amount of any such fee. In addition to the Application fee that DOE may assess, the other administrative fees that DOE will collect in connection with the first solicitation will be from Borrowers who enter into a Conditional Commitment, in an amount sufficient to cover DOE's administrative expenses applicable to that Borrower's Pre-Application, Application, Term Sheet, Conditional Commitment, the Loan Guarantee Agreement, and subsequent monitoring and servicing expenses. With respect to future solicitations, DOE may decide to assess a Pre-Application and/or an Application fee. DOE will revisit this issue in the forthcoming regulations that DOE will propose for public

comment later this year.

As for the financing structure of proposed projects, Title XVII does not impose any specific limitations, other than the guarantee "shall not exceed an amount equal to 80 percent of the project cost of the facility that is the subject of the guarantee as estimated at the time at which the guarantee is issued." 42 U.S.C. 16512(c). However, section 1702(d)(1) provides: "No guarantee shall be made unless the Secretary determines that there is reasonable prospect of repayment of the principal and interest on the obligation by the borrower." 42 U.S.C. 16512(d)(1). DOE believes this statutory provision requires DOE to make repayment of debt a very high priority of the loan guarantee program and authorizes DOE to adopt policies that ensure that Borrowers and Lenders have a similar motivation and use their best efforts to ensure repayment. Thus, DOE would prefer to limit the financial risk to the Federal government from the first loan guarantees issued under Title XVII as DOE gains valuable experience and expertise with these financial and commercial arrangements. This intention is bolstered by the mandate of Section 1702(g)(2)(B), which requires that "with respect to any property acquired pursuant to a guarantee or related agreements, [the Secretary] shall be superior to the rights of any other person with respect to the property." This statutory provision requires DOE to possess a first lien priority in the assets of the project and other collateral security pledged. Because DOE is not permitted by Title XVII to adopt a pari passu financing structure, any holders of non-guaranteed debt have a subordinate claim to DOE in the event of default, and will not be able to recover on their debt until DOE's claim is paid in full.

To harmonize and balance the twin goals of issuing loan guarantees to encourage early commercial use of new or significantly improved technologies in Eligible Projects while limiting the financial exposure of the Federal government, DOE's first solicitation expresses a preference that DOE not guarantee more than 80 percent of the total face value of any single debt instrument.  Under no circumstance does DOE intend to guarantee 100 percent of the loan.  Accordingly, if a Borrower seeks a loan guarantee for more than 80 percent of the face value of the underlying debt obligation, DOE's review of the project proposal to determine whether to approve a loan guarantee for such amount will be predicated on the sufficiency of evidence presented by the Borrower in support of a higher guarantee percentage.[2]  DOE notes however, that higher guarantee percentages will lead to higher Subsidy Costs.

For similar reasons of increasing the probability of repayment, in reviewing project proposals, DOE intends to consider whether Project Sponsors will make a significant financial commitment to the project.  In addition, DOE intends to consider whether a Project Sponsor will rely upon other government assistance (e.g., financial assistance, tax credits, other loan guarantees) to support financing, construction, or operation of the project.  DOE does not intend to disqualify project proposals that employ other forms of Federal and non-Federal government assistance, but in reviewing proposals, DOE will take into account how much equity will be invested and the extent of the financial risk borne by the Project Sponsor.[3]

---

[2] DOE does not have a preference as to whether non-Projects Costs, as defined in Section VII of these guidelines, are financed with debt or equity, as long as DOE maintains a first lien priority in the assets of the project and other collateral pledged as security.

[3] Since the guidelines are not substantive regulations, DOE will not reject project proposals solely on the

In connection with any loan guaranteed by DOE that may be syndicated, traded, or otherwise sold on the secondary market, DOE will require that the guaranteed portion and non-guaranteed portion of the debt instrument are resold on a pro-rata basis. The guaranteed portion of the debt may not be "stripped" from the non-guaranteed portion, i.e. sold separately as an instrument fully guaranteed by the Federal government.

In further support of DOE's objective to ensure full repayment of debt, DOE expects that participating Lenders will have to meet certain eligibility requirements, as described in greater detail in Section VI of these guidelines. These criteria are intended to ensure that the Lender has the financial wherewithal and appropriate experience and expertise to meet its fiduciary obligations in connection with the debt guaranteed by DOE. DOE expects that the Lender and other appropriate parties will exercise a high level of care and diligence in the establishment and enforcement of the conditions precedent to all loan disbursements and Borrower covenants, as provided for in the loan agreement or related documents, throughout the term of the loan. Moreover, DOE also expects each Lender to diligently perform its duties in the servicing and collection of the loan as well as in ensuring that the collateral package securing the loan remains uncompromised. The Lender will also be expected to provide regular, periodic financial reports on the status and condition of the loan, consistent with the terms of the Loan Guarantee Agreement. The Lender is required to promptly notify DOE if it becomes aware of any problems or irregularities concerning the project or the ability of the Borrower to make payment on the loan or other debt obligations.

---

basis of the guidelines. However, Applicants are advised of their heavy burden of justification if they seek to persuade DOE to accept risk in excess of the outer boundaries of what the guidelines indicate to be preferable.

In addition to the other measures described above limiting the Federal government's risk exposure, commitments to guarantee loans will not exceed a face value of $2 billion, in the aggregate, under the first solicitation. Commencing with a loan guarantee program of this size will allow DOE to achieve considerable progress in assisting new or significantly improved energy technologies to market while also enabling DOE to gain valuable experience and expertise that it will incorporate in program regulations and apply to future solicitations. DOE recognizes that some project proposals that would otherwise merit full consideration for a loan guarantee under these guidelines will, because of DOE's self-imposed ceiling on loan guarantee commitments, have to await full consideration under future solicitations issued under the final regulations. To accommodate concerns of Project Sponsors whose proposals are deferred full consideration because they either exceed or comprise a substantial amount of the total loan guarantee commitments available under the first solicitation, DOE will consider whether such proposals should be afforded expedited consideration under the final regulations, when adopted.

Finally, please note that the solicitation issued in conjunction with these guidelines addresses many important aspects of the application process, including the relevant period of time during which Pre-Applications for loan guarantees may be filed. Because each project will be unique and each loan guarantee potentially subjects the Federal government to significant financial liability, DOE plans to engage in a rigorous review of a proposed project before determining that it may be eligible for a loan guarantee or subsequently approving and issuing a loan guarantee.

**National Environmental Policy Act (NEPA)**

Through the issuance of these guidelines DOE is making no decision relative to the approval of a loan guarantee for a particular proposed project. DOE has therefore determined that publication of the policy guidelines is covered under the Categorical Exclusion found at paragraph A.6 of Appendix A to Subpart D, 10 CFR Part 1021, which applies to the establishment of procedural rulemakings. Accordingly, neither an environmental assessment nor an environmental impact statement is required at this time. However, appropriate NEPA project review will be conducted prior to execution of a Loan Guarantee Agreement.

**Review Under the Paperwork Reduction Act**

These guidelines provide that Pre-Applications submitted to DOE in response to the solicitation and Applications, if invited by DOE, should contain certain information. This collection of information must be approved by the Office of Management and Budget pursuant to the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.) and the procedures implementing that Act, 5 CFR 1320.1 et seq. DOE is requesting emergency processing of the Paperwork Reduction Act Submission for this collection of information pursuant to 5 CFR § 1320.13. DOE is requesting that OMB approve the collection of information prior to the issuance of the solicitation. This emergency collection will be valid for 180 days. Shortly after OMB's approval of the emergency collection, DOE will issue a notice seeking public comment on the information collection and will submit the proposed collection of information to OMB for approval pursuant to 44 U.S.C. 3507(a). An agency may not conduct or sponsor, and a person is not

required to respond to a collection of information unless it displays a currently

valid OMB control number.

Issued in Washington, DC on August 8, 2006

_____

James T. Campbell
Acting Chief Financial Officer

## Loan Guarantees for Projects that Employ Innovative Technologies; Guidelines for Proposals Submitted in Response to First Solicitation under Title XVII of the Energy Policy Act of 2005

### I. Purpose

These guidelines set forth goals and procedures that the Department of Energy ("DOE") intends to use for receiving, evaluating, and, after consultation with the Secretary of the Treasury, approving applications for loan guarantees to support Eligible Projects under Title XVII of the Energy Policy Act of 2005.

### II. Definitions

As used in these guidelines:

A. "Act" means Title XVII of the Energy Policy Act of 2005 (42 U.S.C. 16511-16514).

B. "Administrative Cost of Issuing a Loan Guarantee" means the combined total of all of the administrative expenses that DOE incurs during:

    1.  The evaluation of a Pre-Application and an Application for a loan guarantee;

    2.  The offering, negotiation, and closing of a loan guarantee; and

    3.  The servicing of the loan guarantee and monitoring the progress of a project benefiting from a loan guarantee issued by DOE.

Payment of the Administrative Cost of Issuing a Loan Guarantee, which is required to be collected by DOE under section 1702(h) of the Act, is wholly distinct and separate from payment of the Subsidy Cost.

C. "Applicant" means any firm, corporation, company, partnership, association, society, trust, joint venture, joint stock company, or governmental non-Federal entity, that has the authority to enter into, and is seeking, a loan guarantee issued by the Secretary for a loan or other debt obligation of an Eligible Project under the Act.

D. "Application" means a written submission in response to a DOE invitation to apply for a loan guarantee that DOE will solicit from Applicant after reviewing and approving a completed Pre-Application, and which should include the items listed in Section III.F. of these guidelines.

E. "Borrower" means any project company or entity that enters into a loan or other debt obligation for an Eligible Project.

F. "Commercial Technology" means a technology in general use in the commercial marketplace, but does not include a technology solely by use of such technology in a demonstration project funded by DOE.

G. "Conditional Commitment" means a Term Sheet offered by DOE and accepted by the Applicant, with the understanding of the parties that the Applicant thereafter satisfies all specified and precedent funding obligations, and all other contractual, statutory, regulatory or other requirements.

H. "Credit Review Board" means a board created by DOE in accordance with Office of Management and Budget (OMB) Circular A-129 to oversee the loan guarantee program and approve loan guarantees for individual projects.

I. "Eligible Project" means a project located in the United States that meets the applicable requirements of section 1703 of the Act.

J. "Guaranteed Obligations" mean loans or other debt obligations that the Secretary guarantees under a Loan Guarantee Agreement.

K. "Holder" means any individual or legal entity that has lawfully succeeded in due course to all or part of the rights, title, and interest in a Guaranteed Obligation.

L. "Lender" or "Eligible Lender" means any individual or legal entity, approved by DOE, formed for the purpose of, or engaged in the business of, lending money, including, but not limited to, commercial banks, savings and loan institutions, insurance companies, factoring companies, investment banks, institutional investors, venture capital investment companies, trusts, or other entities designated as trustees or agents acting on behalf of bondholders or other lenders.

M. "Loan Guarantee Agreement" means a written agreement that, when entered into by a Borrower, a Lender and the Secretary pursuant to the Act after satisfaction of the conditions precedent specified in the Conditional Commitment and any other applicable contractual, statutory, and regulatory requirements, establishes the obligation of the Secretary to guarantee payment of principal and interest on specified loans or other debt obligations of a Borrower to the Lender subject to the terms and conditions specified in the Loan Guarantee Agreement. The term "Loan Guarantee Agreement" has the same meaning as a "loan guarantee commitment" (as defined in section 502(4) of the Federal Credit Reform Act of 1990 (2 U.S.C. 661a)).

N. "Project Costs," as described with greater specificity in Section VII of these guidelines, means the estimated sum of the amounts to be expended or accrued by Borrower for costs that are necessary, reasonable, and directly related to the design, construction, and startup of an Eligible Project.

O. "Project Sponsor" means any individual, firm, corporation, company, partnership, association, society, trust, joint venture, joint stock company or the like that assumes substantial responsibility for the development, financing, and structuring of a project eligible for a loan guarantee and owns or controls the Applicant.

P. "Pre-Application" means a written submission in response to a solicitation that broadly describes the project proposal, including the proposed role of a loan guarantee in the project and the eligibility of the project to receive a loan

guarantee under the Act, and includes the items listed in Section III.C. of these guidelines.

Q. "Secretary" means the Secretary of Energy or designee.

R. "Subsidy Cost" has the meaning given the term "cost of a loan guarantee" within the meaning of section 502(5)(C) of the Federal Credit Reform Act of 1990 (2 U.S.C. 661a(5)(C)). The "Subsidy Cost" represents the net present value, at the time when the guaranteed loan or other debt obligation is disbursed, of the expected liability to the Federal government from issuing the loan guarantee, inclusive of estimated payments to be made by the Federal government, such as default payments, and estimated payments to be made to the Federal government such as recoveries. The Subsidy Cost amount is required by section 1702(b) of the Act to be funded either by an appropriation or by payment by Borrower. Payment of the Subsidy Cost is wholly distinct and separate from payment of the Administrative Cost of Issuing a Loan Guarantee.

S. "Term Sheet" means an offering document issued by DOE that specifies the general terms and conditions under which DOE anticipates it may guarantee payment of principal and accrued interest on specified loans or other debt obligations of a Borrower in connection with an Eligible Project. A Term Sheet is not a Loan Guarantee Agreement and imposes no obligation on the Secretary to execute a Loan Guarantee Agreement.

III. *Loan Guarantee Application Process*

A. In conjunction with these guidelines, DOE is issuing a solicitation announcement to solicit the submission by Project Sponsors of Pre-Applications

for loan guarantees for projects that employ innovative technologies. The guidelines will apply to this first solicitation; all future solicitations will be issued pursuant to program regulations that DOE will promulgate at a later time.

B. The solicitation announcement issued in conjunction with these guidelines contains, among other things, the following information:

    1. A brief description of the Eligible Projects for which loan guarantee applications are solicited;

    2. The place and time for Pre-Application submission;

    3. The name and address of the DOE representative whom potential applicants may contact to receive further information and a copy of the solicitation; and

    4. The form, format and page limits applicable to the submission of a Pre-Application.

C. In response to the solicitation, interested parties are invited to submit Pre-Applications to DOE. Pre-Applications should meet all requirements specified in the solicitation; DOE does not intend to review or approve loan guarantees for proposals that do not meet the requirements provided for in the solicitation. In addition, the Pre-Application should contain the following information and documentation:

    1. A completed Pre-Application form signed by an individual with full authority to bind the Project Sponsor;

    2. A business plan including an overview of the proposed project including:

a)  A description of the Project Sponsors, including their experience in project investment, development, construction, operation and maintenance;

b)  A description of the technology to be utilized, including its commercial applications and social uses, the owners or controllers of the intellectual property incorporated in and utilized by such technology, and its manufacturer(s), and licensees, if any, of the technology authorized to make the technology available in the United States, and whether and how the technology is or will be made available in the United States for further commercial use;

c)  The estimated amount of the total Project Costs (including escalation and contingencies);

d)  The timeframe required for construction and commissioning of the facility; and

e)  A description of the primary off-take or revenue-generating agreement(s) that will primarily provide financial support for the project.

3.  A financing plan overview describing the amount of equity to be invested and the sources of such equity, the amount of the total debt obligations to be incurred and the funding sources of all such debt, the anticipated guarantee percentage of the Government-guaranteed debt, and a financial model detailing the investments and the cash flows generated from the project over the project life-cycle;

4.  An explanation of what impact the loan guarantee will have on the interest rate, debt term, and overall financing structure for the project;

5.  A copy of a commitment letter from an Eligible Lender expressing its commitment to provide the required debt financing necessary to construct and fully commission the project subject to commercially reasonable conditions governing disbursement commonly included in arm's length debt financing arrangements for projects and loan amounts similar to the proposed project;

6.  A copy of the equity commitment letter(s) from each of the Project Sponsors and a description of the sources for such equity;

7.  An overview of how the project will comply with the eligibility requirements under section 1703 of the Act;

8.  An outline of the potential environmental impacts of the project and how these impacts will be mitigated;

9.  A description of the anticipated air pollution and greenhouse gas reduction benefits;

10. A description of how the proposed project advances the President's Advanced Energy Initiative; and

11. An executive summary briefly encapsulating the key project features and attributes.

D.  In reviewing completed Pre-Applications, DOE intends to utilize the criteria referenced in the Act, the solicitation, and these guidelines.[4]  In addition, prior to a comprehensive evaluation, an initial review of the Pre-Applications will be performed to determine the following:

1.  The proposal is for an Eligible Project; and

2.  The submission contains the information requested by the solicitation.

If a Pre-Application fails to meet these requirements, it may be deemed non-responsive and eliminated from further review.  As part of the subsequent and more comprehensive Pre-Application review, DOE may conduct an independent review of the financial capability of an Applicant (including personal credit information of the principal(s) if there is insufficient information to assess the financial capability of the organization).  In addition, DOE may ask for additional information during the review process and may request one or more meetings with the Project Sponsor(s).

E.  After reviewing a completed Pre-Application, DOE will provide a written response to the Project Sponsor.[5]  In this response, DOE will do one of two things.  DOE will either invite an Applicant to submit a comprehensive Application for a loan guarantee and specify the amount of the Application fee that DOE has decided to assess, if any, or DOE will advise the Project Sponsor

---

[4] While these factors are designed for review of Pre-Applications, DOE intends to use these factors, as appropriate, in reviewing Applications as well.
[5] While DOE intends to review Applicant's written submission, neither the Pre-Application nor any written or other feedback that DOE may provide in response to the Pre-Application is intended to obviate the need for an Application. In addition, any response that DOE may provide to a Pre-Application or subsequent Application does not obligate DOE to issue a loan guarantee for a project; only a duly executed Loan Guarantee Agreement may contractually obligate DOE to guarantee any loan or other debt obligations.

that the project proposal is ineligible for further consideration in the review process under the guidelines. Project Sponsors whose proposals are denied further review will not be barred from re-submitting an updated or revised project proposal in response to future solicitations under the final regulations to be adopted by DOE.

F.   In response to an invitation to submit an Application, interested Applicants are expected to meet all requirements specified in the invitation, the solicitation and these guidelines. DOE will be expecting that the information and documentation requested, as well as the substance and content of such documentation required for the Application, will conform substantially with that produced during the course of an arm's length commercially negotiated project or commercial financing. The maturity, balance sheet and experience of the Project Sponsors, the credit rating of the Lenders and the off-take counterparties, and the scope and breadth of the security package supporting the loan are additional important factors that DOE will consider in its review of an Application.[6] An Application should include, among other things, the following information and materials:

1. A completed Application form signed by an individual with full authority to bind Applicant;

2. Payment of the Application fee, if any;

3. A detailed description of all material amendments, modifications, and additions made to the information and documentation provided in the Pre-

---

[6] Additional factors that DOE expects to consider when reviewing Applications are described in Section IV of these guidelines.

Application, including any changes in the proposed project's financing structure or terms;

4. A description of the nature and scope of the proposed project, including key milestones, location of the project, identification and commercial feasibility of the new or significantly improved technology(ies) to be employed in the project, how Applicant intends to employ such technology(ies) in the project, and how the Applicant or others intend to assure the further commercial availability of the technology(ies) in the United States;

5. A detailed explanation of how the proposed project qualifies as an Eligible Project;

6. A detailed estimate for the total Project Costs (including escalation and contingencies), together with a description of the methodology and assumptions used;

7. An estimate of the amount of the Subsidy Cost for the project, including a description of the methodology used for this calculation and any supporting documentation;

8. A detailed description of the construction contractor(s) and equipment supplier(s), construction schedules for the project including major activity and cost milestones as well as the performance guarantees, performance bonds, liquidated damages provisions, and equipment warranties to be provided;

9. A detailed description of the operations and maintenance provider(s), the plant operating plan, estimated staffing requirements, parts inventory, major maintenance schedule, estimated annual downtime, and performance guarantees and related liquidated damage provisions, if any;

10. A description of the management plan of operations that Applicant will employ in carrying out the project, and information concerning the management experience of each officer or key person associated with the project;

11. A detailed description of the project decommissioning, deconstruction and disposal plan and the anticipated costs associated therewith;

12. An analysis of the market for the product(s) to be produced by the project, including relevant economics justifying the analysis, and copies of any contractual agreements for the sale of these products or assurance of the revenues to be generated from sale of these products;

13. A detailed description of the overall financial plan for the proposed project, including all sources of funding, equity, and debt, and the liability of parties associated with the project over the lifetime of the requested loan guarantee;

14. A copy of all loan documents that Borrower and Lender will sign if the Application for a loan guarantee is approved, containing all of the terms and conditions of the loan or other debt obligations to be guaranteed, including the proposed amount of the loan, interest charges,

repayment position, principal repayment schedule, fees, pre-payment and late payment penalties, and cure rights;

15.   A copy of all material agreements, whether entered into or proposed, relevant to the investment, construction and commissioning of the project;

16.   A copy of the financial closing checklist for the equity and debt;

17.   Applicant's business plan on which the project is based and project pro forma statements for the proposed life of the loan guarantee, including income statements, balance sheets, and cash flows. All such statements should include assumptions made in their preparation and the range of revenue, operating cost, and credit assumptions considered;

18.   Financial statements for the past three (3) years that have been audited by an independent certified public accountant, including all associated notes, as well as interim financial statements and notes for the current fiscal year, of Applicant and parties relevant to Applicant's financial backing, together with business and financial interests of principal organizations, if appropriate, such as parent and subsidiary corporations or partners of Applicant;

19.   A copy of all legal opinions, engineering reports, and other material reports, analysis, and reviews related to the project;

20.   Credit history of Applicant and, if appropriate, any party who owns or controls a five percent or greater interest in the project or the Applicant;

21.   A preliminary credit assessment for the project without a loan guarantee from a nationally recognized rating agency;

22. A list of all project-related applications filed and approvals issued by Federal, state, and local government agencies for permits and authorizations to site, construct, and operate the project. If still outstanding, the Application should contain an estimated date of completion for any required filings and approvals;

23. A report containing an analysis of the potential environmental impacts of the project that will enable DOE to assess whether the project will comply with all applicable environmental requirements and how and to what measurable extent the project avoids, reduces, or sequesters air pollutants or anthropogenic emissions of greenhouse gases, including how Borrower intends to verify those benefits;

24. A listing of assets associated, or to be associated, with the project and any other asset that will serve as collateral for the guaranteed loan and assure repayment of the loans and other debt obligations of the project, including appropriate data as to the value and useful life of any physical assets and a description of any other associated security and its value. With respect to any ownership interest in a real property asset described above or any pledged asset that is not part of the project, an appraisal should be performed by state licensed or certified appraisers that is consistent with the "Uniform Standards of Professional Appraisal Practice," promulgated by the Appraisal Standards Board of the Appraisal Foundation;

25.   An analysis demonstrating that at the time of the Application, there is a reasonable prospect that Borrower will be able to repay the loan or other debt obligation to be guaranteed (including interest) according to its terms, and a complete description of the operational and financial assumptions on which this demonstration is based;

26.   Written affirmation from an officer of the Lender confirming that Lender is an Eligible Lender in good standing with DOE's and other agencies' loan guarantee programs; and

27.   Such other information requested in the solicitation or invitation to submit an Application necessary for a complete assessment of the loan guarantee application for the project.

G. Following Applicant's submission of an Application, DOE will review the Application based on the factors mentioned in subsection F of Section III and Section IV of the guidelines. If the Credit Review Board determines that a project may be suitable for a loan guarantee, because, among other things, it qualifies as an Eligible Project, there exists a reasonable expectation of payment based on the materials provided in the Application, and the proposed project will advance the President's Advanced Energy Initiative, DOE may notify the Borrower and Lender in writing and provide them with a copy of a proposed Term Sheet. In the event that DOE reviews an Application and decides not to proceed further with the issuance of a proposed Term Sheet, DOE will inform Applicant in writing the reason(s) for the denial.

H. Concurrent with the review process described above, DOE will consult with the U.S. Department of Treasury regarding the terms and conditions of the potential loan guarantee and will work with OMB to determine the Subsidy Cost for a potential loan guarantee based on the particular set of terms and conditions associated with the project. OMB will ultimately review and approve the final determination of the Subsidy Cost.

I. Subsequent to any negotiations and revisions of the proposed Term Sheet including the Subsidy Cost in accordance with subsection H of Section III of the guidelines, the Term Sheet becomes a Conditional Commitment if, and only if, both DOE and Applicant agree to the proposed terms and conditions and sign the Term Sheet. Among other things, the Conditional Commitment will specify the required payment of fees for the Administrative Cost of Issuing a Loan

Guarantee. Subsequent to entering into a Conditional Commitment, and upon agreement as to the detailed terms and conditions to be contained in the Loan Guarantee Agreement and other related documents, as well as availability of authority provided in an appropriations act for the loan guarantee, and fulfillment of other applicable statutory, regulatory, or other requirements, the Credit Review Board will set a closing date. DOE will enter into a Loan Guarantee Agreement with an Applicant that satisfies the specified conditions precedent if and only if all funding and other contractual, statutory and regulatory requirements have been satisfied.

J.  Prior to the closing date, the Secretary will ensure that:

1.  Pursuant to section 1702(b) of the Act, Congress has made an appropriation for the Subsidy Cost of the loan guarantee, or that the Secretary will receive payment in full from the Borrower as part of the closing and Congress has provided sufficient additional authority in an appropriations act;

2.  Pursuant to section 1702(h) of the Act, and in accordance with Section V.R. of these guidelines, the Secretary has received from Borrower payment of a fee for DOE's Administrative Cost of Issuing a Loan Guarantee or will receive payment of the fee as part of the closing;

3.  The Director of OMB has reviewed and approved DOE's calculation of the Subsidy Cost of the loan guarantee;

4.  The Secretary of the Treasury has been consulted as to the terms and conditions of the Loan Guarantee Agreement;

5. The Loan Guarantee Agreement and related documents contain all terms and conditions the Secretary deems reasonable and necessary to protect the interests of the United States; and

6. All conditions precedent specified in the Conditional Commitment have either been satisfied or waived by the Secretary and all other applicable contractual, statutory, and regulatory requirements have been satisfied.

## IV. Evaluation of Applications

In evaluating Applications invited for submission, DOE plans to consider the following factors[7]:

---

[7] While these factors are designed for review of Applications, DOE intends to use these factors, as appropriate, in reviewing Pre-Applications as well.

A.  Whether the Application is complete, signed by the appropriate entity or entities with the authority to bind the Project Sponsor and other relevant parties to the agreement, and complies with the eligibility requirements stated in the Act, these guidelines, and the solicitation;

B.  Whether the Application contains sufficient information, including a detailed description of the nature and scope of the project and the nature, scope, and risk coverage of the loan guarantee sought, to enable DOE to perform a thorough assessment of the project;

C.  Whether and to what measurable extent the project avoids, reduces, or sequesters air pollutants or anthropogenic emissions of greenhouse gases;

D.  Whether the new or significantly improved technology to be employed in the project, as compared to commercial technologies in service in the United States at the time the guarantee is issued, is ready to be employed commercially in the United States, can yield a commercially viable product(s) in the use proposed in the project, and is or will be available for further commercial use in the United States;

E.  Whether the project will advance the goals of the President's Advanced Energy Initiative;

F.  Whether the requested amount of the loan guarantee is reasonable relative to the nature and scope of the project;

G.  The extent to which Project Costs are funded by guaranteed debt;

H.  The extent to which Applicant and other principals involved in the project have made a significant equity commitment to the project;

I.  Whether the project will be ready for full deployment and operations in the proximate future;

J.  Whether there is sufficient evidence that Applicant will initiate and complete the project in a timely, efficient, and acceptable manner;

K.  Whether and/or to what extent Applicant will rely upon other Federal and non-Federal governmental assistance (grants, tax credits, other loan guarantees, etc.) to support the financing and construction and/or operation of the project;

L.  Whether there is reasonable assurance that the project is economically feasible and will produce sufficient revenues to service the project's debt obligations over the life of the loan guarantee and assure timely repayment of guaranteed loans and other debt obligations;

M. Whether the collateral, warrantees, and other assurance of repayment described in the Application provide adequate safeguard to the Federal government in the event of default;

N.  Whether Applicant possesses the capacity and expertise to successfully operate the project, based on factors such as financial soundness, management organization, and the nature and extent of corporate and personnel experience;

O.  Whether the project will comply with all applicable laws and regulations, including all applicable environmental statutes and regulations;

P.  Whether the levels of market, regulatory, legal, financial, technological, and other risks associated with the project are appropriate for a loan guarantee provided by DOE;

Q. Whether the entity issuing the loan or other debt obligation subject to the loan guarantee is an Eligible Lender; and

R. Such other criteria that the Secretary and the Credit Review Board deem relevant in evaluating the merits of an Application.

V. *Findings by the Secretary*

Prior to the issuance by DOE of a loan guarantee, the Secretary should ensure that Applicant satisfies the following requirements and conditions (some or all of which should be specified in the Loan Guarantee Agreement):

A. The project qualifies as an Eligible Project under the Act;

B. The project will be constructed and operated in the United States and the technology is or is likely to be available in the United States for further commercial application;

C. The debt guaranteed by DOE is limited to no more than 80 percent of total Project Costs;

D. The amount of the loan guarantee does not exceed 80 percent of the total face value of the loan or other debt obligation of the project, or provides sufficient evidence to support a guarantee exceeding 80 percent (but in no event 100 percent);

E. Applicant and other principals involved in the project have made a significant equity investment;

F. The prospective Borrower is obligated to make full repayment of the guaranteed loan over a period of up to the lesser of 30 years or 90 percent of the

projected useful life of the project's major physical assets, as calculated in accordance with generally accepted accounting principles and practices;

G. The loan guarantee does not finance, either directly or indirectly, a federally tax-exempt obligation. Accordingly, the loan guarantee may not be used for a federally tax-exempt obligation or serve as collateral to secure a tax-exempt obligation;

H. The guaranteed portion of a loan must not be separated from or "stripped" from the non-guaranteed portion of the loan and resold in the secondary debt market;

I. The amount of the loan guaranteed, when combined with other funds committed to the project, will be sufficient to carry out the project, including adequate contingency funds;

J. There is a reasonable prospect of repayment by Borrower of the principal and interest of the Guaranteed Obligations;

K. The prospective Borrower has pledged project assets and other collateral or surety, including non project-related assets, as determined by the Secretary to be necessary as assurance for the repayment of the loan;

L. The Loan Guarantee Agreement and related documents include detailed terms and conditions as appropriate to protect the interests of the United States in the case of default, including ensuring availability of all the intellectual property rights, technical data including software, and physical assets necessary for any person selected, including, but not limited to, the Secretary, to complete and operate the defaulting project;

M. The Borrower's interest rate on the guaranteed loan is determined by the Secretary to be reasonable, taking into account the range of interest rates prevailing in the private sector for similar Federal government guaranteed obligations of comparable risk;

N. The guaranteed loan is not subordinate to any loan or other debt obligation for the project not part of the Guaranteed Obligations and is in a first lien position regarding all assets of the project and all collateral security pledged;

O. There is satisfactory evidence that Borrower is willing, competent, and capable of performing the terms and conditions of the loan or other debt obligation and the loan guarantee;

P. The Lender is not a Federal entity, possesses sufficient financial wherewithal and expertise, and will exercise the requisite standard of care as deemed necessary by the Secretary and stated in DOE's lender eligibility criteria in Section VI of these guidelines;

Q. Lender or other parties servicing the loan and monitoring the project should be satisfactory to the Secretary. In addition, the Secretary will need to find that the Lender and other appropriate parties will exercise a high level of care and diligence in the establishment and enforcement of the conditions precedent to all loan disbursements and the Borrower covenants throughout the term of the loan and that each Lender will be required to diligently perform its duties in the servicing and collection of the loan as well as in ensuring that the collateral package securing the loan remains uncompromised. The Lender will also provide annual or more frequent periodic financial reports on the status and condition of

the loan, and is required to promptly notify DOE if it becomes aware of any problems or irregularities concerning the project or the ability of the Borrower to make payment on the loan or other debt obligations. Even though DOE will rely on Lender (or other servicer) to service and monitor the loan with utmost care and expertise, Lender's responsibilities with regard to the loan are separate from DOE's own monitoring and review of the loan and the project;

R. As specified in the Conditional Commitment, the prospective Borrower makes payment of the fee for the Administrative Cost of Issuing a Loan Guarantee pursuant to section 1702(h) of the Act. While covering the other costs included in the Administrative Cost of Issuing a Loan Guarantee, this payment will not include the servicing and monitoring costs identified in Section II.B. of these guidelines. These latter costs will be assessed in accordance with the Loan Guarantee Agreement which will require payment of administrative fees to the Federal government by Borrower, either directly or through the Lender, periodically thereafter for the duration of the loan guarantee. DOE intends to use all of the fees mentioned above to defray administrative expenses associated with issuing and monitoring loan guarantees;

S. If Borrower is to make payment in full for the Subsidy Cost of the loan guarantee pursuant to section 1702(b)(2) of the Act, such payment must be received by the Secretary prior to, or at the time of, closing;

T. DOE representatives have access to the project site at all reasonable times in order to monitor the performance of the project;

U. DOE and Borrower have reached an agreement as to what project information will be made available to DOE and which project information will be made publicly available;

V. The prospective Borrower has filed applications for or obtained any required regulatory approvals for the project and is in compliance with all Federal and state regulatory requirements;

W. Applicant has no delinquent Federal debt, including tax liabilities, unless the delinquency has been resolved with the appropriate Federal agency in accordance with the standards of the Debt Collection Improvement Act of 1996; and

X. The Loan Guarantee Agreement contains such other terms and conditions as the Secretary deems reasonable and necessary to protect the interests of the United States.

## VI. Lender Eligibility

A. Lenders associated with a project should meet the following requirements:

The Lender is a "non-Federal qualified institutional buyer," as defined in 17 CFR 230.144A(a), including qualified retirement plans and governmental plans;

B. The Lender is not a party debarred or suspended from participation in a Federal government contract (under 48 CFR 9.4) or participation in a non-procurement activity (under a set of uniform regulations implemented in agency regulations for numerous agencies, including DOE, at 10 CFR 1036);

C. The Lender is not delinquent on any Federal debt or loan;

D. The Lender is duly organized and legally authorized to enter into the transaction;

E. The Lender is able to demonstrate experience in originating and servicing loans for commercial deals similar in size and scope with the project under consideration; and

F. The Lender is able to demonstrate experience or capability as the lead lender or underwriter of other energy related projects.

VII. *Project Costs*

A. In conjunction with the Secretary's determination of the Project Costs associated with the issuance of a loan guarantee, Applicant should record such costs in accordance with generally accepted accounting principles and practices. Applicant should calculate the sum of reasonable and customary costs that it has paid and expects to pay, and which are directly related to the project, to estimate the total sum of Project Costs. Project Costs may include, but are not limited to:

1. Costs of acquisition, lease or rental of real property, including engineering fees, surveys, title insurance, recording fees, and legal fees incurred in connection with land acquisition, lease or rental, site improvements, site restoration, access roads, and fencing;

2. Engineering, architectural, legal and bond fees, and insurance paid in connection with construction of the facility; and materials, labor, services, travel and transportation for facility construction, startup, and tests;

3. Equipment purchase and startup testing;

4. Costs to provide equipment, facilities, and services related to safety

and environmental protection;

5.  Financial and legal services costs, including other professional services and fees necessary to obtain required licenses and permits and to prepare environmental reports and data;

6.  Interest costs and other normal charges affixed by lenders;

7.  Necessary and appropriate insurance and bonds of all types;

8.  Costs of startup, commissioning and shakedown;

9.  Costs of obtaining licenses to intellectual property necessary to design, construct, and operate the project; and

10. Other necessary and reasonable costs approved by the Secretary.

B.  Applicant should not record the following costs as Project Costs associated with the loan guarantee:

1.  Fees and commissions charged to Borrower, including finder fees, for obtaining Federal funds;

2.  Parent corporation's general and administrative expenses, and non-project related parent corporation assessments, including organizational expenses;

3.  Goodwill, franchise, trade, or brand name costs;

4.  Dividends and profit sharing to stockholders, employees, and officers;

5.  Research, development, and demonstration costs of readying the energy technology for employment in a commercial project;

6.  Costs that are excessive or are not directly required to carry out the project, as determined by the Secretary;

7.  Administrative Cost of Issuing a Loan Guarantee paid by the Borrower;

8.  The Subsidy Cost of the loan guarantee; and

9.  Operating expenses incurred after startup, commissioning and shakedown.

## VIII.    *Principal and Interest Assistance Contract*

With respect to any Guaranteed Obligation, the Secretary may enter into a contract to pay Holders, for and on behalf of Borrower, from funds appropriated for that purpose, the principal and interest charges that become due and payable on the unpaid balance of the Guaranteed Obligation, if the Secretary finds that:

A. Borrower is unable to meet the payments and is not in default;

B. Borrower will, and is financially able to, continue to make the scheduled payments on the remaining portion of the principal and interest due under the non-guaranteed portion of the debt obligation, or an arrangement, approved by the Secretary, has otherwise been agreed to avoid an impending payment default;

C. It is in the public interest to permit Borrower to continue to pursue the purposes of the project;

D. In paying the principal and interest, the Federal government expects a probable net benefit greater than it would receive in the event of a default;

E. The payment authorized is no greater than the amount of principal and interest that Borrower is obligated to pay under the agreement being guaranteed; and

F. Borrower agrees to reimburse the Secretary for the payment (including interest) on terms and conditions that are satisfactory to the Secretary and executes all written contracts required by the Secretary for such purpose.

## IX. Full Faith and Credit

As specified in the Act, the United States pledges its full faith and credit to the payment of all Guaranteed Obligations with respect to principal and interest under the terms and conditions of the Loan Guarantee Agreement.

## X. Default/Audit

As required by sections 1702(g)(1)(A) and 1702(i)(1) of the Act, DOE in the near future will issue regulations pertaining to default and audit requirements that will apply to any loan guarantee issued, and Loan Agreement executed, by DOE.