Exhibit H


BEVERIDGE
&DIAMOND pc

Michael G. Murphy
15th Floor
477 Madison Avenue
New York, NY 10022-5802
Direct: (212) 702-5436
Fax: (212) 702-5450
mmurphy@bdlaw.com

January 4, 2007

<u>VIA E-MAIL & FAX</u>

David N. Minkin, Esq.
Powell Goldstein, LLP
One Atlantic Center, 14th Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488

> Re:     PMO Solid Waste Processing Facility: Middletown, New York
>         Energy Policy Act & Other Issues

Dear David:

We are in receipt of Pencor Masada OxyNol, LLC's ("PMO") year-end report dated December 6, 2006, regarding the above-referenced waste-to-ethanol project. As you know, the City has posed a number of basic questions concerning the project that have remained unanswered for quite some time. One concern of note has been PMO's inability to provide the City with reasonable reassurances that it can meet the December 8, 2008 Service Date deadline specified in the City/PMO agreements. Unfortunately, instead of addressing this and other issues, the year-end report merely raises more troubling questions.

First, the report's discussion of loan guarantees under the federal Energy Policy Act of 2005 is not accurate. Paragraphs (1) and (2) of the year-end report confuse two distinct programs under the Act. The statement that "the Energy Policy Act of 2005 expressly authorized appropriations for construction loan guarantees for up to four projects to commercially demonstrate the feasibility and viability of producing biomass ethanol, including one project that uses municipal solid waste as a feed stock" may be true, but this program is not the focus of the initial solicitation recently issued by the Department of Energy ("DOE"). The program to support up to four biomass-to-ethanol demonstration projects falls under Title XV of the Energy Policy Act. Our understanding is that there are no guidelines or regulations in place for the Title XV program, and that no appropriations have been made to support this program. Title XVII, not Title XV, has been the primary focus of DOE's attention. The document attached to PMO's year-end report confirms this to be the case.

David N. Minkin, Esq.
January 4, 2007
Page 2

The guidelines attached to PMO's report expressly relate to "Title XVII" of the Energy Policy Act. Title XVII provides for certain incentives for "innovative technologies." PMO would appear to face a number of significant hurdles before it could qualify for a loan guarantee under this particular program. First, only projects that "avoid, reduce or sequester air pollutants or anthropogenic emissions of greenhouse gases" are eligible. *See* Energy Policy Act § 1703(a). Second, the PMO facility does not appear to fit within any of the eligible categories of projects specified in Section 1703(b) of the Act. A DOE website document lists "biomass" projects in the context of the Title XVII program, but only by reference to Section 932 of the Act, which express excludes biomass projects relying on municipal solid waste as a feed stock. Third, to be eligible, projects must meet the air emission limits set forth in Section 1703(d) of the Act. Unless I am mistaken, the specified limits for sulfur dioxide and nitrogen oxide are significantly lower than the corresponding limits set forth in PMO's Title V operating permit.

Even if PMO could overcome these "eligibility" problems, DOE indicates in the document attached to the PMO report that there is a "significant volume of interest" in the program. Thus, PMO faces significant competition to secure a loan guarantee. Moreover, DOE also indicates that, at this time, it is merely seeking "pre-application" submissions. DOE has stated it will invite certain interested parties to submit formal applications after DOE reviews these pre-application submissions. Thus, it is not evident how this program could possibly facilitate PMO meeting the December 9, 2008 Service Date deadline.

With respect to financing in general, PMO appears to have made little progress since the last annual update. The fact that PMO "anticipates" that it will not close on equity and debt financing until it receives a DOE loan guarantee is not reassuring. In light of the hurdles noted above, PMO appears to be further away than ever from securing financing for the project.

You state that some equity raised through a London-based investment banker will be used to "fund certain aspects of the PMO project." PMO mentioned such a possibility at the August 8, 2006 public meeting held at City Hall. However, your letter provides no information regarding which "aspects" of the project might be funded, or when this partial funding might become available.

Please address these financing issues and discrepancies as soon as possible, including the apparent confusion between loan guaranties available under Title XV and Title XVII of the Energy Policy Act.

Finally, the City is deeply troubled by PMO's sudden announcement that it intends to relocate old "pilot plant" equipment for use in Middletown. The City did not enter into agreements with PMO to relocate and operate "pilot plant" equipment in Middletown. Such a proposal is not consistent with the scope or intent of the City/PMO agreements. At the August 8, 2006 meeting Mr. Watkins represented that in assessing economies of scale, PMO had decided that it was no longer pursuing a ramp-up approach to building the facility. This latest revelation

David N. Minkin, Esq.
January 4, 2007
Page 3

suggests PMO has once again changed its mind. Without first consulting with the City, PMO has made a decision that has significant implications for PMO's relationship with the City.

We question whether PMO's use of this pilot equipment would be consistent with the facility's site plan approval and Title V permit, or would require a modification to one or both of these approvals? The City is frustrated at PMO's failure to provide satisfactory responses to its inquiries over the course of the last nine to ten months. Now, based on this year-end report, the list of questions has only grown.

The City currently does not have a reasonable basis to believe that PMO can meet its contractual obligations, including the Service Date deadline. If you have any questions, please feel free to contact me or Chris McKenzie at this office.

Very truly yours,

Michael Murphy

cc:    Honorable Marlinda Duncanson, Mayor       (via fax & U.S. mail)
       Thomas Farrell, Esq., Corporation Counsel   (via fax & U.S. mail)
       Donald Watkins, PMO                         (via fax & E-mail)
       Christopher J. McKenzie, Esq.

79842v3  New York 012753

Exhibit I

**POWELL**
**GOLDSTEIN** LLP



RESIDENT IN ATLANTA OFFICE
DIRECT DIAL: (404) 572-6771
CELL: (404) 307-3611
DMINKIN@POGOLAW.COM

January 5, 2007

**VIA FACSIMILE AND EMAIL**

Michael G. Murphy, Esq.
Beveridge & Diamond PC
477 Madison Avenue, 15ᵗʰ Floor
New York, New York 10022-5802

   Re: 2006 Year-End Report
      PMO Solid Waste Processing Facility
      Middletown, New York

Dear Mike:

   Thank you for your letter of January 4, 2007 regarding PMO's year-end report to the City.

   We respectfully disagree with your repeated assertion that the City's questions concerning the PMO project have remained unanswered. We have answered all of the City's questions regarding the project in good faith and on several occasions. We have answered written questions and addressed them in person before the Common Council on multiple occasions. It has been apparent to us for some time that our answers make those City officials who oppose the project for political reasons uncomfortable, but we are moving forward pursuant to the terms of the agreements between the City and PMO.

   The City has some fundamental misunderstandings regarding the construction loan guarantees available under the U.S. Department of Energy's ("DOE") first funding solicitation, issued on August 8, 2006. As you know, the publicly announced DOE solicitation and attendant guidelines govern the award of $2 billion in loan guarantees for eligible projects "that employ new energy technologies." These projects specifically include "efforts that can convert cellulosic biomass into ethanol", and there is no exclusion in the solicitation or guidelines for projects that convert cellulosic biomass into ethanol using municipal solid waste as a feedstock.

   For your information, Masada requested and obtained clarification last October about the status of the loan guarantee programs authorized by §1511 of the Energy Policy Act of 2005. Section 1511 specifically authorized the Secretary of Energy to issue loan guarantees to carry out four projects to commercially demonstrate the feasibility of producing cellulosic biomass ethanol, including one such project that uses municipal solid waste as feedstock. Because the Energy Policy Act authorized about a dozen such loan guarantee programs, DOE has only implemented the loan guarantees authorized by Title 17 of the Act, "Incentives for Innovative

One Atlantic Center • Fourteenth Floor • 1201 West Peachtree Street, NW • Atlanta, GA 30309-3488
Tel: 404.572.6600 • Fax: 404.572.6999
www.pogolaw.com

Michael G. Murphy, Esq.
January 5, 2007
Page 2

Technologies," which applies to "projects that avoid, reduce, or sequester air pollutants or anthropogenic emissions of greenhouse gasses **and** employ new or significantly improved technologies." However, as evidenced by DOE's public announcements and guidelines, DOE has fashioned this program and its initial solicitation to encapsulate **all** of the technologies covered by each of the other programs, including §1511. DOE believed that creating a dozen separate loan programs would be duplicative and potentially wasteful and combining them would be a more efficient way to serve the intent of Congress. As a practical matter, all of the DOE loan guarantee programs have now been wrapped up into one. This clarification was also directly provided to us by a senior member of the U.S. Senate who serves on the Senate Energy and Natural Resources Committee, the Senate Committee that oversees DOE's implementation of the energy initiatives authorized by Congress. If you have received information directly from government officials that contradicts the information that we have received, please share it with us.

On December 28, 2006, Masada completed and filed its required pre-application form for a DOE construction loan guarantee for the PMO project, as designed and permitted for Middletown and in conformity with our City agreements. We are confident that the PMO project is eligible for the loan guarantee and fits the eligibility requirements for DOE's consideration of a loan guarantee award. As stated above, the Energy Policy Act expressly authorized appropriations for construction loan guarantees for up to four projects to commercially demonstrate the feasibility and viability of producing cellulosic biomass ethanol, including at least one project that uses municipal solid waste as a feedstock. The Act also requires that the projects be fully permitted. Contrary to the assertions in your letter, our research indicates that there are not a substantial number of eligible municipal solid waste-to-ethanol construction projects that are fully permitted at the state and federal level. In fact, we know of only one, and that is ours.

With respect to the financing issues raised by you, excluding the London-based investment bank, Masada has obtained renewed financial commitments from Masada's existing financial partners that total up to $50,000,000 in new equity for PMO. As previously indicated to you, we may use funds from the European equity raise-up headed by the London bank for PMO, if and when they are needed.

With respect to your comments about Masada's plans to integrate major equipment and components from its TVA pilot plant facility, it should be noted that everything we do to construct and operate the PMO facility will be in strict compliance with our operating permits, design capacity, regulatory requirements and the City agreements. Also as we have advised the City on many occasions, PMO is constantly evaluating time and cost saving measures for the PMO project. All of these measures are carefully considered within our design, regulatory and contractual parameters.

The City's continued lack of cooperation reinforces the belief that much of the City's posturing and questions are based upon political opposition to the project and are intended to interfere with Masada's ongoing financial relationships and its substantial progress in moving

1117489

forward with the PMO project. We will continue to move forward, and we will meet all of our obligations in our agreements with the City, and we expect the City to do the same.

With kindest regards,

David N. Minkin

DNM/wp

cc:    Mr. Donald V. Watkins
        The Honorable Marlinda Duncanson
        Thomas Farrell, Esq.
        Christopher McKenzie, Esq.
        Mr. Tim Judge

1117489

Exhibit J



BEVERIDGE
& DIAMOND PC

Michael G. Murphy
15th Floor
477 Madison Avenue
New York, NY 10022-5802
Direct: (212) 702-5436
Fax: (212) 702-5450
mmurphy@bdlaw.com

January 17, 2007

**VIA E-MAIL & FAX**

David N. Minkin, Esq.
Powell Goldstein, LLP
One Atlantic Center, 14th Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488

      Re:    PMO Solid Waste Processing Facility: Middletown, New York
             Energy Policy Act & Other Issues

Dear David:

      We are in receipt of your letter dated January 5, 2007 on behalf of Pencor Masada OxyNol, LLC's ("PMO"). Please be advised that the City of Middletown respectfully disagrees with PMO's position that the City's requests for information are an unreasonable or improper attempt to interfere with PMO's financial relationships. In all its communications, the City has been attempting to obtain basic information to which it believes it is entitled so that any rights the City might have under the City/PMO agreements are not inadvertently waived or otherwise adversely impacted.

      We also do not believe that we have misconstrued any provisions of the Energy Policy Act of 2005 or the Department of Energy's ("DOE") initial solicitation issued for construction loan guarantees. Statements in our prior correspondence are consistent with the DOE guidelines that PMO attached to its year-end report. Those guidelines were issued in relation to Title XVII, not Title XV, and define an "Eligible Project" as one that "meets the applicable requirements of Section 1703 of the Act." Our January 4th letter specifically focused on these "applicable requirements", including, for example, emissions limit requirements that are lower than those set forth in PMO's Title V operating permit. However, rather than engage in an unproductive exchange regarding the scope of DOE's initial solicitation, we would ask that your keep the City fully apprised of any developments regarding PMO's application.

      We also respectfully disagree with your claim that PMO has been responsive to the City's information requests. PMO should recognize that the City's ability to make certain determinations, such as those relating to the upgrades to the wastewater treatment facility, are

Washington, D.C.      Maryland      New York      Massachusetts      New Jersey      Texas      California

BEVERIDGE & DIAMO  )PC

David N. Minkin, Esq.
January 17, 2007
Page 2

significantly compromised by the uncertainty surrounding the PMO project. The City believes its requests for information have been very reasonable under the circumstances, and that the following issues, among others, have not been sufficiently addressed by PMO:

1. The project time schedule provided by PMO on August 4, 2006 anticipated on-site activities by November 2006. Thus, the schedule is no longer accurate.

2. Whether the alternative financing arrangements PMO announced to the Common Council last August are consistent with the structure of the City/PMO agreements in relation to, for example, the completion of a Lease Agreement or PILOT agreement?

3. Whether PMO's financing can be finalized in time to allow PMO to meet the Service Date deadline?

4. Information regarding the specific quality and content of the wastewater discharges from the facility in order to facilitate the City's time-sensitive WWTF upgrade decisions.

5. Whether PMO's decision to use an evaporator/condensation system at the facility triggers the need for a modified site plan approval, a Title V permit modification, a PSD permit, or further SEQRA review (based on the City's legal obligation as lead agency)?

6. Whether PMO's decision to use pilot equipment is consistent with such prior approvals.

7. Whether PMO has retained an EPC contractor?

8. Whether PMO is in a position to submit construction drawings to support a building permit application in order to meet the Service Date deadline?

While we understand that PMO has asserted that the items noted above will not cause PMO to miss the Service Date deadline and are consistent with the City/PMO agreements, the City has not received information to support PMO's assertions. As noted above, rather than

BEVERIDGE & DIAMON Inc.

David N. Minkin, Esq.
January 17, 2007
Page 3

engage in an ongoing exchange of correspondence, the City will await receipt of additional information from PMO addressing these issues.  In the meantime, the City expressly reserves all rights afforded it under the agreements.

Sincerely,

Michael Murphy

cc:    Honorable Marlinda Duncanson, Mayor        (via fax & U.S. mail)
       Thomas Farrell, Esq., Corporation Counsel  (via fax & U.S. mail)
       Donald Watkins, PMO                        (via fax & E-mail)
       Christopher J. McKenzie, Esq.

79965v2  NewYork 012753

**Exhibit K**

# PROGRESS REPORT TO THE CITY OF MIDDLETOWN, NEW YORK ON THE ORANGE RECYCLING AND ETHANOL PRODUCTION FACILITY BY PENCOR MASADA OXYNOL, LLC

## May 22, 2007



Submitted By:

Pencor Orange Corp.
Manager
Pencor Masada OxyNol, LLC
2170 Highland Avenue, Suite 100
Birmingham, Alabama 35205
205-558-4665 (Office)
877-558-4670 (Fax)
donaldvwatkinspc@aol.com

## Introduction.

In a letter dated April 18, 2007, Michael Murphy, Special Counsel for the City of Middletown, New York ("City")[1], requested that Pencor Masada OxyNol, LLC ("PMO") provide the City a progress report at its May 22, 2007 public work session addressing various issues identified in Murphy's letter. Some of the issues raised in the Murphy letter were initially addressed in an April 19, 2007 reply letter written by Masada's General Counsel, David Minkin. However, all of them are addressed in greater detail in this progress report.

This report addresses the questions raised by the City in Mr. Murphy's April 18 letter. Interestingly, this report also comes at a time when Americans — especially vulnerable fixed income citizens — and local governments in some areas of the country are bracing themselves for $4 per gallon gas prices, as forecasted by Masada a year ago.[2] Thankfully, the City's visionary partnership with PMO will create a much needed immunity for Middletown to petroleum price uncertainty and volatility, while effectively addressing the environmental realities and global political instability America is experiencing.[3]

As background for this report, PMO reminds the City that for nearly a year, Mr. Murphy has repeatedly expressed concern on behalf of the City, with no basis in fact, that PMO is not taking the steps necessary for "PMO's compliance with its 'essential obligations' under our agreements." As stated by PMO on many occasions, its essential obligations to the City are threefold: (a) acceptance and disposal of the City's waste streams, under the terms and conditions of the City agreements; (b) production of ethanol from the City's waste streams on the site leased by PMO from the City, in accordance with the requirements of PMO's Part 360 and Title V permits; and (c) remittance of payments to the City, in accordance with the terms and conditions of the City agreements.

Once Mr. Murphy joined the City's PMO project team, he became subject to the affirmative duties expressly imposed upon Special Counsel and other named City officials by Common Council Resolution No. 20-96, which was unanimously approved by the Council, including then-Councilwoman and current Mayor, Marlinda Duncanson.

---

[1] PMO was first notified in writing on April 20, 2006 that Mr. Murphy was the City's Special Counsel on all matters relating to the PMO facility.

[2] In an April 25, 2006 e-mail to Mr. Murphy, Masada predicted gasoline prices would reach the $4 per gallon levels, thereby straining municipal and local government budgets. See, "Gas nears $4 in some areas", USA Today, front page, May 7, 2007. Fortunately, the City's partnership with PMO provides to the City a practical and viable solution to rising gas prices, at no cost to the City.

[3] U.S. gas prices are increasing at an alarming rate. The first time gas prices averaged above $1-a-gallon was 1979. The first time they averaged above $2-a-gallon was May, 2004. The first time gas prices averaged above $3-a-gallon was May of 2006. In early May of 2007, gas prices are averaging above $3-a-gallon in many areas of the country. See, "$3-a-gallon gas prices spreading across USA", USA Today, front page, May 1, 2007. By May of 2008, Masada predicts that U.S. gas prices will average above $4-a-gallon. As of mid-April of 2007, the average gas prices per gallon in Europe ranged from $5.14 in Spain to $8.37 in the UK. This pricing index is significant because European gas prices are indicative of pricing trends for U.S. gas prices and suggest that Americans could see $4-a-gallon gas prices in the U.S. in the near future. See, "Summer Bumper: $4 a gallon?", The Seattle Times, front page, April 26, 2007.

The resolution specifies a range of activities in which Mr. Murphy and others are mandated to assist and cooperate with PMO, including, but not limited to, the following: (a) providing information and documents requested by PMO; (b) attending meetings with PMO, officials and consultants of other municipalities in Orange County; (c) working with PMO's project financing team; and (d) pursuing and obtaining necessary permits and approvals for the PMO facility; and (e) obtaining waste management services agreements with other local municipalities. The resolution mandates that Mr. Murphy and other City project team members undertake these actions "so as to expedite and coordinate the activities necessary to undertake and accomplish the [PMO] Project."

Not one time since Mr. Murphy has been representing the City on PMO-related matters has he provided or offered to provide PMO with any meaningful assistance or cooperation to aid PMO in undertaking and accomplishing the PMO project, as the City is required to do under Resolution No. 20-96 and the City agreements.[4]  Much of Mr. Murphy's correspondence to PMO since April 20, 2006 has attempted to revisit old issues resolved long ago, at extraordinary expense to the City and PMO.

At no time since the City agreements were signed by PMO and the City has Mr. Murphy (or any other City official) notified PMO of any violation of its obligations under the City agreements.  Every letter of inquiry written by Mr. Murphy to PMO has been answered, in a responsible, responsive and timely manner.[5]

In spite of this background, PMO continues to look for the positive benefits accruing from its public-private sector partnership with the City, and issues the following progress report addressing the matters raised in Mr. Murphy's April 18 letter in the order in which they appear.

### 1.  The TVA Biomass Pilot Plant Facilities and Equipment.

On March 9, 2007, PMO notified the City that it had successfully bid to acquire the TVA biomass pilot plant and equipment.  This City is intimately familiar with the TVA facilities because City officials made a site visit to the pilot plant, and they are extensively discussed in the City's Kroll due diligence report.

---

[4] In this regard, it is worth noting that Mr. Murphy, in his capacity as Special Counsel for the City on PMO-related matters, has written 17 letters and e-mails to PMO since April 20, 2006. Only one of them, a June 7, 2006 letter, offered the City's expressed cooperation with PMO. This offer of cooperation dealt with a potential due diligence review of City files by third-party financial institutions. Even then, the offer of cooperation was linked to a notification by the City of its intent to charge PMO exorbitant legal fees and costs for an estimated (and unreasonable) 15 business days of document review work by Mr. Murphy even though Assistant City Attorney Alex Smith was already intimately familiar with the City's PMO-related documents. To date, City records reflect $86,952.08 in payments to Mr. Murphy's law firm for letter writing and reviewing the City's PMO related files.

[5] PMO believes that its partnership with the City would be better served if the communications between the partners were direct, and not filtered through legal counsel.

3

On October 20, 2006, Masada Resource Group, LLC[6] submitted a bid for the TVA facilities and equipment. This bid was part of PMO's continuing time and cost saving measures for developing the City's waste-to-ethanol facility. PMO is paying cash for the facilities and equipment at closing. No financing was necessary for this transaction, since PMO is paying for the TVA facilities and equipment from internal funds.

When the TVA bid was submitted, PMO was mindful of the City's legally tenuous, but forcefully articulated position, that PMO must begin accepting and disposing of the City's waste streams by December 9, 2008. The City has taken this legal position even though the City Waste Management Services Agreement expressly provides for an automatic extension of the "Service Date" deadline for the very type of "Uncontrollable Circumstances" defined in the Agreement arising from the terminal illness of Masada's former CEO, Daryl Harms.[7] As PMO first reported to the City in August of 2005 and repeated in PMO's December 30, 2005 year-end status report, Mr. Harms became sick with brain cancer in 2004 and died in July of 2005. In April of 2006, PMO notified the City that Mr. Harms' terminal illness had a "material adverse effect on the Project." Mr. Harms' death also impacted the "ownership, possession or operation of the Project by [PMO]"[8], and was beyond the control of PMO.

Separately, there was a five-month delay by the City in delivering a signed version of the contracts to PMO.[9] The City agreements were properly executed by then-Mayor DeStefano on December 8, 2003, but not delivered to PMO until April of 2004. The City has never explained this delay to PMO.

The successful acquisition of the TVA buildings and biomass equipment is a part of PMO's ongoing "commercially reasonable efforts to reduce costs and time associated with the 'Uncontrollable Circumstances' [relating to the PMO project]."[10]

Contrary to Mr. Murphy's description of the facilities and equipment as "dated", the TVA buildings and biomass conversion equipment were inspected by engineers from the

---

[6] The bid was submitted in collaboration with Auburn University and PureVision Technology of Fort Lupton, Colorado.

[7] In a series of correspondence with Mr. Murphy, beginning as early as April 30, 2006, PMO: (a) provided the City with adequate notice of the applicability of "Uncontrollable Circumstances", triggering an automatic extension of the Service Date; (b) properly reserved its legal rights on PMO's entitlement to the extension; and, (c) informed the City that PMO would seek legal redress on this issue, should it become necessary in the future. PMO asserts that the December 9, 2008 Service Date is due to be extended by at least 15 months, as explained more fully in the April 30, 2006 e-mail from Donald V. Watkins to Mr. Murphy.

[8] See, "City Waste Management Services Agreement", Section 14(c).

[9] All of these "Uncontrollable Circumstances" are spelled out in detail in Mr. Watkins' April 30, 2006 e-mail to Mr. Murphy, along with the month in which the City agreements bearing Mayor DeStefano's signature were delivered to PMO. Mr. Harms' illness and death delayed PMO's project development, and triggered a reallocation of equity interests in Masada's ownership structure involving the Estate of Daryl Harms, Terry Johnson, and Pencor Orange Corp., the designated "Manager" of PMO. Prior to Mr. Harms' death, Pencor Orange Corp. was the designated "Co-Manager" of PMO. Today, Pencor Orange Corp. owns a 25% equity interest in PMO and has executed a purchase agreement with Terry Johnson to acquire all of his equity interests in PMO and other Masada-related entities.

[10] See, "City Waste Management Services Agreement", Section 14(b)(iv).

Harris Group, Inc.[11], Auburn University and PMO on May 8, 2007. The facilities and equipment were in excellent condition and are capable of being dismantled at TVA and reassembled at PMO's Middletown site as part of its overall plant construction activities.[12] The TVA biomass conversion equipment is suitable for operational use at the PMO facility. The Harris Group is currently engaged in the process of analyzing TVA's process equipment for the purpose of retrofitting and integrating this equipment into the PMO facility, all in conformity with PMO's obligations under its regulatory permits and the City agreements.

Neither the City agreements nor PMO's regulatory permits dictate the manufacturer or origin of the equipment to be used in the CES OxyNol process. PMO is clearly contemplating how equipment and facilities purchased by PMO from TVA (and others) can be utilized in the Middletown facility, but at all times PMO will utilize equipment and process systems in the Middletown facility that are in full compliance with the permits. This equipment procurement process is an ongoing engineering activity that is strictly monitored and assessed by PMO and the Harris Group.

Mr. Murphy states, with no basis in fact, that PMO's use of TVA facilities and equipment in the PMO facility's footprint "appears to be inconsistent with the facility contemplated under the City/PMO agreements." Without any documents or other evidence to support his position, Mr. Murphy erroneously assumes that PMO has retreated from its original plans to develop a full-scale waste-to-ethanol with a capacity to handle up to 960 tons per day. To the contrary, PMO has signed, certified and submitted to the U.S. Department of Energy ("DOE") a pre-application submission that seeks federal construction loan guarantees of up to $229 million for a full-scale PMO waste-to-ethanol facility capable of processing up to 960 tons of MSW per day.

PMO has also notified the City that it is negotiating for the acquisition of additional buildings and biomass conversion equipment from a Louisiana-based private ethanol company. PMO, the Harris Group and Auburn University have made physical inspections of these facilities and have concluded that portions of the process systems and equipment are suitable for use in the City's PMO facility. This potential acquisition involves process equipment and buildings that were constructed and tested, but were never used in a commercial setting because of a change in ownership and business objectives. The biomass conversion equipment is in excellent condition. PMO will pay cash for the equipment it purchases, and no external financing will be necessary for this purchase. Again, the acquisition of these facilities and equipment is a commercially reasonable effort by PMO to reduce costs and time associated with the "Uncontrollable Circumstances" relating to the PMO facility.

PMO hopes that the City appreciates the steady forward progress it has made in developing the PMO-City waste-to-ethanol facility in the face of Mr. Harms' death and

---

[11] The Harris Group, Inc. is PMO's Seattle-based process engineering firm.
[12] As per Section 25 of the Lease Agreement between the City and PMO, the reassembly of these facilities will be done using local building trade union construction workers.

5

the political and attitudinal sea-change that PMO has experienced from City officials in the post-DeStefano era.

### 2. The Current Status of PMO's Financing.

On December 28, 2007, PMO submitted its DOE pre-application submission for up to $229 million in federal construction loan guarantees. Accompanying the PMO's pre-application submission were two financing letters from private equity firms for $40 to $50 million in equity. PMO's loan guarantee request is supported by U.S. Senators Hillary Rodham Clinton (D-NY)[13] and Jeff Sessions (R-AL)[14]. The letters of support for the PMO facility from Senators Clinton and Sessions are attached as Exhibits A and B, respectively. Senators Clinton and Sessions join other senior members of Congress who have written Energy Secretary Samuel W. Bodman letters of support and encouragement for the PMO project in recognition of Middletown's bold initiative in using its MSW as an innovative tool in the nation's drive for energy independence.

PMO is one of 143 entities nationwide applying for federal construction loan guarantees. To our knowledge, PMO is the only DOE applicant that meets the specific language of Sections 1510 through 1512 of the Energy Policy Act of 2005 that provides for loan guarantees of up to $250 million for at least one federally permitted, MSW-to-ethanol facility.

PMO anticipates a favorable response from DOE to its pre-application submission at any time. Pending the closing of private equity and DOE guaranteed debt transactions, PMO has moved forward with the development of the PMO facility using internal funding from two of the company's investors. This course of action is another effort by PMO to reduce costs and time associated with the "Uncontrollable Circumstances" relating to the PMO facility.

### 3. The Current Status of PMO's Pre-Application for a Construction Loan Guarantee Under the Energy Policy Act.

This information is provided in Section 2 above. In addition to the information above, PMO is attaching a completed copy of its completed DOE pre-application form as Exhibit C.

### 4. The Current Status of PMO's Efforts to Retain an EPC Contractor.

PMO will use the services of an EPC contractor for the full-scale PMO facility and is currently engaged in confidential evaluations of several candidates. As discussed in paragraph 5 below, one of the EPC firms considered has already priced the PMO facility on a design/build basis. PMO will not finalize its selection of an EPC contractor until (i) its talks with all candidates are concluded, and (ii) its institutional financing partners have

---

[13] Senator Clinton is a member of the Senate Environment and Public Works Committee.
[14] Senator Sessions is a member of the Senate Energy and Natural Resources Committee.

concurred in the selection. PMO's investment bankers are currently handling these talks. PMO anticipates adding the Harris Group and an outside consultant to the EPC selection process.

### 5.  The Current Status of PMO's Preparation of Construction Drawings.

PMO's large-scale waste-to-ethanol facility engineering and design documents were prepared several years ago. The project is using a "design/build approach" centered on an EPC firm. The engineering and design documents have been priced by one EPC firm. These documents are currently being reviewed and evaluated further by PMO with an immediate goal of accommodating the City's expressed desire to have PMO begin accepting and disposing of the City's waste streams by a December 9, 2008 Service Date. The City's firm (but erroneously) position on the Service Date has caused PMO to alter its project development approach for meeting the company's essential obligations under the City agreements and regulatory permits, and for achieving PMO's business objectives of building a full scale waste-to-ethanol facility.

PMO is first committed to advancing the City's articulated goal. PMO will achieve the City's goal by using its full panoply of rights under the City agreements to begin accepting and disposing of the City's waste by December 9, 2008. PMO will implement its initial start-up recycling operations through a strategic third-party partnership. As discussed in paragraph 8 below, PMO will also employ the transfer station on site to fulfill its contractual obligation to "use its best efforts to accept and dispose of as much Acceptable Waste as is practicable."

PMO will commence its waste-to-ethanol operations, to the extent practical by December 9, 2008, by developing and building PMO's full scale waste-to-ethanol facility in stages, starting with the reassembly and operation of the TVA facilities and equipment on the site PMO leases from the City. Once the City's December 9, 2008 Service Date desires are achieved by PMO, the company will resume PMO's preferred project development approach for its full-scale PMO facility in a manner that prudently advances PMO's original business objectives.

The construction documents for implementing this modified project development approach for the PMO facility, as described above, are being reviewed and finalized.

### 6.  An Updated Project Schedule Demonstrating Completion of Construction by the Service Date Deadline.

As discussed earlier, PMO does not agree with the City that the Service Date deadline is December 9, 2008. Nevertheless, PMO has taken and is taking steps to reduce construction time for the PMO facility. These steps are described in Section 1 of this report, and are ongoing.

7

On August 4, 2006, PMO submitted to the City an indicative schedule covering the major construction activities. As discussed below, PMO has made substantive progress in the categories covered on the indicative schedule, through April of 2007.

### a. Project Team.

PMO's project development team, scheduled to be assembled in September of 2006, is assembled and working, as needed. As discussed in paragraph 4 above, an EPC firm will be selected at a later date. The PMO project team includes, but is not limited to, the following entities:

### (i) O & M Contractor: Link Resources, Inc.

Link Resources, Inc. is a leading O&M firm headquartered in Marietta, Georgia. The firm has operated a variety of facilities for a diverse client group covering packaged boilers to complex generating stations. (Link has an alliance with AEP Resource Company, an affiliate of American Electric Power.)  Gary Sanden, President, is responsible for the Project agreement.

### (ii) Independent Engineer: R.W. Beck, Inc.

R.W. Beck, Inc. was founded in 1942, and specializes in the operation, planning, organization and methods, financial analyses, administrative procedures, design and other matters related to electric, water, gas, wastewater and solid waste facilities.  The firm is recognized as one of the nation's leading consulting engineering firms (serving industry, utilities, and state and Federal governments), and is a leader in developing comprehensive solid waste management solutions. R.W. Beck has been involved in over 500 solid waste projects nationwide and has a complete understanding of the technical, financial, regulatory, environmental and social issues surrounding solid waste management. The principals assigned to the Project are Jeffrey F. Clunie, Executive Director, Solid Waste Management, and Herbert M. Kosstrin, Ph.D. Senior Director, Special Projects.

### (iii) Process Engineering Oversight: Harris Group Inc.

The Harris Group, Inc., the Facility's process design engineer, has provided engineering and design services to a broad range of industries for 50 years. The Harris Group specializes in consulting engineering, design, and construction management for companies in the pulp and paper, biotechnology, energy, oil, gas, chemical, electronics and manufacturing industries. The Harris Group has been consistently ranked in the *Engineering News Record's* "Top 500 Design Firms" in the United States. Major customers include: Weyerhaeuser, James River, Boise Cascade, Immunex, Starbucks, Coors Brewing Company, Public Service Company of Colorado, and Boeing.  Robert "Bob" Harris is the team leader.

### (iv) Research and Development: Auburn University.

Masada and PMO have teamed with Auburn University's Center for Bioresource Engineering to refine the CES OxyNol process to extract more quantities of fuel grade ethanol from PMO's contracted MSW. Harry Cullinan, Director of the

8

Center for BioResource Engineering, is Auburn's team leader for the Masada project.

### (v) Environmental Consultants: Malcolm Pirnie, Inc.

Malcolm Pirnie, Inc. (MPI) of White Plains, New York, is a century-old environmental engineering firm providing permitting services to the Masada. With a diversified staff of approximately 1,000 engineers, scientists, and planners, MPI is one of the largest consulting firms in the United States concentrating solely on environmental disciplines.   MPI provides services in solid and hazardous waste management, water and wastewater engineering, and air pollution control. In addition to the corporate headquarters in White Plains, New York, MPI maintains 36 offices throughout the United States. Scott Phillips is responsible for the PMO project.

### (vi) Corporate Counsel: Powell Goldstein, LLP

Powell Goldstein LLP is a 97-year old Atlanta-based law firm with offices also in Washington, D.C. and Dallas, Texas. Powell Goldstein represents major corporations and organizations throughout the world. The Firm has a strong representation in health care policy matters, tax, energy, government contracts, government affairs, real estate finance and commercial mortgage-backed securities, healthcare policy matters and tax. David Minkin is the Powell Goldstein partner in charge of the PMO account and the related Masada affiliates.

### (vii) Financial Advisory Services: JPMorgan - New York

JPMorgan Chase & Co., the parent company of J.P. Morgan Securities Inc. ("JPMSI"), is a publicly held company headquartered in New York City. JPMorgan Chase & Co. is a global financial services company with over 70,000 employees throughout the United States, with assets of $1.3 trillion and operations in more than 50 countries. The firm is a leader in investment banking, financial services for consumers, small business and commercial banking, financial transaction processing, asset and wealth management, and private equity. A component of the Dow Jones Industrial Average, JPMorgan serves millions of consumers in the United States and many of the world's most prominent corporate, institutional and government clients under its JPMorgan and Chase brands.

JPMSI is one of the world's leading investment banks, as evidenced by the breadth of its client relationships and product capabilities. The firm provides a full range of investment banking products and services in all major capital markets, including advising on strategy and structure, capital raising, sophisticated risk management, and market-making in cash securities and derivative instruments. The investment bank also commits the firm's own capital to proprietary investing and trading activities.

Roy Torkelson is the JPMSI partner assigned to the PMO project.

9

### (viii) Financial Advisory Services: Ewing Bemiss & Co.

Ewing Bemiss & Co. is a private, full service investment banking company headquartered in Richmond, VA. EB&Co. is a member of the NASD and has closed more than 150 transactions since its inception in 1992. EB&Co. provides a broad range of corporate finance services including mergers and acquisitions and the raising of equity and debt in the private markets. EB&Co. has a number of industry specializations, one of which is alternative energy. EB&Co.'s focus in alternative energy revolves around biomass waste streams, including MSW to ethanol, landfill gas to energy, various organic wastes to energy and wood waste to energy. Mary Bacon is the Ewing Bemiss principal assigned to the PMO project.

### (ix) Financial Advisory Services: The Black Emerald Group-London

The Black Emerald Group was founded in 1994 as one of the first financial advisory firms specializing in the environmental technology sector. Black Emerald advises financial institutions and corporate investors, assisting them in sourcing and executing transactions. Since its inception, Black Emerald has advised on over 20 transactions in the environmental technology space. It has particular expertise in renewable energy but also has experience in organics, recycling, waste recovery, biomass and alternative fuels technologies in both Europe and North America. Eric Urbani is the Black Emerald principal assigned to the PMO project.

### (x) Financial Advisory Services: ASI Advisors, LLC.

ASI Advisors, LLC is a White Plains, New York-based financial advisory boutique specializing in mergers and acquisition and corporate finance. ASI was formed in January of 2002 and has led a number of successful transactions, including the financing of corporate real estate deals for a $30 billion pension fund, $50 million financing of a hotel resort development project in the Caribbean, the acquisition of a NBA franchise, lead advisor in the bid to acquire the world's 4th largest aircraft leasing company, and lead advisor in the merger process for the world's largest barter company.

Donald Stukes is the CEO of the firm. He was part of the AT&T divesture team in the 1980s and has been the initiator and point person for several multi-million dollar projects with the Boeing Company, MCI Communications, and Morgan Stanley Dean Witter. Stukes has worked jointly with several international investment banks in providing privatization consultation for emerging countries and the United States government. He also led the restructuring team for W.R. Lazard, an investment banking firm. Mr. Stukes is the ASI Advisors principal assigned to the Masada project.

### b. Engineering Work.

PMO's engineering work with the Harris Group, scheduled for October of 2006, began as projected, and is ongoing.  As discussed earlier, the Harris Group is overseeing the equipment procurement process with TVA and the Louisiana-based ethanol company.

### c. Equipment and Facilities Acquisition.

PMO is funding project development from internal funds, as needed.  PMO's successful acquisition of the TVA buildings, facilities and equipment, together with the Louisiana plant equipment, is estimated to save up to six or seven months of actual construction time.[15]  The buildings, facilities and equipment are modular in nature and are being acquired off-site for assembly in Middletown.

Facilities reassembly and equipment installation should proceed and be completed within the timeline specified in the indicative schedule PMO provided the City in August of 2006.

### d. Site Preparation.

Site preparation plans and work will be finalized based upon the completion of PMO's current buildings, facilities and equipment acquisition process.  The site preparation scope of work will be handled under a separate contract. PMO anticipates giving formal notice to the City within the next 90-120 days to implement the Work Plan for Investigation of the Middletown Landfill during Construction of the Orange Recycling and Ethanol Production Facility executed by Mayor DeStefano and NYSDEC Commissioner John Cahill on October 16, 2000.

### e. Transfer Station.

As is discussed in more detail in paragraph 10 below, PMO's plans for the transfer station area, scheduled for February of 2008, are proceeding on schedule. PMO is confident that its transfer station area will be ready on or before December 9, 2008.

### f. Revised PMO Indicative Schedule.

In light of the above-referenced events, the Harris Group and others are assisting PMO with a revised PMO indicative schedule.  The revised schedule will be made available to the City when it is completed.

---

[15] This time-savings estimate is also applicable to the City's erroneously calculated December 9, 2008 Service Date.

7. <u>Modifications That May Be Required to PMO's Permits</u>.

Since it executed the City agreements, PMO has carefully avoided undertaking any action that would require changes or modifications to its permits.[16] Nothing PMO has reported to the City in this document or in its prior correspondence with the City has mandated a modification to its regulatory permits, including PMO's August of 2006 discussions with the City regarding its consideration of an evaporator/condensation system at the facility, instead of a pretreatment system.[17]

At the appropriate time, PMO will need City-issued permits and licenses for the construction and operation of its facility. PMO is the City's contractual partner for a defined scope of services in the City agreements. PMO cannot fulfill its contractual obligations to the City without the issuance by the City of various City-issued permits and licenses. PMO fully expects the City to "provide at its own expense all such cooperation in connection with [PMO's efforts in] obtaining and maintaining such permits", as mandated in the City Waste Management Services Agreement.[18] The "Lease Agreement" executed between the City and PMO also mandates the City's cooperation regarding permit matters in Section 10.1, providing as follows:

> "City agrees to cooperate with Company in obtaining any required licenses, permits and zoning variances or approvals pursuant to this Lease, the Operating Lease and the City Waste Agreement. **City agrees that it shall act reasonably, diligently and in good faith in providing all such approvals, licenses, variances and permits for Company."[19]** [Emphasis added]

PMO will submit its application to the City for a building permit and business license in a timely fashion, and we look forward to the City's mandatory cooperation in this regard.

8. <u>Whether PMO Intends To Use Any Portion of Its Facility As a Transfer Station</u>.

PMO is mandated by the City agreements and its Part 360 permit to designate and use a portion of its facility as a transfer station. For example, Section 6 of the "City Waste Management Services Agreement" executed between the City and PMO confers upon PMO the following rights:

---

[16] PMO has provided the City with copies of its NYSDEC 6NYRR part 360, Solid Waste Management permit and the Title V Air Permit.
[17] In August of 2006, PMO provided the City with an August 4, 2006 letter from the NYSDEC, Region III stating that PMO's consideration of an evaporator/condensation system at the facility would not require a permit modification.
[18] See, "City Waste Management Services Agreement", Schedule 2, Section 1, "Permits".
[19] During its August, 2006 appearance before the Common Council, Mr. Murphy strongly hinted that the City might use its permitting authority to frustrate PMO's performance of its contractual obligations to develop and operate the PMO facility. PMO hereby gives notice to all persons that it will pursue every legal remedy against any private-party actor who, acting in concert with others, unlawfully interferes with PMO's contractual relationship arising from the City agreements, or who actively encourages the City to retreat from its mandatory obligations to issue PMO its construction and operating permits and licenses.

(a) "If sufficient Facility capacity is not available [at the PMO Facility] **for any reason**, the Company (i) **shall use the Facility as a transfer station to dispose of Acceptable Waste at the Alternative Disposal Facilities**, or (ii) direct the City to deliver Acceptable Waste to an Alternate Disposal Facility within thirty-six (36) miles of the Facility." [Emphasis added]

This contractual language is also contained in the "Article 5-G Municipal Waste Management Services Agreements" between the City and the 15 villages, townships and cities listed in Attachment-Background H to the "Comprehensive Waste Management Services Agreement" executed between the City and PMO.

The City has known about the transfer station contractual and permitting requirement and its potential use for several years. The transfer station area at the PMO facility was included in the City agreements and the Part 360 permit to ensure PMO's ability to accept and dispose of the City's waste streams to the extent practicable[20], and it was the City that insisted on the inclusion of the Section 6 language quoted above. As such, the transfer station area is an integral part of the PMO facility and will be in place at the PMO facility by the Service Date. PMO will use the transfer station, as needed, for any reason deemed appropriate by PMO.

9.    <u>Whether PMO Proposes To Seek Amendments To The City/PMO Agreements</u>.

At this time, PMO sees no need for any amendments to the City agreements.[21] If the City desires proposed amendments to the City agreements, PMO will consider them in good faith.

10.    <u>Additional PMO-Related Matters.</u>

a.  **The Rollins Matter.**

It has been reported to PMO that Alderman Rollins is now working for Mr. Jim Taylor at Taylor Recycling Company. Mr. Taylor is in the waste disposal business. Reportedly, Mr. Taylor has a new gasification technology he wants to deploy in Orange County for MSW. Mr. Taylor, either individually or through entities he controls (collectively, "Taylor"), is reportedly in a business partnership with Abengoa Bioenergy Biomass of Kansas, LLC. Abengoa Bioenergy is attempting to deploy with Taylor a cellulose conversion system using waste material that potentially competes with PMO. If these reports are accurate, Mr. Rollins has a conflict of interest on all matters dealing with PMO, and PMO would respectfully request that he voluntarily refrain from participating

---

[20] As discussed in paragraph 6 of this report, PMO will use the transfer station to fulfill its contractual obligation to "use its best efforts to accept and dispose of as much Acceptable Waste as is practicable." See, "City Waste Management Services Agreement", Section 14(b)(v).

[21] Absent any impermissible conduct by the City (or others) with PMO's rights under the City agreements, PMO is confident it can meet or exceed its essential obligations, as articulated in this report.

in any and all Common Council discussions, deliberations and votes on matters pertaining to PMO.

### b. PMO's Offer of a $3 Million Lump Sum Payment.

Also, PMO wrote the City on May 6, 2006 offering to structure its third-party financing agreements in a manner that would permit PMO to advance the first three years of its annual host fee payments to the City in a single $3 million lump-sum payment at the closing of PMO's equity financing. The City never accepted this offer. If the City's financial condition motivates it to revisit this offer in the near future, it should let PMO know of its interest in this arrangement as soon as possible.

### c. Benefits to the City from its PMO's Partnership.

Clearly, we understand that to be completely successful, PMO must have the full cooperation of the City. With that cooperation and the successful development of the facility, the City will enjoy significant benefits. While PMO has specifically outlined these benefits for the City previously, we think that it would be helpful to outline them again (recognizing that some of the construction jobs and total amounts to be spent as described below may need to be reduced because PMO will be required to alter its approach due to the City's insistence on maintaining the original Service Date without recognizing Uncontrollable Circumstances):

Construction of the Facility

- 350 jobs will be created for the construction, and the construction will generate an additional 330 "spin-off" jobs

- Over $100 million will be spent with workers and vendors from the Middletown area

- The local economy will receive a boost in excess of $200 million during construction

Operations

- PMO will make direct payments to the City:

    o $100,000, payable at closing of project financing

    o Annual Base Host Fee of $1,000,000, adjusted for inflation, commencing after Service Date

    o Annual Additional Host Fee based upon volume of waste delivered to the facility

14

- o $100,000 annual payment in lieu of taxes, commencing on the third anniversary of the Service Date

- o $50,000 to cover costs of site plan approval, issuance of building permit, and all other fees related to construction of the facility, payable at closing of project financing

- o Up to $100,000 annually, adjusted for inflation, to reimburse the City for salaries (including payroll burden) of two City employees who will monitor the operations of the facility

- The City will realize savings in disposal of municipal solid waste and sludge: The City will pay $65 per ton of municipal solid waste, adjusted for inflation (note: Orange County currently charges $75 per ton for disposal of municipal solid waste). The City will pay from $22.50 to $80 per ton of sludge depending on percent of solids in sludge, adjusted for inflation (note: the City is currently paying $79 per ton of sludge). In addition PMO must offer to the City the lowest price that it charges any of the municipalities that deliver municipal solid waste to the facility

- PMO will pay the cost of implementing the site Work Plan approved by NYSDEC for cleanup of the City's landfill pursuant to Voluntary Cleanup Agreement with NYSDEC

- PMO will pay the cost of surety bond to be obtained by the City pursuant to Voluntary Cleanup Agreement with NYSDEC

- PMO will pay the cost of $5 million environmental liability insurance policy to be obtained and maintained by the City with respect to site contamination pursuant to Voluntary Cleanup Agreement with NYSDEC

- PMO will pay the standard tariff for potable water used in facility, commencing on Start-Up Date

- PMO will pay the standard tariff for sanitary sewage delivered by PMO to City's wastewater treatment plant, commencing on Start-Up Date

- PMO will pay the cost of installation of traffic devices for access to site

- 150 permanent jobs will be created in the facility, and the operations will generate an additional 150-250 "spin-off" jobs (maintenance, hauling, janitorial, etc.)

- Expenditures from the facility will infuse between $62 million and $68 million annually into the local economy, an aggregate of over $1.2 billion in 20 years of operation of the facility

15

- Collection costs will be reduced due to commingled collection of garbage and recyclables

- The tax base will be increased through new jobs and associated economic multipliers

- Ethanol will be available for use with City vehicles

- The region will benefit from the effects of "clean fuel" from ethanol usage

In addition PMO has specifically agreed to provide protection to the City in several respects:

- PMO will provide an irrevocable Letter of Credit in an amount sufficient to cover cost difference for disposal of all municipal waste under contract for 183 day period after termination, amount to be revised annually based upon current costs for disposal by PMO and at alternate contract landfills.

- PMO will provide $5 million environmental liability insurance policy to be obtained and maintained by PMO with respect to future risk from PMO's operations

- PMO will provide $1.5 million financial assurance bond required under NYSDEC permit

- PMO will provide a demolition bond in a minimum amount of $500,000 to cover cost of razing the facility in the event of termination of agreements with the City, the cost of the demolition bond will be reviewed by licensed P.E annually

In addition, PMO has agreed to certain restrictions within the applicable agreements with the City:

- Restrictions on waste and sludge delivery

  o PMO will not accept waste from New York City

  o PMO will not accept sludge from any location that is more than 150 miles from the facility

- Odor control: If odor emanating from the facility is not properly controlled by PMO, the Commissioner of Department of Public Works can pursue appropriate remedies, including termination of Lease

In addition to the foregoing, PMO has agreed that, except for specifically limited areas involving delivery of the City's municipal solid waste to the facility and the execution of standard Municipal Waste Agreements, the City will have no liability to PMO or to any

16

third-party with respect to any potential liability relating to the facility; specifically the City has no liability for payment of PMO's financing or for any environmental problems were they to occur at the facility or for failure of any other municipality to deliver its agreed-upon minimum tonnages of waste.

PMO is proud of its partnership with the City and looks forward to a long and mutually rewarding relationship. If the City needs more in formation from PMO, please do not hesitate to contact us. As always, thank you for being PMO's long-term partner in progress.

Submitted By:

Donald V. Watkins
President
Pencor Orange Corp.
Manager
Pencor Masada OxyNol, LLC
2170 Highland Avenue, Suite 100
Birmingham, Alabama 35205
205-558-4665 (Office)
877-558-4670 (Fax)
donaldvwatkinspc@aol.com

17

# Exhibit A

## March 26, 2007 Letter of Support from Senator Hillary Rodham Clinton to DOE Secretary Samuel Bodman

HILLARY RODHAM CLINTON
NEW YORK
SENATOR

RUSSELL SENATE OFFICE BUILDING
SUITE 476
WASHINGTON, DC 20510-3204
202-224-4451

COMMITTEES:
ARMED SERVICES
ENVIRONMENT AND PUBLIC WORKS
HEALTH, EDUCATION, LABOR, AND PENSIONS
SPECIAL COMMITTEE ON AGING

# United States Senate

WASHINGTON, DC 20510-3204

March 26, 2007

The Honorable Samuel Bodman
Secretary
United States Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

RE:    Municipal Solid Waste Loan Guarantee Program and Cellulosic Biomass and
Waste-Derived Ethanol Conversion Assistance

Dear Mr. Secretary:

I would like to congratulate the Department of Energy for its recent investment of $385 million for cellulosic waste to ethanol projects. We need to continue to promote the use of cellulosic ethanol, and I urge you to institute the Municipal Solid Waste Loan Guarantee Program and Cellulosic Biomass and Waste-Derived Ethanol Conversion Assistance under sections 1510 through 1512 of the *Energy Policy Act of 2005*.

In order to promote the use of cellulosic ethanol, I bring to your attention an eligible project in Middletown, New York, under development by Pencor-Masada OxyNol of Birmingham, Alabama. This company's technology converts municipal solid waste, and wastewater bio-solid sludge, into ethanol and other useful by-products. As you are aware, this company has submitted a pre-application to the Department of Energy and is awaiting final approval before they construct such a facility in Orange County, New York. I urge you to promote the use of cellulosic ethanol and support their application for the Loan Guarantee Program.

Pencor-Masada OxyNol's technology can help this country meet the goals expressed in the Advanced Energy Initiative by providing a local supply of ethanol and an environmentally sustainable waste disposal option. This technology deserves support as it meets our need for fuel, and provides for environmentally sustainable local disposal of municipal wastes.

Please feel free to contact my staff should you have any questions.

Sincerely yours,

Hillary Rodham Clinton

Hillary Rodham Clinton

# Exhibit B

## January 10, 2007 Letter of Support from Senator Jeff Sessions to DOE Secretary Samuel Bodman

ENERGY AND NATURAL RESOURCES
BUDGET

# United States Senate

WASHINGTON, DC 20510–0104

**COPY**

January 10, 2007

The Honorable Samuel Bodman
Secretary
US Department of Energy
1000 Independence Avenue, SW
Washington, D.C.  20585

Dear Secretary Bodman:

I am writing to express my support for the application submitted by the Masada Resource Group, LLC, to the US Department of Energy for the loan guarantee program for projects that employ innovative technologies in support of the Advanced Energy Initiative.

As you may know, Masada has developed and extensively tested a cellulose-to-ethanol process called CES OxyNol, which safely disposes of garbage and sewage sludge while generating ethanol. This loan guarantee would enable Masada, through the newly established Pencor Masada OxyNol (PMO), to build and operate the proposed Orange Recycling and Ethanol Production Facility in Middletown, New York. This facility would be Masada's first commercial application of its cellulose-to-ethanol process, and it would provide the community with a cost-effective, environmentally-friendly waste management option and locally-produced, low-cost fuel grade ethanol.

As I am sure you will agree, this technology is vital to our nation's efforts to advance alternative fuel sources. I wholeheartedly support this effort and urge your full consideration of the Masada Resource Group's loan guarantee application. If you have any questions or need additional information, please do not hesitate to contact Michelle Tims, Grants and Projects Director, in my Birmingham office at 205-731-1500. I look forward to a favorable response regarding this project at your earliest convenience.

Very truly yours,

Jeff Sessions
United States Senator

PRINTED ON RECYCLED PAPER

JS:mjt

# Exhibit C

# December 28, 2006 DOE Loan Guarantee Pre-Application Form

FORM APPROVED
OMB NO.1910-5129

## U.S. Department of Energy Loan Guarantee Pre-Application

DOE's Loan Guarantee Program Office invites you to submit a Pre-Application for a DOE Loan Guarantee. Should the Pre-Application meet the criteria suggested in the Guidelines, DOE may invite you to submit an Application. After filling out this form, please print two copies. Next, click on the "Submit by Email" button above to submit this data electronically. Select "Other" to save this data in an electronic format. Email this file to the Loan Guarantee Program Office at lgprogram@hq.doe.gov. Upload supporting documentation using DOE's Industry Interface Procurement System (http://e-center.doe.gov) and submit one original and one paper copy to the address below. It is highly recommended that all hard copies be sent via Express Mail. Please note your Pre-Application should not exceed 60 pages. For more information please visit our website at http://www.lgprogram.energy.gov.

Mail All Paper Copies to:
Director
U.S. DOE Loan Guarantee Program Office
1000 Independence Ave, SW
Washington, DC 20585-0121

### GENERAL INFORMATION

**Organization Name**

Masada Resource Group, LLC

| Contact Last Name | First Name | Position/Title |
|---|---|---|
| Watkins | Donald | Manager |

| Phone Number (digits only, no spaces) | Fax Number (digits only, no spaces) |
|---|---|
| +1 (205) 558-4665 | +1 (877) 558-4670 |

**Address**

2170 Highland Avenue, Suite 100

| City | State | 9 Digit Zip Code |
|---|---|---|
| Birmingham | Alabama | 35205 |

| Email | Federal Taxpayer ID | DUNS Number |
|---|---|---|
| donaldvwatkinspc@aol.com |  | Applied For |

| Project Location - City | State | 9 Digit Zip Code |
|---|---|---|
| Middletown | New York | 10940-5710 |

### PROJECT SPONSORS (ASSET HOLDERS)

| Organization Name | Contact/Phone | Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|---|
| Masada Resource | 2055584665 | 2170 Highland Ave Ste 10 | Birmingham | AL | 35205 | U.S.A. |
| Masada Oxynol | 2055584665 | 2170 Highland Ave Ste 10 | Birmingham | AL | 35205 | U.S.A. |
| Pencor Masada Co | 2055584665 | 2170 Highland Ave Ste 10 | Birmingham | AL | 35205 | U.S.A. |
| Pencor Orange Co | 2055584665 | 2170 Highland Ave Ste 10 | Birmingham | AL | 35205 | U.S.A. |

DOE-LGP-Form 01-v.08/2006

FORM APPROVED
OMB NO.1910-5129

## SUMMARY OF LOAN GUARANTEE REQUEST

| Required Period of Guarantee | 20 | yrs | Total Project Cost | $ | 182,000,000 |
|---|---|---|---|---|---|
| Guarantee/Loan Instrument | 70 | % | Proposed Guarantee/Loan | $ | 255,000,000 |
| Default/Equity Ratio | 75 | % | | | |

\* Please indicate dollars in millions

## CATEGORY OF PROJECT

Please refer to Part I Section D of the Solicitation to determine the appropriate category number of your project. For example, you would insert a check mark on the third line in the far right column for a photovoltaic manufacturing project. If your project does not fit in any of the prescribed categories, please check the "Other" line in the right box.

| Category | Description | Check Appropriate Box |
|---|---|---|
| 1 | Biomass | ☒ |
| 2 | Hydrogen | ☐ |
| 3 | Solar | ☐ |
| 4 | Wind and Hydropower | ☐ |
| 5 | Advanced Fossil Energy-Coal | ☐ |
| 6 | Carbon Sequestration Practices and Technologies | ☐ |
| 7 | Electricity Delivery and Energy Reliability | ☐ |
| 8 | Alternative Fuel Vehicles | ☐ |
| 9 | Industrial Energy Efficiency Projects | ☐ |
| 10 | Pollution Control Equipment | ☐ |

## CERTIFICATION

The undersigned certifies that the data and information submitted and the representations made in this Pre-Application and any attachments to this Pre-Application are true and correct, to the best of the Applicant's knowledge and belief after due diligence, and that the Applicant has not omitted any material facts.

The undersigned further certifies to having full authority to bind the Applicant.

Applicant (Organization Name)

Masada Resource Group, LLC

Name of Applicant's Authorized Officer *(will fulfill on-line certification)*   Title

Donald V. Watkins                                    Manager

Signature of Authorized Officer  *(for paper copy only)*

Donald V Watkins                              Date   12/28/2006

DOE-LGP-Form 01-v.08/2006

Exhibit L

# CITY OF MIDDLETOWN, NY
## COMMON COUNCIL
### RECORD OF VOTE

HE FOLLOWING WAS PRESENTED

y Alderman _Vander Voort_

'd by Alderman _Rodrigues_

ate of Adoption _6-11-07_

dex Number _157.07_

| NAMES | AYES | NOES | ABSTAIN | ABSENT |
|---|---|---|---|---|
| VanderVoort | ✓ | | | |
| Kleiner | ✓ | | | |
| Rodrigues | ✓ | | | |
| Depew | ✓ | | | |
| Rollins | | | ✓ | |
| Sierra | | | | ✓ |
| Meyer | ✓ | | | |
| Burr | | | | ✓ |
| PRES. MOSON | ✓ | | | |
| TOTAL | 6 | | 1 | 1 |

CITY OF MIDDLETOWN, NEW YORK
COMMON COUNCIL

WHEREAS, in 1994 the City of Middletown issued a request for proposals for a comprehensive, integrated and environmentally sound solution to its solid waste needs that excludes incineration, and Pencor Orange Corp. was selected as the preferred bidder; and

WHEREAS, effective December 9, 2003, the City of Middletown entered into a certain City Waste Management Services Agreement, Comprehensive Waste Management Services Agreement, Lease Agreement, and Host Community Agreement (collectively, the "City Agreements") with Pencor-Masada OxyNol, LLC ("PMO") for the construction and operation on City property of a full-scale waste-to-ethanol facility which would utilize the CES OxyNol process to convert municipal solid waste ("MSW") and sewage sludge into ethanol and other valuable products and which is expected to process 230,000 wet tons per year of MSW and up to 49,000 tons per year (dry solids basis) of sewage sludge in order to produce 7 million gallons per year of ethanol (the "Facility"); and

WHEREAS, the City Agreements require that the Facility must be constructed and fully operational, such that it begins accepting and processing all of the City's MSW, sewage sludge and construction waste no later than December 9, 2008; and

WHEREAS, the environmental review conducted for the project pursuant to the New York State Environmental Quality Review Act, and the conclusions drawn therefrom, were premised on the assumption that PMO would construct the Facility described above; and

WHEREAS, the agreements between the City and PMO require PMO to make certain host fee payments to the City upon commencement of operations of the Facility; and

WHEREAS, on or about May 6, 2006, PMO communicated to the City that it had an opportunity to structure certain third-party financing for the Facility in a manner that would allow PMO to offer to the City, subject to the City fulfilling certain conditions not contained in the City Agreements, an advance payment upon closing of said financing of the first three years in host fees to the City in a single $3 million payment; and

WHEREAS, Masada Resource Group, LLC has submitted a U.S. Department of Energy Loan Guarantee Pre-Application for a Biomass project;

NOW, THEREFORE, BE IT RESOLVED, the Common Council of the City of Middletown shall continue to comply with the strict terms and conditions of the City Agreements, and, cognizant of and without waiving rights and remedies afforded the City in said agreements, has determined not to accept PMO's offer of an advance host fee payment; and be it further

RESOLVED, that the Common Council of the City of Middletown expresses its support for the application of Mass. Resources Group, LLC for a U.S. Department of Energy Loan Guarantee, PROVIDED such application is in support of the Facility described above and provided PMO complies with all terms and conditions of the City Agreements.

# OFFICE OF THE COMMON COUNCIL CLERK
# CITY OF MIDDLETOWN
# MIDDLETOWN, NEW YORK

RESOLUITON NUMBER _157-07_    LOCAL LAW NUMBER_____

I hereby Certify that the attached is a true copy of a Resolution and/or Local Law adopted by the City of Middletown Common Council·on

_____June 11, 2007_____

and presented to the Office of the Mayor on

_____June 13, 2007_____

_Charles F. Mitchell_
Charles F. Mitchell
Clerk of the Common Council

_____

For Mayor's use only:

I hereby approve the attached Resolution/ Local Law

_Marlinda Duncan_                    _6-13-07_
Mayor, City of Middletown              Date

_____

For Mayor's use only:

I hereby dis-approve of the attached Resolution/Local Law for the following reason(s):

_____

_____

_____

_____

Mayor, City of Middletown              Date

Exhibit M

Michael O. Murphy
15th Floor
477 Madison Avenue
New York, NY 10022-5802
Direct: (212) 702-5436
Fax: (212) 702-5450
mmurphy@bdlaw.com

June 12, 2007

**VIA E-MAIL & FAX**

David N. Minkin, Esq.
Powell Goldstein, LLP
One Atlantic Center, 14th Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488

    Re:     PMO Solid Waste Processing Facility: Middletown, New York

Dear David:

    This letter addresses a number of recent submissions from Pencor Masada OxyNol, LLC ("PMO") regarding the status of its proposed waste-to-ethanol facility, including a document entitled "Progress Report to the City of Middletown, New York on the Orange Recycling and Ethanol Production Facility by Pencor Masada OxyNol, LLC" dated May 22, 2007 (hereinafter "May 2007 Report"). As we stated at the May 22, 2007 meeting before the City of Middletown Common Council, we did not have an opportunity to review the May 2007 Report before the meeting and therefore reserved judgment as to its contents. Now that we have completed our review, we are prepared to address a number of issues raised by PMO's submissions, which raise new and deeply troubling concerns over PMO's ability to comply with the letter and spirit of the City/PMO agreements.

**PMO's Transfer Station Proposal Fails To Meet Service Date Deadline**

    Although many of the City's questions remain unanswered, PMO has finally made its intentions known for the first time regarding its plans for the facility. The May 2007 Report (page 7) states that PMO will not construct a full-scale waste-to-ethanol facility by December 9, 2008. Rather, PMO plans to "employ the transfer station on site to fulfill its contractual obligation" and intends to develop and build "PMO's full scale waste-to-ethanol facility in stages, starting with the reassembly and operation of the TVA facilities and equipment" and then, sometime after December 9, 2008, "resume PMO's preferred project development approach for its full-scale PMO facility in a manner that prudently advances PMO's original business objectives." To be clear, the City believes that this proposed course of action would be a direct

David N. Minkin, Esq.
June 12, 2007
Page 2

violation of the City/PMO agreements, and would eviscerate the basis for the City's decision to contract with PMO in the first place.

The fundamental premise underlying the City/PMO agreements was PMO's proposal — in response to a detailed Request for Proposals ("RFP") process — to construct a comprehensive, integrated and environmentally sound solid waste processing facility on the City's property for handling all of the City's municipal solid waste ("MSW"), sewage sludge and other wastes. The contemplated facility is composed of a materials recovery facility ("MRF") for separating the various components of the waste stream, and a full-scale waste-to-ethanol facility using the OxyNol process to convert the biomass portion of the waste stream into fuel-grade ethanol. Donald Watkins confirmed this intention at the May 22, 2007 Common Council meeting, and it is further confirmed by PMO's U.S. Department of Energy ("DOE") Loan Guarantee Pre-Application, as well as the findings statement for the project issued by the City pursuant to the State Environmental Quality Review Act ("SEQRA").

By contrast, PMO's expressed intention to construct a MSW transfer station with a 2 to 4 ton-per-day, pilot-scale waste-to-ethanol plant is not consistent with the City/PMO agreements or the City's SEQRA findings, and is not an acceptable proposal for construction on City property. Section 1 of the City Waste Management Services Agreement expressly affords the City the right to terminate the agreements in the event PMO fails to meet the Service Date deadline of December 9, 2008. "Service Date" is defined as the "date the City shall commence delivery of all of its Acceptable Waste to the <u>Facility</u>." The agreement defines "Facility" as an "integrated solid waste management processing facility, together with all additions, replacements, appurtenant structures and equipment, to be designed, constructed and operated by the Company on the <u>Facility Site</u>." "Facility Site" is defined as "the real property upon which the Facility is located." Thus, PMO must, by the Service Date deadline of December 9, 2008, have a fully operational waste-to-ethanol facility at the Facility Site. If it fails to do so, the City has the express right to terminate the agreements.

Based on the May 2007 Report, PMO's position is that it need only construct some sort of temporary facility capable of accepting all the City's waste by the Service Date, and that PMO can take as long as it desires to actually complete construction of a full-scale facility, on its own timeline. PMO's reading of the agreements would render the Conditions Precedent and the City's termination rights under the City Waste Management Services Agreement meaningless, which is unacceptable to the City. PMO seems to recognize this problem in the May 2007 Report by repeatedly citing its "contractual obligation" to "use its best efforts to accept and Dispose of as much Acceptable Waste as is practicable." In fact, this language is merely one of the obligations in Section 14 of the City Waste Management Services Agreement applicable to a party seeking to excuse its nonperformance in the event of "uncontrollable circumstances". As discussed below, no uncontrollable circumstance has occurred. Thus, reference to this particular "contractual obligation" does not excuse PMO's looming failure to comply with an explicit condition precedent.

David N. Minkin, Esq.
June 12, 2007
Page 3

We remind you that well over a decade has already passed since the City first issued the RFP in 1994. Now, based on the May 2007 Report, it appears the promised "Facility" would not be realized for closer to two decades after the RFP. The City will not be held hostage to PMO's failure to meet mandatory contractual obligations that currently apply and have not been waived, as opposed to contractual obligations that PMO wished applied based on a non-existent uncontrollable circumstance.

PMO's attempt to excuse its anticipated nonperformance using Section 6 of the City Waste Management Services Agreement (Alternate Disposal Facilities) is unavailing. *See* May 2007 Report § 8. In order to prevent a public health hazard, the PMO facility was required, in the event of an outage, to have the capability to be used on a temporary basis as a transfer station to accept and dispose of all the City's waste without interruption. This provision does not excuse PMO from actually constructing the facility as contemplated in the agreements. In a November 6, 2002 communication to the City, for example, PMO provided the following response to a question posed by the City:

> *Will the Facility be designed with storage capacity to store the MSW that does not get processed in a day?*
>
> No. PMO did not include MSW storage capacity in the design since MSW will be processed to feedstock each day of MRF operations. In the event of a scheduled or unscheduled shutdown, the MRF tipping floor provides a platform for temporary storage (24 hours) as operation shifts to a traditional transfer station operation mode.

Thus, the agreements permit the facility to operate as a transfer station only as a contingency measure in the event of a shutdown of the full-scale waste-to-ethanol processing facility, not as an integral aspect of the operations due to PMO's failure to timely pursue and complete construction.

Further, PMO's newly disclosed proposal is completely at odds with environmental impact findings statement issued by the City of Middletown Common Council, as lead agency under SEQRA. The findings statement expressly states that PMO would construct and operate a facility that "would utilize an innovative process, the CES OxyNol™ process, for converting municipal solid waste (MSW) and sewage sludge into ethanol and other valuable products. The Facility is expected to process 230,000 wet tons per year of MSW and up to 49,000 tons per year (dry solids basis) of sewage sludge and produce 7 million gallons per year or ethanol." All of the City's findings are based on this assumption and would be rendered invalid if PMO pursues its alternative proposal because it has not been assessed under SEQRA. PMO's unilateral change almost certainly would require the preparation of a supplemental environmental impact statement, which by law is subject to public review and comment.

David N. Minkin, Esq.
June 12, 2007
Page 4

### Fundamental Agreement Provisions Rendered Meaningless By PMO

We have previously pointed out that PMO's unilateral decision not to seek financing through the City of Middletown Industrial Development Agency ("IDA"), as contemplated under all the City/PMO agreements, affects fundamental, substantive obligations under the agreements. The term of the Lease Agreement and the Comprehensive Waste Management Services Agreement, for instance, does not begin until the closing of IDA bond financing, which now apparently will never occur. Similarly, the one-time payment of $100,000 to the City under Section 2 of the Lease is not payable until the closing of IDA bond financing; the $100,000 PILOT payment to the City under the Host Community Agreement will never become due since the facility will not be owned by the IDA; the one-time payment of $50,000 relating to local approvals under the Host Community Agreement is not payable until the closing of IDA bond financing; and the contract termination fee payable in the event of certain defaults is defined as a proportion of the outstanding principal amount of the IDA bonds.

PMO's change in financing affects fundamental assumptions in the City/PMO agreements and would render several provisions meaningless. Accordingly, we believe PMO's assertions that these issues are "ministerial" or "minor" in nature (May 22, 2007 Common Council meeting) and that there is "no need for any amendments to the City agreements" (May 2007 Report § 9) are incorrect and disingenuous. We do not understand, for example, how PMO is authorized to proceed with any site preparation or construction activities on the City's property, considering that the term of the Lease Agreement cannot commence in the absence of an amendment to its terms.[1]  *See* Lease § 1.

### Resolution 20-96 Does Not Affect City's Obligations

PMO makes reference to a resolution (No. 20-96) passed by the Common Council in 1996 relating to the PMO project. *See* May 2007 Report at 2-3. Many years after Resolution 20-96 passed, the parties entered into a number of agreements, which supersede any and all prior agreements, commitments or understandings by or between the parties. Section 24.3 of the Lease Agreement states:

> The Lease, together with the City Waste Agreement, the Comprehensive Waste Agreement and the Host Community

---

[1]  We are in receipt of your letter dated June 6, 2007, in which you assert "You have mentioned on several occasions that the City may desire amending the Lease between the City and PMO to cover certain unidentified matters." You are incorrect. First, the City has identified the "matters" at issue on several occasions. Further, the City has never expressed a "desire" to amend the Lease. The City has merely stated that the course of action that PMO has unilaterally determined to undertake is inconsistent with the terms of the Lease in the absence of an amendment.

David N. Minkin, Esq.
June 12, 2007
Page 5

Agreement, (i) is the <u>entire understanding</u> of the parties with
respect to the subject hereof and supersedes <u>all prior agreements,
understandings and commitments</u> with respect thereto and (ii) may
be modified only by written agreement executed by both parties.

The City's rights and obligations are defined solely by the City/PMO agreements, not by a
resolution that predates the agreements by seven years. This is not to say, however, that the City
is unwilling to cooperate with PMO. In fact, the City recently approved a resolution with respect
to PMO's DOE Loan Guarantee Pre-Application.

### City's Continued Cooperation

PMO levels a number of unfounded charges at the City in relation to its willingness to
cooperate. PMO points to the number of communications that have been directed to PMO
seeking answers to its questions and then claims that it has answered the questions posed by the
City in a "responsible, responsive and timely manner." *See* May 2007 Report at 3. Based on the
responses received to date, we respectfully disagree.

PMO claims that when the City offered in a June 7, 2006 letter to cooperate with PMO's
financing efforts it was accompanied by "notification by the City of its intent to charge PMO
exorbitant legal fees and costs for an estimated (and unreasonable) 15 business days of document
review work by Mr. Murphy even though Assistant City Attorney Alex Smith was already
intimately familiar with the City's PMO-related documents." *See* May 2007 Report at 3. This
completely mischaracterizes the communications on this issue. First, the City never provided an
estimate of legal fees that might be incurred in relation to the due diligence/privilege review
effort; thus, it is difficult to understand how PMO can conclude that the fees would be
"exorbitant." Second, to our recollection, PMO never protested about the estimated 15 days it
might take for the City to gather, assemble and conduct a privilege review of the relevant
information, which is voluminous. Further, PMO, by omission, mischaracterizes the June 7,
2006 letter, which clearly states:

A list may greatly reduce the effort the City needs to undertake to
gather the relevant information. . . . The City currently estimates
that it will require approximately 15 business days to gather,
review and assemble the documents at an appropriate location or
locations. <u>If PMO could narrow the list of documents that would
need to be reviewed, the City may be able to shorten that time.</u>
Please advise us at your earliest convenience.

In its May 25, 2006 letter, Beveridge & Diamond had already advised PMO that the City would
"make every reasonable effort to make the files available for review in an orderly fashion." As
to the City's request that it be reimbursed for legal fees in relation to this effort, the

David N. Minkin, Esq.
June 12, 2007
Page 6

Comprehensive Waste Management Services Agreement clearly and unambiguously states: "The Company [PMO] agrees to reimburse all reasonable costs incurred by the City's counsel in providing the information required in connection with the financing as set forth herein."

## TVA Pilot Equipment and Uncontrollable Circumstances

A number of months ago, PMO informed the City of its plan to seek to acquire pilot plant equipment from the Tennessee Valley Authority ("TVA") pursuant to an RFP. PMO eventually provided the City with the RFP regarding the TVA equipment. The RFP discloses that the TVA equipment has the capacity to process between 2 and 4 tons of MSW per day, approximately one tenth the volume of MSW generated by the City, even ignoring the City's sewage sludge or waste generated by other municipalities. The City informed PMO then, as it does now, that the TVA pilot equipment is completely inconsistent with the facility contemplated in the agreements.

The City's position is further bolstered by other recent PMO's disclosures. In the report, PMO refers to a partnership with Auburn University. *See* May 2007 Report at 5. On May 30, 2007, you forwarded a press release regarding a "research agreement" between PMO and Auburn "to develop and evaluate promising alternatives for the production of ethanol, aviation and other fuels using waste and natural resources." (emphasis added). The release continues:

> The proposed work will include the identification and validation of the optimal pretreatment of municipal waste to prepare it for ethanol production through enzymatic and microbial conversion. Researchers will also explore, a novel and environmentally-friendly means of separating cellulose and lignin from biomass; identify a cost-effective processing scheme for biomass and municipal waste, enabling the production of synthesis gas that can be used to produce aviation fuel as well as value-added chemicals; and develop a mathematical-based framework that accommodates the inclusion of profitability and other techno-economic measures in the process planning for a large biorefinery. (emphasis added).

The City applauds PMO's research efforts, but the agreements between the City and PMO call for a full-scale operational waste-to-ethanol facility, not a research facility. To the extent PMO intends to conduct research and development operations on the City's property, it is inconsistent with the agreements, as noted above.

In discussing the small-scale TVA pilot equipment PMO proposes to use at the facility site, PMO asserts certain "uncontrollable circumstances" that it claims to "automatically delay" the current Service Date deadline. At one point, PMO claimed three bases for "uncontrollable

BEVERIDGE&DIAMOND

David N. Minkin, Esq.
June 12, 2007
Page 7

circumstances," one of which related to events that occurred prior to the effective date of the City/PMO agreements and therefore could not possibly constitute an uncontrollable circumstance under these agreements. PMO apparently no longer asserts this "uncontrollable circumstance" but still claims that the City's "delay" in delivering executed agreements[2] and Mr. Daryl Harms' illness and death both constituted uncontrollable circumstances. To the contrary, PMO, just prior to Mr. Harms' unfortunate death, voluntarily chose to execute the agreements, and thereby ratified the terms and conditions of the agreements as of the execution date and waived any and all rights to claim uncontrollable circumstances prior to that date. Further, even absent ratification, neither event claimed by PMO constitutes an uncontrollable circumstance under the agreements for the reasons stated in our May 25, 2006 letter.  We refer you to that letter for its contents.

Thus, PMO's claims that it acquired the TVA equipment to minimize the costs and time associated with "uncontrollable circumstances" is of little moment because no "uncontrollable circumstance" has arisen. In any event, PMO cannot excuse its nonperformance because it failed to provide the City "prompt written notice describing the particulars of the uncontrollable circumstance and the potential duration of the prevention of or delay in performance." City Waste Management Services Agreement § 14(b)(i). Our records indicate that PMO first claimed uncontrollable circumstances in an email dated April 30, 2006, well after the alleged events claimed by PMO to excuse its anticipated nonperformance.

### Other Issues Based on the May 2007 Report

We note the following additional issues based on the May 2007 Report:

1. Aside from being inconsistent with the Service Date deadline in the City/PMO agreements, it is our understanding that PMO has not even consummated its purchase of the TVA equipment at this juncture.

2. PMO appears to have made no progress in securing a contractor to construct the facility beyond that reported to the Common Council last August.

3. Although PMO continues to contend that its plans are consistent with the approved site plan, Part 360 permit and other governmental approvals, the report offers no evidence to support this contention.

---

[2] PMO claims: "The City Agreements were properly executed by then-Mayor DeStefano on December 8, 2003, but not delivered to PMO until April 2004. The City has never explained this delay to PMO." PMO's claim is false. In fact, Mayor DeStefano did not execute the agreements until late-March 2004, at which time they were promptly delivered to PMO. As PMO is well aware, the agreements were not executed until that time because the City and PMO were still finalizing certain insurance and indemnification details prior to that time.

BEVERIDGE & DIAMOND

David N. Minkin, Esq.
June 12, 2007
Page 8

4. PMO asserts that the City, under the agreements, is required to act reasonably and in good faith in providing approvals for the project. This does not address the issue of whether modifications to existing permits are required, and certainly not those permits issued by other entities.[3] Moreover, while the City agreed to "act reasonably, diligently and in good faith" with PMO in obtaining required approvals, the City cannot and will not abrogate its legal duty to review the merits of any application that comes before it, whether under SEQRA or other applicable provisions of State or local law.[4]

5. PMO states that it "anticipates a favorable response from DOE to its [Energy Policy Act] pre-application submission at any time." *See* May 2007 Report at 6. As reported to the Common Council on May 22, 2007, DOE's deadline for making determinations to invite certain pre-applicants to submit a formal application has been extended to December 31, 2007, at which time. Assuming PMO is one of the selected entities at that time,[5] an actual award will not be made until (1) a formal application has been submitted, (2) the application is reviewed, (3) the application is approved and (4) DOE has issued final regulations under the Title XVII program. PMO offers no explanation as to how a DOE construction loan guarantee might be available in time to support the construction of the Facility required under the agreements by the Service Date deadline, assuming again the Facility is actually deemed eligible under Title XVII of the Energy Policy Act. PMO's statements that, in the event a DOE loan guarantee is not available, PMO will proceed with alternative financing provides the City with no reassurance with respect to PMO's obligations to meet the Service Date deadline.

---

[3] PMO, in the May 2007 Report states: "In August of 2006, PMO provided the City with an August 4, 2006 letter from the NYSDEC, Region III stating that PMO's consideration of an evaporator/condensation system at the facility would not require a permit modification." As we have pointed out in the past, this is simply incorrect. The NYSDEC's August 4, 2006 letter concerning PMO's change to an evaporator/condensation system clearly states:

> As stated in Mr. Baldwin's response, <u>design details should be submitted to Department staff</u> at the appropriate time, in accordance with existing permit requirements. Of course, <u>the Department must reserve a final view of this matter until that time</u>. (emphasis added).

[4] PMO's assertion that "Mr. Murphy strongly hinted that the City might use its permitting authority to frustrate PMO's performance of its contractual obligations to develop and operate the PMO facility" is patently false. No such statement was made at the August 2006 Common Council meeting or at any other time.

[5] PMO has never explained how it will meet the air emission limits set forth in Title XVII of the Energy Policy Act.

6. Notwithstanding the fact that PMO reported last August that it expected to receive financing within 45 days (which followed earlier promises of financing), the May 2007 Report confirms that no financing has been obtained to date, and none is imminent.

7. PMO continues to assert, with no basis in fact, that the project would result in certain benefits to the City, such as "immunity for Middletown to petroleum price uncertainty and volatility."

### May 31, 2007 Letter

We also are in receipt of a letter dated May 31, 2007, in which PMO, among other things, purports to give the City "notice of its request for the City to implement, effective immediately, the *Work Plan for Investigation of the Middletown Landfill during Construction of the Orange Recycling and Ethanol Production Facility.*" This request is inconsistent with the terms of the City/PMO agreements. We refer you to the Lease Agreement, in which PMO "agrees, at its own expense, to execute" the Work Plan. We invite you to provide some clarification on this issue.

The May 31st letter also attaches an indicative schedule for the project. The schedule is confusing and appears to be incomplete. For example, the schedule suggests that PMO will "begin processing MSW" by December 2009, but no explanation of this task is provided. The last item on the schedule, "Qualify Ethanol production Process," which extends well beyond December 2009, strongly suggests that PMO will not, by that date, be processing MSW as required under the agreements. However, no explanation is provided as to what the "Qualify Ethanol production Process" task constitutes. Please provide a narrative description of each task so that the City can properly understand the schedule.

### Conflict of Interest

We have passed along your May 24, 2007 letter to the City. The City's officials understand their obligations with respect to avoiding conflicts of interest, and will continue to act appropriately in all respects.

BEVERIDGE & DIAMOND

David N. Minkin, Esq.
June 12, 2007
Page 10

In closing, it appears that PMO has chosen to go down a path that would violate the fundamental bargain reached in the City/PMO agreements. The City will not tolerate such open defiance of PMO's basic contractual obligations, and reserves all its rights and remedies with respect thereto.

Sincerely,

Michael Murphy

cc:    Honorable Marlinda Duncanson, Mayor      (via fax & U.S. mail)
       Alex Smith, Esq., Corporation Counsel     (via fax & U.S. mail)
       Donald Watkins, PMO                        (via fax & E-mail)
       Christopher J. McKenzie, Esq.

85700v5 NewYork 012753