UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
CITY OF MIDDLETOWN, MARLINDA DUNCANSON,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY
AS MAYOR OF THE CITY OF MIDDLETOWN, ROBERT
MOSON, IN HIS OFFICIAL CAPACITY AS PRESIDENT
OF THE COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, MAXINE MEYER, INDIVIDUALLY
AND IN HER OFFICIAL CAPACITY AS A MEMBER OF
THE COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, JAMES ROLLINS, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY AS A MEMBER OF
THE COMMON COUNCIL OF THE CITY OF
MIDDLETOWN, THOMAS J. BURR, IN HIS OFFICIAL
CAPACITY AS A MEMBER OF THE COMMON
COUNCIL OF THE CITY OF MIDDLETOWN, JOHN
VANDERVOORT, IN HIS OFFICIAL CAPACITY AS A
MEMBER OF THE COMMON COUNCIL OF THE CITY
OF MIDDLETOWN, GERALD KLEINER, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF MIDDLETOWN,
RAYMOND DEPEW, IN HIS OFFICIAL CAPACITY AS
A MEMBER OF THE COMMON COUNCIL OF THE
CITY OF MIDDLETOWN, AND JOEL SIERRA, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF THE
COMMON COUNCIL OF THE CITY OF MIDDLETOWN,

**VERIFIED ANSWER WITH
COUNTER-CLAIMS AND
OBJECTIONS IN POINT OF LAW**

07 CV 6572 (CLB)

Index No. 2007-6035

Petitioners,

-against-

PENCOR-MASADA OXYNOL, LLC,

Respondent.

-------------------------------------------------------------------X

Respondent, PENCOR-MASADA OXYNOL, LLC, by its attorneys, TARSHIS,

CATANIA, LIBERTH, MAHON & MILLIGRAM, PLLC, answering the verified

petition of the petitioners, alleges as follows:

### AS TO THE NATURE OF THE ACTION

FIRST: Denies each and every allegation contained in the paragraphs of the

verified petition numbered "1" and "2."

## AS TO THE PARTIES

SECOND:  Denies any knowledge or information sufficient to form a belief as to the truth or falsity of each and every allegation contained in the paragraphs of the verified petition numbered "3," "4," "5," "6," "7," "8," "9," "10," "11," "12" and "13."

## AS TO THE JURISDICTION AND VENUE

THIRD:  Denies each and every allegation contained in the paragraphs of the verified petition numbered "15," "16" and "17" and respectfully refers all questions of law to the court.

## AS TO THE AGREEMENTS BETWEEN THE CITY AND PMO

FOURTH:  Denies any knowledge or information sufficient to form a belief as to the truth or falsity of each and every allegation contained in the paragraphs of the verified petition numbered "18," "19," "22," "23," "27," "28" and "29."

FIFTH:  Denies upon information and belief each and every allegation contained in the paragraphs of the verified petition numbered "20," "21," and respectfully refers all of questions of law to the court.

SIXTH:  Denies any knowledge or information sufficient to form a belief as to whether the agreements at issue had an effective date of December 9, 2003 as contained in the paragraph of the verified petition numbered "24," and respectfully refers all of the questions of law to the court. Otherwise, avers that the documents speak for themselves.

SEVENTH:  Admits each and every allegation contained in the paragraph of the verified petition numbered "25," but respectfully refers all of the questions of law to the court.

EIGHTH:  Denies upon information and belief each and every allegation contained in the paragraph of the verified petition numbered "30."

NINTH:  Denies each and every allegation contained in the paragraph of the verified petition numbered "31."

2

TENTH: Denies each and every allegation contained in the paragraphs of the verified petition numbered "32," "33," "34," "35," "36" and "37" and avers the documents speak for themselves.

## AS TO THE RELEVANT POST-AGREEMENT CONDUCT

ELEVENTH: Denies each and every allegation contained in the paragraph of the verified petition numbered "38," "39," "40," "41," "42," "43," "47," "48" and "53."

TWELFTH: Denies each and every allegation contained in the paragraphs of the verified petition numbered "44," "45," "46" and "56," and respectfully refers all questions of law to the court.

THIRTEENTH: Admits each and every allegation contained in the paragraph of the verified petition numbered "49," except denies any knowledge or information as to "deliver a project status update".

FOURTEENTH: Denies any knowledge or information sufficient to form a belief as to the truth or falsity of each and every allegation contained in the paragraph of the verified petition numbered "50."

FIFTEENTH: Admits each and every allegation contained in the paragraphs of the verified petition numbered "51" and "52" and avers that the documents speak for themselves.

SIXTEENTH: Denies the allegation "demanded" as contained in the paragraph of the verified petition numbered "54."

SEVENTEENTH: Denies any knowledge or information sufficient to form a belief as to the truth or falsity of each and every allegation contained in the paragraph of the verified petition numbered "55" and avers that the resolution speaks for itself.

## AS TO THE ARBITRATION PROCEEDING

EIGHTEENTH: Admits each and every allegation contained in the paragraphs of the verified petition numbered "57," "58" and "59" and avers that the documents speak for themselves.

### AS TO THE FIRST CLAIM FOR RELIEF

NINETEENTH: Repeats and realleges each and every response to the allegations contained in the paragraphs of the verified petition numbered "1" through "59," inclusive, as realleged in paragraph "60," with the same force and effect as though more fully set forth at length herein.

TWENTIETH: Denies any knowledge or information sufficient to form a belief as to the truth or falsity of each and every allegation contained in the paragraph of the verified petition numbered "63," "64."

TWENTY-FIRST: Denies each and every allegation contained in the paragraphs of the verified petition numbered "65" and "66," and "67", and respectfully refers all questions of law to the court.

### AS TO THE SECOND CLAIM FOR RELIEF

TWENTY-SECOND: Repeats and realleges each and every response to the allegations contained in the paragraphs of the verified petition numbered "1" through "67," inclusive, as realleged in paragraph "68," with the same force and effect as though more fully set forth at length herein.

TWENTY-THIRD: Denies each and every allegation contained in the paragraphs of the verified petition numbered "69," "70," and "73," and respectfully refers all questions of law to the court. However, allegations in paragraphs "71" and "72" are conclusions of law not requiring a response.

### AS TO THE THIRD CLAIM FOR RELIEF

TWENTY-FOURTH: Repeats and realleges each and every response to the allegations contained in the paragraphs of the verified petition numbered "1" through "73," inclusive, as realleged in paragraph "74," with the same force and effect as though more fully set forth at length herein.

TWENTY-FIFTH: Denies each and every allegation contained in the paragraphs of the verified petition numbered "75," "77," and "78," and respectfully refers all

4

questions of law to the court.

TWENTY-SIXTH: Denies any knowledge or information sufficient to form a belief as to the truth or falsity of each and every allegation contained in the paragraph of the verified petition numbered "76."

TWENTY-SEVENTH: Denies each and every allegation contained in the paragraphs of the verified petition numbered "79" and "80."

## AS TO THE FOURTH CLAIM FOR RELIEF

TWENTY-EIGHTH: Repeats and realleges each and every response to the allegations contained in the paragraphs of the verified petition numbered "1" through "80," inclusive, as realleged in paragraph "81," with the same force and effect as though more fully set forth at length herein.

TWENTY-NINTH: Denies each and every allegation contained in the paragraphs of the verified petition numbered "82," "86" and "87."

THIRTIETH: Denies each and every allegation contained in the paragraphs of the verified petition numbered "83," "84," and "85," and respectfully refers all questions of law to the court.

## AS TO THE FIFTH CLAIM FOR RELIEF

THIRTY-FIRST: Repeats and realleges each and every response to the allegations contained in the paragraphs of the verified petition numbered "1" through "87," inclusive, as realleged in paragraph "88," with the same force and effect as though more fully set forth at length herein.

THIRTY-SECOND: Denies each and every allegation contained in the paragraphs of the verified petition numbered "89," "90," "91" and "92" and refers questions of law to the court.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE & POINT OF LAW

THIRTY-THIRD: The injuries and/or damages alleged to have been sustained by petitioners were caused in whole or partly by the culpable conduct of the petitioners.

5

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE & POINT OF LAW

THIRTY-FOURTH:  The allegations set forth within the petition fail to state a cause of action.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE & POINT OF LAW

THIRTY-FIFTH:  Petitioner's claims are barred by the applicable statutes of limitations governing petitions to stay and/or dismiss claims brought in an arbitration.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE & POINT OF LAW

THIRTY-SIXTH: Since the Federal Arbitration Act and/or the Commercial Rules of the American Arbitration Association control, the Petition improperly relies upon the laws of the State of New York. The Petition must be dismissed. The parties have clearly agreed to arbitrate, all of PMO's claims are within the scope of the arbitration clause, PMO's statutory claims are arbitral, and the arbitration of arbitral claims should proceed without delay even if some claims are found to be non-arbitral.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE & POINT OF LAW

THIRTY-SEVENTH: Since PMO has withdrawn, without prejudice, its claims against the individuals, the first and second claims for relief are moot and must be dismissed.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE & POINT OF LAW

THIRTY-EIGHTH: The Court lacks jurisdiction to entertain the statutory and limitations type defenses raised in the Petition. These defenses must be dismissed and/or referred to the arbitrator for consideration. In the alternative, the City has waived its limitation type defenses. In the further alternative PMO has *de facto* complied with all limitations type defenses raised in the Petition.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE & POINT OF LAW

THIRTY-NINTH: PMO's Section 1983 claims are within the scope of the arbitration clause and are otherwise arbitral.

6

## GENERAL COUNTER-CLAIM AVERMENTS OF FACT

1.      On January, 23, 1995, PMO was designated by the City as the "preferred vendor" for disposing of municipal solid waste (MSW) and sludge for the City and other municipalities in Orange County. PMO's long-term solution for waste disposal was the construction and operation of an innovative waste to ethanol facility to be located in Middletown on the land leased from the City. The facility would covert MSW and non-hazardous sludge into ethanol and other useful products using PMO's patented CES OxyNol process. It would serve Middletown and surrounding municipalities.

2.      On January 22nd, 1996, the City unanimously adopted Resolution No. 20-96 which (a) named PMO as the project developer, (b) designated the City's project team members, (c) pledged the City's full cooperation in assisting PMO with project financing, and (d) authorized the City's project team (including its special counsel) to assist PMO in pursuing the needed approvals, permits, and other evidences of permission and authority needed to develop, construct, and acquire the project. Then Councilwoman and current Mayor Marlinda Duncanson voted in favor of Resolution No. 20-96. At all times relevant herein, the Resolution has remained in effect.

3.      Following the adoption of Resolution 20-96, PMO worked diligently with the City and the municipalities in the Orange County area to obtain their support for the facility. PMO and its representatives attended more that 200 public meetings to secure supply contracts or other commitments for the local municipalities MSW and sludge and received overwhelming support for the planned facility. Formal approvals for the waste-to-ethanol project were obtained in December 2003 when the Common Council voted to ratify the four municipal agreements between PMO and the City. The signed City

7

agreements were delivered by the City to PMO in April of 2004.

4. PMO has secured all environmental permits, identified principal Engineering, Procurement and Construction (EPC) providers, created a risk mitigation plan, and assembled most of the key parties required for construction, stat up and operation. PMO'S development work has resulted in securing long term commitments for a large portion of the primary revenue streams of the facility. PMO estimates that the target cost of development, construction, installation and financing will total $287 million.

5. The New York State Department of Environmental Conservation (NYSDEC) with approval from the Environmental Protection Agency (EPA) issued a Federal Title V Air Permit and a New York Part 360 Solid Waste Permit, among others. The facility has also concluded the State Environmental Quality Review (SEQR) process to assess environmental impacts of the project. Since PMO's facility is the first commercial MSW to ethanol project in the United States, the federal and state environmental agencies worked together for nearly two years to determine the correct classification for the facility prior to issuing the appropriate permits. Importantly, these agencies concluded that the PMO Facility is not subject to provisions of the Clean Air Act that trigger prevention of Significant Deterioration (PSD) in non-attainment areas since the project is not an incinerator or a chemical plant. All challenges to the permits have asserted such claims have been denied in the courts, and the remaining public comment and appeal periods for any further challenges have expired.

6. In reliance on the good faith of City officials who adopted Resolution No. 20-96 and ratified the City agreements, PMO spent more than $41 million in pre-development work and development activities relating to the waste-to-ethanol facility. Throughout the

project development period, PMO gave City project team members written and oral progress reports on all aspects of the project development.

7. In January of 2004, Daryl Harms, the founder and CEO of Masada, PMO's parent company, developed brain cancer and eventually died from his debilitating condition in July of 2005. PMO timely notified the City about Mr. Harms' prolonged illness and unfortunate death. Mr. Harms's illness and death had a "material adverse effect" on the PMO project and impacted the ownership, possession, or operation of the Project, as those terms are defined in Section 14 "Uncontrollable Circumstances" of the City Waster Management Services Agreement (CWMSA). PMO notified the City on several occasions about the "Uncontrollable Circumstances" PMO experiences because of Mr. Harms's illness and death. As such, PMO was entitled to extend the date by which PMO must begin accepting and disposing of the City's waste beyond the December 9th, 2008 "Service Date" specified in the City agreements with PMO.

8. In December of 2005, the City was notified in writing that Pencor Orange Corp., a member of PMO had been designated by the Masada shareholders to head all of the Masada companies, including PMO. The City was also informed that PMO was continuing its development of the waster-to-ethanol facility. Shortly thereafter, PMO was invited to meet with the Common Council.

9. In February of 2006, PMO met with the Common Council. The Mayor and Council were openly hostile to PMO'S continued development of the project. Council members, including Aldermen James Rollins and Maxine Meyers, voiced their extreme dissatisfaction with the City agreements which were ratified by the previous common council and signed by then Mayor Joseph De Stefano. At the time, PMO did non know

9

that Mr. Rollins had an undisclosed conflict of interest because of his associations with potential competitors to PMO in the waste disposal business.

10. In spite of the City's new political and attitudinal sea-change and open hostility to the PMO project, PMO pledged during the February 2006 council meeting to educate the new Council members on the project, and pressed on with its development plans. It retained financial advisors, engineering firms, projects consultants, research and development partners, and engaged in extensive due diligence work with potential financing partners.

11. In April of 2006, PMO was notified that the City had hired the law firm of Beveridge and Diamond (B & D) as special counsel on the PMO project. From April 20, 2006 through June 12, 2007, B & D acting in concert with the City, engaged in an unrelenting and continuing letter writing campaign designed to undermine, obstruct and thwart PMO's ability to develop the waste-to-ethanol facility and obtain financing. B & D's actions were in complete disregard of the separate and independent affirmative duty imposed upon B & D by Resolution 20-96. The B & D body of correspondence:

    a. Deliberately and substantially mischaracterized PMO's development plans and related construction activities.

    b. Declared (on June 12, 2007) the City's intent to "terminate the agreements" in the event that "PMO does not have a "fully operational waste-to-ethanol facility at the Facility Site" by December 9th, 2008;

    c. Arbitrarily and capriciously imposed new conditions restricting PMO's substantive rights and expanding existing obligations under the City agreements;

10

d.  Renounced or otherwise ignored B & D's separate and independent

affirmative duty, as special counsel to the City, to provide PMO with

the needed project related assistance and cooperation specified in

Resolution No. 20-96 which remained in effect;

e.  Repudiated and unilaterally nullified all of PMO's prior and timely

written notifications to the City of "Uncontrollable Circumstances"

and PMO's commercially reasonable steps to reduce costs and time

associated with theses circumstances, and/or

f.  Improperly attempted to interfere with PMO's duly issued Title V Air

Permit and NYSDEC Part 360 Solid Waste Permit.

12. As the City's designated "preferred vendor" and "project developer", PMO

politely and properly reserved its legal rights under the agreements while proceeding with

its efforts to accommodate the City's repeated requests for information and erroneously

issues mandate that PMO commence accepting the City's waste streams by December 9th,

2008. PMO's good faith efforts to cooperate with the City were met with massive

resistance and bad faith actions by the City at every turn.

13. On May 22, 2007, PMO attended the Common Council meeting and formally

requested that Alderman Rollins, a leading opponent of the City's contractual relationship

with PMO, refrain from participating in any further Common Council discussions,

deliberations, and votes on matters pertaining to PMO. On information and belief, PMO

alleges that Mr. Rollins already participated in Common Council discussions,

deliberations and votes prior to PMO's recusal request even though he had undisclosed

conflicts of interest. PMO also provided the City, on its own initiative, with a written

11

progress report, along with a copy of its completed Department of Energy (DOE) loan

guarantee pre-application submission form. The report detailed PMO's ongoing

"commercially reasonable efforts to reduce costs and time associated with the

"Uncontrollable Circumstances" related to Mr. Harms's death and the PMO project.

14. On May 31, 2007, PMO provided the City with a notice of its indicative

construction schedule prepared by PMO's engineers and a requests for the City to

implement the Work Plan for Investigation of the Middletown Landfill during

construction of the Orange Recycling and Ethanol Production Facility, the projects

official name.

15. Throughout the course of its dealing with the City, PMO repeatedly affirmed

PMO's willingness and ability to meet its essential obligations to the City. These

obligations are threefold: (a) acceptance and disposal of the City's waste streams, under

the terms and conditions of the various City agreements, (b) production of ethanol from

the City's waste streams on the site leased by PMO from the City, in accordance with the

requirements of PMO's Part 360 and Title V permits, and (c) remittance of payments to

the City, in accordance with the terms and conditions of the City agreements.

16. On June 12, 2007 B & D sent PMO  private letter declaring the City's intent to

"terminate the agreements" in the event PMO does not have a "fully operational waste-

to-ethanol facility at the Facility Site" by December 9, 2008. This was the first time the

City and B & D had threatened PMO with explicit adverse action that is detrimental to

the very foundation for financing the facility. The private letter was sent to PMO one day

after the City publicly adopted a Resolution (at PMO's request) announcing support for

PMO's December 28th, 2006 U.S. DOE pre-application submission for a construction

12

loan guarantee of $229 million for the project.

17. The June 12th, 2007 B & D letter had the purpose and effect of undermining PMO's DOE and private equity financing. When authorizing the June 12 letter, the City and B & D knew PMO had a duty to report the June 12 contract termination threat to the DOE and the equity firms. They also knew PMO was one of 143 entities aggressively competing for limited DOE loan guarantee money, and that PMO's application enjoyed significant bipartisan support from senior members of Congress, including New York Sen. Clinton. Finally, they know that the PMO project was being financed from the revenue streams derived from long-term waste contracts with the City and surrounding municipalities. In short, defendants knew the letter would have a chilling effect on PMO's financing efforts resulting in devastating consequences to PMO.

18. On June 13, 2007, PMO demanded that the City withdraw and repudiate the June 12, 2007 letter. The City refused to do so. This defiant refusal leaves PMO in the unfortunate position of having to report the City's letter and threats to the DOE and other appropriate authorities or risk the appearance of committing a financial fraud on the DOE. This course of action by the City is certain to be the death blow for PMO's pre-application submission.

19. The actions and conduct of the City were done under color of law, were arbitrary and capricious, without any rational basis, were contrary to the City's enunciated public policy and written agreements with PMO, were taken in bad faith, with malice, and were intended to deny PMO of its contractual property rights, without due process or equal protection of laws. The totality of the City's open and continuing hostility toward PMO since December of 2005 has irreparably harmed PMO's well-positioned chances for

13

necessary third party project equity and debt financing. PMO's waste-to-ethanol project has, in effect, been sabotage by its own business partner, the City.

20.    The City agreements have a total economic value to PMO of several hundred million dollars. PMO's Title V Air Permit and Part 360 Permit have a separate estimated value to PMO of $41 million.

21.    In these counter-claims PMO requests the Court dismiss the Petition entirely and permit arbitration of all of its claims to proceed without delay in the filed arbitration proceeding.

WHEREFORE, defendant, PENCOR-MASADA OXYNOL, LLC, demands judgment:

    1. dismissing the petition;

    2. granting its counterclaims;

    3. for costs, interest, disbursements and reasonable attorneys' fees incurred in this action.

    4. such other relief as this Court may deem just, proper and equitable.

Dated: Newburgh, New York
       July 23, 2007

Yours, etc.,

TARSHIS, CATANIA, LIBERTH,
MAHON & MILLIGRAM, PLLC

By:_____/s/_____
NICHOLAS A. PASCALE (NP-5766)
Attorneys for Defendant
PENCOR-MASADA OXYNOL, LLC
One Corwin Court
P.O. Box 1479
Newburgh, New York 12550
Tel. No. (845) 565-1100

14

TO:

BEVERIDGE & DIAMOND, P.C.
Attorneys for Petitioners
477 Madison Avenue – 15th Floor
New York, New York 10022-5802
Tel. No. (212) 702-5400